1  James P. Fogelman, SBN 161584
2  Shannon E. Mader, SBN 235271
   Katarzyna Ryzewska, SBN 300386
3  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
   Los Angeles, California 90071-3197
4  Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
5  JFogelman@gibsondunn.com
   SMader@gibsondunn.com
6  KRyzewska@gibsondunn.com

7

8
   Attorneys for Defendant
9  Gibson, Dunn & Crutcher, LLP

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13 | DR. JEFFREY ISAACS,                | CASE NO. 2:19-CV-08000-DSF-RAO
   |                                    |
14 |              Plaintiff,            | **DECLARATION OF KATARZYNA RYZEWSKA IN SUPPORT OF DEFENDANT GIBSON, DUNN & CRUTCHER, LLP'S MOTION TO STRIKE PLAINTIFF'S COMPLAINT**
15 |        v.                          |
   |                                    |
16 | USC KECK SCHOOL OF MEDICINE.       |
   | GIESEL SCHOOL OF MEDICINE AT       | [Defendant's Notice of Motion and Motion To Dismiss Plaintiff's Complaint, Request for Judicial Notice, Declaration of James P. Fogelman and Proposed Order Filed Concurrently herewith]
17 | DARTMOUTH, DARTMOUTH               |
   | HITCHCOCK MEDICAL CENTER,          |
18 | NH BOARD OF MEDICINE, GIBSON,      |
   | DUNN & CRUTCHER, LLP and JOHN      |
   | or JANE DOE,                       |
19 |                                    |
20 |              Defendants.           | **Hearing**
   |                                    | Date:     January 27, 2019
21 |                                    | Time:     1:30 PM
   |                                    | Location: Courtroom 7D
22 |                                    | Judge:    Hon. Dale S. Fischer

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF KATARZYNA RYZEWSKA IN SUPPORT OF DEFENDANT GIBSON, DUNN & CRUTCHER, LLP'S MOTION TO STRIKE PLAINTIFF'S COMPLAINT

## DECLARATION OF KATARZYNA RYZEWSKA

I, Katarzyna Ryzewska, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am an attorney with the law firm of Gibson, Dunn & Crutcher, LLP, and counsel of record for defendant Gibson, Dunn & Crutcher, LLP ("Gibson Dunn") and USC Keck School of Medicine ("USC") in the above-captioned matter. I am submitting this declaration in support of Gibson Dunn's Motion to Strike Plaintiff's Complaint pursuant to California Code of Civil Procedure Section 425.16.  I have personal knowledge of the matters stated herein and if called to testify to such matters would and could do so.

2.      Concurrent with Gibson Dunn's Motion to Strike Plaintiff's Complaint, Gibson Dunn has submitted a request to judicially notice certain documents.

3.      Pursuant to Local Rule 7-3, on October 10, 2019, my colleague Shannon E. Mader and I met and conferred telephonically with Plaintiff's counsel regarding the matters at issue in Gibson Dunn's Motion to Strike. Plaintiff's counsel indicated that they disagreed with our assessment of the Complaint and would not be dismissing any claims against Gibson Dunn.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the Confidential Settlement Agreement and Mutual Release entered into by Jeffrey Isaacs on the one hand, and the University of Southern California on the other hand, on April 4, 2007.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of the Confidential Settlement Agreement and Release entered into by Jeffrey Isaacs on the one hand, and the University of Southern California on the other hand, on August 31, 2008.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of a Motion to Enforce a Settlement Agreement, filed by the University of Southern California ("USC") on April 21, 2008 in *Isaacs v. USC, et al.*, No. CV-06-3338 GAF, ECF 77, in the Central District of California District Court before Judge Gary A. Feess.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of the Opposition to USC's Motion to Enforce a Settlement Agreement, filed by Jeffrey Isaacs on April

Gibson, Dunn &
Crutcher LLP

1

DECLARATION OF KATARZYNA RYZEWSKA IN SUPPORT OF DEFENDANT GIBSON, DUNN & CRUTCHER,
LLP'S MOTION TO STRIKE PLAINTIFF'S COMPLAINT

28, 2008 in *Isaacs v. USC, et al.*, No. CV-06-3338 GAF, ECF 78, in the Central District of California District Court before Judge Gary A. Feess.

8.    Attached hereto as **Exhibit 5** is a true and correct copy of the Order on USC's Motion to Enforce a Settlement Agreement, entered by Judge Gary A. Feess on May 8, 2008 in Isaacs v. USC, et al., No. CV-06-3338 GAF, ECF 81, in the Central District of California District Court.

9.    Attached hereto as **Exhibit 6** is a true and correct copy of a New Hampshire District Court Summary Judgment, entered on April 18, 2014 in *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-CV-040-LM, 2014 WL 1572559 (D.N.H. Apr. 18, 2014).

10.    Attached hereto as **Exhibit 7** is a true and correct copy of the *In re: Jeffrey D. Isaacs, M.D. Final Decision and Order*, Docket #: 13-07, entered on March 11, 2014 by the New Hampshire Board of Medicine.

11.    Attached hereto as **Exhibit 8** is a true and correct copy of a Pennsylvania District Court Memorandum on Motions to Dismiss, entered on August 25, 2014 in Trustees of Dartmouth Coll., No. CIV.A. 13-5708, 2014 WL 4186536 (E.D. Pa. Aug. 25, 2014).

12.    Attached hereto as **Exhibit 9** is a true and correct copy of a Third Circuit Opinion, entered on April 7, 2015 in *Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70 (3d Cir. 2015).

13.    Attached hereto as **Exhibit 10** is a true and correct copy of a New Hampshire District Court Order, entered on February 5, 2018 in *Isaacs v. Trustees of Dartmouth Coll.*, No. 17-CV-040-LM, 2018 WL 734182 (D.N.H. Feb. 5, 2018).

14.    Attached hereto as **Exhibit 11** is a true and correct copy of a Massachusetts District Court Memorandum and Order on a Partial Motion to Dismiss Plaintiff Jeffrey Isaacs' June 20, 2017 Complaint, entered on March 12, 2018 in *Isaacs v. United States Dep't of Educ.*, No. CV 17-11221-FDS, 2018 WL 1257760 (D. Mass. Mar. 12, 2018).

15.    Attached hereto as **Exhibit 12** is a true and correct copy of the March 19, 2012 letter send by the Dartmouth-Hitchcock Medical Center to Jeffrey Isaacs,

Gibson, Dunn & Crutcher LLP

2

DECLARATION OF KATARZYNA RYZEWSKA IN SUPPORT OF DEFENDANT GIBSON, DUNN & CRUTCHER, LLP'S MOTION TO STRIKE PLAINTIFF'S COMPLAINT

dismissing him from the residency program, ECF 144-2, filed in *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-CV-040-LM, 2014 WL 1572559 (D.N.H. Apr. 18, 2014), as part of Defendants' Memorandum of Law in Support of Summary Judgment.

16.    Attached hereto as **Exhibit 13** is a true and correct copy of a letter sent from Keith Matthews to USC Office of General Counsel, dated August 3, 2018, ECF 1-1, at 44-46.

17.    Attached hereto as **Exhibit 14** is a true and correct copy of an email sent from USC counsel Andreas Joerg Meyer to Keith Matthews, dated May 30, 2019, ECF 1-1, at 47-48.

18.    Attached hereto as **Exhibit 15** is a true and correct copy of an email sent from Jeffrey Isaacs to USC counsel Andreas Joerg Meyer, dated May 31, 2019, ECF 1-2, at 28.

19.    Attached hereto as **Exhibit 16** is a true and correct copy of Plaintiff Jeffrey Isaacs' Complaint, No. 2:19-CV-02011-DSF-RAO, ECF 1, filed on March 18, 2019 in *Isaacs v. Dartmouth Hitchcock Medical Center et al.*, (C.D. Cal. Sept. 12, 2019).

20.    Attached hereto as **Exhibit 17** is a true and correct copy of USC's Motion to Dismiss Plaintiff's Complaint, No. 2:19-CV-02011-DSF-RAO, ECF 14, filed on June 26, 2019 in *Isaacs v. Dartmouth Hitchcock Medical Center et al.*, (C.D. Cal. Sept. 12, 2019).

21.    Attached hereto as **Exhibit 18** is a true and correct copy of USC's Opposition to Plaintiff's Motion for Leave to Amend, No. 2:19-CV-02011-DSF-RAO, ECF 62, filed on September 13, 2019 in *Isaacs v. Dartmouth Hitchcock Medical Center et al.*, (C.D. Cal. Sept. 12, 2019).

22.    Attached hereto as **Exhibit 19** is a true and correct copy of USC's Motion to Dismiss Plaintiff's First Amended Complaint, No. 2:19-CV-02011-DSF-RAO, ECF 41, filed on August 2, 2019 in *Isaacs v. Dartmouth Hitchcock Medical Center et al.*, (C.D. Cal. Sept. 12, 2019).

23.    Attached hereto as **Exhibit 20** is a true and correct copy of an email exchange sent by the Plaintiff to Gibson Dunn on August 20, 2019 with the subject name "Disqualification."

24.    Attached hereto as **Exhibit 21** is a true and correct copy of an email exchange sent by the Plaintiff to Gibson Dunn on August 3, 2019 with the subject name "Please."

25.    Attached hereto as **Exhibit 22** is a true and correct copy of an email exchange sent by Gibson Dunn to the Plaintiff on October 7, 2019 with the subject name "Isaacs v. USC - Meet and Confer."

26.    Attached hereto as **Exhibit 23** is a true and correct copy of an email exchange sent by the Plaintiff to Gibson Dunn on August 31, 2019 with the subject name "7-3 Meet & Confer."

27.    Attached hereto as **Exhibit 24** is a true and correct copy of one thread of an email exchange sent by the Plaintiff to Gibson Dunn on August 2, 2019 with the subject name "NO TRESPASS LETTER AND USC POLICE REPORT."

28.    Attached hereto as **Exhibit 25** is a true and correct copy of one thread of an email exchange sent by the Plaintiff to Gibson Dunn on August 2, 2019 with the subject name "NO TRESPASS LETTER AND USC POLICE REPORT."

29.    Attached hereto as **Exhibit 26** is a true and correct copy of one thread of an email exchange sent by the Plaintiff to Gibson Dunn on August 2, 2019 with the subject name "NO TRESPASS LETTER AND USC POLICE REPORT."

I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct.  I have executed this declaration in Los Angeles, California on November 4, 2019.

/s/ _____

Katarzyna Ryzewska

Gibson, Dunn &
Crutcher LLP

4

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

Jeffrey Isaacs ("Isaacs"), on the one hand, and University of Southern California ("USC"), on the other hand, have agreed to enter into this Confidential Settlement Agreement and Release (the "Agreement").

1.  **Dismissal With Prejudice.**

Isaacs agrees that he will execute and deliver for filing to counsel of record for USC, Robin D. Dal Soglio of Dal Soglio & Martens LLP, the Dismissal with Prejudice (attached hereto as Exhibit A) of Robert Baughman, Brian E. Henderson, Peter J. Katsufrakis and James M.H. Ball (together, the "Individual Defendants") from United States District Court Case No. CV-06-3338 GAF (Ex). Counsel for USC will file the Dismissal with Prejudice with the Court.

2.  **Sealing of Disciplinary Records.**

In exchange for the Dismissal with Prejudice of the Individual Defendants, referenced above, Defendant USC agrees that commencing immediately upon the execution of this Settlement Agreement and receipt of the signed Dismissal with Prejudice, USC will not release or disclose Isaacs' disciplinary records to any third party, including but not limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order.

3.  **Non-Admission of Liability.**

This Agreement shall not in any way be construed as an admission by USC or any of the Individual Defendants that they have harassed, discriminated against or retaliated against Isaacs in any way, or otherwise acted wrongfully with respect to Isaacs. USC and the Individual Defendants specifically deny that they have any liability to or have done any wrongful acts against Isaacs.

4.  **No Other or Future Lawsuits, Charges, Claims.**

With the exception of United States District Court Case No. CV-06-3338 GAF (Ex) (the "Lawsuit"), Isaacs represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against the Individual Defendants or any other persons or entities released herein, and he agrees that he will not file any lawsuits, charges, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.

If Isaacs's representations in this paragraph prove to be false, or if he violates the promises made in this paragraph and files a lawsuit, charge, complaint, or appeal of any kind with any court or administrative or governmental agency against the Individual Defendants, based on any events, acts or omissions through and including the date hereof, Isaacs will pay for all costs and losses, including actual attorneys' fees, incurred by Defendants in connection with said lawsuit, charge, complaint, or appeal.

Initialed JDI

1

USC 2

Exhibit 1
Page 5

5.    **Complete Release by Isaacs.**

       As a material inducement to USC to enter into this Agreement, Isaacs hereby irrevocably and unconditionally waives and releases all rights and claims, known and unknown, which he may have against each and all of the Individual Defendants and each of their respective assigns, agents, representatives, attorneys, spouses, children and other family members, and all persons acting by, through, under or in concert with any of them, from the beginning of time to the date Isaacs signs this Agreement.  This includes but is not limited to a release of all rights and claims Isaacs may have against the Individual Defendants under any federal or state anti-discrimination statutes, including but not limited to the Americans with Disabilities Act and the Rehabilitation Act of 1973, as well as all claims, known and unknown, which he may have for breach of contract, express or implied; breach of the covenant of good faith and fair dealing; and retaliation, defamation, conspiracy, infliction of emotional distress, invasion of privacy, assault, battery, misrepresentation, or any other tort.

6.    **Knowing and Voluntary Waiver of Known and Unknown Claims**

       Isaacs agrees that, as a condition of this Agreement, he expressly releases all rights and claims that he does not know about, as well as those he knows about.  Thus, consistent with the terms of his release, Isaacs expressly waives all rights under Section 1542 of the Civil Code of the State of California, which reads as follows:

       "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

7.    **Encouragement to Consult With Attorney**

       Counsel for USC has strongly encouraged Isaacs to consult with an attorney before signing this Agreement, and Isaacs hereby acknowledges that he has either fully consulted with an attorney prior to signing or has knowingly and voluntarily decided not to do so.

8.    **No Representations**

       The parties hereto represent and agree that no promises, statements or inducements have been made to them which caused them to sign this Agreement other than those expressly stated in this Agreement.

9.    **Successors**

       This Agreement shall be binding upon the parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the parties and others released herein, their representatives, executors, successors and assigns.

Initialed  JDI

2

USC 3

Exhibit 1
Page 6

10.  **Confidentiality of This Agreement**

a.  As a material inducement for USC to enter into this Agreement, Isaacs agrees not to disclose the negotiation, terms, or conditions of this Agreement to anyone other than Isaacs's attorneys and parents (hereafter referred to as "Isaacs's Confidants") and, even as to such a person, only if such persons agree to honor this confidentiality requirement. Violation of this confidentiality requirement by any of Isaacs's Confidants will be treated as a violation of this Agreement by Isaacs.

b.  This section does not prohibit disclosure of the negotiation, terms or conditions of this Agreement to the extent necessary legally to enforce this Agreement, nor does it prohibit disclosures to the extent otherwise required by law (but only if the enforcing party notifies the other party and its attorneys of a disclosure obligation or request within three business days after he/it learns of it and does not actively oppose the party taking all steps it deems to be appropriate to prevent or limit the required disclosure).

c.  If Isaacs is asked about his claims against the Individual Defendants, and only if asked, he may state only that "the matter has been resolved."

11.  **Newly Discovered Facts**

Isaacs acknowledges that he might hereafter discover facts different from or in addition to those he now knows or believes to be true with respect to a claim or claims released herein, and he expressly agrees to assume the risk of possible discovery of additional or different facts, and agrees that this Agreement shall be and remain effective in all respects regardless of such additional or different discovered facts.

12.  **Voluntary Participation in This Agreement**

The parties acknowledge that they have thoroughly discussed all aspects of their rights and this Agreement with their respective attorneys, or have knowingly and voluntary chosen not to do so, and that they have carefully read and fully understand all of the provisions of this Agreement, that they have been given a reasonable period of time to consider signing this Agreement, and that they are voluntarily signing this Agreement.

13.  **Governing Law**

This Agreement is made and entered into in the State of California and shall in all respects be interpreted, enforced and governed under the laws of said State.

14.  **Further Necessary Actions**

The parties agree, without further consideration, to sign and/or cause to be signed, and to deliver to counsel for one another, any other documents and to take any other action as may be necessary to fulfill their obligations under this Agreement, including, but not limited to, effecting the dismissal of all outstanding administrative charges.

Initialed JDI



3

USC 4

Exhibit 1
Page 7

15.    **Severability**

Should any of the provisions in this Agreement, other than the Release set forth in Paragraph 5, be declared or be determined to be illegal or invalid, all remaining parts, terms or provisions shall be valid, and the illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

16.    **Proper Construction**

a.  The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the parties.

b.  As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

c.  The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions hereof.

17.    **Entire Agreement**

This Agreement is the entire agreement between Isaacs and USC and fully supersedes any and all prior agreements or understandings between the parties pertaining to its subject matter.

**PLEASE READ CAREFULLY.  THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.**

Executed at <u>Berwyn Pennsylvania</u>, this 29th day of August 2007.


By: _____
    Jeffrey Isaacs


Executed at Los Angeles, California, this 31st day of August 2007.

UNIVERSITY OF SOUTHERN CALIFORNIA


By: _____
    Dennis F. Dougherty
    Senior Vice President for Finance


Initialed JDI

4

USC 5

Exhibit 1
Page 8

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

The University of Southern California ("USC") and Jeffrey Isaacs ("Isaacs") have agreed to enter into this Confidential Settlement Agreement and Mutual Release (the "Agreement").

### 1. Dismissal With Prejudice.

Isaacs agrees that he will execute and deliver for filing to counsel of record for USC, Robin D. Dal Soglio of Dal Soglio & Martens LLP, the Stipulation of Dismissal with Prejudice (attached hereto as Exhibit A) of USC from United States District Court Case No. CV-06-3338 GAF (Ex). Counsel for USC will file the Dismissal with Prejudice with the Court.

### 2. No Future Application to University.

Isaacs understands and agrees that his education at USC has ended irrevocably and forever and will not be resumed again at any time in the future. Isaacs further agrees that he will not apply for or otherwise seek admission to USC or any related or affiliated entity at any time in the future, under any circumstances whatsoever.

### 3. Non-Admission of Liability.

This Agreement shall not in any way be construed as an admission by USC that it has discriminated against or retaliated against Isaacs in any way, or otherwise acted wrongfully with respect to Isaacs or any other person, or that Isaacs has any rights whatsoever against it. USC specifically denies that it has any liability to or has done any wrongful acts against Isaacs or any other person.

### 4. Benefits for Isaacs.

Within fourteen (14) days of USC's receipt of the original of this Agreement signed by Isaacs and including executed copies of Exhibits A and B, USC will transmit to Isaacs one check made payable to Isaacs in the gross amount of Ten Thousand Dollars ($10,000).

### 5. Responsibility for Taxes.

Isaacs understands and acknowledges that USC will report the payment described in paragraph 4 to the appropriate taxing authorities as required by law. Isaacs agrees that he is solely responsible for all tax obligations, including, but not limited to, all payment obligations which may arise as a consequence of this Agreement. Isaacs further agrees promptly to pay and to indemnify and hold USC and others released herein harmless from and against any and all loss, cost, damage or expense, including, without limitation, attorneys' fees, interest, assessments, withholding and penalties, arising out of any dispute over underwithholding or other tax treatment of any of the proceeds received by Isaacs as a result of this Agreement. Isaacs further agrees not to seek or make any claim against USC or others released herein for any loss, cost, damage or expense if a claim or adverse determination is made in connection with underwithholding or other tax treatment of any of the proceeds of this Agreement or any portion

Initialed

1

**USC 6**

Exhibit 2
Page 9

thereof. Isaacs understands and agrees that neither USC nor others released herein has any duty to defend against any claim or assertion in connection with underwithholding or other tax treatment of the proceeds of this settlement or any portion thereof, and Isaacs agrees to assume full responsibility for defending against any such claim or assertion.

### 6. No Other or Future Lawsuits, Charges, Claims for Arbitration or Complaints of Any Nature Whatsoever.

With the exception of United States District Court Case No. CV-06-3338 GAF (Ex), which is fully and finally settled herein, Isaacs represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, and he agrees that he will not file any lawsuits, charges, claims for arbitration, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.

If Isaacs's representations in this paragraph prove to be false, or if he violates the promises made in this paragraph and files a lawsuit, charge, claim for arbitration, complaint, or appeal of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, based on any events, acts or omissions through and including the date hereof, Isaacs will pay for all costs and losses, including actual attorneys' fees, incurred by USC in connection with said lawsuit, charge, complaint, or appeal.

### 7. Complete Release by Isaacs.

As a material inducement to USC to enter into this Agreement, Isaacs hereby irrevocably and unconditionally waives and releases all rights and claims, known and unknown, which he may have against USC, the Keck School of Medicine, and each of their respective successors, assigns, agents, trustees, officers, administrators, faculty, students, current and former employees, representatives, attorneys, divisions, subsidiaries, affiliates (and agents, trustees, officers, administrators, faculty, current and former employees, representatives and attorneys of such divisions, subsidiaries, and affiliates), and Robert Baughman and each of his family members, and all persons acting by, through, under or in concert with any of them (collectively, the "Releasees") from the beginning of time to the date Isaacs signs this Agreement from any and all claims, demands, contracts, expenses, liens, covenants, debts, attorney's fees, causes of action, damages, judgments, orders, and liabilities (collectively "Claims") of whatever kind or nature in law, equity, or otherwise, whether now known or unknown, suspected, or unsuspected, and whether or not concealed or hidden, which Isaacs now owns or holds or had at any time heretofore owned or held against the Releasees.

Initialed

2

8.  **Release by USC**

   As a material inducement to Isaacs to enter into this Agreement, USC does hereby irrevocably and unconditionally release, acquit and forever discharge Isaacs from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, grievances, costs, losses, and expenses (including attorneys' fees and costs) of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, including but not limited to any claim for malicious institution of civil proceedings, and abuse of process.  Notwithstanding any other provision herein, this release by the University is not intended to, and does not, release debts unrelated to the lawsuit, including but not limited to tuition or loans.

9.  **Knowing and Voluntary Waiver of Known and Unknown Claims**

   Consistent with the terms of their respective releases in paragraphs 7 and 8, Isaacs and USC acknowledge and agree that, as a condition of this Agreement, they expressly release all rights and claims that they do not know about, as well as those they know about.  Thus, consistent with the terms of their respective releases, Isaacs and USC expressly waive all rights under Section 1542 of the Civil Code of the State of California, which reads as follows:

   "A general release does not extend to claims which the creditor
   does not know or suspect to exist in his or her favor at the time of
   executing the release, which if known by him or her must have
   materially affected his or her settlement with the debtor."

10.  **Ownership of Claims**

   Isaacs represents and agrees that he has not assigned or transferred, or attempted to assign or transfer, to any person or entity, any of the claims he is releasing in this Agreement.

11.  **Encouragement to Consult With Attorney**

   USC encourages Isaacs to consult with an attorney before signing this Agreement, and Isaacs hereby acknowledges that he has had the opportunity to consult with an attorney prior to signing, and has either done so or voluntarily chosen not to do wo.

12.  **No Representations**

   The parties represent and agree that no promises, statements or inducements have been made to them which caused them to sign this Agreement other than those expressly stated in this Agreement.

Initialed  2 DA

3

USC 8

Exhibit 2
Page 11

13.  <u>Successors</u>

This Agreement shall be binding upon the parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the parties and others released herein, their representatives, executors, successors and assigns.

14.  <u>Confidentiality of This Agreement</u>

a.  As a material inducement for USC to enter into this Agreement, Isaacs agrees not to disclose the negotiation, terms, conditions, or amount of this Agreement to anyone other than Isaacs's attorneys and tax adviser (hereafter referred to as "Isaacs's Confidants") and, even as to such a person, only if the person agrees to honor this confidentiality requirement. Violation of this confidentiality requirement by any of Isaacs's Confidants will be treated as a violation of this Agreement by Isaacs.

b.  This section does not prohibit Isaacs's disclosure of the negotiation, terms, conditions, or amount of this Agreement to the extent necessary legally to enforce this Agreement, nor does it prohibit disclosures to the extent otherwise required by law (but only if Isaacs notifies USC and its attorneys of a disclosure obligation or request within three business days after he learns of it and does not actively oppose USC's taking all steps it deems to be appropriate to prevent or limit the required disclosure).

c.  If Isaacs is asked about his claims against USC, including breach of enrollment contract and wrongful dismissal, and only if asked, he may state only that "the matter has been resolved." However, the parties further agree that Isaacs is not required to disclose this matter to anyone.

15.  <u>Damages for Isaacs's Breach of Confidentiality</u>

A breach of paragraph 14 will be deemed a material breach of this entire Agreement. Isaacs agrees to pay USC the sum of Five Thousand Dollars ($5,000) as liquidated damages for each violation in the event USC obtains a judgment, ruling, award, or decision that paragraph 14 has been violated. The parties to this Agreement agree that this liquidated damages provision is appropriate with regard to any breach of paragraph 14 because: (1) paragraph 14 is essential for the protection of USC's interests; (2) damages for breach of paragraph 14 would be difficult to prove with certainty; and (3) the sum of Five Thousand Dollars ($5,000) per breach represents a reasonable estimate of the harm likely to result from each such breach.

16.  <u>Newly Discovered Facts</u>

Isaacs acknowledges that he might hereafter discover facts different from or in addition to those he now knows or believes to be true with respect to a claim or claims released herein, and he expressly agrees to assume the risk of possible discovery of additional or different facts, and agrees that this Agreement shall be and remain effective in all respects regardless of such additional or different discovered facts.



Initialed

4

**USC 9**

Exhibit 2
Page 12

**17.  Voluntary Participation in This Agreement**

        The parties acknowledge that they have thoroughly discussed all aspects of their rights and this Agreement with their respective attorneys, or have knowingly and voluntary chosen not to do so, and that they have carefully read and fully understand all of the provisions of this Agreement, that they have been given a reasonable period of time to consider signing this Agreement, and that they are voluntarily signing this Agreement.

**18.  Governing Law**

        This Agreement is made and entered into in the State of California and shall in all respects be interpreted, enforced and governed under the laws of said State.

**19.  Further Necessary Actions**

        The parties agree, without further consideration, to sign and/or cause to be signed, and to deliver to counsel for one another, any other documents and to take any other action as may be necessary to fulfill their obligations under this Agreement, including, but not limited to, effecting the dismissal of all outstanding administrative charges.

**20.  Severability**

        Should any of the provisions in this Agreement, other than the Release set forth in Paragraph 7, be declared or be determined to be illegal or invalid, all remaining parts, terms or provisions shall be valid, and the illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

**21.  Proper Construction**

        a.  The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the parties.

        b.  As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

        c.  The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions hereof.

**22.  Entire Agreement**

        This Agreement is the entire agreement between Isaacs and USC and fully supersedes any and all prior agreements or understandings between the parties pertaining to its subject matter.

Initialed A·A· 2 Dd

5

USC 10

Exhibit 2
Page 13

**PLEASE READ CAREFULLY. THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

Executed at <u>Saint-Jean, FRANCE</u> this 31st day of March 2008.

By: _Jeffrey D Isaacs_

Jeffrey Isaacs

Executed at Los Angeles, California, this ___APR 0 4___ 2008.

UNIVERSITY OF SOUTHERN CALIFORNIA

By: _Dennis F Dougherty_

Dennis F. Dougherty
Senior Vice President for Finance

6

USC 11

Exhibit 2
Page 14

1  DAL SOGLIO & MARTENS LLP
2     Robin D. Dal Soglio (State Bar No. 155334)
   27240 Turnberry Lane, Suite 200
3  Valencia, California 91355
4  Telephone: (661) 362-0736
   Facsimile: (661) 244-4942
5  E-mail: rdalsoglio@dm-lawfirm.com

6
   Attorneys for Defendants University of
7  Southern California, Robert Baughman, Brian
8  E. Henderson, Peter J. Katsufrakis and James
   M.H. Ball
9

10              UNITED STATES DISTRICT COURT
11            CENTRAL DISTRICT OF CALIFORNIA
12

   JEFFREY DAVID ISAACS,              CASE NO. CV-06-3338 GAF (Ex)
13
14          Plaintiff,               **DEFENDANT UNIVERSITY OF
                                     SOUTHERN CALIFORNIA'S
15       v.                          MOTION TO ENFORCE
                                     SETTLEMENT AGREEMENT;
16  UNIVERSITY OF SOUTHERN           MEMORANDUM OF POINTS AND
17  CALIFORNIA; ROBERT WILLIAM       AUTHORITIES AND DECLARATION
   BAUGHMAN; BRIAN E.               OF ROBIN D. DAL SOGLIO IN
18  HENDERSON; PETER J.             SUPPORT THEREOF**
19  KATSUFRAKIS; and JAMES M.H.
   BALL                            Date:       May 12, 2008
20                                 Time:       9:30 a.m.
21          Defendants.            Courtroom:  740 – Roybal
                                               Hon. Gary A. Feess
22
23

24  **TO PLAINTIFF JEFFREY DAVID ISAACS, IN PRO SE:**

25         **PLEASE TAKE NOTICE** that on Monday, May 12, 2008, at 9:30

26  a.m., or as soon thereafter as the matter can be heard, before the Honorable Gary

27  A. Feess in Courtroom 740 of the United States District Court, Central District of

28  California, Roybal Federal Building located at 255 East Temple Street, Los

                                              **Defendant's Motion to Enforce Settlement**

Exhibit 3
Page 15

Angeles, California 90012, Defendant University of Southern California ("USC") will, and hereby does, move the Court for an Order enforcing the settlement agreement entered into by the parties to this action.

Defendant makes this motion on the grounds that the parties reached an agreement in principle to settle this matter on March 28, 2008, and thereafter negotiated and executed a Settlement Agreement on March 31 (Plaintiff) and April 4, 2008 (Defendant). Thereafter, prior to signing the agreed upon Stipulation for Dismissal, Plaintiff notified Defendant of his intention to attempt "void" the Settlement Agreement and proceed with litigation.

Nevertheless, the Settlement Agreement entered into by the parties, and fully executed, is an enforceable contract. Defendant seeks an order from the Court enforcing that agreement.

Pursuant to Local Rule 16-12, this case is exempt from the meet and confer requirement of Local Rule 7-3, on the grounds that Plaintiff is appearing *pro se* and is not an attorney.

Dated:     April 21, 2008                Respectfully submitted,

                                         DAL SOGLIO & MARTENS LLP
                                             Robin D. Dal Soglio


                                         By: _____
                                             Robin D. Dal Soglio
                                         Attorneys for Defendants University of
                                         Southern California, *et al.*

Exhibit 3
Page 16

1           **MEMORANDUM OF POINTS AND AUTHORITIES**

2             Defendant University of Southern California ("Defendant") hereby

3 moves the Court for an Order enforcing the terms of the Settlement Agreement

4 negotiated and executed by Plaintiff and Defendant. This litigation has been

5 ongoing for over two years. Finally, after extensive negotiations with Plaintiff

6 (and previously with his attorney-friend who negotiated on his behalf from

7 approximately September 2007 through January 2008), the parties were able to

8 reach an agreement to settle this matter. Plaintiff has executed the Settlement

9 Agreement, but now seeks to "void" the Agreement and refuses to sign the

10 Stipulation for Dismissal necessary to end this action. Defendant asks the Court to

11 intervene and bring this matter to an end.

12                              **I.**

13                  **FACTUAL SUMMARY**

14            As set forth in the attached Declaration of Robin D. Dal Soglio,

15 settlement discussions have been ongoing throughout the course of this litigation.

16 Dal Soglio Decl., ¶ 1. These discussions continued until an agreement was reached

17 in principle on March 28, 2008. Throughout the negotiations, Plaintiff displayed

18 understanding and skill in the negotiation process. Dal Soglio Decl., ¶ 2. He

19 sought clarification on offers made by defense counsel, and made counter offers.

20 He never displayed confusion over the substance or process of the settlement

21 negotiations. Dal Soglio Decl., ¶ 2.

22           On Friday, March 28, 2008, Plaintiff sent defense counsel an email

23 accepting Defendant's most recent settlement offer. He stated that the offer was

24 "immediately accepted pending the forthcoming bilateral/mutual general release

25 terms agreement." Dal Soglio Decl., ¶ 3 and Exh. A thereto. Plaintiff e-mailed

26 defense counsel later that same evening, seeking to confirm that she received his

27 earlier e-mail and to "set a schedule for finalizing the settlement contract." He

28 stated that he would "need to confirm (preferably in writing and verbally) this with

1     you today as a binding contract...."  Dal Soglio Decl., ¶ 3 and Exh. A thereto.

2          USC's attorney responded to Plaintiff via e-mail informing him that

3     she would commence drafting a written agreement to document the terms of the

4     settlement.  Dal Soglio Decl., ¶ 4.

5          On Monday, March 31, 2008, defense counsel provided a draft of the

6     Settlement Agreement to Plaintiff via e-mail.  Plaintiff e-mailed back comments

7     and requested certain changes to the draft Agreement.  Plaintiff and Defendant's

8     attorney proceeded throughout the day on Monday to continue to negotiate the

9     specific language and various minor aspects of the agreement, although the amount

10     of the settlement and major terms and already been accepted through e-mail.  Dal

11     Soglio Decl., ¶ 5 and Exh. B thereto.

12          Later that afternoon, at 4:12 p.m. on March 31, 2008, Plaintiff e-

13     mailed to defense counsel the signed Settlement Agreement, thereby fully

14     accepting all the terms and language of the Settlement Agreement.  Dal Soglio

15     Decl., ¶ 6 and Exh. C thereto.  Defendant's attorney immediately forwarded the

16     agreement to USC for signing.  Defendant executed the Settlement Agreement on

17     April 2, 2008.

18          Among other things, the final executed Settlement Agreement

19     contained the following provisions relevant to this enforcement action:

20              • Plaintiff will execute and deliver to defense counsel a

21                Stipulation for Dismissal with Prejudice to be filed with the

22                Court.  (Paragraphs 1 and 19)

23              • Plaintiff has the opportunity to review the Agreement with an

24                attorney and either did so or has knowingly and voluntarily

25                chosen not do so.  (Paragraph 17)

26     / / /

27     / / /

28     / / /

<div align="center">2</div>

**Defendant's Motion to Enforce Settlement**

Exhibit 3
Page 18

- Plaintiff carefully read and fully understands all of the provisions of the Agreement and has been given a reasonable period of time to consider signing the Agreement, and is voluntarily doing so.
- This Agreement is the entire agreement between Isaacs and USC and fully supersedes any and all prior agreements and understandings between the parties. (Paragraph 22)

On April 2, 2008, Plaintiff sent defense counsel another copy of the signed Settlement Agreement. He was concerned because he had originally typed his initials on each of the pages of the Settlement Agreement, and the new copy contained his handwritten initials. Dal Soglio Decl., ¶ 7 and Exh. D thereto.

Over the next several days, Plaintiff and Defendant's attorney exchanged several emails regarding whether payment would be made by USC by wire transfer or check and whether USC would be willing to join in a stipulation to strike or seal the papers in support of the motions filed on March 31. During the next several days, Plaintiff expressed no remorse over the settlement itself, just interest in ironing out these post-settlement issues. Dal Soglio Decl., ¶ 8.

On Friday, April 4, 2008, the second version of settlement agreement (containing Plaintiff's handwritten initials) was executed by Defendant and counsel thereafter forwarded this copy of the final, fully executed Settlement Agreement to Plaintiff on Monday, April 7, 2008. Dal Soglio Decl., ¶ 9 and Exh. E thereto. That same afternoon, defense counsel inquired about the status of the Stipulation for Dismissal, which was Exhibit A to the Settlement Agreement, and which Plaintiff had agreed to sign upon execution of Settlement Agreement. However, Plaintiff did not respond to this inquiry.

On Tuesday, April 8, 2008, more than one week after he signed the settlement agreement, Plaintiff emailed defense counsel to inform her for the first time that he "intended to void the settlement." Plaintiff stated that he believed that

3        **Defendant's Motion to Enforce Settlement**

Exhibit 3
Page 19

1   he had accepted a settlement that "was far short of what is appropriate" but

2   explained that he "was honestly trying to put this matter behind [him]."  Dal Soglio

3   Decl., ¶ 11 and Exh. F thereto.

## I.

## ARGUMENT

6        After months of negotiations, Plaintiff and Defendant finally

7   negotiated and entered into a written, binding Settlement Agreement.  Plaintiff is

8   now apparently suffering from "buyer's remorse" and is sorry that he accepted an

9   offer that is, in his own words, "far short" of what he wanted.   He claims that he is

10  seeking to "void" the Settlement Agreement but he has no valid legal grounds to

11  do so.

12       A district court has the inherent power to enforce an agreement to

13  settle a litigation pending before the court.  In re Suchy, 786 F.2d 900, 902-903 (9th

14  Cir. 1985).  The court can order specific performance of a settlement agreement or

15  award damages against the party in breach.  TNT Marketing, Inc. v. Agresti, 796 F.

16  2d 276, 278 (9th Cir. 1986); Hobbs & Co. v. American Investors Management, Inc.,

17  576 F.2d 29, 33 and n. 7 (3rd Cir. 1978).

18       This Court should exercise its inherent power to enforce this

19  Settlement Agreement.  USC has been subjected to two years of litigation from a

20  student who was dismissed for stalking and harassing a fellow medical student.

21  After two years of defending itself against Plaintiff's baseless accusations,

22  Defendant prepared to file its Motion for Summary Judgment on March 31, 2008.

23  One day before Defendant's filing and faced with the impending dismissal of his

24  lawsuit, Plaintiff agreed to a reasonable settlement of his claims.  Indeed, Plaintiff

25  was so frantic about the possibility of losing summary judgment and ending up

26  with nothing that he sent a second email to defense counsel after accepting the

27  settlement offer, anxiously seeking to set up a teleconference to confirm receipt of

28  his email accepting the offer and wanting to set a schedule for finalizing the

4        **Defendant's Motion to Enforce Settlement**

Exhibit 3
Page 20

1  settlement. He stressed: "I'll need to confirm (preferably in writing and verbally)
2  this with you today as binding contract...." Thus, while Plaintiff may claim that he
3  felt some sort of "duress" in later signing written Agreement (although certainly
4  not legally cognizable duress), his immediate response was to nervously seek to
5  confirm what he obviously viewed as a desirable settlement.

6        His conduct in the following days further confirmed both his desire to
7  finalize the settlement to which he had agreed and his ability to negotiate a written
8  agreement expressing the terms and language he desired. Upon receipt of the draft
9  agreement, after having a weekend to think about the deal he had struck, he
10  provided substantive comments and requested changes to the Agreement. In
11  particular, Plaintiff negotiated aggressively the aspects of the Settlement
12  Agreement related to confidentiality. However, he never raised any concerns or
13  sought to re-negotiate the settlement amount.

14        On March 31, 2008, three days after the initial agreement was reached
15  in principle, Plaintiff signed the written Settlement Agreement and e-mailed it back
16  to defense counsel.

17        Even after signing the Agreement, Plaintiff continued to seek
18  cooperation from defense counsel in effectuating the settlement. He sought an
19  agreement to wire the settlement funds rather than mailing a check. He requested
20  that Defendant join in a Stipulation to strike or seal the various documents filed
21  with the Court on March 31. He even *re-initialed* the pages of the Settlement
22  Agreement on April 2, apparently concerned that the type-written initials might not
23  be enforceable!

24        Thus, while Plaintiff may try to belatedly claim some unknown duress
25  in signing the Agreement, his conduct before, during and after executing the
26  Agreement evidences otherwise. He entered into the Agreement knowingly and
27  voluntarily and the Settlement Agreement should be enforced.

28  ///

5        **Defendant's Motion to Enforce Settlement**

Exhibit 3
Page 21

# I.

## **CONCLUSION**

For the foregoing reasons, Defendant University of Southern California respectfully requests that this Court issue an order enforcing the Settlement Agreement and dismissing this Action in accordance with the Agreement.

Dated:   April 21, 2008        Respectfully submitted,

DAL SOGLIO & MARTENS LLP
Robin D. Dal Soglio


By: _Robin D. Dal Soglie_____
   Robin D. Dal Soglio
Attorneys for Defendants University of
Southern California, Robert Baughman,
Brian E. Henderson, Peter J. Katsufrakis and
James M.H. Ball

Case 2:10-cv-08906-DSF-RAO   Document 64-2   Filed 11/04/19   Page 24 of 264   Page
ID #:1699
Case 2:06-cv-03998-GAF-E   Document 78   Filed 04/28/08   Page 1 of 16   Page ID #:731

1  JEFFREY DAVID ISAACS
2  3553 West Chester Pike
   PMB #177
3  Newtown Square, PA 19073
   Telephone:   (215) 609 - 4625
4  Mobile:      (610) 202 -1460
   E-Facsimile: (310) 564-0432
5  Email: jdi@alum.dartmouth.org

6

7

8

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13

14

15                                          **BY FAX**

16

17  JEFFREY DAVID ISAACS                )
                                        )   Case No. CV-06-3338 GAF (Ex)
18          Plaintiff, *pro se*,        )
                                        )
19              -V-                     )   **PLAINTIFF'S OPPOSITION TO**
                                        )   **DEFENDANT USC'S MOTION**
20  UNIVERSITY OF SOUTHERN CALIFORNIA;  )   **TO ENFORCE SETTLEMENT**
                                        )
21          Defendant.                  )
                                        )
22                                      )
                                        )   Date:    May 12, 2008
23                                      )   Time:    9:30 a.m.
                                        )   Court:   740 - Roybal
24                                      )   Judge:   Honorable Gary A. Feess
25  _____)

26

27

28

-1-

PLAINTIFF'S OPPOSITION TO DEFENDANT USC'S MOTION TO ENFORCE SETTLEMENT
No. CV-06-3338 GAF (Ex)

Exhibit 4
Page 23

## PLAINTIFF'S OPPOSITION TO DEFENDANT USC'S
## MOTION TO ENFORCE SETTLEMENT

The Plaintiff has sought a settlement to restore his reputation as a medical student since January 17, 2006 - six months before this lawsuit was filed. In Plaintiff's January 2006 'settlement offer,' his only 'demands' were 1) that former Defendants Baughman and Henderson stop communicating about his standing in medical school, and 2) that the school schedule unbiased counseling services to more appropriately address the student dispute. Since January 2006, USC has vigorously sought to intimidate the Plaintiff from asserting his legal rights.

In October 2006, Plaintiff offered USC to settle the matter in sole exchange for his readmission to Keck. USC rejected this offer. In early 2007, Plaintiff offered to settle this matter in exchange for clearing his academic record along with a refund of his student loans. USC did not respond; the issue was again raised in this Court's case management scheduling conference in June, 2007. USC Counsel assured the Court, and afterwards the Plaintiff, that they would investigate the possibility of a settlement that cleared Plaintiff's records. At stated, Plaintiff also sought a refund of his student loans – approximately $62,000 – along with the academic record revision.

Plaintiff was informed that the monetary settlement request caused delays. Plaintiff proposed to USC Counsel a "partial settlement to reduce career risks to all parties," entailing a "dismissal of all charges against Katsufrakis, Ball, and Henderson in exchange for closing Plaintiff's student records at USC." USC found this intriguing, and finally in August 2007, they delivered their proposed partial settlement paperwork to Plaintiff. The settlement paperwork invoked terminology to "seal Plaintiff's academic and disciplinary records at USC." Plaintiff didn't fully understand what a "sealed" record meant, in an academic context. Because the main case was not being dropped, Plaintiff decided to accept the partial settlement, for whatever uncertain value that it was worth. Accordingly, Plaintiff signed USC's partial settlement agreement without fully understanding what implications a "sealed" record would have on his future. He immediately signed a joint stipulation to dismiss the case against the individual Defendants, even before USC executed the partial settlement via the appropriate signature.

1   Following his dismissal of the individual defendants, over a period of six weeks, Plaintiff
2   made at least a dozen requests for USC's signed & executed Partial Settlement agreement. Plaintiff
3   felt, and had informed USC, that USC's Counsel was using indirect and subtle tactics to, still, harass
4   him. Around the time Mr. Michael Payne became involved, USC finally provided the signed and
5   executed partial settlement agreement.

6   Mr Michael Payne then proposed to settle the case, in exchange for a tuition refund and a
7   'voluntary withdrawal' or, preferably, 'full expungement.' Three months later, in January 2007, USC
8   tentatively accepted to a voluntary withdrawal, but would not commit to any monetary settlement. In
9   the following days, USC mysteriously retracted their informal verbal agreement to clear Plaintiff's
10  records.

11  In February and March, Plaintiff made diligent efforts to find settlement terms that would be
12  acceptable to USC and still clear his record. Because USC was reluctant to alter academic records,
13  Plaintiff proposed that USC refund his tuition and characterize the refund as a "cancellation of
14  enrollment consideration paid." As such, Plaintiff hoped that his academic records would be rendered
15  insignificant, if indeed, his enrollment contract had been cancelled. After a week or so, USC rejected
16  this offer.

17  Around March 20th, USC proposed an agreement with a "general release" (Exhibit E, USC's
18  Motion to Enforce Settlement) that "unconditionally and irrevocably … acquits .. Isaacs from any
19  and all charges, complaints .. controversies … of any nature whatsoever, known or unknown,
20  suspected or unsuspected." The only exception to the "general release" is that it would not "release
21  debts unrelated to the lawsuit," i.e., student loans for tuition.

22  Simultaneously, USC delivered a scant discovery document production, implying to Plaintiff
23  that USC would utilize any means – including destroying, withholding, or losing evidence – to hurt
24  his case. Likewise, in violation of a USC restraining order, Keck Student Amy Baughman emailed
25  Plaintiff's close friend, George F. Baker, two years after Plaintiff departed from Keck. USC was
26  attempting to intimidate Plaintiff, by threatening to involve and annoy Plaintiff's friends. USC was
27  banking on the fact that they could create tension to intimidate Plaintiff into dropping his case against
28  USC for fear of unwanted publicity/involvement of friends; Mr. Baker's presence in California
    during January 2006 would shed important testimony, should this case progress to trial.

-3-

On March 31st, Plaintiff made numerous requests to clarify the implications of the settlement agreement. Specifically, it was unclear to Plaintiff whether or not this "settlement agreement" truly cleared his record. USC eventually modified Paragraph 14.C to include the provision that "Isaacs is not required to disclose this matter to anyone." During what Plaintiff can only describe in retrospect as "wishful thinking," Plaintiff signed a settlement agreement hoping – but without any assurance – that it cleared his record. Moreover, on March 28th , Plaintiff wrote in an email to Dal Soglio that he "never thought" he would engage in settlement discussions with so little consideration on the table; USC's intimidation and delay tactics, and refusal to comply with discovery, clearly achieved a level of duress; considering that the Plaintiff voided the settlement within a week, it should not be enforced under these circumstances.

Indeed, the terms of settlement still remain unclear to Plaintiff. Plaintiff has been "acquitted" by USC, and released from all "promises and agreements [including enrollment if the contract is read literally, but not including enrollment if tuition is considered a 'debt unrelated to the lawsuit']" suggesting that his records at USC *might* be effectively nullified.  On the other hand, USC specifically refused to alter Plaintiff's academic records. It is unclear if Plaintiff's academic records are even "sealed," per the partial settlement agreement: Paragraph 22 of the Global Settlement Agreement states that it "supercedes" all previous agreements, effectively cancelling the previous partial settlement. Such an accident, given the time constraint and duress of threatened sanctions, should not be enforced.

In other words, the current settlement agreement creates an impossible state wherein Plaintiff is both expelled and acquitted, simultaneously, and possibly, released from his tuition enrollment consideration paid (in which case, USC owes Plaintiff $42,000 that is not accounted for in the settlement). It is unclear whether a  faculty execution of a "[wrongful] dismissal for failure to comply with Keck standards" is something that can be "acquitted," Plaintiff simply did not reach this analytical conclusion until several days after signing the contract. Moreover, as further evidence that Plaintiff didn't have time to thoroughly analyze the settlement at the time of signing, Plaintiff may have accidentally "unsealed" his records by superceding the prior partial settlement agreement (Paragraph 22 of Global Settlement.)

-4-

1  USC was well aware of the vague (and perhaps, meaningless) nature of the agreement; in

2  Exhibit B of their Motion to Enforce Settlement (page 26), USC Counsel says "it is preferable to

3  stick with 'this matter,' which is vague enough that you are free to apply it as you like."

4  The Plaintiff is concerned that his intended future career path is likely to require disclosure of

5  academic records. While Plaintiff had "wishful thinking" that the voided settlement's contractual

6  general release would suffice in clearing his records, in retrospect it seems most likely that Plaintiff's

7  academic records will pre-empt any general contractual "acquittal." Because USC is unwilling to

8  alter Plaintiff's academic records, and because Plaintiff now realizes that the "General Release" is

9  probably not sufficient protection of his future career interests, Plaintiff informed USC that he is not

10  willing to dismiss this case. Plaintiff has spent more than two years trying to clear his name, and only

11  intended to enter into an agreement that, in absolute, unequivocal, and unambiguous terms, clears his

12  USC record.

13  During the two days prior to the in-principle agreement, Plaintiff sought readmission

14  reconsideration as a settlement possibility. Hence, a lot changed on March 28th. During the hours

15  leading up to Plaintiff tentatively accepting USC's settlement on March 28th, USC threatened

16  Plaintiff with sanctions for filing a Motion to Compel. Exhibit A contains an automatically

17  transcribed "Vonage voicemail" left for Plaintiff by USC Counsel, in which USC Counsel used

18  strong language and intonation to intimidate Plaintiff into settling and dropping the pending Motion

19  to Compel. Plaintiff believes USC's threat of sanctions was absolutely frivolous. One day after USC

20  Counsel missed the Rule 37 five-day deadline to complete the USC portion of the Joint Stipulation,

21  USC Counsel complained that Plaintiff was without justification to file a motion to compel on most

22  of his discovery request categories. Indeed, Plaintiff had verbally told USC Counsel six days earlier

23  that he wouldn't move to compel about forty of the sixty Second Request for Document categories.

24  Within hours of receiving her threatening voicemail, and even though it was after the deadline and

25  USC Counsel had made no prior efforts to clarify in a timely manner, Plaintiff emailed USC Counsel

26  an exact list of the items he intended to move to compel. Moreover, because Plaintiff reasonably

27  believes USC has lost and or destroyed and or withheld evidence, he maintains that he would have

28  had legal justification to move to compel production of all sixty of his requests.

-5-

Finally, Plaintiff never received a signed, initialed, and fully executed copy of the settlement agreement prior to when he declared it void. In Exhibit E of their Motion to Enforce Settlement, USC alleges that on April 7th they sent Plaintiff an executed settlement via email that is "initialed by Mr. Dougherty on each page." Plaintiff never received this email, and enquired with USC Counsel about proof of sending/service. USC Counsel was unable to provide such proof and acknowledged further email difficulties (Exhibit A). While USC has ridiculed Plaintiff on more than one occasion for his use of 'certified & tracked email' (which is endorsed by the California Bar), it seems that more correspondence has been lost by USC during this lawsuit than most individuals lose during a lifetime.

Taking these facts and the settlement timeline into consideration, the Plaintiff invokes the following respective defenses against the formation and the enforcement of an overly vague and contradictory settlement proposed by USC.

1) Lack of Consideration - In exchange for dismissing a lawsuit in the United States District Court against USC, and claims that they have probably destroyed evidence, Plaintiff has clearly and consistently sought, at a minimum, that his academic record be cleared and student loans refunded. Absent any immediate duress or "wishful thinking" when he signed the agreement, the historical pattern shows consistent attempts, over several years, to clear his academic record and/or seek readmission to Keck. As such, an agreement that does not unequivocally clear Plaintiff's record is absent of sufficient consideration. (Should USC un-redact the dollar amount of settlement, it will also be clear that there is no significant economic consideration involved in this settlement.)

2) 'Non est factum' - The contract was signed without full knowledge of its meaning, absent any neglect on behalf of the Plaintiff. Indeed, it remains unclear to Plaintiff what exactly (if anything) an "acquittal" and "sealing" means, in light of the fact that USC will not alter academic records. Plaintiff had "wishful thinking" when he signed an agreement that used "acquittal" terminology, without fully understanding its meaning – if any.

3) Illegality and/or impracticality – Plaintiff would be unable to answer future job applications or academic admissions applications that require disclosure of past disciplinary actions. On one hand, Plaintiff was "acquitted" by USC; on the other, his dismissal remains in

1   effect according to USC. Hence, any answer (short of divulging this entire lawsuit, and even
2   then, it would remain unclear) could be construed as a dishonest response.

3   4)      Duress – USC communicated, in a suspicious manner, with Plaintiff's close friends
4   during the days leading up to the alleged settlement formation. USC sent Plaintiff five
5   hundred pages of discovery documents that seemed to indicate to Plaintiff that they would not
6   abide by Federal Rules of evidence retention. In the hours leading up to Plaintiff agreeing in-
7   principle to USC's proposed settlement, USC even threatened to seek sanctions against
8   Plaintiff for filing a Motion to Compel. Having fought USC's retaliation for nearly three
9   years, Plaintiff claims some level of 'learned hopelessness' that prompted him, in retrospect,
10  to sign an insufficient settlement agreement. Indeed, within twenty-four hours of reaching an
11  in-principle agreement, it is clear that the Plaintiff was still angered over USC's frivolous
12  threat of sanctions (Exhibit A). Because Plaintiff regretted a decision made under some
13  duress, and subsequently voided the overly vague settlement within a week - before ever
14  receiving a fully initialed and executed copy - it should not be enforceable.

15  5)      Unclean hands – At this point, there is a legitimate question raised as to whether or not
16  USC had any good faith in entering into this agreement. USC has dodged discovery, used
17  delay tactics (including taking two months to sign the prior partial settlement agreement),
18  made careless errors with Plaintiff's confidential information, retaliated, invoked 'foul'
19  litigation tactics in communicating with Plaintiff's close friends, and finally, made an empty –
20  or entirely vague – settlement offer. Why a major institution such as USC would allegedly
21  desire settlement, yet offer almost nothing in tangible terms, causes Plaintiff to question
22  whether or not USC's lawyers had any good faith in entering this agreement. Indeed, Plaintiff
23  sued one of USC's lawyers, and presumably, USC's counsel are the only persons left at USC
24  with any animosity towards Plaintiff (the Deans have resigned and the students have long
25  since forgotten this matter).

26  6)      Undue influence – Since Plaintiff enrolled at Keck, his future career options and
27  ability to make a living depend, to a large extent, upon academic records issued by Keck.
28  Wrongfully dismissed, USC is able to exert undue influence on Plaintiff. Indeed, back in 2006
    this undue influence (in the form of retaliatory disciplinary hearings) caused Plaintiff to

-7-

Case 2:10-cv-08088-DSF-RAO Document 64-2 Filed 04/11/10 Page 31 of 264 Page
Case 2:06-cv-03338-GAF-EO Document 78 Filed 04/28/08 Page 8 of 26 Page ID #:738
ID #:1706

accept blame for a student controversy in hopes that the matter would go away. In terms of

the formation, or lack thereof, of a settlement contract, Plaintiff was again "hoping for the

best" in signing a purported 'acquittal,' realizing that USC had unlimited legal resources and

apparent disregard for the consequences of losing or destroying evidence.

7)       Unconscionability – The consideration offered is so obviously inadequate that to

enforce this contract would be unfair to a Plaintiff who has spent years trying to either clear

his academic record or be readmitted to USC Keck.

Respectfully submitted, this 28th day of April, 2008.

JEFFREY DAVID ISAACS

Plaintiff, *pro se*
3553 West Chester Pike
PMB #177
Newtown Square, PA 19073
Telephone: (215) 609-4625
Facsimile: (310) 564-0432
Email: jdi@alum.dartmouth.org

-8-

Case 2:19-cv-08889-DSF-RAO Document 64-2 Filed 03/04/19 Page 32 of 264 Page
ID #:1707
Case 2:06-cv-03338-GAF-E Document 81 Filed 05/08/08 Page 1 of 6 Page
LINK: 77

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3338 GAF (Ex) | Date | May 8, 2008 |
|---|---|---|---|
| Title | Isaacs v. University of Southern California, et al. | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Michele Murray | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**        **(In Chambers)**

### ORDER RE: MOTION TO ENFORCE SETTLEMENT

#### I. INTRODUCTION & BACKGROUND

Pro se Plaintiff Jeffrey David Isaacs brought this action against the University of Southern California ("USC") and various individuals, alleging that he has been discriminated against because of his post-traumatic stress disorder and "Bipolar II Affective Disorder." Isaacs contends that during his first year of medical school at USC, a fellow female classmate ridiculed and harassed him, thereby exacerbating his medical disabilities. According to Isaacs, administrators at the medical school did not help him overcome his emotional distress, but rather were influenced by the taunter's father, Robert Baughman, who is also the director of the National Institutes of Health Neurological Disease division, to retaliate against Isaacs and portray the taunter as a victim of stalking and harassment. After administrative hearings regarding his alleged harassment of his classmate, Isaacs was suspended and dismissed from USC.

After two years of wrangling, Isaacs and USC reached a settlement and executed a Confidential Settlement Agreement and Mutual Release (the "Settlement"). Isaacs sought, through his law suit, to clear his record. He is now not sure whether the Settlement effectuates that goal. As such, Isaacs wants to "void" the Settlement and refuses to dismiss his case, in contravention to the terms of the agreement. Isaacs states that he was under duress when he entered into the agreement and that key provisions of the Settlement are unintelligible. USC has filed a motion asking the Court to enforce the Settlement.

The Court concludes that Isaacs fails to puts forth any grounds to void the Settlement. As discussed in detail below, the mere fact that Isaacs claims to no longer know if the Settlement accomplishes his ultimate goal is not grounds to undo the agreement. Accordingly, USC's motion to enforce the settlement is **GRANTED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3338 GAF (Ex) | Date | May 8, 2008 |
|---|---|---|---|
| Title | Isaacs v. University of Southern California, et al. | | |

## II. STATEMENT OF FACTS

On March 31, 2008, Isaacs signed a Confidential Settlement Agreement and Mutual Release. (Dal Soglio Decl. ¶ 6, Ex. C [Settlement with Isaacs' typed initials on each page] at 47-52 .) He transmitted the Settlement to USC's counsel that day. (Dal Soglio Decl. ¶ 6.) USC executed the agreement on April 2, 2008. (Dal Soglio Decl. ¶ 6.)

Isaacs subsequently executed another copy of the agreement, putting handwritten initials in place of where he had typed his initials. (Dal Soglio Decl., ¶ 7, Ex. D [Settlement with Isaacs' signed initials].) He transmitted that version of the Settlement to USC's counsel on April 2, 2008. (Dal Soglio Decl. ¶ 7.)

By April 3, 2008, Isaacs had received the executed Settlement (with typed initials) from USC. (Dal Soglio Decl., Ex. E [e-mail string with April 3, 2008 email from Isaacs (Isaacs stating "Thank you for the fully exectued agreement. While I agree it now suffices as a binding agremeent, I noticed the pages aren't initialed by your client.")] at 60.)

On April 4, 2008, USC executed the Settlement (with the handwritten initials). (Dal Soglio Decl. ¶ 9, Ex. E at 61-66 [executed settlement ("Final Settlement")].)[1]

Key provisions of the Final Settlement are as follows:

- "Isaacs agrees that he will execute and deliver for filing . . . the Stipulation of Dismissal with Prejudice." (Final Settlement § 1.)

- "USC will transmit to Isaacs one check made payable to Isaacs in the gross amount of [redacted]." (Final Settlement § 4.)

- " USC encourages Isaacs to consult with an attorney before signing this Agreement, and Isaacs hereby acknowledges that he has had the opportunity to consult with an attorney prior to signing, and has either done so or voluntarily chosen not to do wo." [sic] (Final Settlement § 11.)

- "The parties acknowledge that they have thoroughly discussed all aspects of their rights and this Agreement with their respective attorneys, or have knowingly and voluntary chosen not to do so, and that they have carefully read and fully understand all of the provisions of this Agreement, that they have been given a reasonable period of time to

---

[1]The parties do not claim that there are any substantive differences among the executed agreements.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3338 GAF (Ex) | Date | May 8, 2008 |
|---|---|---|---|
| Title | Isaacs v. University of Southern California, et al. | | |

consider signing this Agreement, and that they are voluntarily signing this Agreement."
(Final Settlement § 17.)

- "This Agreement is made and entered into in the State of California and shall in all
respects be interpreted, enforced and governed under the laws of said State." (Final
Settlement § 18.)

- "This Agreement is the entire agreement between Isaacs and USC and fully supersedes
any and all prior agreements or understandings between the parties pertaining to its
subject matter." (Final Settlement § 22.)

## III. DISCUSSION

USC's argument is rather simple: Isaacs signed a valid and binding agreement that should be
enforced. USC relies on a Court's "inherent power to enforce an agreement to settle litigation pending
before the court." (Mem. at 4 (citing In re Suchy, 786 F.2d 900, 902-903 (9th Cir. 1985) ("[I]t is well
settled that a court has inherent power to enforce summarily a settlement agreement involving an action
pending before it.") (citation omitted).) Isaacs, in turn presents seven unconvincing arguments as to why
the Settlement should not be enforced. The Court will discuss each in turn.

### A. LACK OF CONSIDERATION

Isaacs argues that his intent all along has been to clear his academic record and have his student
loans refunded and that if the Settlement does not do so, it lacks consideration. (Opp. at 6.) As noted
above, Isaacs is receiving monetary payment in exchange for settlement. (Final Settlement § 4.) "A
contract is supported by an adequate consideration if there is some benefit to the promisor or detriment
to the promisee." Hayman v. Shoemake, 203 Cal. App. 2d 140, 154 (Ct. App. 1962) (citation omitted).
Isaacs is receiving a benefit: payment. Accordingly, there is consideration.

### B. NON EST FACTUM

To support his non est factum argument, Isaacs states that "the contract was signed without full
knowledge of its meaning, absent any neglect on behalf of the Plaintiff." (Opp. at 6.) However, this is
an improper invocation of the non est factum doctrine. Non est factum "puts in issue on the actual
execution of the instrument." Paul M . Coltoff, et al. Corpus Juris Secundum, Contracts § 678 (2008);
see also Richard A. Lord, Willston on Contracts, §69:4 (4th ed.) ("Where a person is fraudulently
induced to sign or indorse a bill or note in the reasonable belief that it is something else, the signer
cannot really be said to have made or indorsed the bill or note; hence the ancient plea of non est factum
is applicable."). The defense arises when the instrument signed by a party is different from the one the
party thought was being signed, i.e, if a contract is altered after being signed (see, e.g., McCaskey

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3338 GAF (Ex) | Date | May 8, 2008 |
|---|---|---|---|
| Title | Isaacs v. University of Southern California, et al. | | |

Register Co. v. Bennett, 60 So. 541, 542 (Ala. Ct. App. 1912).)

Here there are no such allegations. Isaacs simply argues that he is not sure what all of the terms of the Final Settlement mean, despite that one clauses expressly states that the parties "have carefully read and fully understand all of the provisions of this Agreement." (Final Settlement § 17.) Isaacs' after-the-fact assertion is not enough to invoke the ancient plea of non est factum.

### C. ILLEGALITY AND/OR IMPRACTICALITY

Isaacs, without citing any clause in the Settlement, states that it prohibits him from truthfully answering "future job application or academic admissions applications that require disclosure of past disciplinary actions." (Opp. at 6.) The Court is uncertain how this is so, or what Isaacs relies on in support of this argument. However, the confidentiality section of the agreement specifically notes that it does not "prohibit disclosures to the extent otherwise required by law." (Final Settlement § 14.b.) Accordingly, the Court does not find any credence in Isaacs' illegality/impracticality argument.

### D. DURESS

Isaacs claims he entered into the Settlement under duress because shortly before settlement "USC communicated in a suspicions manner, with Plaintiff's close friends" and because USC produced 500 pages of documents, which Isaacs viewed as an indication that USC would not abide by discovery rules, and because USC "threatened to seek sanctions against Plaintiff for filing a Motion to Compel." (Opp. at 7.) None of these alleged acts result in any sort of duress that would void an agreement.

"In addition to statutory duress [which requires confinement or detention], the law recognizes the concept of economic duress as a basis for vitiating a coerced party's consent to an agreement." Tarpy v. County of San Diego, 110 Cal. App. 4th 267, 277 (Ct. App. 2003). This "may arise from an act that is so coercive as to cause a reasonably prudent person, *faced with no reasonable alternative*, to agree to an unfavorable contract." Tarpy, 110 Cal. App. 4th at 277 (citations omitted) (emphasis added).

Isaacs' duress claim fails because he always had a reasonable alterative to settling: pursuing the litigation. As to the belief that USC was engaged in discovery abuse, Isaacs could have sought relief from the Court. As to the threatened motion for sanctions, Isaacs could have either opposed the motion on the merits, or altered his position as to his motion to compel. (Nor does the Court view USC's counsel's indication that it would seek sanctions as anything other than ordinary discourse incumbent with litigation (Opp. Ex. A [transcript of voice message from USC's counsel ("I am putting you on notice that we will seek cost [sic] from you from having to oppose this . . . . otherwise I'm going to be adding my request for sanctions and [costs] to my opposition to this motion.")].)

Accordingly, there is no evidence of duress sufficient to void the Settlement. Indeed, Isaacs was

Case 2:19-cv-08939-DSF-RAO Document 64-2 Filed 03/04/19 Page 36 of 264 Page
ID #:1711
Case 2:06-cv-03338-GAF-E Document 91 Filed 05/08/08 Page 5 of 6 Page ID #:8519

LINK: 77

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 06-3338 GAF (Ex) | Date | May 8, 2008 |
|---|---|---|---|
| Title | Isaacs v. University of Southern California, et al. | | |

more than adamant in ensuring that the Settlement would be binding, transmitting multiple copies and requesting that USC initial each page. (See generally, Dal Soglio Decl.)

### E. UNCLEAN HANDS

Isaacs argues that "USC has dodged discovery, used delay tactics (including taking two months to sign the prior partial settlement agreement), made careless errors with Plaintiff's confidential information, retaliated, invoked 'foul' litigation tactics in communicating with Plaintiff's close friends, and finally, made an empty - or entirely vague - settlement offer." (Opp. at 7.) However, all of this conduct (save the obtuse reference to the "empty" and "vague" settlement offer) appears to have been prior to the parties entering into the settlement agreement. Isaacs was fully aware of this alleged conduct when he decided to settle -- it is disingenuous for him to now rely on this alleged "unclean" conduct in an attempt to negate the agreement simply because he has buyer's remorse. The principles underlying the very doctrine Isaacs seeks to invoke prohibits its application. See Alys Masek, California Jurisprudence 3d, Equity § 26 (2008) ("In sum, the unclean hands doctrine demands that a plaintiff act fairly in the matter for which he or she seeks a remedy").

### F. UNDUE INFLUENCE

Isaacs seems to claim that USC exerted undue influence over him, manipulating his participation in the Settlement, although it is not exactly clear how this is supposed to have occurred. Apparently the undue influence somehow stems from USC's control of his academic records. (Opp. at 7.) Isaacs claims that, "[w]rongfully dismissed, USC is able to exert undue influence on [him]. Indeed, back in 2006 this undue influence (in the form of retaliatory disciplinary hearings) caused Plaintiff to accept blame for a student controversy in hopes that the matter would go away." (Opp. at 7-8.) However, "under California law a party cannot successfully invoke the doctrine of 'undue influence' to escape an apparent contract unless that party proves two things: (1) that she had *a lessened capacity to make a free contract* and (2) that the other party applied its excessive strength to her to secure her agreement." Olam v. Congress Mortgage. Co., 68 F. Supp. 2d 1110, 1141 (N.D. Cal. 1999) (emphasis added). Isaacs simply presents no evidence of a lessened capacity . Furthermore, just as there was no duress, there is no evidence that USC applied any "excessive strength."

### G. UNCONSCIONABILITY

As to unconscionability, Isaacs offers only one sentence: "The consideration offered is so obviously inadequate that to enforce this contract would be unfair to a Plaintiff who has spent years trying to either clear his academic record or be readmitted to USC Keck." (Opp. at 8.) However, it is not at all clear that the consideration was inadequate. Third Story Music, Inc. v. Waits, 41 Cal. App. 4th 798, 808 n.5 (Ct. App. 1995) ("But unless the consideration given was so one-sided as to create an issue of unconscionability, the courts are not in a position to decide whether legal consideration agreed to by

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 06-3338 GAF (Ex) | Date | May 8, 2008 |
|---|---|---|---|
| Title | Isaacs v. University of Southern California, et al. | | |

the parties is or is not fair.").

Although the parties have redacted the amount of money Isaacs is to receive, Issacs does receive payment under the agreement. <u>Swanson v. Skiff</u>, 92 Cal. App. 3d 805, 809 (Ct. App. 1979) ("*any* benefit conferred or agreed to be conferred upon the promisor to which he is not lawfully entitled, or any prejudice suffered or agreed to be suffered other than that which a person is lawfully bound to suffer, is a good consideration for a promise") (emphasis added) (<u>citing</u> Cal. Civ. Code § 1605). Furthermore, in addition to monetary payment, the parties release claims against each other. (Final Settlement §§ 7-8.) This too, serves as adequate consideration. <u>See</u> <u>Carey v. Kraft-Phenix Cheese Corp.</u>, 24 Cal. App. 2d 517, 525 (Ct. App. 1938) ("The compromise of a claim which is asserted in good faith and of the validity of which the parties at the time entertain a doubt, and about which there is a bona fide controversy, is a valuable consideration and will support a promise or a contract.") (citation and internal quotations omitted).

Accordingly, there is no evidence that the consideration was "so one-sided as to create an issue of unconscionability."

### III. CONCLUSION

Isaacs has present no grounds on which to void the Final Settlement. He is bound by its terms. The Court **GRANTS** USC's motion to enforce the terms of the settlement. Isaacs is **ORDERED** to comply with its terms. In addition, per the terms of the Final Settlement (<u>see</u> Final Settlement § 1), the Court **DISMISSES, WITH PREJUDICE,** this case, in its entirety. The hearing previously scheduled for Monday, May 12, 2008 is hereby **VACATED.** Fed. R. Civ. P. 78; L.R. 7-15.

IT IS SO ORDERED.

2014 WL 1572559
United States District Court, D. New Hampshire.

Dr. J.D. ISAACS

v.

DARTMOUTH–HITCHCOCK MEDICAL CENTER,
Mary Hitchcock Memorial Hospital, Dr. Christine
T. Finn, and the Trustees of Dartmouth College.

No. 12–CV–040–LM.
|
Signed April 18, 2014.

**Attorneys and Law Firms**

J.D. Isaacs, Newtown Square, PA, pro se.

Kathleen C. Peahl, Pierre A. Chabot, Wadleigh Starr &
Peters PLLC, Machester, NY, for Dartmouth–Hitchcock
Medical Center, Mary Hitchcock Memorial Hospital, Dr.
Christine T. Finn, and the Trustees of Dartmouth College.

***ORDER***

LANDYA McCAFFERTY, District Judge.

**\*1** Dr. J.D. Isaacs, a former resident in psychiatry
in the Graduate Medical Education ("GME") program
at Dartmouth–Hitchcock Medical Center ("Dartmouth–
Hitchcock"), has sued four defendants and asserts ten
claims, arising from either the treatment he received
during his Dartmouth–Hitchcock residency or his
dismissal from it. Before the court are two motions
for summary judgment. One of them was filed by
Dartmouth–Hitchcock and Mary Hitchcock Memorial
Hospital ("Mary Hitchcock"). Those two defendants shall
be referred to, collectively, as the "Hitchcock defendants."
The other summary-judgment motion was filed by Dr.
Christine Finn, director of the Dartmouth–Hitchcock
Psychiatry Residency Program, and the Trustees of
Dartmouth College ("Trustees"). Those two defendants
shall be referred to, collectively, as the "Dartmouth
defendants." Dr. Isaacs, currently proceeding *pro se,* has
not objected to either motion for summary judgment.
For the reasons that follow, both motions for summary
judgment are granted in full.

While Dr. Isaacs has not objected to either of the pending
summary-judgment motions, he has filed a motion for
a scheduling conference in which he: (1) asks the court
to appoint counsel to review forty hours of videotaped
depositions he has conducted, to search for irregularities;
and (2) states that he "is ... of the belief that it is
wholly inappropriate for opposing counsel to have filed
a motion for summary judgment, when discovery is not
yet complete," doc. no. 140, at 2. But, he has identified no
authority that would support his request for appointment
of counsel, nor has he sought relief under Rule 56(d) of
the Federal Rules of Civil Procedure ("Federal Rules").
Accordingly, his motion for a scheduling conference,
document no. 140, is denied.

**Summary Judgment Standard**

"Summary judgment is appropriate when there is no
genuine issue of material fact and the moving party is
entitled to judgment as a matter of law." *Ponte v. Steelcase
Inc.,* 741 F.3d 310, 319 (1st Cir.2014) (quoting *Cortés–
Rivera v. Dept. of Corr.,* 626 F.3d 21, 26 (1st Cir.2010));
*see also* Fed.R.Civ.P. 56(a). When ruling on a motion for
summary judgment, the court must "view [ ] the entire
record 'in the light most hospitable to the party opposing
summary judgment, indulging all reasonable inferences
in that party's favor.' " *Winslow v. Aroostook Cty.,* 736 F.3d
23, 29 (1st Cir.2013) (quoting *Suarez v. Pueblo Int'l, Inc.,*
229 F.3d 49, 53 (1st Cir.2000)).

"The object of summary judgment is to 'pierce the
boilerplate of the pleadings and assay the parties' proof
in order to determine whether trial is actually required.' "
*Dávila v. Corp. de P.R. para la Difusión Púb.,* 498 F.3d
9, 12 (1st Cir.2007) (quoting *Acosta v. Ames Dep't Stores,
Inc.,* 386 F.3d 5, 7 (1st Cir.2004)). "[T]he court's task
is not to weigh the evidence and determine the truth of
the matter but to determine whether there is a genuine
issue for trial." *Noonan v. Staples, Inc.,* 556 F.3d 20,
25 (1st Cir.2009) (citations and internal quotation marks
omitted).

**\*2** "The nonmovant may defeat a summary judgment
motion by demonstrating, through submissions of
evidentiary quality, that a trialworthy issue persists."
*Sánchez–Rodríguez v. AT & T Mobility P.R., Inc.,* 673
F.3d 1, 9 (1st Cir.2012) (quoting *Iverson v. City of Boston,*
452 F.3d 94, 98 (1st Cir.2006)). In other words, "the party

Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)

2014 WL 1572559, 2014 DNH 086

seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." *Sánchez–Rodríguez,* 673 F.3d at 9 (quoting *Soto–Ocasio v. Fed. Ex. Corp.,* 150 F.3d 14, 18 (1st Cir.1998)) (internal quotation marks omitted).

## Background

As noted, Dr. Isaacs has not filed an objection to either of the two pending summary-judgment motions. Necessarily, he has presented the court with no "short and concise statement of material facts, supported by appropriate record citations, as to which [he] contends a genuine dispute exists so as to require a trial." LR 56.1(b). Accordingly, all the properly supported material facts in the moving parties' factual statements are deemed admitted. *See id.* Those facts, along with others gleaned by the court from the summary-judgment record, *see* Fed.R.Civ.P. 56(c)(3), serve as the basis for the following recitation of the relevant factual background.

In 2005 and 2006, Dr. Isaacs attended medical school at the University of Southern California ("USC"). During his first year, he was suspended and ultimately dismissed for harassing a classmate. From August of 2006 through April of 2010, Dr. Isaacs attended the American University of the Caribbean, Netherlands Antilles, and was awarded an M.D. degree in 2010.

In an Electronic Residency Application Service ("ERAS") application that Dr. Isaacs submitted in September of 2009 to the University of Arizona ("UA") Department of Surgery, he omitted his attendance at USC from a listing of his medical education. [1] Based upon the 2009 ERAS application, Dr. Isaacs was offered a residency in general surgery at UA. He began his UA residency in July of 2010. Approximately three weeks later, he was issued a Notice of Deficiency that cited, among other things, his "[d]emonstrated incompetence in professional activities related to the fulfillment of assigned duties and responsibilities associated with [his] position." Defs.' Mem. of Law, Ex. 11 (doc. no. 144–12), at 1. [2] About three weeks later, Dr. Isaacs was notified that he was going to be put on probation, "based upon his performance and his poor evaluations." *Id.,* Ex. 7 (doc. no. 144–8), at 8. In response, he resigned.

In September of 2010, Dr. Isaacs submitted an ERAS application to Dartmouth–Hitchcock. In that application, he omitted both his attendance at USC and his aborted residency at UA. Based upon his application, Dr. Isaacs was offered admission to the Dartmouth–Hitchcock residency program in psychiatry, which entailed employment as a resident at Mary Hitchcock. In connection with accepting Dartmouth–Hitchcock's offer, Dr. Isaacs stated, among other things, that he had never "voluntarily resigned or withdrawn from any hospital or licensed facility due to professional misconduct, incompetence or negligence." Defs.' Mem. of Law, Ex. 15 (doc. no. 144–16), at 1. He also agreed to the following condition of employment:

> **\*3** Misrepresentation or omission of material information from my employment application, my C.V., or other documents related to my application, may result in rejection of my application or, if I am hired, termination of my employment.

*Id.* at 2.

Also in conjunction with his acceptance of Dartmouth–Hitchcock's offer of admission, Dr. Isaacs completed a data form that included information necessary for Mary Hitchcock to fulfill its reporting obligations to the Equal Employment Opportunity Commission ("EEOC"). On that form, Dr. Isaacs indicated that he did not "have a handicap or disability," Defs.' Mem. of Law, Ex. 16 (doc. no. 144–17), and when asked to "describe any reasonable accommodation that the Hospital could consider enabling [him] to perform [his] job in a safer or better manner," *id.,* Dr. Isaacs responded: "NA," *id.*

After accepting his offer of admission from Dartmouth–Hitchcock, Dr. Isaacs signed a Resident Agreement of Appointment covering his employment by Mary Hitchcock. That agreement specified that Dr. Isaacs' appointment at Mary Hitchcock was for one year, and also provided as follows:

> Continued participation in an academic program at [Dartmouth–Hitchcock Medical Center] is required for

Exhibit 6 - Page 38

Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)
2014 WL 1572559, 2014 DNH 086

this agreement to remain in force. Termination from
your academic program will terminate this agreement.

Mary Hitchcock Memorial Hospital may terminate this
agreement and any obligations it may have there under
at any time upon any reasonable basis which shall
be deemed to include failure to satisfy the academic
requirements of the program; failure to progress in
knowledge or performance at a satisfactory rate; failure
to attain or demonstrate competence in any of the core
competencies; or conduct unbecoming a physician.

Defs.' Mem. of Law, Ex. 18 (doc. no. 144–19), at 3.

The same day he signed the appointment agreement, Dr.
Isaacs also signed an application for a training license
from the State of New Hampshire Board of Medicine.
In a supplement to that application, Dr. Isaacs indicated
that he had resigned from a medical education program,
but also indicated that he had never "been reprimanded,
sanctioned, restricted or disciplined in any activities
involving medical education or practice." Defs.' Mem. of
Law, Ex. 19 (doc. no. 144–20), at 3. By way of explanation
for his resignation from the UA residency program, Dr.
Isaacs wrote:

> I was employed as a preliminary
> surgery resident at the University
> of Arizona for approximately six
> weeks, between July–August 2010. I
> resigned, in good standing, from the
> program, and with permission from
> the program director. At the time,
> the program was under ... probation
> and I felt that the program was
> not a good fit with my overall
> career plans. I planned to reapply to
> categorical programs in 2011 [which]
> would allow me to pursue my
> interest in the neurosciences, and [I]
> succeeded in finding such a program
> at [Dartmouth–Hitchcock].

*Id.* at 4.

**\*4** Dr. Isaacs began his Dartmouth–Hitchcock residency
on June 26, 2011, with an internal-medicine rotation.

Within five days, he was given a reduced patient load,
due to concerns over his ability to handle a full load. In
the e-mail explaining the reduction in duties, Dr. Harley
Friedman, director of Dartmouth–Hitchcock's internal-
medicine residency program, also cited concerns over
Dr. Isaacs' punctuality, preparation for rounds, handling
of his pager, and note writing. Several days later, Dr.
Friedman removed Dr. Isaacs from the internal-medicine
service. In an e-mail to Dr. Finn, Dr. Friedman noted a
number of performance-related issues and also stated that
"[a]s far as we can tell, his medical knowledge is zero."
Defs.' Mem. of Law, Ex. 20 (doc. no. 134–21 (sealed)), at
16.

In mid September of 2011, Dr. Finn placed Dr. Isaacs
on a performance improvement plan ("PIP"), a step that
she had contemplated as early as July 13, a mere three
weeks into his residency. *See* Defs.' Mem. of Law, Ex. 20
(doc. no. 134–21 (sealed)), at 7. In the PIP, she noted "a
concern for lack of details [presumably in patient notes],
gaps in clinical knowledge, repeated lateness, and limited
self direction." *Id.,* Ex. 21 (doc. no. 134–22 (sealed)), at 1.

In early 2012, Dr. Isaacs began a second rotation in
internal medicine. On January 11, Dr. Friedman removed
him from the internal-medicine service for a second time.
In an e-mail to Dr. Finn, Dr. Friedman noted Dr. Isaacs'
continuing problems with punctuality and described an
incident in which Dr. Isaacs reported, on a patient chart,
that he had examined the patient when, by his own
subsequent admission, he had not. Furthermore, Dr.
Friedman stated that Dr. Isaacs explained that his error
on the chart resulted from his copying a previous day's
note, rather than writing a new one—a practice he had
previously been told to avoid.

On January 13, Dr. Finn met with Dr. Isaacs to discuss
performance issues on his internal-medicine rotation.
They also discussed his application to Dartmouth–
Hitchcock and his failure to disclose his UA residency. Dr.
Finn concluded her note on the January 13 meeting this
way:

> I informed Jeff that he would
> be placed on administrative leave,
> effective immediately, while we
> sorted out the options available
> to him. When asked what that

2014 WL 1572559, 2014 DNH 086

might include, I let him know that
remediation of current deficiencies,
dismissal from the program, and
resignation were the 3 available
options at this time. He was
provided a copy of the grievance
policies and procedures, and
indicated his plan to contact GME
today to appeal the decision to place
him on administrative leave.

Defs.' Mem. of Law, Ex. 23 (doc. no. 134–24 (sealed)), at 2.

By letter dated March 19, Dr. Isaacs was "dismiss[ed]
from the adult psychiatry residency training program at
the Dartmouth Hitchcock Medical Center." Defs.' Mem.
of Law, Ex. 1 (doc. no. 144–2), at 1. Dr. Isaacs' dismissal
letter, which was signed by Drs. Finn and Marc Bertrand,
Dartmouth–Hitchcock's Associate Dean for Graduate
Medical Education, stated, in pertinent part:

> **\*5**  The decision to dismiss you from your position
> in the residency is based on academic deficiency
> issues as well as behavior incompatible with the
> role of a physician including the omission of
> material information from your Electronic Residency
> Application Service (ERAS) application, falsification
> of information provided to the New Hampshire
> Board of Medicine, and false reporting in a patient's
> electronic medical record as well as other substantiated
> competency and integrity concerns.

> Specifically, your ERAS application lacked
> information regarding your prior residency training in
> Arizona as well as time served as a medical student at
> the University of Southern California. You also failed
> to divulge your dismissal from medical school at USC in
> information provided to the New Hampshire Board of
> Medicine in support of a NH training license. Concerns
> have been raised during rotations on both psychiatry
> and internal medicine regarding false reporting in the
> medical record and appropriation of medical student
> notes as our own.

> You received feedback regarding academic
> performance concerns beginning in your first week of
> residency training and were subsequently removed from
> internal medicine rotations on two separate occasions
> due to deficits in knowledge, professionalism issues,

and inability to perform basic PGY–1 level tasks when
caring for patients. Furthermore, you have failed to
achieve a performance level in psychiatry that would
allow progression to PGY–2 year duties.

*Id.* The letter also indicated that Dr. Isaacs was being
provided with a copy of the GME grievance process and
procedures, and told him how to initiate the process.
Dr. Isaacs began to grieve his dismissal, but ultimately
abandoned his grievance.

The record includes a copy of a "Notice of Charge of
Discrimination" submitted by Dr. Isaacs to the Boston
office of the EEOC and bearing a date of May 21, 2012.
The notice, which was directed to the director of human
resources at Dartmouth–Hitchcock, identified claims of
disability discrimination and retaliation, listed Dr. Isaacs'
"discharge" as the act of discrimination and/or retaliation,
and specified March 19, 2012, as both the earliest and the
latest date of the action he was complaining about. While
Dr. Isaacs' amended complaint mentions his EEOC filing,
it includes no allegation that he ever filed a complaint with
the New Hampshire commission for human rights, and the
summary-judgment record includes no such complaint.

Dr. Isaacs filed two separate complaints in this court
asserting claims arising from his residency, one in
February of 2012, and one in October of that year. Those
two cases were later consolidated.

In the amended complaint that followed consolidation,
which was filed by an attorney who has since withdrawn
from this case, Dr. Isaacs asserts the following claims:
(1) violation of the ADA, against Dartmouth–Hitchcock,
Mary Hitchcock, and the Trustees (Count I); (2)
wrongful termination, against Dartmouth–Hitchcock
(Count (II); (3) violation of RSA 354–A, against the
three institutional defendants (Count III); (4) breach
of contract, against Dartmouth–Hitchcock (Count IV); (5)
breach of the covenant of good faith and fair dealing,
against Dartmouth–Hitchcock (Count V); (6) negligent
misrepresentation, against all four defendants (Count VI);
(7) violation of Section 504 of the Rehabilitation Act,
against the three institutional defendants (Count VII);
(8) fraud, against all four defendants (Count VIII); (9)
intentional infliction of emotional distress, against all four
defendants (Count IX); and (10) negligent infliction of
emotional distress, against all four defendants (Count X).

Exhibit 6 - Page 40

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 42 of 264   Page
ID #:1717
Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)
2014 WL 1572559, 2014 DNH 086

## Discussion

*6  In the motions now before the court, two pairs of
defendants each move for summary judgment on each
of the claims asserted against them. The court proceeds
count by count.

### A. Count I

In Count I, Dr. Isaacs asserts claims under the ADA
against Dartmouth–Hitchcock, Mary Hitchcock, and the
Trustees. Specifically, he alleges that all three defendants:
(1) discriminated against him, in violation of the ADA,
by failing to make reasonable accommodations for
his mental disability and by denying him employment
opportunities; and (2) discriminated against him and/
or retaliated against him, in violation of the ADA,
by subjecting him to undue scrutiny and criticism. In
the discussion that follows, the court considers each
defendant individually.

### 1. Dartmouth–Hitchcock

Dartmouth–Hitchcock is entitled to judgment as a matter
of law on the merits of Dr. Isaacs' ADA claims. Those
claims, in turn, involve three separate theories of liability:
(1) disability discrimination in the form of failure to
accommodate; (2) disability discrimination in the form of
other adverse employment actions; and (3) retaliation.

### a. Failure to Accommodate

Dr. Isaacs alleges that he has "a well-established
neuropsychiatric disability stemming from a 1997 [head]
injury," Am. Compl. ¶ 25, and that "his mental
impairments substantially limit one or more major life
activities," id. ¶ 39. He asserts that Dartmouth–Hitchcock
violated the ADA by denying requests for reasonable
accommodations that he made on four occasions: (1)
in early September of 2011, see id. ¶¶ 55, 57; (2) on
Thanksgiving weekend, see id. ¶¶ 61–62; (3) "[s]everal days
later," id. ¶ 63; and (4) "over the next few weeks," id. ¶ 65.
The Hitchcock defendants argue that the evidence in the
summary-judgment record is insufficient to demonstrate
that Dr. Isaacs ever made a sufficiently specific request for
an accommodation. The court agrees.

"The ADA prohibits discrimination against a 'qualified
individual' because of the individual's disability 42 U.S.C.
§ 12112(a), a prohibition which includes any failure to
make 'reasonable accommodations to the known physical
or mental limitations of an otherwise qualified individual
with a disability,' id. § 12112(b)(5)(A)." Valle–Arce v. P.R.
Ports Auth., 651 F.3d 190, 197–98 (1st Cir.2011) (citing
Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir.2002)).
With regard to the elements of an ADA discrimination
claim:

> Under McDonnell Douglas Corp.
> v. Green, 411 U.S. 792 (1973),
> a plaintiff in a disability
> discrimination case must first make
> out a three-factor prima facie case.
> Ordinarily, the plaintiff must show
> that he (1) is disabled within
> the meaning of the ADA; (2) is
> qualified to perform the essential
> functions of his job with or without
> a reasonable accommodation; and
> (3) was discharged or otherwise
> adversely affected in whole or
> in part because of his disability.
> See Richardson v. Friendly Ice
> Cream Corp., 594 F.3d 69, 74 (1st
> Cir.2020); García–Ayala v. Lederle
> Parenterals, Inc., 212 F.3d 638, 646
> (1st Cir.2000).

*7  Jones v. Nationwide Life Ins. Co., 696 F.3d 78,
86–87 (1st Cir .2012) (footnote and parallel citations
omitted). While the Hitchcock defendants say that they
"assume that a prima facie case can be made," Defs.'
Mem. of Law (doc. no. 144) 10, that appears to be a
misstatement because, rather than arguing that there was
a non-pretextual reason for denying Dr. Isaacs' requests
for accommodations, at the third step of the McDonnell
Douglas analytical framework, they argue that Dr. Isaacs
never made a proper request for an accommodation in the
first instance, which is a challenge to his prima facie case.

To establish the third element of a prima facie case of
disability discrimination, where the adverse employment
action alleged by the plaintiff is a failure to provide a
reasonable accommodation, "the plaintiff must show that
the employer knew about plaintiff's disability and did not
reasonably accommodate it." Jones, 696 F.3d at 89 (citing

2014 WL 1572559, 2014 DNH 086

*Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 102 (1st Cir.2007); *Rocafort v. IBM Corp.,* 334 F.3d 115, 119 (1st Cir.2003)). The *Jones* court continued:

A plaintiff must explicitly request an accommodation, unless the employer otherwise knew one was needed. *Freadman,* 484 F.3d at 102. An accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability. *Id.; see also Tobin v. Liberty Mut. Ins. Co.,* 553 F.3d 121, 129 (1st Cir.2009). The obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation. B. Lindemann & P. Grossman, *Employment Discrimination Law* ch. 5.III, at 269 (4th ed.2007) (citing 29 C.F.R. § 1630.2(o) app. (2005)). This means not only notice of a condition, but of a "causal connection between the major life activity that is limited and the accommodation sought." *Id.* ch. 13.VI.D.1, at 880 (quoting *Wood v. Crown Redi–Mix, Inc .,* 339 F.3d 682, 687 (8th Cir.2003)) (internal quotation mark omitted).

696 F.3d at 89.

Here, Dr. Isaacs' amended complaint includes these allegations concerning his request for an accommodation: (1) "[i]n early September Plaintiff requested medical leave or an accommodation for his disability," Am. Compl. ¶ 55; (2) "after being informed of Plaintiff's condition Defendant Finn refused any accommodation for the Plaintiff's disability," *id.* ¶ 58; (3) "[d]uring an overnight Thanksgiving shift, Plaintiff ... requested immediate medical leave to a supervising fellow," *id.* ¶ 61; (4) "[s]everal days later the Plaintiff requested medical leave directly from his Program Director Defendant Finn," *id.* ¶ 63; and (5) "[p]laintiff, over the next few weeks, requested accommodations from his Program Director Defendant Finn," *id.* ¶ 65. Those allegations provide little if any additional detail concerning how, exactly, Dr. Isaacs framed his requests, and the conclusory nature of those allegations makes it difficult to conclude that Dr. Isaacs has alleged enough to state a claim that he made requests for accommodations that comply with the requirements of *Jones.*

**\*8** In any event, at summary judgment, Dr. Isaacs has failed to produce evidence that creates a triable issue on that element of his claim. For one thing, it is undisputed that Dr. Isaacs himself concealed his alleged

disability from Dartmouth–Hitchcock in the paperwork he completed in connection with the start of his residency and, in addition, expressly declined to ask for any accommodation. *See* Defs.' Mem. of Law, Ex. 16 (doc. no. 144–17). Beyond that, the only evidence in the record concerning Dr. Isaacs' alleged requests for an accommodation is this, drawn from a note to the file written by Dr. Finn on November 29, 2011:

> He inquired about "part time" work for this year. I let him know that [the first year of a residency] is not well suited to part time work, other than alternating months off and on services. He agrees to remain at a regular schedule for now.

*Id.,* Ex. 20 (doc. no. 134–21 (sealed)), at 10. Dr. Finn's note demonstrates neither a properly framed request for an accommodation, under *Jones,* nor a denial of such a request.

Based upon the foregoing, the court concludes that Dr. Isaacs has failed to establish a prima facie case that he was denied a reasonable accommodation, which entitles Dartmouth–Hitchcock to judgment as a matter of law on the failure-to-accommodate claim asserted in Count I.

*b. Other Disability Discrimination*

Dr. Isaacs also claims that Dartmouth–Hitchcock discriminated against him by: (1) denying him permission to participate in both a research project with Dr. Paul Holtzheimer and the Leadership in Preventive Medicine Residency ("LPMR") program; and (2) subjecting him to "intense" scrutiny and unwarranted criticism.

With respect to the alleged denial of employment opportunities, defendants contend that Dr. Isaacs was not qualified for the LPMR program in the first instance. The court agrees.

On November 29, 2011, Dr. Finn met with Dr. Isaacs, and she reported the following discussion:

Exhibit 6 - Page 42

> Jeff requested the opportunity to
> pursue the LPMR program after this
> year. I let him know that generally
> the PGY–1 and 2 years must
> be successfully completed in order
> to participate in this additional
> training, and that this would likely
> not be possible for next year.

Defs.' Mem. of Law, Ex. 20 (doc. no. 134–21 (sealed))
at 11; *see also* Chabot Decl., Ex. L, Torrey Dep. (doc.
no. 145–12) 156–57, Oct. 17, 2013 (explaining that LPMR
program was for residents in good standing in other
specialty areas). Dr. Finn concluded her November 29
note by stating that Dr. Isaacs "ha[d] not successfully
completed [his] performance improvement plan." Defs.'
Mem. of Law, Ex. 20 (doc. no. 134–21 (sealed)), at 11.
At his deposition, Dr. Isaacs testified that support from
his program director, Dr. Finn, was a prerequisite for
admission to the LPMR program and that, because she
would not support him, he declined to make a formal
application. *See* Chabot Decl., Ex. G, Isaacs Dep. (doc.
no. 145–7) 291:5, Dec. 13, 2013. He further testified that
when he spoke with Dr. Finn about his interest in the
LPMR program in late November or early December,
"[s]he said that [he] wasn't competitive and that she
couldn't support [his] joining the program." *Id.* at 290:12–
14.

**\*9** Based upon the foregoing, it is undisputed that Dr.
Isaacs was not qualified for the LPMR program because
he had not completed the first two years of his residency in
psychiatry. Thus, as to that aspect of the claim asserted in
Count I, Dr. Isaacs has failed to establish his prima facie
case.

The Hitchcock defendants do not, however, address
Dr. Isaacs' claim that he was subjected to disability
discrimination when "[d]efendant Finn denied [him]
permission ... to participate" in a research project with
Dr. Holtzheimer. Am. Compl. ¶ 75. While the lack of
an argument on this aspect of Dr. Isaacs' ADA claim
would ordinarily preclude the court from reaching it,
plaintiff's own deposition testimony demonstrates that he
cannot establish the third element of his prima facie case,
i.e., an adverse employment action. At his deposition,

Dr. Isaacs testified that during the fall of 2011, he
discussed with Dr. Finn the possibility of his working
with Dr. Holtzheimer on a grant-funded research project.
*See* Chabot Decl., Ex. G, Isaacs Dep. (doc. no. 145–7)
282–86, Dec. 13, 2013. He also testified that Dr. Finn
did not forbid him to submit a grant proposal, *see id.*
287:23, but, rather, steered him away from doing so by
telling him that he was "struggling," *id.* at 285:10, and
that "typically first-year interns don't do research," *id.* at
285:10–11. In other words, based upon Dr. Isaacs' own
testimony, he did not pursue a research opportunity with
Dr. Holtzheimer by his own choice, and there is no way the
court could possibly characterize Dr. Isaacs' own decision
as an adverse employment action. Thus, Dr. Isaacs cannot
establish the third element of a discrimination claim based
upon the fact that he did not participate in a research
project with Dr. Holtzheimer.

Finally, the court turns to Dr. Isaacs' assertion that Dr.
Finn's close scrutiny and criticism of his performance
was yet another incident of disability discrimination.
With respect to this aspect of Count I, the Hitchcock
defendants' concession that Dr. Isaacs has established his
prima facie case comes into play, and the court turns to
the remaining steps of the *McDonnell Douglas* framework:

> If [the plaintiff] establishes a *prima
> facie* case, the burden shifts to the
> employer to articulate a legitimate,
> non-discriminatory reason for its
> action. *Freadman v. Metro. Prop.
> & Cas. Ins. Co.,* 484 F.3d 91, 99
> (1st Cir.2007); *see also McDonnell
> Douglas Corp.,* 411 U.S. at 802.
> If the employer offers a non-
> discriminatory reason, the burden
> then shifts back to the plaintiff
> to show that the employer's
> justification is mere pretext cloaking
> discriminatory animus. *Freadman,*
> 484 F.3d at 99.

*Ramos–Echevarría v. Pichis, Inc.,* 659 F.3d 182, 186–87
(1st Cir.2011) (parallel citations omitted).

Here, defendants have articulated a legitimate, non-
discriminatory reason for Dr. Finn's close scrutiny and

Exhibit 6 - Page 43

criticism of Dr. Isaacs, *i.e.,* his poor performance as a resident. Dr. Isaacs' deficiencies, in turn, are documented by any number of communications to Dr. Finn from others involved in his training, and complaints about Dr. Isaacs' performance began shortly after he started his residency. *See, e.g.,* Defs.' Mem. of Law, Ex. 20 (doc. no. 134–21 (sealed)), at 1–6, 15–17, 29, 31–34. Thus, the Hitchcock defendants have carried their burden at step two of the *McDonnell–Douglas* framework.

**\*10** Dr. Isaacs has not responded to the Hitchcock defendants' summary-judgment motion. As a consequence, he has not carried his burden of showing that defendants' reason for Dr. Finn's scrutiny of his performance is pretextual. Moreover, any attempt to do so would be futile.

> "[T]here is no mechanical formula for finding pretext." *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 39 (1st Cir.2003) (internal quotation marks omitted). Instead, "[i]t is the type of inquiry where 'everything depends on the individual facts.' " *Id.* at 40 (quoting *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 57 (1st Cir.1999)). The inquiry focuses on whether the employer truly believed its stated reason for taking action adverse to the employee. *See Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 7 (1st Cir.2000).

*Kelley v. Corr. Med. Servs., Inc.,* 707 F.3d 108, 116 (1st Cir.2013). It is undisputed that Dr. Finn began paying close attention to Dr. Isaacs after she had received multiple critical assessments of both his medical skills and other aspects of his performance, including punctuality, preparedness, and communication. There is simply no basis in the record for doubting that Dr. Finn believed that Dr. Isaacs was struggling as a resident and that his struggles merited the enhanced scrutiny she gave his performance.

### c. Retaliation

Finally, in addition to asserting that the close scrutiny he was given was discriminatory, Dr. Isaacs also asserts that Dr. Finn's close supervision and criticism were acts of retaliation. The Hitchcock defendants do not address that aspect of Count I. Under normal circumstances, that would preclude the court from granting Dartmouth–Hitchcock summary judgment on that claim, but not here. As for the mechanics of an ADA retaliation claim, the court of appeals has recently explained:

A retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII. *See Freadman v. Metro. Prop. and Cas. Ins. Co.,* 484 F.3d 91, 106 (1st Cir.2007); *see also Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1st Cir.1997) (observing that "guidance on the proper analysis of [an] ADA retaliation claim is found in Title VII cases"). To make out a prima facie retaliation claim, the plaintiff must show that: "(1) [he] engaged in protected conduct; (2)[he] experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 25 (1st Cir.2004). Once the plaintiff has made a prima facie showing of retaliation, the defendant "must articulate a legitimate, non-retaliatory reason for its employment decision." *Id.* at 26. If the defendant meets this burden, the plaintiff must show that the proffered legitimate reason is pretextual and that "the job action was the result of the defendant's retaliatory animus." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U .S. 502, 510–11 (1993)).

**\*11** *Kelley,* 707 F.3d at 115 (parallel citations omitted). Given the court's determination, in the context of Dr. Isaacs' discrimination claim, that he failed to carry his burden of showing that defendants' explanation for closely scrutinizing his performance was pretextual, the court has no difficulty concluding that his retaliation claim also fails, at the third step of the *McDonnell Douglas* framework.

### d. Summary

Dartmouth–Hitchcock is entitled to judgment as a matter of law on Dr. Isaacs' claims that it violated the ADA by: (1) denying him a reasonable accommodation; (2) discriminating against him by denying him the opportunity to participate in the LPMR program or pursue a research opportunity with Dr. Holtzheimer; or (3) retaliating against him.

### 2. Mary Hitchcock

Mary Hitchcock is entitled to judgment as a matter of law on Count I because Dr. Isaacs has failed to properly assert an ADA claim against it. The ADA provides, in pertinent part:

Exhibit 6 - Page 44

The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides ... to any person alleging discrimination on the basis of disability in violation of any provision of this chapter ... concerning employment.

42 U.S.C. § 12117(a); *see also Loubriel v. Fondo del Seguro del Estado,* 694 F.3d 139, 142 (1st Cir.2012). 42 U.S.C. § 2000e–5, in turn, provides that "a claimant [such as Dr. Isaacs] who seeks to recover for an asserted violation of Title I of the ADA ... first must exhaust administrative remedies by filing a charge with the EEOC, or alternatively, with an appropriate state or local agency, within the prescribed time limits." *Bonilla v. Muebles J. J. Alvarez, Inc.,* 194 F.3d 275, 278 (1st Cir.1999). As for the relevant time limits, the statute provides, in pertinent part, that

[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge ... shall be served upon the person against whom such charge is made ... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty

days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier....

42 U.S.C. § 2000e–5(e)(1). Dr. Isaacs served a charge on Dartmouth–Hitchcock, but has never served a charge on Mary Hitchcock. The time for doing so has long passed. Thus, Dr. Isaacs' ADA claim against Mary Hitchcock is barred, *see Bonilla,* 194 F.3d at 278 (citations omitted), which entitles Mary Hitchcock to judgment as a matter of law on Count I.

### 3. The Trustees

**\*12** Dr. Isaacs has never served the College with a charge of discrimination, and the time for doing so has passed. Accordingly, the Trustees are also entitled to judgment as a matter of law on Dr. Isaacs' ADA claim.

### B. Count II

In Count II, Dr. Isaacs asserts a claim for wrongful discharge against Dartmouth–Hitchcock. Specifically, he claims that Dartmouth–Hitchcock violated the common law of New Hampshire by discharging him for: (1) notifying the president of the Dartmouth College, on January 15 and February 6, 2011, of "alleged violations of Dartmouth's Business ethics guidelines," Am. Compl. ¶ 81; (2) filing an official ethics complaint with the president on January 15; and (3) filing a complaint under the Health Insurance Portability and Accountability Act, which Dartmouth–Hitchcock learned of on March 16, three days before he was dismissed from his residency. Dartmouth–Hitchcock is entitled to summary judgment on Count II because even assuming that Dr. Isaacs was an at-will employee of Dartmouth–Hitchcock, a proposition that is subject to legitimate dispute, the undisputed evidence demonstrates that he was not discharged for engaging in conduct that public policy would encourage.

The court begins by describing the elements of Dr. Isaacs' claim.

In order to succeed on a wrongful discharge claim, a plaintiff must establish two elements: (1) that the discharge was "motivated by bad faith, retaliation or malice"; and (2) that the plaintiff was discharged "for performing an act that public policy would encourage

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 47 of 264   Page
ID #:1722
Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)
2014 WL 1572559, 2014 DNH 086

or for refusing to do something that public policy would
condemn."

*Leeds v. BAE Sys.,* 165 N.H. 376, 379 (2013) (quoting
*Karch v.. BayBank FSB,* 147 N.H. 525, 536 (2002)).
Here, presuming that dismissal from his residency is
the legal equivalent of being discharged, defendants have
produced a substantial amount of evidence that Dr.
Isaacs was discharged for: (1) his poor performance as
a resident; and (2) his dishonesty during the application
process. Regarding the former, the record includes: (1)
documentation of extensive discussion among multiple
Dartmouth–Hitchcock doctors concerning Dr. Isaacs'
performance deficiencies; (2) documentation concerning
Dr. Isaacs' placement on a PIP and associated follow-
up; (3) documentation of the meeting at which Dr.
Isaacs was placed on administrative leave; and (4) Dr.
Isaacs' letter of dismissal. Dartmouth–Hitchcock's long,
well-documented history of dealing with Dr. Isaacs,
and attempting to help him overcome his performance
deficiencies, is evidence that he was discharged for failing
to correct those deficiencies. For his part, Dr. Isaacs has
produced no evidence to create a triable issue of fact on
the reasons for his discharge. Thus, the court is compelled
to rule, as a matter of law, that Dr. Isaacs was discharged
for the reasons stated in his letter of dismissal, i.e., his
poor performance as a resident and his dishonesty when
applying to Dartmouth–Hitchcock.

**\*13**  Having determined that there is no genuine issue of
material fact concerning the reasons why Dr. Isaacs was
dismissed, *see Travers v. Flight Servs. & Sys., Inc.,* 737 F.3d
144, 146 (1st Cir.2013) (explaining that a factual "dispute
[is] genuine if a reasonable jury, drawing favorable
inferences, could resolve it in favor of the nonmoving
party") (citation and internal quotation marks omitted),
the court turns to the issue of public policy. "[O]rdinarily
the issue of whether a public policy exists is a question
for the jury." *Leeds,* 165 N.H. at 379 (quoting *Short v.
Sch. Admin. Unit No. 16,* 136 N.H. 76, 84 (1902)). Here,
however, because the court is confident that there is no
public policy that would encourage a medical resident to
perform his duties poorly, or misrepresent his educational
background when applying for a residency, this is one of
those cases where "the presence or absence of ... a public
policy is so clear that [the] court may rule on its existence
as a matter of law, and take the question away from the
jury." *Leeds,* 165 N.H. at 379 (citation omitted). Because,
as a matter of law, the conduct for which Dr. Isaacs
was discharged included no acts that public policy would

encourage, Dartmouth–Hitchcock is entitled to judgment
as a matter of law on Count II.

### C. Count III
In Count III, Dr. Isaacs asserts claims under RSA 354–
A against the three institutional defendants. They argue
that they are entitled to summary judgment due to Dr.
Isaacs' failure to file a complaint with the New Hampshire
commission for human rights. They are correct.

Under New Hampshire's Law Against Discrimination, a
person wishing to bring a civil action seeking redress for a
violation of RSA 354–A may do so only "at the expiration
of 180 days after the timely filing of a complaint with
the commission, or sooner if the commission assents in
writing." RSA 354–A:21–a, I. Here, as Dr. Isaacs has
neither alleged nor produced evidence that he ever filed
a complaint with the commission, and as the time for
doing so has passed, see RSA 354–A:21, III, the three
institutional defendants are entitled to judgment as a
matter of law on Count III.

### D. Count IV
In Count IV, Dr. Isaacs asserts a claim for breach
of contract against Dartmouth–Hitchcock. The precise
contours of that claim are somewhat difficult to ascertain.
Accordingly, the court quotes liberally from the amended
complaint:

> Plaintiff signed and accepted an Agreement
> of Appointment an[d] eight additional forms,
> applications, an[d] agreements sent to him by
> [Dartmouth–Hitchcock] human resources.
>
> ....
>
> By beginning his employment under these contracts
> on or around June 26th, 2011 Plaintiff was fully
> reliant on Defendant's promises therein. Including
> the Administrative Leave and termination provisions
> contained therein.
>
> On January 13th 2012, Defendant Finn and the rest of
> Plaintiff's program directors verbally informed Plaintiff
> that he was being placed on immediate Administrative
> Leave.

**\*14**  Upon information and good faith belief, the
[Dartmouth–Hitchcock] handbook, regulations, and

2014 WL 1572559, 2014 DNH 086

documents provided to the Plaintiff as a new hire, require a more [thorough] written record prior [to] denying requests for accommodation, and prior to termination.

[Dartmouth–Hitchcock] breached [its] own rules [and] regulations in denying Plaintiff[']s requests for accommodation and ultimately in his termination.

Defendants therefore breached the contract that they had with Plaintiff, all to his detriment and damage.

Am. Compl. ¶¶ 118, 121–25. Given the sketchiness of the foregoing allegations, it is not so clear that Count IV could even survive a motion to dismiss. That said, as best the court can tell, the claim in Count IV is that Dartmouth–Hitchcock breached an agreement with Dr. Isaacs by failing to provide him with "a more thorough written record prior to denying [his] requests for accommodation, and prior to [his] termination," *id.* ¶ 123. Dartmouth–Hitchcock is entitled to judgment as a matter of law on Count IV.

Under New Hampshire law, "[a] breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." *Audette v. Cummings,* —— N.H. ——, ——, 82 A.3d 1269, 1273 (2013) (quoting *Lassone v. Stanton,* 157 N.H. 582, 588 (2008)). The only contract that Dr. Isaacs identifies with any specificity in his amended complaint, and the only contract document in the summary-judgment record, is the employment agreement between Dr. Isaacs and Mary Hitchcock. While Dr. Isaacs alleges that he signed other "agreements sent to him by [Dartmouth–Hitchcock] human resources," Am. Compl. ¶ 118, his amended complaint does not specifically identify any such agreements or describe their contents.

Dr. Isaacs alleges, generally, in paragraph 123, that a "handbook, regulations and documents" provided to him by Dartmouth–Hitchcock at the start of his residency required Dartmouth–Hitchcock to provide him with a "more thorough written record" than the one he received. But, he never alleges: (1) what, precisely, he was due; (2) what, in fact, he received; and (3) how the written record provided to him was less than what he was due. Moreover, Dr. Isaacs alleges no facts that would establish that by breaching its own rules and regulations, Dartmouth–Hitchcock breached any agreement it had made with him. On the other hand, the employment agreement between

Mary Hitchcock and Dr. Isaacs includes a provision that incorporates, into that agreement, "[t]he Graduate Medical Education *Policies and Procedures Manual for Residents and Fellows.*" Defs.' Mem. of Law, Ex. 18 (doc. no. 144–19), at 1. Thus, it would appear that a failure to provide any documentation required by the *Manual* would be a breach of contract by Mary Hitchcock, not a breach by Dartmouth–Hitchcock.

In any event, in response to the summary-judgment motion filed by the Hitchcock defendants, in which they argue that Dartmouth–Hitchcock had no contractual relationship with Dr. Isaacs, he has produced no evidence that would create a triable issue regarding the existence of any contract between himself and Dartmouth–Hitchcock or the terms thereof. Absent a contract, there can be no breach of contract, which entitles Dartmouth–Hitchcock to judgment as a matter of law on Count IV.

**\*15** While there is no need to say more, the court turns, briefly, to the adequacy of the written record Dr. Isaacs was provided. As noted, his employment agreement with Mary Hitchcock incorporated, by reference, the GME *Policies and Procedures Manual.* Portions of the *Manual* are included in the summary-judgment record, as an attachment to the letter of dismissal that Dr. Isaacs received from Dartmouth–Hitchcock. *See* Defs.' Mem. of Law, Ex. 1 (doc. no. 144–2), at 3–6. The portion of the *Manual* attached to Dr. Isaacs' dismissal letter says nothing about the written record that must be provided prior to denying a request for an accommodation. But, it does include a procedure for notification of non-renewal, dismissal, or other concerns. That procedure begins with this step:

> The Resident shall be informed in writing of the documented deficiencies or allegations and of the recommendation for non-renewal, dismissal or remedial training in a private meeting with the Program Director or a duly appointed representative. At this meeting or as soon thereafter as possible, the resident shall be provided with a copy of this policy.

Exhibit 6 - Page 47

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 49 of 264   Page
ID #:1724
Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)
2014 WL 1572559, 2014 DNH 086

Defs.' Mem. of Law, Ex. 1 (doc. no. 144–2), at 3. The *Manual* then goes on to outline an appeal process. Here, it is undisputed that: (1) Dr. Isaacs was informed of his deficiencies in writing; (2) he was provided with a copy of the policy outlined in the *Manual;* and (3) he began, but later abandoned, the appeal process described therein. Thus, there appears to be no basis for any claim that Dr. Isaacs' dismissal failed to comply with the requirements stated in the *Manual.*

To sum up, Dr. Isaacs has failed to produce evidence of any promise that Dartmouth–Hitchcock made to him but failed to perform. Because Dartmouth–Hitchcock is the only defendant against which Dr. Isaacs has made a claim for breach of contract, Dartmouth–Hitchcock is entitled to judgment as a matter of law on the breach-of-contract claim asserted in Count IV.

### E. Count V

In Count V, Dr. Isaacs asserts a claim for breach of the covenant of good faith and fair dealing, against Dartmouth–Hitchcock. Dr. Isaacs bases Count V on *Centronics Corp. v. Genicom Corp.,* 132 N .H. 133 (1989) and, in particular, on that opinion's statement that "an employer violates an implied term of a contract for employment at-will by firing an employee out of malice or bad faith in retaliation for action taken or refused by the employee in consonance with public policy," *id.* at 140 (citing *Cloutier v. Great Atl. & Pac. Tea Co.,* 121 N.H. 915, 921–22 (1981)). [3] Dartmouth–Hitchcock is entitled to judgment as a matter of law on Count V for the same reason that Count II fails; the conduct for which Dr. Isaacs was discharged included no acts that public policy would disfavor.

### F. Count VI

In Count VI, Dr. Isaacs asserts claims for negligent misrepresentation against all four defendants. He bases those claims upon an allegation that on one occasion, after he asked for an accommodation for his alleged disability, "[d]efendant Finn told [him] that 'accommodations are difficult to arrange for an intern.' " Am. Compl. ¶ 141. That is the only false statement alleged in Count VI. As for when that statement was made, Dr. Isaacs alleges only that it followed one of his four requests for an accommodation, *see id.* ¶ 67, requests that, he alleges, spanned the fall and winter of 2011, *see id.* ¶¶ 55, 61, 63, 65. Count VI fails

because it is based upon a statement of opinion rather than a statement of material fact.

**\*16** Count VI, as pled in the amended complaint, rests upon a single allegedly false statement, Dr. Finn's statement that "accommodations are difficult to arrange for an intern." Am. Compl. ¶ 141. Because Dr. Isaacs has not further amended his complaint to include any other statements, the court limits its consideration to the single statement quoted above.

"The elements of ... a claim [for negligent misrepresentation] are a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." *Wyle v. Lees,* 162 N.H. 406, 413 (2011) (citing *Snierson v. Scruton,* 145 N.H. 73, 78 (2000)).

There are several different problems with Count VI. First and foremost, the statement upon which Dr. Isaacs bases his claim for negligent misrepresentation is a statement of opinion rather than a statement of fact. What one person might find difficult to arrange could well be regarded by another person as easy to arrange. Whether something is "difficult to arrange" is a quintessential statement of opinion. Statements of opinion, however, do not generally provide a proper basis for a claim of misrepresentation, *see DePalantino v. DePalantino,* 139 N.H. 522, 523 (1995), and there are no allegations in the amended complaint that would support a deviation from that general rule, *see id.* (citing *Shafmaster v. Shafmaster,* 138 N.H. 460, 464 (1994); *Eno Brick Corp. v. Barber–Greene Co.,* 109 N.H. 156, 158 (1968)).

Dr. Isaacs' allegations concerning the falsity of Dr. Finn's statement reinforce the court's conclusion that the statement is an unactionable statement of opinion. After quoting Dr. Finn's statement, the amended complaint continues: "This representation was untruthful because [Dartmouth–Hitchcock] is required by law to make reasonable accommodations for all employees with disabilities under the ADA, NH RSA 358:A [4] and Section 504 of the Rehabilitation Act of 1973." Am. Compl. ¶ 142.

Assuming, for the sake of argument, that Dartmouth–Hitchcock did have some legal obligation to provide Dr. Isaacs with a reasonable accommodation, and that the statement at issue was a statement of fact rather than a statement of opinion, the existence of such an obligation has no bearing on the accuracy of Dr. Finn's statement. All

Exhibit 6 - Page 48

Dr. Finn is alleged to have said is that an accommodation for an intern would be difficult to arrange. For that statement to be inaccurate, it must have been the case that accommodations for interns were *not* difficult to arrange, and Dr. Isaacs has alleged no facts to support that proposition, nor has he produced any evidence at summary judgment to create a triable dispute on this issue.

To summarize, all four defendants are entitled to judgment as a matter of law on the claim for negligent misrepresentation asserted in Count VI, because the statement on which that claim is based is an unactionable statement of opinion rather than a statement of material fact.

### G. Count VII

**\*17** In Count VII, Dr. Isaacs asserts claims for discrimination and retaliation under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), against Dartmouth–Hitchcock, Mary Hitchcock, and the Trustees. Specifically, he claims that those defendants discriminated against him by denying him a reasonable accommodation for his disabilities, and that they either discriminated or retaliated against him by denying him: (1) permission to participate in the LPMR program; and (2) access to a research opportunity with Dr. Holtzheimer. [5] The Dartmouth defendants argue that the Trustees are entitled to summary judgment on Count VII because: (1) Dr. Isaacs never applied to participate in any Dartmouth program that received federal funding; and (2) he was not qualified for any of the programs he applied for, given his inability to keep up with his regular workload. For reasons that are not clear, the Dartmouth Defendants do not address, in any way, Dr. Isaacs' claim that they are liable to him under the Rehabilitation Act for failing to provide him with a reasonable accommodation, nor do they specifically address his retaliation claims. The Hitchcock defendants argue that they are entitled to summary judgment on Count VII for the same reasons that entitle them to summary judgment on the ADA claim asserted in Count I. The court considers, in turn, the arguments made by the Dartmouth defendants and the Hitchcock defendants.

### 1. The Dartmouth Defendants' Arguments

The Dartmouth defendants first argue that Dr. Isaacs' Rehabilitation Act claim fails because, even though some of Dartmouth College's programs "arguably receive[ ]

grant funding for faculty research projects, plaintiff never applied to those programs ." Defs.' Mem. of Law (doc. no. 133–1) 14. That argument is unavailing.

The court begins with the language of the Rehabilitation Act, which provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...

29 U.S.C. § 794(a). Three decades ago, the United States Supreme Court held that the foregoing language limited the Rehabilitation Act's "ban on discrimination to the specific program that receives federal funds." *CONRAIL v. Darrone,* 465 U.S. 624, 635 (1984). But, Congress subsequently amended the statute to broaden its coverage. Shortly thereafter, the court of appeals explained:

> At the time the complaint [in the case before it] was filed, the Supreme Court had interpreted section 504 to apply only to specific programs that received federal financial aid, and not to programs that received no federal financial aid, even if other programs within the same institution received federal financial aid. *Grove City College v. Bell,* 465 U.S. 555 (1984); *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624 (1984).

**\*18** In 1988, however, Congress amended section 504 by passing the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28, 29 (1988) (the 1988 amendments), which was designed to "overturn" the holding of the Supreme Court's decisions in *Grove City* and *Darrone. See* S.Rep. No. 64, 100th Cong., 2nd Sess. 2, reprinted in 1988 *U.S.Code Cong. & Admin. News* 3, 3–4. The Civil Rights Restoration Act mandates that any program in an institution that receives federal financial aid, no matter how specific the purpose or program for which that aid is given, must follow the guidelines of the Rehabilitation Act of 1973.

Exhibit 6 - Page 49

2014 WL 1572559, 2014 DNH 086

*Leake v. L.I. Jewish Med. Ctr.,* 869 F.2d 130, 131 (2d Cir.1989) (parallel citations omitted); *see also DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1383–84 (10th Cir.1990); *Lussier v. Dugger,* 904 F.2d 661, 663–64 (11th Cir.1990)). Thus, the Act now provides that "the term 'program or activity' means all the operations of ... a college, university, or other postsecondary institution ... or ... an entire corporation ... any part of which is extended Federal financial assistance." 42 U.S.C. §§ 794(b)(2)(A) & (b)(3)(A).

As a result of Congress's amendment of the Rehabilitation Act, the proper test for determining whether the Trustees may be subject to liability under it is not whether Dr. Isaacs applied to or participated in a specific Dartmouth College program that received federal funding but, rather, whether any part of Dartmouth College receives any federal financial assistance. Dr. Isaacs makes no such allegation in his amended complaint. Therefore, Count VII may well have been vulnerable to dismissal, for failure to state a claim, if the Trustees (or either of the other two institutional defendants) had filed a Rule 12(b)(6) motion based upon Dr. Isaacs' failure to allege that they received federal funds. But that ship seems to have sailed, and here we are at summary judgment.

Rather than being able to get by on the deficiencies of Dr. Isaacs' amended complaint, the Trustees, in the current procedural posture, must produce uncontroverted evidence that Dartmouth College receives no federal funds. They have not done so and, to the contrary, have come close to conceding that Dartmouth College does, in fact, receive some federal funding, albeit for programs in which Dr. Isaacs did not take part. The long and the short of it is that, notwithstanding Dr. Isaacs' failure to allege that Dartmouth College receives federal funds, the Trustees are not entitled to judgment as a matter of law on Dr. Isaacs' Rehabilitation Act claim based upon their argument concerning federal funding. *Cf. Lee v. Trs. of Dartmouth Coll.,* 958 F.Supp. 37 (D.N.H.1997) (reaching the merits of neurosurgery resident's Rehabilitation Act claim against the Trustees of Dartmouth College, Dartmouth–Hitchcock, and Mary Hitchcock).

The Dartmouth defendants next argue that that even if Dartmouth College did deny Dr. Isaacs access to the LPMR program, the Trustees cannot be liable to him for discrimination under the Rehabilitation Act because

he was not qualified, in the first instance, to participate in that program. Given that "the same standards apply to both the Rehabilitation Act and ADA," *Enica v. Principi,* 544 F.3d 328, 338 n. 11 (1st Cir.2008) (citing *Calero–Cerezo,* 355 F.3d at 23); *see also* 29 U.S.C. § 794(d), the court's determination that Dr. Isaacs failed to establish a prima facie case of discrimination under the ADA based upon Dr. Finn's decision not to support his participation in the LPMR program also entitles the Trustees to judgment as a matter of law on Dr. Isaacs' parallel Rehabilitation Act discrimination claim. The same reasoning necessarily applies to the portion of Count VII in which Dr. Isaacs claims that Dartmouth College discriminated against him in violation of the Rehabilitation Act when Dr. Finn dissuaded him from pursuing a research project with Dr. Holtzheimer.

**\*19** As noted, the Dartmouth defendants do not address Dr. Isaacs' Rehabilitation Act accommodation claim in their motion for summary judgment. That omission, however, is of no moment because the court's determination that Dr. Isaacs did not establish his ADA accommodation claim applies with full force to the accommodation claim he asserts under the Rehabilitation Act in Count VII. *See Enica,* 544 F.3d at 338 n. 11.

The retaliation claims that Dr. Isaacs asserts against the Trustees in Count VII, however, stand on a somewhat different footing than the discrimination claims. Count I includes a retaliation claim based upon Dr. Finn's intensive scrutiny of Dr. Isaacs, but no retaliation claim based upon the way in which Dr. Finn responded to Dr. Isaacs' interests in the LPMR program and doing research with Dr. Holtzheimer. Accordingly, the court's disposition of Count I does not dictate its disposition of the retaliation claims asserted Count VII. Thus, the court must address those claims more specifically.

As for the elements of a retaliation claim under the Rehabilitation Act,

> the plaintiff can make out a prima facie case by "show[ing] that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action."

*Palmquist v. Shinseki,* 689 F.3d 66, 70 (1st Cir.2012) (quoting *D.B. ex rel. Elizabeth B. v. Esposito,* 675 F.3d 26, 41 (1st Cir.2012)). The McDonnell Douglas framework

Exhibit 6 - Page 50

Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)
2014 WL 1572559, 2014 DNH 086

is also used to evaluate retaliation claims under the Rehabilitation Act. See Palmquist, 689 F.3d at 70–71.

As to the first element of Dr. Isaacs' prima facie case, it is clear that seeking a reasonable accommodation is protected conduct under the Rehabilitation Act, *see Kelley,* 707 F.3d at 115; *Enica,* 544 F.3d at 338 n. 11, and that is the conduct on which Dr. Isaacs bases his retaliation claims in Count VII. While Dr. Isaacs' amended complaint alleges nearly a half dozen requests, the summary-judgment record includes evidence on just one, made in late November of 2011. While the timing of that request calls into question Dr. Isaacs' ability to establish the causation element of his prima facie case, given his testimony concerning the timing of the allegedly retaliatory acts, the court will presume that Dr. Isaacs can establish the first and third elements of his prima facie case.

It is not so clear, however, that Dr. Isaacs has established the second element. For the purposes of a retaliation claim under the Rehabilitation Act, "[a]n adverse action is one that might well dissuade a reasonable person from making or supporting a charge of discrimination." *Esposito,* 675 F.3d at 41 (citing *Colón–Fontánez v. Mun'y of San Juan,* 660 F.3d 17, 36–37 (1st Cir.2011); *Reinhardt v. Albuq. Pub. Schs. Bd. of* Educ., 595 F.3d 1126, 1133 (10th Cir.2010)). Here, viewing Dr. Isaacs' deposition testimony in the light most favorable to him, Dr. Finn encouraged him not to apply for a grant to work with Dr. Holtzheimer, by pointing out his struggles as a first-year resident, and she declined to support an application for admission into the LPMR program, which resulted in his deciding not to submit one. Dr. Isaacs' own testimony demonstrates that in neither instance did Dr. Finn take any actual action but, rather, discussed the Holtzheimer research project and the LPMR program with Dr. Isaacs, with the result that he decided not to apply for either. It is rather a stretch to characterize anything that Dr. Finn did as an employment action and even more of a stretch to conclude that her conduct toward Dr. Isaacs would have dissuaded a reasonable person from making a charge of discrimination. Even so, the court will presume that Dr. Isaacs has established his prima facie case.

**\*20** As with Dr. Isaacs' retaliation claim under the ADA, his Rehabilitation Act retaliation claim fails at the third step of the *McDonnell Douglas* framework. The summary-judgment record is replete with evidence

concerning the legitimate non-discriminatory reasons why Dr. Finn dissuaded Dr. Isaacs from applying for a grant to do research with Dr. Holtzheimer, *i.e.,* his struggles as a first-year resident, and why she declined to support his application for the LPMR program, *i.e.,* the fact that he would be applying, as a first-year resident, for a program that is generally open to those who have completed two years of residency.

By failing to oppose the Dartmouth defendants' summary-judgment motion, Dr. Isaacs has, necessarily, failed to produce evidence that the reasons given for Dr. Finn's actions were pretextual. On the other hand, the record contains a substantial amount of evidence demonstrating that they were not. When Dr. Finn mentioned Dr. Isaacs' struggles as a resident as a reason for dissuading him from applying for a research grant, she had heard of his shortcomings from many different people at Dartmouth–Hitchcock and Mary Hitchcock, and he had been both dismissed from the medical service and placed on a PIP. There is simply no basis for questioning the sincerity of Dr. Finn's belief that Dr. Isaacs was struggling as a resident, and was ill suited to take on the additional responsibilities of a research project. The basis for Dr. Finn's belief that Dr. Isaacs was unqualified for the LPMR program is similarly self-evident. At the time she declined to give her endorsement, he was a struggling first-year resident, on a PIP, who wanted to apply for a program open to residents who had completed their first two years. Again, there is no basis for questioning the sincerity of Dr. Finn's belief that Dr. Isaacs was unqualified for the LPMR program.

Because Dr. Isaacs has produced no evidence from which the court could conclude that the reasons given for his treatment by Dr. Finn were pretextual, the Trustees are entitled to judgment as a matter of law on Dr. Isaacs' retaliation claims under the Rehabilitation Act.

*2. The Hitchcock Defendants' Arguments*
The Hitchcock defendants are entitled to judgment as a matter of law on Count VII for reasons discussed in detail above: (1) Dr. Isaacs' reasonable-accommodation claim fails because he never properly requested an accommodation; (2) his discrimination claim pertaining to participation in the LPMR program fails because he has not established the second element of his prima facie case, *i.e.,* that he was qualified for that program; (3) his discrimination claim pertaining to research with Dr. Holtzheimer fails because Dr. Isaacs has not established

Exhibit 6 - Page 51

the third element of his prima facie case, *i.e.,* an adverse employment action; and (4) his retaliation claims fail because he has produced no evidence to demonstrate that the reasons given for Dr. Finn's actions were pretextual.

### H. Count VIII

**\*21** In Count VIII, Dr. Isaacs asserts claims for fraud against all four defendants. He bases those claims on three allegedly false statements, described in his amended complaint as follows:

> Defendants throughout Plaintiff's employment, knowingly, or with conscious indifference, misrepresented Plaintiff's performance as a resident physician. Such representations had the effect of causing Plaintiff's reputation as an employee to be irreparably harmed.
>
> ....
>
> On January 13, 2012 at approximately 9:15 AM, Plaintiff was fraudulently threatened while in a meeting with Defendant Finn and another senior professor.
>
> ....
>
> On March 19, 2012 Plaintiff received a letter terminating his employment. The letter falsely alleged that he had been on formal Administrative Leave.

Am. Compl. ¶¶ 174, 180, 186. Focusing on the "statement" alleged in paragraph 174, the Hitchcock defendants argue that they are entitled to summary judgment because the undisputed record demonstrates that statement to be true. The Dartmouth defendants argue, among other things, that Dr. Isaacs cannot establish reliance upon any of the statements on which he bases his fraud claim. Neither motion for summary judgment addresses the "statements" alleged in paragraphs 180 and 186.

As to the elements of a claim for fraud, or intentional misrepresentation, the New Hampshire Supreme Court has explained:

> " '[O]ne who fraudulently makes a misrepresentation ... for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to

liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.' " *Gray v. First NH Banks,* 138 N.H. 279, 283 (1994) (quoting *Restatement (Second) of Torts* § 525, at 55 (1977)). "The tort of intentional misrepresentation, or fraud, must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation." *Patch v. Arsenault,* 139 N.H. 313, 319 (1995). "In order to withstand a motion to dismiss, the plaintiff must specify the *essential details* of the fraud, and *specifically allege* the facts of the defendant's fraudulent actions." *Jay Edwards, Inc. v. Baker,* 130 N.H. 41, 46–47 (1987) (brackets and quotation omitted).

*Tessier v. Rockefeller,* 162 N.H. 324, 331–32 (2011) (parallel citations omitted, emphasis in the original). Having described the elements of Dr. Isaacs' claim, the court turns to each of the three allegedly fraudulent statements upon which Count VII is based.

### A. Paragraph 174

To begin, the second sentence in paragraph 174, which refers to damage to Dr. Isaacs' reputation, tends to suggest a claim for defamation. *See Sanguedolce v. Wolfe,* 164 N.H. 644, 646 (2013) ("To be defamatory, the complained-of language must tend to lower the plaintiff in the esteem of any substantial and respectable group ....") (citation and internal quotation marks omitted)). But, as Dr. Isaacs cites only the law of fraud and speaks of his reliance upon the statements at issue but not their effect on any others to whom those statements may have been published, the court presumes that Dr. Isaacs is not making a defamation claim.

**\*22** It is well established, and Dr. Isaacs acknowledges, *see* Am. Compl. ¶ 174, that "[a] plaintiff cannot allege

Exhibit 6 - Page 52

fraud in general terms, but must specifically allege the essential details of the fraud and the facts of the defendants' fraudulent conduct." *Snierson,* 145 N.H. at 77 (citing *Proctor v. Bank of N.H., N .A .,* 123 N.H. 395, 399 (1983)). Dr. Isaacs' allegation, in paragraph 174 of the amended complaint, that "[d]efendants throughout [his] employment, knowingly, or with conscious indifference, misrepresented his performance as a resident physician," falls far short of the required level of specificity, which is why the court places quotation marks around the word "statement" in its discussion of paragraph 174.

After scouring the amended complaint, the court was able to locate two other statements upon which Dr. Isaacs may have intended to base his fraud claim. First, in support of the claim asserted in Count III, Dr. Isaacs alleges that "[u]pon starting work at [Dartmouth–Hitchcock he] was the subject of intense, unwarranted criticism." Am. Compl. ¶ 96. By calling his criticism "unwarranted," Dr. Isaacs appears to assert that while being criticized, his critics told him things about his performance that were not true. Precisely what untrue things they may have said, the amended complaint does not say.

Then, in support of the claims asserted in Counts I, III, VII, Dr. Isaacs alleges that in response to his request for support of his application to participate in the LPMR program, Dr. Finn told him "that he 'wasn't competitive enough.' " *Id.* ¶ 77; *see also id.* ¶¶ 114, 163. Apart from offering a conclusory allegation that he had "credentials that [met] or exceed[ed] the criteria required to participate in the [LPMR] program," *id.* ¶ 115, an allegation that is entirely at odds with the record evidence that Dr. Isaacs was a first-year resident on a PIP when he spoke with Dr. Finn about getting into a program that was generally open to residents who had completed their second years, Dr. Isaacs offers no further details concerning Dr. Finn's statement or its purported falsity. As with the allegation in paragraph 174, Dr. Isaacs' allegations concerning unwarranted criticism and Dr. Finn's statement about his qualifications for the LPMR program fall short of the level of specificity required to state a claim for fraud.

Notwithstanding the patent failure of Dr. Isaacs' amended complaint to state an adequately specific claim for fraud, the Hitchcock defendants defend against that claim on the merits. Without the specific allegations to which they are entitled by both *Tessier,* 162 N.H. at 332, and Rule 9(b) of the Federal Rules, they appear to argue, in a general

way, that none of the things that may have been said about Dr. Isaacs' performance could possibly have been false because he was, in fact, a bad resident. Given the court's inability to address Dr. Isaacs' fraud claim on a statement-by-statement basis, due to Dr. Isaacs' failure to adequately allege fraud, the better approach to Count VIII is to focus, as the Dartmouth defendants do, on the element of reliance. [6]

**\*23** The court begins by acknowledging one rather unusual aspect of the "statements" alleged in paragraph 174 as underlying Dr. Isaacs' fraud claim. Rather than being statements about something over which the speaker had superior knowledge, those statements, as vaguely as they are alleged, were statements made to Dr. Isaacs about his own performance. One would think that nobody would know more about Dr. Isaacs' performance than Dr. Isaacs himself. Be that as it may, Dr. Isaacs' basic argument is that: (1) Dr. Finn and others, knowing him to be a good resident falsely told him that he was a bad resident; (2) he believed them; and (3) he had to endure the stress of believing himself to be a bad resident when, in fact, he was a good one. That theory of reliance, however, is belied by undisputed evidence in the summary-judgment record.

Specifically, the record includes documents, some written by Dr. Isaacs himself, demonstrating that he disagreed with many of the negative assessments of his performance. For example, in a July 3, 2011, e-mail to Dr. Friedman, sent in response to being removed from the medical service, Dr. Isaacs reported that over the preceding weekend, he had: (1) filed his progress notes earlier than usual, *see* Defs.' Mem. of Law, Ex. 20 (doc. no. 134–21 (sealed)), at 19; and (2) "handled a cardiology situation more calmly than the resident," *id.* In a September 26 e-mail to Dr. Finn, regarding his PIP, Dr. Isaacs stated his belief that "sometimes [his] orders were criticized [when they] were, in fact correct." *Id.* at 8. On December 26, Dr. Isaacs sent Dr. Douglas Noordsy an e-mail in which he defended himself against a criticism for failing to change a patient's medication order. *See id.* at 26.

Beyond that, the record also includes statements by others in which they reported instances in which Dr. Isaacs challenged criticisms of his performance. *See* Defs.' Mem. of Law, Ex. 20 (doc. no. 134–21 (sealed)), at 4 (October 1 resident evaluation reporting Dr. Isaacs' justification for deciding not to write a treatment note); *id.* at 10

Exhibit 6 - Page 53

Case 2:19-cv-08000-DSF-RAO    Document 64-2    Filed 11/04/19    Page 55 of 264    Page
ID #:1730
Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)
2014 WL 1572559, 2014 DNH 086

(November 19 meeting note reporting Dr. Isaacs' focus on justifying his medical decision making); *id.* at 33 (January 11, 2012, e-mail from Dr. Friedman to Dr. Finn, reporting Dr. Isaacs' explanation for misleading treatment note). Finally, as Dr. Finn reported in her memorandum on the meeting at which Dr. Isaacs was placed on administrative leave, even at that late date, he expressed his belief that the issues that Dr. Friedman discussed with him were " 'not as bad' as the medical [ ] service has made [them] out to be." Defs.' Mem. of Law, Ex. 23 (doc. no. 134–24 (sealed)), at 1.

In sum, defendants have produced a substantial amount of uncontroverted evidence that throughout his tenure as a resident, Dr. Isaacs retained the capacity to challenge negative assessments of his performance, which demonstrates that he did not, in fact, believe them. And, if he did not believe those statements, he could hardly have relied upon them.

#### B. Paragraph 180

**\*24** Paragraph 180 asserts Dr. Isaacs' claim that he "was fraudulently threatened while in a meeting [on January 13, 2012] with Defendant Finn and another senior professor." Am. Compl. ¶ 180. As best the court can tell, the "fraudulent threat" to which Dr. Isaacs refers consisted of false statements about his performance made at the meeting in which he was threatened with dismissal from his academic program. As for reliance, the amended complaint says this:

> Plaintiff was justified in relying on the Defendants' misrepresentation [of his performance]. As an employee he had every right and expectation to trust that his Program Directors' statements and evaluations were accurate, true, and fair.

> As a result of the Defendants' misrepresentations [at the January 13 meeting] Plaintiff worked for months with the stress of believing his job performance was less than satisfactory.

*Id.* ¶¶ 183–84. As the court has already explained, defendants have produced undisputed evidence that thoroughly undermines Dr. Isaacs' theory of reliance. The fraud claim based upon paragraph 180 also fails for an even more fundamental reason. It is undisputed that Dr. Isaacs was placed on administrative leave immediately after the January 13 meeting. Thus, nothing that was said during that meeting could possibly have resulted in Dr.

Isaacs working for months under the stress of believing false statements about the quality of his performance.

#### C. Paragraph 186

In paragraph 186 of his amended complaint, Dr. Isaacs states that the letter dismissing him from Dartmouth–Hitchcock "falsely alleged that he had been on formal Administrative Leave." The amended complaint, however, does not even attempt to explain how Dr. Isaacs might have relied upon that statement, and the court is a loss as to how he might establish that element of his claim. Moreover, it is undisputed that shortly after receiving the letter containing that statement, Dr. Isaacs began to engage in the Dartmouth–Hitchcock grievance procedure, filed a charge with the EEOC, and filed his first action in this court. Thus, the undisputed record refutes any argument that Dr. Isaacs relied upon the statement in paragraph 186, to his detriment, by declining to pursue the remedies available to him. Absent justifiable reliance, there can be no claim for fraud based upon the statement in paragraph 186.

#### D. Summary

Even when the record in this case is viewed in the light most favorable to Dr. Isaacs, *see Winslow,* 736 F.3d at 29, there is no evidence that Dr. Isaacs relied, to his detriment, on any of the statements that form the basis for his fraud claim. Thus, defendants are entitled to judgment as a matter of law on the claim asserted in Count VIII.

#### I. Count IX

In Count IX, Dr. Isaacs asserts claims for intentional infliction of emotional distress, against all four defendants. In the words of the amended complaint:

> This case is one of the few cases where actions of a Defendant can be found to rise to the high bar of atrocious, and utterly intolerable in a civilized community.

> **\*25** Here, the Defendants' agents were not only Plaintiff's direct supervisors, they were also trained psychologists.

> Defendants[ ] had notice and knowledge of Plaintiff's neuropsychiatric disability. Further, because it is their field of study Defendant[ ]s had actual knowledge

Exhibit 6 - Page 54

of what that condition consisted of, specifically what would cause that condition to intensify.

Using that knowledge Defendants[ ] intentionally put the Plaintiff through a series of work place tests to determine the amount of stress the Defendant could take with his condition.

Am. Compl. ¶¶ 191–94 (internal quotation marks and citation omitted). Dr. Isaacs further alleges that the "work place tests" to which he was subjected "were performed with the intention of forcing [him] to resign his position." Am. Compl. ¶ 196. Defendants are entitled to judgment as a matter of law on Count IX because the alleged conduct underlying the claims stated therein is not sufficiently egregious to support a claim for intentional infliction of emotional distress.

"In order to make out a claim for intentional infliction of emotional distress, a plaintiff must allege that a defendant 'by extreme and outrageous conduct, intentionally or recklessly cause[d] severe emotional distress to another.' " *Tessier,* 162 N.H. at 341 (quoting *Morancy v. Morancy,* 134 N.H. 493, 496 (1991)).

> In determining whether conduct is extreme and outrageous, it is not enough that a person has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice." *Mikell v. Sch. Admin. Unit No. 33,* 158 N.H. 723, 729 (2009) (citation and quotations omitted). Rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

*Tessier,* 162 N.H. at 341 (parallel citation omitted).

The court begins with one of the factual bases for Dr. Isaacs' claim. While Dr. Isaacs alleges that "[d]efendants[ ] had notice and knowledge of [his] neuropsychiatric disability," Am. Compl. ¶ 193, it is undisputed that in the paperwork he submitted upon accepting Dartmouth–Hitchcock's offer of admission, he represented that he had *no* disability and did not require any accommodations. *See* Defs.' Mem. of Law, Ex. 16 (doc. no. 144–17) (emphasis added). Thus, at least with respect to the first part of Dr. Isaacs' residency, the undisputed record demonstrates

that defendants had no reason to believe that he suffered from a mental disability. And, at her deposition, Dr. Finn testified that "at the time [she] was working with [Dr. Isaacs, she] was not in the capacity to be evaluating [him] as a physician." Defs.' Mem. of Law, Ex. 29, Finn Dep. (doc. no. 144–30) 25:20–22, Jan. 15, 2014. That said, the record is clear that by the time Dr. Isaacs was put on his PIP in mid September, Dr. Finn was aware that he was claiming to suffer from conditions that could have been symptoms of a mental disability. Specifically, the PIP directed Dr. Isaacs to:

**\*26** 1. Make sure to engage in self care activities so that you can be well rested in preparation for work[; and]

2. Consider EAP ... or other therapy assessment for help with coping with work stress[.]

Defs.' Mem. of Law, Ex. 21 (doc. no. 134–22 (sealed)), at 2.

Turning to Dr. Isaacs' theory of liability for intentional infliction of emotional distress, the court has little trouble concluding that it would be intolerable in a civilized community for medical educators to conduct secret experiments upon an unwitting subject with the purpose of driving him out of an academic program. The problem with Dr. Isaacs' claim, however, is that the undisputed factual record demonstrates that that Dr. Finn and others responsible for training Dr. Isaacs went to great lengths to help him remain in the program and have a successful residency.

Specifically, it is undisputed that: (1) Dr. Friedman made an attempt, ultimately unsuccessful, to salvage Dr. Isaacs' first rotation in internal medicine by reducing his patient load, *see* Defs.' Mem. of Law, Ex. 20 (doc. no. 134–21 (sealed)), at 13–18, 20; (2) Dr. Isaacs was given numerous substantive suggestions about how to improve his performance, *see id.* at 7, 9, 20, 24–28; (3) arrangements were made to shift Dr. Isaacs' rotation schedule, so he could return to internal medicine after he had developed the necessary skills in other departments, *see id.* at 17; and (4) notwithstanding the fact that Dr. Friedman would have dismissed Dr. Isaacs from Dartmouth–Hitchcock in early July, *see id.* at 16, Dr. Finn placed him on a PIP in September, *see id.,* Ex. 21 (doc. no. 134–22 (sealed)). Dr. Isaacs' PIP, in turn, included the following provision:

Exhibit 6 - Page 55

During this improvement period, residency staff members will provide additional support and supervision to you. You will meet on a weekly basis with Dr. West to discuss feedback on rotation regarding core competency issues that may arise as a part of your work on the inpatient unit. You will meet with a senior resident ... on an at least weekly basis to interview a patient together and practice presentations. For all calls, you will have a more senior resident present for direct supervision. I will also plan to meet with you to review use of templates and tips for organization.

*Id.* at 2.

Because the undisputed record provides no support whatsoever for Dr. Isaacs' theory of liability for intentional infliction of emotional distress, all four defendants are entitled to judgment as a matter of law on Count IX.

### J. Count X

In Count X, Dr. Isaacs asserts claims for negligent infliction of emotional distress, against all four defendants. Specifically, he asserts that by breaching several different statutory and common-law duties, defendants caused him to suffer emotional distress that resulted in "an acute-on-chronic stress reaction that caused [him] to seek immediate treatment." Am. Compl. ¶ 207. All four defendants are entitled to judgment as a matter of law because Dr. Isaacs has not disclosed an expert witness to provide evidence on the causal relationship between defendants' acts and the physical symptoms that allegedly resulted therefrom.

**\*27** "The elements of a claim for negligent infliction of emotional distress include: '(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms.' " *Tessier,* 162 N.H. at 342 (quoting *O'Donnell*

*v. HCA Health Servs. of N.H., Inc.,* 152 N.H. 608, 611 (2005) (citation omitted). In *O'Donnell,* the New Hampshire Supreme Court also explained that, "[t]o ensure that the emotional injury is sufficiently serious to be afforded legal protection as well as to establish causation, we have repeatedly held that 'expert testimony is required to prove physical symptoms suffered from alleged negligent infliction of emotional distress.' " 152 N.H. at 611–12 (quoting *Silva v. Warden, N.H. State Prison,* 150 N.H. 372, 374 (2003)).

Here, Dr. Isaacs has disclosed no expert who will testify about physical manifestations of his emotional distress, and the deadline for expert disclosure has passed, *see* Discovery Plan (doc. no. 61) 5. Dr. Isaacs' failure to secure an expert to testify on either the seriousness of his emotional distress or the issue of causation forecloses his claim for negligent infliction of emotional distress, and entitles all four defendants to judgment as a matter of law on Count X. *See Michnovez v. Blair, LLC,* No. 10–cv–110–LM, 2012 WL 2627567, at *9–10 (D.N.H. JulY 5, 2012).

### Conclusion

As the court indicated at the outset of this order, Dr. Isaacs' motion for a scheduling conference, document no. 140, is denied. For the reasons detailed above, the motion for summary judgment filed by the Hitchcock defendants, document no. 132, and the motion for summary judgment filed by the Dartmouth defendants, document no. 133, are both granted in full. Because all four defendants are entitled to summary judgment on all of the claims asserted against them, the two other pending motions in this case, the Hitchcock defendants' motion to protect witnesses from harassment, document no. 126, and the Dartmouth defendants' motion to restrict plaintiff's ex parte communications, document no. 129, are both denied as moot. The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 1572559, 2014 DNH 086

Isaacs v. Dartmouth-Hitchcock Medical Center, Not Reported in F.Supp.3d (2014)

2014 WL 1572559, 2014 DNH 086

Footnotes

1     The process by which residents find their residencies works like this: "Individuals interested in participating in a residency program submit a standardized application through the Electronic Residency Application Service (ERAS). The decision to extend an invitation to an applicant is based upon a review of their completed ERAS application. After the ERAS application is submitted and interviews are conducted, applicants may then match with a specific training program through a process overseen by the National Residency Match Program. When a candidate 'matches' with a program, that program is obligated to start them as long as they satisfy eligibility requirements." Defs.' Mem. of Law, Ex. 32, Bertrand Aff. (doc. no. 144–33) ¶¶ 5–8.

2     The Notice of Deficiency also cited "[p]ersonal conduct that substantially impaire[d] [Dr. Isaacs'] fulfillment of properly assigned duties and responsibilities," and his "[i]nability or failure to perform the essential functions of the job or tasks assigned." Defs.' Mem. of Law, Ex. 11 (doc. no. 144–12), at 1.

3     *Cloutier* describes two other categories of contract cases in which the covenant of good faith and fair dealing might be violated, i.e., cases "dealing with standards of conduct in contract formation," 132 N.H. at 139, and cases "dealing with ... limits on discretion in contractual performance," *id.* Neither of those categories is relevant here.

4     The court presumes that Dr. Isaacs intended to refer to RSA 354–A, *i.e.,* New Hampshire's Law Against Discrimination.

5     Dr. Isaacs alleges, in paragraphs 159 and 160, that he was denied permission to work with Dr. Holtzheimer, and also alleges, in paragraph 166, that he "was also denied opportunities to participate in research at DMS." While that would suggest a claim that he was denied research opportunities beyond the one with Dr. Holtzheimer, Dr. Isaacs made clear at his deposition that the only research opportunity he claims to have been denied was the one with Dr. Holtzheimer. *See* Chabot Decl., Ex. G, Isaacs Dep. (doc. no. 145–7) 282:4–8, Dec. 13, 2013.

6     That said, the court notes that based upon its determination, when ruling on Count I, that the record included evidence that Dr. Finn's close scrutiny of Dr. Isaacs was justified by all the criticisms of his performance that she had received, there is ample support in the record for the general proposition that Dr. Isaacs was not a good resident.

---

**End of Document**            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    21

Exhibit 6 - Page 57

**Before the**
**New Hampshire Board of Medicine**
**Concord, New Hampshire**

In the Matter of:                                                    Docket #:  13-07
      Jeffrey D. Isaacs, M.D.
      License No.:  RT-2198
      (Adjudicatory/Disciplinary Proceeding)

## FINAL DECISION AND ORDER

Before the New Hampshire Board of Medicine ("Board") is an adjudicatory/disciplinary proceeding in the matter of Jeffrey D. Isaacs, M.D. ("Respondent" or "Dr. Isaacs").

### Background Information
### (Procedural History and Motions)

The Board of Medicine ("Board") granted Dr. Isaacs a Resident Training license pursuant to N.H. Admin. Rules Med 305.04, in May 2011.  The license was granted where the application revealed Dr. Isaacs was pursuing post graduate training at the Dartmouth Hitchcock Medical Center ("DHMC") in the psychiatry residency program ("Program").

In March 2012 the Board received information from DHMC indicating that Dr. Isaacs had been terminated from the Program where Respondent had allegedly omitted material facts from his Application for Training License for Residents and Graduate Fellows and the supplement filed along with the application.  As a result of this information, the Board commenced an investigation to determine whether Respondent committed professional misconduct pursuant to RSA 329:17, VI and RSA 329:18.

The investigation revealed the following:

Between August 2005 and June 2006 Respondent attended the Keck School of Medicine, a medical education institution, at the University of Southern California ("USC").  In February

Exhibit 7
Page 58

2006 the Keck School suspended Respondent due to behavior-related issues, and ultimately the School expelled him. In June 2010 Respondent received a medical degree from the American University of the Caribbean. On May 18, 2011, Respondent filed his application for training license with the Board having been enrolled in the Program at DHMC.

The application required Respondent to disclose medical schools attended. Respondent listed the American University of the Caribbean but failed to disclose attendance at the Keck School. Additionally, Respondent answered "No" to a question on the supplement to the application which asked whether he had "ever been reprimanded, sanctioned, restricted or disciplined in any activities involving medical education or practice."

Given the investigatory revelations the Board found reasonable basis for commencing an adjudicatory/disciplinary proceeding against Respondent. On October 7, 2013 the Board issued a Notice of Hearing ("Notice") commencing a proceeding pursuant to RSA 329:18-a and N.H. Admin. R. Med 206 for February 5, 2014 at 1:00 p.m. The purpose of the hearing was to determine whether in May 2011 Respondent engaged in professional misconduct by submitting false information to the Board and for failing to fully disclose all previous medical schools attended. The Notice further indicated that Respondent could be subjected to disciplinary sanctions pursuant to RSA 329:17, VII. The Notice also informed Respondent that he may be represented by counsel at the hearing, at his own expense; and that failure to appear may result in the hearing being held *in absentia* with disciplinary sanctions imposed without further notice or opportunity to be heard.

On January 29, 2014, at 3:14 p.m., Respondent sent the Board via e-mail, a so-called "Motion to Stay Hearing or Appear by Teleconference." The e-mail indicated Respondent was moving to stay the proceeding because he had pending "federal litigation in the Pennsylvania

2

Exhibit 7
Page 59

District Court." The e-mail further indicated that Respondent entered into a settlement agreement with USC which he alleges sealed his disciplinary records. He further claimed that "the AAMC and NHES …both investigated this issue already and agreed with [him]." He additionally alleged that the Board failed to investigate his allegations against DHMC, including that he was "defrauded, instructed to perform unnecessary [medical] exams and abandoned as a patient."

Respondent's January 29, 2014 e-mail also noted that he was "taking action against the Board for what appears to be punitive actions against [him]" and he requested that the Board defer "to the legal authority of the federal judiciary system and postpone [the] hearing." Respondent also wrote that he was not able to drive to New Hampshire for medical reasons, that he conducted three depositions via Skype and that if the stay was denied he requested to appear by telephone or video conference.

On February 3, 2014 hearing counsel objected to the request. The objection indicated that Respondent failed to comply with Board rules, in that any requests to continue or postpone are required to be filed at least ten days prior to the scheduled hearing. Additionally, hearing counsel noted further procedural issues with the request; specifically that it did not comply with the provisions of N.H. Admin. R. Med 204, et. seq.

The presiding officer denied the request to Stay the proceeding, finding first that Respondent failed to follow Board procedural regulation and for the reasons articulated in hearing counsel's objection, the so-called "motion" should be denied. The Board found unpersuasive the notion that the case should be stayed because of a pending federal lawsuit in Pennsylvania. Moreover, Respondent provided no information relative to his "illness." Respondent was informed of the denial on February 3, 2014 at approximately 4:30 p.m. He

subsequently forwarded another e-mail on February 5, 2014, at approximately 6:00 a.m.

indicating that a winter storm and his current automobile situation would preclude him from

attending the hearing.

The hearing went forward as scheduled on February 5, 2014, commencing just after 1:00

p.m.  Board members present included:

Mark Sullivan, P.A.
John H. Wheeler, D.O.
Robert M. Vidaver, M.D.
Louis E. Rosenthall, M.D.
Gail Barba, Public Member
Edmund J. Waters, Jr., Public Member

Gail Barba, Public Member, served as presiding officer.  Respondent did not appear, and

Attorney Jeff Cahill appeared as hearing counsel.

**Discussion and Rulings**

It is first necessary to discuss Respondent's request for a stay and his decision not to

attend the hearing.  Regardless of the procedural irregularities concerning Respondent's request

to stay the proceeding sent via e-mail on January 29, 2014 the Board finds substantively, the

rational for the request to be both lacking in factual detail and unpersuasive.  The issue before the

Board is a narrow one.  It revolves around whether Respondent violated RSA 329:17, VI (a) by

failing to disclose, in 2011 on the residency training application and supplement, his attendance

and dismissal from the Keck School of Medicine.  The fact that Respondent named the Board in

a federal lawsuit that is currently pending is of no moment in the determination of that issue.

Moreover, pursuant to RSA 329:17, IX, no civil action shall be maintained against the board

with regard to any activity or action taken in the performance of its statutory duties.  *See* RSA

329:17, IX.  The Board thus determined it was appropriate to proceed.

4

Exhibit 7
Page 61

The Board finds that timely notice had been provided to the Respondent with regard to the hearing. Here, where Respondent had over four months to prepare and attend or timely ask for a continuance, his eleventh hour request to stay the proceeding was without merit. Had there been some legitimate medical reason that had been articulated by the Respondent, the Board would have given that issue consideration. Respondent, however, simply indicated that he had medical reasons that precluded him from driving to New Hampshire, which he then did not reassert on February 5, 2014 when he provided notice that he would not attend the hearing, citing instead to weather conditions and automobile issues. Petitioner provided no reasonable grounds for continuing the hearing, nor did he ask for reconsideration, indicating that weather - given the forecast - would prevent him from attending.

The Board opened the hearing just after 1:00 p.m. on February 5, 2014. It first entered Exhibits A and B, Respondents e-mails dated January 29 and February 5, as exhibits for Respondent. It also accepted Exhibits 1-3 from hearing counsel. Exhibit 1 is Respondent's 2011 NH Application for Residency Training License; Exhibit 2 is an excerpt of a March 1, 2007 court order in *Isaacs v. USC*; and Exhibit 3, the April 2008 Confidential Settlement in *Isaacs v. USC*. These exhibits along with notice of witnesses to be presented were provided to Respondent on January 31, 2014.

Hearing counsel also presented the testimony of Dori Lefevbre, Board Investigator. Ms. Lefevbre testified that she was able to obtain the documents that were marked as exhibits 2 and 3 as public records available on-line from the federal court system. She explained that the documents reflect that Respondent was dismissed from the Keck School. In fact, Exhibit 2, the California Federal District Court, Central District's Order on a Motion to Dismiss reveals that Respondent alleged he suffered from PTSD and an organic brain injury and in 2005 began his

studies at Keck School of Medicine. The Order further indicates that Respondent had numerous social problems with his classmates and engaged in offensive messaging to a female classmate that Respondent attributes to his Bipolar II diagnosis. The Order indicated Respondent alleged that several defendants attempted to harm his standing at USC, that Respondent attended a disciplinary hearing before the Student Performance Committee – where he did not contest stalking allegations against him; and that he was suspended and ultimately dismissed from the school. The Order at Exhibit 2 also indicated that Plaintiff requested that USC postpone the dismissal hearing scheduled for June 7, 2006, but that the hearing went ahead as scheduled.

Ms. Lefevbre also testified that she obtained Exhibit 3, as a public court record from the federal court's on-line system, which purportedly is the confidential settlement agreement between Respondent and USC. The document at page 1, indicates that Respondent understood and agreed "that his education at USC has ended irrevocably and forever and will not be resumed again at any time in the future."

In Exhibit A, Respondent alleges that the settlement agreement with USC "clearly sealed [his] disciplinary records, and a subsequent agreement annulled all contracts and acquitted all controversies with USC." It appears this is the reason Respondent contends he was not required to disclose the Keck School information on his training license application. A review, however, of Exhibit 3 indicates that it is only information related to the lawsuit, and the negotiation of the Settlement Agreement's terms and conditions that is confidential, along with the monetary settlement amount. There is no provision in Exhibit 3 "sealing the disciplinary records."

Exhibit 1, page 4 asks whether the applicant has been "reprimanded, sanctioned, restricted or disciplined in any activities involving medical education…" and Respondent certified, under penalty of perjury that he had not, where he marked "No" to the question.

6

Exhibit 7
Page 63

Whether Respondent entered into a settlement agreement does not negate the fact that he attended a medical educational institution which ultimately dismissed him and will never allow him to return. The fact remains that there was discipline and expulsion from a medical educational institution notwithstanding the representation that the records have been sealed or a subsequent agreement "annulled all contracts." That Respondent brought a lawsuit against USC, which the parties settled and where USC specifically denied liability for the claims against it does not immunize Respondent from answering the application question truthfully.

The question on the application did not require Respondent to divulge information regarding the Confidential Settlement Agreement. The answer in the license application was, however, required to be correct. Respondent could have chosen to say, "Yes" which would have likely given him an opportunity to explain; or he could have indicated that he contends he was wrongfully dismissed.

RSA 329:17, IV (a) reads that disciplinary action may be taken against a licensee where the Board finds the person "has knowingly provided false information during any application for professional licensure… whether by making any affirmative statement which was false at the time it was made or by failing to disclose any fact material to the application." The Board finds that Respondent was required to truthfully divulge an answer to question 3 on the supplement to the application. The Board also finds that Respondent was required to list all medical schools attended. The application form and the supplement do not distinguish and inform the applicant that an answer is not required if some record was sealed or records were nullified by operation of law.

Here, Respondent was aware that he attended the Keck School, he was further aware that he was "sanctioned" or "restricted" or "disciplined" in "activities involving medical education."

Exhibit 7
Page 64

As such, Respondent deliberately, consciously, and with purpose of design answered question 3 falsely. Likewise, it is a material fact that Respondent attended a medical school other than American University of the Caribbean. Inaccuracies in the information provided which are false, constitute a valid basis for discipline and license denial.

In this case, we need not take action on the license itself since pursuant to N.H. Admin R. Med 305.04(b) training licenses are only valid for the practice of medicine when *inter alia* the licensee is practicing under the auspices of the training program. *See* N.H. Admin R. Med 305.04 (b) (1). Here, there was evidence that the DHMC terminated Respondent from their Program. Accordingly, the license is revoked as of the date of termination; as such it was canceled by operation of law.

We, however, believe a reprimand is appropriate in this situation. Respondent treated his time at the Keck School as if it never occurred. He provided no documents to suggest or provided no credible evidence regarding the dissolution of his record of attendance at the Keck School. Even where Respondent chose not to attend the hearing, he still could have provided documentary support for his position in advance of the hearing. N.H. Admin. R. Med 206.09 (c). For example, he could have submitted his exhibits supporting the statements found in Exhibit A, but chose instead an alternate course of action. Exhibit 3 certainly does not suggest the nullity of the sanction or discipline, where Exhibit 2 clearly evinces Respondent was dismissed from the medical school on June 13, 2006.[1] We find this Agreement does not insulate Respondent from having to affirmatively disclose his attendance. As such, where we also find the evidence submitted supports the conclusion that Respondent knowingly made a false statement and further

---

[1] Exhibit 2 does indicate that on June 22, 2006 Respondent appealed the decision asking for a reversal. Exhibit 3, at paragraph 19 references the potentiality of effecting the dismissal of all outstanding administrative charges. There, however, is no credible evidence before this Board which suggests Respondent's termination from the school was dismissed. Further we are aware of no New Hampshire requirement that would equate a civil settlement to the annulment of a criminal record pursuant to RSA 651:5, X.

failed to disclose a material fact, the license of Dr. Isaacs is REVOKED and he is

REPRIMANDED.

\*BY ORDER OF THE BOARD

Dated: 3/11/2014

Penny Taylor, Administrator
Authorized Representative of the
New Hampshire Board of Medicine

\*Michael Barr, M.D., Board Member, recused.

9

Exhibit 7
Page 66

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 68 of 264   Page
ID #:1743
Isaacs v. Trustees of Dartmouth College, Not Reported in F. Supp.3d (2014)

2014 WL 4186536

2014 WL 4186536
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Dr. Jeffrey David ISAACS, Plaintiff,
v.
TRUSTEES OF DARTMOUTH COLLEGE,
Arizona Board of Regents, Dr. Marc Bertrand,
Dr. Jim Yong Kim, Edward Kaplan, New
Hampshire Board of Medicine, Dr. Amy
Waer, Mary Hitchcock Memorial Hospital,
University of Arizona Health Sciences Center,
John Doe # 1, and John Doe # 2, Defendants.

Civil Action No. 13–5708.
|
Signed Aug. 25, 2014.

**Attorneys and Law Firms**

Jeffrey David Isaacs, Newtown Square, PA, pro se.

Peter Thomas Shapiro, Nicholas M. Donzuso, Lewis
Brisbois Bisgaard & Smith, LLP, Newark, NJ, Eric A.
Weiss, Marshall Dennehey Warner Coleman & Goggin,
Neil J. Hamburg, Jodi S. Wilenzik, Hamburg & Golden,
P.C., Philadelphia, PA, for Defendants.

### MEMORANDUM

TUCKER, District Judge.

**\*1** Presently before this Court is Defendants Marc
Bertrand, Edward Kaplan, and Mary Hitchcock
Memorial Hospital's Motion to Dismiss for Lack of
Jurisdiction (Doc. 24), Defendants Jim Yong Kim and
Trustees of Dartmouth College's Motion to Dismiss
for Lack of Jurisdiction (Doc. 25), Defendants Arizona
Board of Regents, University of Arizona Health Sciences
Center, and Amy Waer's Motion to Dismiss (Doc. 26),
Defendant Arizona Board of Regents et al.'s Declaration
in Support of Motion to Dismiss (Doc. 27), Defendant
Arizona Board of Regents et al.'s First Affidavit in
Support of Motion to Dismiss (Doc. 28), Defendant
Arizona Board of Regents et al.'s Second Affidavit in
Support of Motion to Dismiss (Doc. 29), Defendant
Arizona Board of Regents et al.'s Memorandum of Law

in Support of Motion to Dismiss (Doc. 30), Plaintiff
David Isaacs' Response in Opposition to Motions to
Dismiss by Dartmouth Defendants (Doc. 32), Plaintiff
Isaacs' Default Entry for Emergency Injunction (Doc. 33),
Plaintiff Isaacs' Amendment to Response in Opposition to
Motions to Dismiss by Dartmouth Defendants (Doc. 34),
Defendant Arizona Board of Regents et al.'s Response to
Plaintiff's Request for Default (Doc. 36), Defendant New
Hampshire Board of Medicine's Objection to Application
for Default (Doc. 37), Defendant New Hampshire Board
of Medicine's Motion to Dismiss (Doc. 42), Plaintiff
Isaacs' Response in Opposition to Motion to Dismiss
and Request for Appointment of Counsel (Doc. 44), and
Plaintiff Isaacs' Addendum to Response to Motion to
Dismiss for Lack of Jurisdiction (Doc. 47).

## I. FACTUAL AND PROCEDURAL BACKGROUND

The pertinent facts alleged by the Plaintiff are as follows.
In 2006, Plaintiff David Isaacs ("Isaacs") commenced
federal litigation against the California medical school
in which he was enrolled, its Dean, Assistant Dean of
Student Affairs, a university general counsel, and an NIH
director ("the California Defendants"). (Am.Compl.¶ 8.)
Isaacs filed the suit, alleging he was inappropriately
disciplined as a result of favoritism toward a classmate
who was the daughter of an NIH director. (*Id.*) In 2007, in
exchange for the dismissal of claims against the individual
defendants, the California medical school agreed to seal
any and all disciplinary records of the Plaintiff governed
under the Family Educational Rights and Privacy Act
("FERPA"). (*Id.* at ¶ 9.) In 2008, Isaacs' entire lawsuit
was settled, and in exchange the California medical school
issued a broad acquittal of Isaacs and annulled Isaacs'
enrollment in the school. (*Id.*)

In 2010, Isaacs graduated from a foreign medical school
in the Caribbean. (*Id.* at ¶¶ 10–11.) Upon his graduation,
Isaacs made numerous residency applications to various
hospitals across the United States, via the Electronic
Residency Application Service ("ERAS"). (*Id.*) All of
Isaacs' applications were made from Pennsylvania, where
Isaacs was then a resident. (*Id.*) In the same year, Isaacs
was accepted and enrolled as a surgical resident at the
Defendant University of Arizona Health Sciences Center
("UAHSC"). (*Id.* at ¶ 12.) During this period, Defendant
John Doe # 1 allegedly communicated with University
of Arizona officials and informed them of Isaacs' prior
disciplinary history at the California medical school. (*Id.*
at ¶ 13.) Isaacs claims that he was told on the second day

2014 WL 4186536

in his position at University of Arizona that he was "not qualified for the residency." (*Id.* at ¶ 14.)

**\*2** Based on his suspicions that University of Arizona officials communicated with Defendant John Doe # 1, Isaacs resigned from his surgical residency within six weeks of arriving in Arizona. (*Id.* at ¶ 16.) Following that incident, Isaacs decided to enroll in another residency program at Dartmouth College. (*Id.*) Isaacs alleges that University of Arizona had already effectively decided to terminate him before he began his residency. (*Id.* at ¶ 15.) Isaacs claims that the University of Arizona "constructively terminated" him by criticizing his performance as a surgical resident in a fraudulent and excessive manner. (*Id.* at ¶ 16.)

Isaacs applied to Defendant Mary Hitchcock Memorial Hospital ("MHMH") at Dartmouth College and accepted a position as a psychiatry intern. (*Id.* at ¶ 17.) As part of his application, Isaacs also submitted an application for a training license to the New Hampshire Board of Medicine. (*Id.*) Isaacs claims that Dartmouth College also effectively decided to terminate him before he started his residency. (*Id.* at ¶ 18.) During the first week of his psychiatry internship, Isaacs "was witnessed to have 'nervous breakdown' characteristics and 'incapacitating anxiety,' necessitating his removal as a doctor on the inpatient medical M2 ward." (*Id.* at ¶ 19.) Isaacs alleges that on his first two days of work on M2, he was asked to perform two unnecessary prostate exams and was generally hazed for the next six months. (*Id.*) Isaacs then filed a lawsuit against Dartmouth College for hazing, fraud, and medical injuries caused by abuse. (*Id.*) Isaacs claims that in February 2012, Defendant Edward Kaplan ("Mr.Kaplan") informed Isaacs that he would be dismissed from the Dartmouth College program because of the incident at his California medical school. (*Id.* at ¶ 20.)

On January 16, 2012, Isaacs informed Defendant Jim Yong Kim ("Dr .Kim") that he intended to file suit against Dartmouth College and requested that Dr. Kim order all emails preserved, pursuant to Federal Rule of Civil Procedure ("FRCP") 34. (*Id.* at ¶ 21.) On January 19, 2012, Isaacs claims his hospital email account was deleted, thereby destroying evidence and violating Dartmouth College's own email policy and FRCP 34. (*Id.* at ¶¶ 22–23.) Two months later, Isaacs accused Dr. Kim of inaction regarding a request for an investigation concerning the alleged fraud and abuse. (*Id.* at ¶ 24.) A week after this accusation was made, Isaacs was terminated from Dartmouth College's residency program. (*Id.*)

Isaacs believes that Dr. Kim previously worked with and knew the Defendant NIH Director from the California litigation because the two had ten to fifteen years of overlapping employment within Harvard Medical School's International Health Faculty. (*Id.* at ¶ 25.) Isaacs alleges that Defendant John Doe # 2 did not want Isaacs to become a licensed doctor and communicated with Mr. Kaplan about his prior California litigation in violation of FERPA and his two federal court settlement agreements. (*Id.* at ¶ 26.)

**\*3** Isaacs asserted in his original suit against Dartmouth College that he was the first resident ever to be dismissed from his position without a fair hearing. (*Id.* at ¶ 28.) Isaacs was offered a post dismissal hearing, which was to take place on Dartmouth College premises, via a letter mailed to his Pennsylvania residence. (*Id.*) Isaacs, however, claims he did not feel safe attending the hearing because he had alleged crimes such as evidence destruction, fraud, and unnecessary hazing against individuals who would have been in attendance. (*Id.*) Isaacs argues that Defendant Dr. Marc Bertrand ("Dr.Bertrand") denied Isaacs' request for a fair hearing by video conference even though Dartmouth College routinely requests video conferences for depositions and other similar matters. (*Id.*)

Isaacs asserts that Dr. Bertrand trained with the University of Arizona's Department of Surgery for five years. (*Id.* at ¶ 29.) Through this connection, Isaacs alleges, Dr. Bertrand or his appointees conspired with individuals at the University of Arizona's Department of Surgery in order to subject Isaacs to coordinated criticism of his work. (*Id.*) Isaacs alleges that this was done in order to build a case for terminating him from his U.S. medical training without raising the California issue. (*Id.*) As a result, Isaacs claims, his federal training subsidy has been exhausted by the Defendants and he has no further opportunity of becoming a licensed physician in the U.S. (*Id.*)

Isaacs claims that he has been subjected to numerous claims from a growing number of parties that he committed intentional fraud by omitting his 2006 California legal dispute from his ERAS application. (*Id.*

Exhibit 8 - Page 68

at ¶ 30.) Isaacs states that the ERAS administrator and the American Academy of Medical Colleges first investigated the matter in April of 2012 and exonerated him in a matter of weeks. (*Id.*) New Hampshire Employment Security, Isaacs notes, also conducted an initial hearing on this matter in April of 2012 and an appeal hearing in June 2012. (*Id.* at ¶ 31.) Both hearings, Isaacs claims, determined that Isaacs did not commit intentional fraud by omitting the California incident from his residency applications. (*Id.*)

Isaacs further claims that the New Hampshire Board of Medicine ("NHBM"), after months of deliberation, found that the California disciplinary records were never actually sealed or annulled and ordered Isaacs to travel to New Hampshire in February of 2014 to discipline him for not disclosing the California incident. (*Id.* at ¶ 33.) Meanwhile, officials at the NHBM allegedly ignored Isaacs' requests to adequately investigate complaints of fraud committed by Dr. Bertrand and others at Dartmouth College. (*Id.*)

On September 30, 2013, Isaacs filed the instant Complaint with the Eastern District of Pennsylvania. In response, a number of motions to dismiss the Complaint were filed and on December 6, 2013, Isaacs filed an Amended Complaint alleging the following:

**\*4** (1) Conspiracy against all Defendants except the NHBM. Isaacs alleges that through Dr. Amy Waer ("Dr.Waer"), a medical resident at the University of Arizona, along with John Doe # 1, John Doe # 2, Mr. Kaplan, and Dr. Bertrand, Defendants transmitted knowledge of Isaacs' sealed disciplinary records and executed coordinated criticism of Isaacs' work in order to "break" him and convince him to speak about the prior California litigation. Isaacs claims to have suffered medical consequences and career loss as a result of this conspiracy;

(2) Intentional Infliction of Emotional Distress against all Defendants except the NHBM. Isaacs claims that the conduct displayed by Defendants was extreme and outrageous, done with severe disregard for the probability of causing him emotional distress, and effective in that Isaacs did indeed suffer embarrassment, humiliation, and severe emotional distress;

(3) Breach of Contract against Defendants MHMH and the Trustees of Dartmouth College ("Dartmouth College"). Isaacs asserts that MHMH and Dartmouth College's denial of Isaacs' reasonable accommodation to attend his post dismissal hearing through teleconferencing was done only to inconvenience and intimidate Isaacs and did not honor their contractual offer for a fair hearing in a reasonable fashion;

(4) Civil Obstruction of Justice against all "Dartmouth Defendants," including Dr. Bertrand, Mr. Kaplan, Dr. Kim, Dartmouth College, and MHMH. Isaacs claims these Defendants intentionally deleted his email account in violation of FRCP 34 and raised countless objections in an effort to obstruct Isaacs' original lawsuit against Dartmouth College;

(5) Injunctive Relief against the NHBM, Dartmouth College, and MHMH. Isaacs argues that unless Defendants are enjoined they will seriously jeopardize his chance to become a physician free from stress and abuse.

In response, Defendants and Isaacs have filed a number of motions. On December 9, 2013, Dr. Bertrand, Mr. Kaplan, and MHMH filed a Motion to Dismiss Isaacs' Complaint based on a Lack of Personal Jurisdiction pursuant to FRCP 12(b)(2). Dr. Kim and Dartmouth College soon followed with their own Motion to Dismiss for Lack of Jurisdiction filed on December 12, 2013. Next, Arizona Board of Regents ("ABOR"), UAHSC, and Dr. Waer filed a Motion to Dismiss Isaacs' Complaint on December 16, 2013. Isaacs filed a Response in Opposition to Motions to Dismiss by Dartmouth Defendants on January 12, 2014, a Default Entry for Emergency Injunction on January 23, 2014, and an Amendment to Response in Opposition to Motions to Dismiss by Dartmouth Defendants a few days later on January 28, 2014. The NHBM's Motion to Dismiss for Lack of Jurisdiction was filed on March 4, 2014. Finally, Isaacs filed a Response in Opposition to Motion to Dismiss and Request for Appointment of Counsel on April 18, 2014. Affidavits, declarations, and filings in support and opposition were filed along with these documents. The Court now addresses the pending motions.

## II. APPLICABLE STANDARDS OF REVIEW

Exhibit 8 - Page 69

### A. Dismissal Based on Lack of Personal Jurisdiction Pursuant to *Federal Rule of Civil Procedure 12(b)(2)*

**\*5** Motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), like those for failure to state a claim under Rule 12(b)(6), require the court to accept as true the allegations of the pleadings and all reasonable inferences therefrom. FED. R. CIV. P. 12(b)(2); *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 368 (3d Cir.2002); *Brown & Brown, Inc. v. Cola,* 745 F.Supp.2d 588, 602 (E.D.Pa.2010). However, unlike Rule 12(b)(6), Rule 12(b)(2) does not limit the scope of the court's review to the face of the pleadings. *See Pinker,* 292 F.3d at 368. Consideration of affidavits or some other competent evidence submitted by the parties is appropriate and, typically, necessary. *See Patterson by Patterson v. FBI,* 893 F.2d 595, 603–04 (3d Cir.1990).

Although plaintiffs bear the ultimate burden of proving personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the preliminary stages of litigation. *In re Chocolate Confectionary Antitrust Litigation,* 602 F.Supp.2d 538, 556 (M.D.Pa.2009) (citing *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992)). Rather, plaintiffs must merely allege sufficient facts to establish a prima facie case of jurisdiction over the person. *In re Chocolate Confectionary Antitrust Litigation,* 602 F.Supp.2d at 556 (citing *Mellon Bank (E.) PSFS, Nat'l Ass'n,* 960 F.2d at 1223). Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction. *See Patterson by Patterson,* 893 F.2d at 603–04; *In re Chocolate Confectionary Antitrust Litigation,* 602 F.Supp.2d at 556 (citing *Mellon Bank (E.) PSFS, Nat'l Ass'n,* 960 F.2d at 1223). It is the burden of the plaintiff to prove that the defendant purposefully availed himself of the forum state. To satisfy this burden, "at no point may the plaintiff rely on the bare pleadings alone," but rather must sustain its burden "through sworn affidavits or other competent evidence." *Patterson by Patterson,* 893 F.2d at 603–04 (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir.1984)); *In re Fasteners Antitrust Litigation,* Civil Action No. 08–md–1912, 2011 WL 3563989, at \*12 (E.D.Pa. Aug.12, 2011).

### B. Dismissal Based on Lack of Subject Matter Jurisdiction Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*

Motions to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) can be raised at any time during the proceedings. FED. R. CIV. P. 12(h)(3). These motions challenge a federal court's authority to even hear the case and the party asserting jurisdiction bears the burden of showing that the case is properly before the court at all stages of litigation. *See Byrne v. Cleveland Clinic,* 684 F.Supp.2d 641, 649 (E.D.Pa.2010) (citing *Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1045 (3d Cir.1993)); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991); *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

**\*6** Motions pursuant to Rule 12(b)(1) come in two forms: (1) those that attack the Complaint on its face and (2) those that attack some factual element within the Complaint that establishes jurisdiction. *McAllister Towing and Transp. Co., Inc. v. United States,* Civil Action No. 12–2208, 2014 WL 1608484, at \*5 (E.D.Pa. Apr.22, 2014) (citing *Mortensen,* 549 F.2d at 891); *Doe v. Goldstein's Deli,* 82 Fed.Appx. 773, 775 (3d Cir.2003); *Yuksel v. Northern Am. Power Tech., Inc.,* 805 F.Supp. 310, 311 (E.D.Pa.1992). Facial attacks do not challenge the Complaint on its factual record but instead contend that the pleadings fail to present an action within the court's jurisdiction. *See e.g., Mortensen,* 549 F.2d at 891; *Jarman v. Capital Blue Cross,* Civil Action No. 1:13–CV–0932, 2014 WL 643613, at \*2 (M.D.Pa. Feb.19, 2014). In that case, as there is no challenge to the factual record, the district court must accept as true the allegations within the Complaint and is limited to considering only the Complaint and its attached documents. *See e.g., Mortensen,* 549 F.2d at 891; *Jarman,* 2014 WL 643613, at \*2. On the other hand, factual attacks call allegations in the Complaint into question and a court may weigh evidence outside of the pleadings in order to determine its power to hear the case. *See e.g., Mortensen,* 549 F.2d at 891; *Jarman,* 2014 WL 643613, at \*2.

### III. DISCUSSION

**Personal Jurisdiction Generally (General Personal Jurisdiction And Specific Personal Jurisdiction)**
A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists. First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant. Second, the court must

Exhibit 8 - Page 70

2014 WL 4186536

determine whether the exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment. *See IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 258–59 (3d Cir.1998); *Kabbaj v. Simpson,* 547 Fed.Appx. 84, 86 (3d Cir.2013); *Yetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 150 (3d Cir.1996). Because Pennsylvania's long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process as defined under the Constitution of the United States, federal law defines the parameters of this Court's *in personam* jurisdiction. *See* 42 PA. CONS. STAT. ANN. § 5322(b) (2014); *Yetrotex Certainteed Corp.,* 75 F.3d at 150.

The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only if that defendant has established "minimum contacts" with the forum state and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Remick v. Manfredy,* 238 F.3d 248, 255 (3d Cir.2001) (citing *International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Such minimum contacts are established when there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Remick,* 238 F.3d at 255.

**\*7** These principles are reflected in the two recognized types of personal jurisdiction: (1) General Jurisdiction, which rests on general contact with the forum, and (2) Specific Jurisdiction, which rests on claim-specific contacts with the forum. *See Remick,* 238 F.3d at 255; *Marten v. Godwin,* 499 F.3d 290, 296 (3d Cir.2007) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). General Jurisdiction is based on the defendants' "continuous and systematic" contacts with the forum state and "exists even if the plaintiff's cause of action arises from the defendant's non-forum related activities." *Remick,* 238 F.3d at 255 (citing *Vetrotex Certainteed Corp.,* 75 F.3d at 151 n. 3). Specific Jurisdiction, in contrast, is present "only if the plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into

court in that forum." *Remick,* 238 F.3d at 255 (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)) (quotation marks omitted).

**Establishing Specific Personal Jurisdiction Using Minimum Contacts Analysis**

Determining whether specific jurisdiction exists requires a fact-intensive, three-part inquiry. *Marten,* 499 F.3d at 296. "First, the defendant must have purposefully directed his activities at the forum." *Id.* (citations and quotations omitted). "Second, the plaintiff's claim must arise out of or relate to at least one of those specific activities." *Id.* (citations and quotations omitted). Third, if the prior two requirements are met, "courts may consider additional factors to ensure that the assertion of jurisdiction otherwise comports with fair play and substantial justice." *Id.* (citations and quotations omitted); *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 317 (3d Cir.2007) (citations omitted).

What constitutes purposeful direction or "purposeful availment" varies with the "quality and nature of the defendant's activity." *Burger King Corp.,* 471 U.S. at 474–75 (citing *Hanson,* 357 U.S. at 253). In assessing whether specific personal jurisdiction can be asserted over a defendant, the court must focus on the "relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* ––– U.S. ––––, –––– – ––––, 134 S.Ct. 1115, 1121–22, 188 L.Ed.2d 12 (2014) (citations omitted).

The plaintiff or third party actions alone cannot be the only link between the defendant and the forum state. *Walden,* 134 S.Ct. at 1122–23. The defendant's conduct in the forum state must form the connection upon which jurisdiction rests. *Id.* It must also be noted that minimum contacts analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (citations omitted). In determining whether a defendant directs his activities at a forum, the question is whether he has "followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach., Ltd. v. Nicastro,* ––– U.S. ––––, 131 S.Ct. 2780, 2789, 180 L.Ed.2d 765 (2011). The Supreme Court has, for example, upheld jurisdiction over defendants who have "reached out beyond their State into another" by entering

Exhibit 8 - Page 71

2014 WL 4186536

contractual relationships that "envisioned continuing and widereaching contacts" in the forum state or by circulating magazines in an effort to "deliberately exploit" a market in the forum State. *Walden,* 134 S.Ct. at 1122–23 (citing *Burger King Corp.,* 471 U.S. at 479–80 and *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Here, physical presence in the forum state is not a prerequisite for jurisdiction to be found, though "physical entry into the State-either by the defendant in person or through an agent, goods, mail, or some other means-is certainly a relevant contact." *Walden,* 134 S.Ct. at 1122–23 (citing *Keeton,* 465 U.S. 773–774).

**\*8** With regard to the second prong of minimum contacts analysis, the Third Circuit has stated that:

> [T]here is no "specific rule" susceptible to mechanical application in every case ... But in the course of this necessarily fact-sensitive inquiry, the analysis should hew closely to the reciprocity principle upon which specific jurisdiction rests ... With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations ... Specific jurisdiction is the cost of enjoying the benefits.

*O'Connor,* 496 F.3d at 323–25 (citations omitted.) The Third Circuit has also noted that this connection "can be somewhat looser than the tort concept of proximate causation ... but it must nonetheless be intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable." *Id.*

Once minimum contacts have been established, it must be decided whether the assertion of personal jurisdiction would "comport with fair play and substantial justice." *O'Connor,* 496 F.3d at 317 (citing *Burger King Corp.,* 471 U.S. at 476). Here, the defendant must present a "compelling case that the presence of some other considerations would render the jurisdiction unreasonable" because once minimum contacts have been

established jurisdiction is presumptively constitutional. *O'Connor,* 496 F.3d at 324 (citing *Burger King Corp.,* 471 U.S. at 477); *see also Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,* 149 F.3d 197, 207 (3d Cir.1998) (noting that it is only in "rare" cases in which minimum contacts have been established but jurisdiction is found to be unreasonable). The Supreme Court has looked to several factors to determine whether fairness enables or strips jurisdiction. These factors include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies ... and the procedural and substantive interests of other nations." *O'Connor,* 496 F.3d at 324 (citing *Burger King Corp.,* 471 U.S. at 477 and *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). Among these factors, the burden on the defendant is a "primary concern." *O'Connor,* 496 F.3d at 324.

### Establishing Specific Personal Jurisdiction Using The *Calder* Effects Test

In addition to the minimum contacts analysis noted above, a separate route to specific personal jurisdiction is available to victims of intentional torts, namely the "effects test" stemming from the Supreme Court's ruling in *Calder v. Jones,* 465 U.S. 783, 788–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). This ruling stated that intentional torts aimed at a forum state and causing injury within that state can subject a tortfeasor to jurisdiction in that target state. *Id.* The Third Circuit has held that the effects test requires the plaintiff to show: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. *IMO Indus., Inc.,* 155 F.3d at 265–67. With regard to the third prong of the effects test, the Third Circuit has also held that "the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.*

Exhibit 8 - Page 72

2014 WL 4186536

*A. Defendants Mary Hitchcock Memorial Hospital ("MHMH"), Dr. Marc Bertrand ("Dr.Bertrand"), and Mr. Edward Kaplan ("Mr.Kaplan") (collectively, "MHMH Defendants")*

**\*9** The MHMH Defendants argue that they are all located in the state of New Hampshire and have no connection at all to the Commonwealth of Pennsylvania for the purposes of personal jurisdiction. As a result of the absence of connections, the MHMH Defendants also argue that this Court lacks general personal jurisdiction over all MHMH Defendants, that there is no specific personal jurisdiction as to the breach of contract claim against MHMH, that this Court lacks specific jurisdiction as to Isaacs' injunctive relief claim, and finally that this Court lacks specific jurisdiction as to intentional tort claims against all MHMH Defendants. Isaacs makes no effort to counter the MHMH Defendants and has failed to submit any response to oppose the MHMH Defendants' arguments.

### This Court Lacks General Personal Jurisdiction Over All MHMH Defendants

As noted above, general personal jurisdiction grants courts the ability to hear "any and all claims" against out-of-state defendants "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* —— U.S. ——, ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) (citing *International Shoe Co. .,* 326 U.S. at 317).

Here, it is clear that none of the MHMH Defendants qualify under the "continuous and systematic" standard. The MHMH Defendants have shown that none of the MHMH Defendants maintain offices, facilities, property, assets, bank accounts or the like in the state of Pennsylvania, nor are any of them licensed to carry out their business or professional duties in Pennsylvania, nor do any of them regularly undertake any activity in Pennsylvania closely related to their regular business and/or educational activities. (MHMH Defs. Mot. to Dismiss for Lack of Jurisdiction 23–27; Kaplan Aff. ¶¶ 3–12; Bertrand Aff. ¶¶ 1–6; Arden-ornt Aff. ¶¶ 1–13.)

Defendant MHMH is a teaching hospital located in the state of New Hampshire, organized under the laws of that state, with its principal place of business located in New Hampshire as well. (Arden-ornt Aff. ¶¶ 1–13.)

MHMH does not serve patients in the Pennsylvania area, maintain any programs in the state, nor does it pay taxes in the state. (*Id.*) MHMH is not qualified to do business in Pennsylvania and only a small percentage of the products MHMH uses come from the state. (*Id.*) Defendant Dr. Bertrand does not teach or practice medicine in Pennsylvania or conduct any business in the state, and cannot recall a visit into the state for any purpose at all in the past ten years. (Bertrand Aff. ¶ 1–6.) Defendant Mr. Kaplan is not licensed to practice law in Pennsylvania, does not pay any taxes in the state, has only visited the state leisurely or professionally a negligible number of times, and does not target clients from the state of Pennsylvania. (Kaplan Aff. ¶¶ 3–12.)

Courts in this district have noted that in order to sustain general jurisdiction, the plaintiff must show "significantly more than mere minimum contacts" which are "central to the conduct of [a defendant's] business." *Lolli v. Parc Management, LLC,* Civil Action No. 3:11–CV–1372, 2012 WL 688475, at \* 1 (M.D.Pa. Mar.2, 2012) (citing *Provident Nat. Bank v. California Fed. Sav. and Loan Ass'n,* 819 F.2d 434, 436–38 (3d Cir.1987)); *see also, e.g., Clark v. Matsushita Elec. Indus. Co., Ltd.,* 811 F.Supp. 1061, 1067 (M.D.Pa.1993) (noting general jurisdiction contacts must be "extensive and pervasive.") (citations omitted); *Henning v. Suarez Corp.,* 713 F.Supp.2d 459, 464 (E.D.Pa.2010) (stating general jurisdiction contacts must be "perpetual [and] abiding."). Here, the MHMH Defendants have scant contacts to the state of Pennsylvania and do not even approach the level of regular and central contact needed to attain general personal jurisdiction. As a result, this Court lacks general personal jurisdiction over all MHMH Defendants.

### This Court Lacks Specific Personal Jurisdiction Over MHMH As To Breach Of Contract Claim

**\*10** Isaacs' breach of contract claim is based on his assertion that MHMH and Dartmouth College offered to provide him with a hearing after his dismissal from his residency but subsequently refused his demand to conduct the hearing via video conference. In analyzing specific jurisdiction in the context of a breach of contract claim, district courts consider "whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 150 (3d Cir.2001) (citations omitted). By deliberately engaging in significant activities with the forum state or creating "continuing obligations

Exhibit 8 - Page 73

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 75 of 264   Page
ID #:1750
Isaacs v. Trustees of Dartmouth College, Not Reported in F. Supp.3d (2014)
2014 WL 4186536

between [themselves] and residents of the forum," parties may purposely avail themselves of the forum state. *Burger King Corp.,* 471 U.S. at 475–77. The mere existence of a contract, however, "is insufficient to establish minimum contacts." *Metcalfe v. Renaissance Marine, Inc.,* 566 F.3d, 324, 333 n. 7 (3d Cir.2009). The court evaluates "the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing." *Remick,* 238 F.3d at 256 (citing *Mellon Bank (E.) PSFS, Nat. Ass'n,* 960 F.2d at 1223.)

The Court will assume for the sake of argument that MHMH's alleged offer is a contract. Here, MHMH's contacts with the forum state of Pennsylvania in relation to Isaacs' claim are too slight to establish the minimum contacts required under the framework established by the Supreme Court. The only alleged contact with Pennsylvania related to this claim is MHMH's letter to Plaintiff offering a hearing to be conducted in New Hampshire. Through the mailing of a single letter offering a hearing, MHMH directed its actions at Isaacs himself, not at the forum of Pennsylvania. *See Walden,* 134 S.Ct. at 1122–23. The letter's passing though the state of Pennsylvania is happenstance and based purely on the location of Isaacs at the time of its mailing. Moreover, courts of this district have looked skeptically upon jurisdiction derived principally from letters or communications traveling into the forum state for the purpose of conflict resolution. *See UMAC, Inc. v. Aqua–Gas AVK Ltd.,* No. Civ.A. 04–4022, 2005 WL 742497, at * 4 (E.D.Pa. Mar.30, 2005) (citing *Devault of Delaware, Inc. v. Omaha Public Power District,* 633 F.Supp. 374, 376–78 (E.D.Pa.1986)); *Lawman Armor Corp. v. Simon,* 319 F.Supp.2d 499, 503 (E.D.Pa.2004).

### This Court Lacks Specific Personal Jurisdiction Over MHMH As To Injunctive Relief Claim

Though this Court makes no comment on whether, as an initial matter, Injunctive Relief is a cognizable claim, it finds it has no jurisdiction over the issue. Isaacs bases his claim on MHMH's letter dismissing him from the Dartmouth College program and the possible future harm such sanction would garner. (Am.Compl.¶ 55.) MHMH's letter to Isaacs concerning his residency is not sufficient to create the minimum contacts necessary to create specific jurisdiction. There are no facts alleged that show MHMH purposefully availed itself of the benefits and protections of operating in Pennsylvania with regard to this claim

but rather facts showing MHMH's desire to contact Isaacs, who happened to be residing in the state. *See e.g., Remick,* 238 F.3d at 255; *Walden,* 134 S.Ct. at 1122–23. Additionally, the claim that Isaacs felt some injury in the state of Pennsylvania due to his termination from MHMH's residency program cannot alone sustain the contacts needed to establish jurisdiction. *See Corrales Martin v. Clemson Univ.,* Civil Action No. 07–536, 2007 WL 4531028, at *8 (E.D.Pa. Dec.20, 2007). Rather than focusing the analysis on the state in which Isaacs happened to feel the consequences of MHMH's actions, the proper focal point is New Hampshire, the area in which the allegedly injurious action was made. *Id.*

### This Court Lacks Specific Personal Jurisdiction Over MHMH Defendants As To All Remaining Tort Claims

**\*11** Isaacs' claims for conspiracy, intentional infliction of emotional distress, and civil obstruction are based on his allegations of a wide reaching plot to prevent him from a future career in medicine, the mysterious deletion of Isaacs' email account, and the intentional harm these actions caused. (Am.Compl.¶¶ 34–42, 47–52.) Isaacs has failed to allege any contacts that MHMH, Dr. Bertrand, or Mr. Kaplan have to the state of Pennsylvania that establish any of the minimum contacts needed to substantiate specific personal jurisdiction. He makes no allegations that would suggest any of the MHMH Defendants' actions availed themselves of the benefits or protections of the state of Pennsylvania. *See e.g., Remick,* 238 F.3d at 255. Isaacs makes no allegations of the MHMH Defendants' physical presence in the forum state, personally or by proxy, during any of the interactions that led to his dismissal, nor does he aver some connection to the forum state in the alleged deletion of his email account. The MHMH Defendants actions here concern only a relationship with Isaacs and lack the necessary link to the forum of Pennsylvania needed under minimum contacts analysis. *See Walden,* 134 S.Ct. at 1122–23 (minimum contacts analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.").

Furthermore, under the *Calder* effects test, Isaacs' claim against the MHMH Defendants also fails. Under *Calder,* specific personal jurisdiction can be attained if "the defendant expressly aimed its tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *IMO Indus., Inc.,* 155 F.3d at 265–67. It is also required that the plaintiff show "that

the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.* Isaacs alleges no action on the part of the MHMH Defendants that was specifically aimed at the forum of Pennsylvania as opposed to Isaacs himself. The Third Circuit has held that specific jurisdiction cannot be exercised over defendants against whom intentional tort claims have been asserted, where the only connection to the forum is the plaintiff's location in the forum. *See e.g.,* *Marten,* 499 F.3d at 299.

### B. Defendants Trustees of Dartmouth College ("Dartmouth College") and Dr. Jim Yong Kim ("Dr.Kim") (collectively, "Dartmouth Defendants")

The Dartmouth Defendants argue that they both are located in the state of New Hampshire and have inadequate contacts to the state of Pennsylvania for jurisdiction purposes. The Dartmouth Defendants also argue that Isaacs' allegations against them have nothing to do with the forum state of Pennsylvania and all of Isaacs' claims against the Dartmouth Defendants should be dismissed or transferred to the appropriate court in the state of New Hampshire. Isaacs does not challenge the Dartmouth Defendants' claim that this Court lacks general personal jurisdiction, but instead focuses on attaining specific jurisdiction based on letters he received from Dartmouth College while he resided in Pennsylvania. (Pl.'s Resp. in Opp'n to Dartmouth Defs.' Mot. to Dismiss 4.)

### This Court Lacks General Personal Jurisdiction Over All Dartmouth Defendants

**\*12** Defendant Dartmouth College has shown that Dartmouth College is an institution of higher learning located in the state of New Hampshire, with its principal place of business in the state of New Hampshire. (O'Leary Decl. ¶¶ 1–3, 9.) Dartmouth College has shown that it is not authorized to do business in the state of Pennsylvania, it does not maintain an office or facility in Pennsylvania, it has no officers or employees in the state, it maintains no registered agent for service of process in Pennsylvania, it does not advertise in any Pennsylvania publication, it does not maintain a bank account, post-office box, or phone listing in Pennsylvania, it does not obtain direct revenue from products sold or services rendered in Pennsylvania, it does not own any real property in Pennsylvania, and

no activities of Dartmouth College are controlled by any entity located in Pennsylvania. (*Id* . at ¶¶ 5–20.) Like all national universities, Dartmouth College maintains some contacts with the state including securities held by a bank headquartered in Pennsylvania, the recruiting of athletes and faculty living in the state, access to its website from within the state, and the admission and enrollment of students coming from the state. (*Id.* at ¶¶ 13, 16, 21–24.) These *de minimis* contacts, which any national university may have with the state of Pennsylvania, are inadequate to establish general personal jurisdiction in this district.

In *Gehling v. St. George's Sch. of Medicine, Ltd.,* the Third Circuit found that a Caribbean medical school did not have sufficient contacts with Pennsylvania to establish general jurisdiction for tort and breach of contract claims despite the fact that the school advertised in national papers circulated in Pennsylvania, admitted and enrolled students from Pennsylvania, sent representatives to the state as part of a "media swing" to raise the school's profile, and entered into an agreement with a college in Pennsylvania to establish a joint international program to combine pre-medical studies in Pennsylvania with the medical school. 773 F.2d 539, 541–43 (3d Cir.1985). The court also found that several hundred thousand dollars in tuition flowed from Pennsylvania residents to the school. *Id.* The court noted:

> [T]he fact that some of St. George's students are Pennsylvania residents does not signify a relevant business contact. Advanced educational institutions typically draw their student body from numerous states, and appellants' theory would subject them to suit on non-forum related claims in every state where a member of the student body resides. Thus, the fact that residents of the state apply and are accepted for admission to St. George's is of no moment.

*Id.* at 542–43 (citations omitted). Further, courts in this district have found that activities typical for a national university, such as recruiting forum state students, faculty, and athletes, receiving donations and tuition dollars

Exhibit 8 - Page 75

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 77 of 264   Page
ID #:1752
Isaacs v. Trustees of Dartmouth College, Not Reported in F. Supp.3d (2014)
2014 WL 4186536

from forum state residents, and having students, faculty, staff, and administrators participate in conferences in the forum state, should not alone subject an institution to general jurisdiction in the forum state of Pennsylvania. *See Corrales Martin,* 2007 WL 4531028, at \*5–7; *Gallant v. Trs. of Columbia Univ. in the City of New York,* 111 F .Supp.2d 638, 641–44 (E.D.Pa.2000); *Kendell v. Trustees of Amherst College,* Civil Action No. 06–4983, 2007 WL 172396, at \*4–6 (E.D.Pa. Jan 18, 2007). Any nationally prominent university would engage in these types of activities with numerous institutions in any number of states. However, these activities do no suggest a specific targeting the forum state of Pennsylvania; only a general participation in interstate academic activities that happen to take place in the forum state. [1] *See Gallant,* 111 F.Supp.2d at 631–42.

**\*13** Likewise, Dr. Kim's contacts with the forum state of Pennsylvania do not rise to the level needed to establish general personal jurisdiction. Dr. Kim has shown that he does not currently reside in Pennsylvania nor has he ever resided in the state, he does not own real property or lease property in the state, he does not own or have any business affiliations in Pennsylvania, and he has never been employed by an institution or organization in the state. (Kim Decl. ¶¶ 1–9.) During his time as president of Dartmouth College, Dr. Kim played golf and participated in fundraising activities with Dartmouth College graduates located in Pennsylvania. (*Id.* at ¶ 9.) Though Isaacs claims that these activities, along with a recent speech given in Philadelphia, are enough to establish minimum contacts (Pl.'s Addendum to Resp. to Mot. to Dismiss for Lack of Jurisdiction 4), these interactions fail to represent contacts "so 'continuous and systematic' as to render [Dr. Kim] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A.,* 131 S.Ct. at 2851 (citation omitted).

### This Court Lacks Specific Personal Jurisdiction Over All The Dartmouth Defendants As To All Claims

Isaacs' breach of contract claim against Dartmouth College is duplicative of the breach of contract claim against MHMH, and fails for the same reasons. Isaacs argues in his response to the Dartmouth Defendants' Motion to Dismiss that his claim for jurisdiction is based on the two letters Dartmouth College sent to Isaacs in Pennsylvania notifying him of his termination from the residency program and the hearing taking place in New

Hampshire. (Pl.'s Resp. in Opp'n to Dartmouth Defs.' Mot. to Dismiss 4.) These letters send by Dartmouth College, however, do nothing to show that Dartmouth College aimed its actions at the forum state as opposed to Isaacs, who simply happened to be residing within it. *See Walden,* 134 S .Ct. at 1122–23.

Isaacs' claim against Dartmouth College for Injunctive Relief is also duplicative of his claim against MHMH, and also fails for the same reason: there are no facts alleged that show Dartmouth College purposefully availed itself of the benefits and protections of operating in Pennsylvania in any way with regard to this claim. *See e.g., Remick,* 238 F.3d at 255.

Isaacs' claims against both Dartmouth Defendants for conspiracy, intentional infliction of emotional distress, and civil obstruction also fail under minimum contacts analysis. Here, Isaacs fails to allege any facts that suggest the Dartmouth Defendants, through their actions, availed themselves of the benefits or protections of the state of Pennsylvania. *See e.g., Remick,* 238 F.3d at 255. Isaacs has not alleged that the decision to dismiss Isaacs or the deletion of his email account was made in Pennsylvania, and though he claims that Dr. Kim's golfing and fundraising activities are sufficient to establish minimum contacts (Pl.'s Addendum to Resp. to Mot. to Dismiss for Lack of Jurisdiction 4), these activities have nothing to do with the claims Isaacs brings forth. Also, while Isaacs himself may feel injury because of his dismissal in Pennsylvania, the alleged cause of the harm did not occur in Pennsylvania, and jurisdiction cannot rest on such indirect connection alone. *See Corrales Martin,* 2007 WL 4531028, at \*8 ("[T]he proper focus is on the time of the [injurious] act, not the point at which the consequences of the act become painful."). Moreover, because Isaacs cannot show that the Dartmouth Defendants specifically aimed their actions at the forum of Pennsylvania as opposed to Isaacs himself, Isaacs cannot establish specific personal jurisdiction under the *Calder* effects test. *See e.g., Marten,* 499 F.3d at 299.

### C. Defendant New Hampshire Board of Medicine ("NHBM")

**\*14** Defendant NHBM argues that it is located in the state of New Hampshire and has inadequate contacts with the state of Pennsylvania for personal jurisdiction purposes. The NHBM also argues that this Court lacks subject matter jurisdiction because it is a part of the

Case 2:19-cv-08000-DSF-RAO    Document 64-2    Filed 11/04/19    Page 78 of 264    Page
ID #:1753
Isaacs v. Trustees of Dartmouth College, Not Reported in F. Supp.3d (2014)

2014 WL 4186536

state of New Hampshire and a state is not a "citizen" for the purposes of diversity jurisdiction. Finally, the NHBM argues that this Court should dismiss the NHBM as a defendant based on abstention doctrine and general comity principles. Isaacs refutes that any state immunity exists and, as with the Dartmouth Defendants, asserts that because the NHBM sent him letters concerning his hearing they have established the minimum contacts needed for specific personal jurisdiction. (Pl.'s Resp. in Opp'n to Mot. to Dismiss and Req. for Appointment of Counsel 3.)

**This Court Lacks Personal Jurisdiction Over Defendant NHBM** [2]

Defendant NHBM has shown that it is an organization located exclusively in the state of New Hampshire and is authorized to take action only regarding the practice of medicine in New Hampshire. (Taylor Decl. ¶ 1; N.H. Revised Statutes Annotated § 329:2.) The NHBM has also shown that it is an administratively attached agency of the New Hampshire Department of Health and Human Services, established to regulate the practice of medicine by doctors in New Hampshire, with the primary goal of insuring public health, safety, and welfare. *See* N.H. Revised Statutes Annotated §§ 329:1–aa; 329:2. The NHBM's only office is in Concord, New Hampshire. (Taylor Decl. ¶ 1; N.H. Revised Statutes Annotated § 329:2.)

Here, the NHBM's limited contact outside of the state of New Hampshire involves medical students corresponding with the NHBM with regard to their application for residency at hospitals located in the state New Hampshire. (NHBM's Mot. to Dismiss. 9.) Successful residency applicants, the NHBM notes, are required to obtain a training license from the NHBM to allow them to function as doctors during their residency. (*Id.*) In this way, the NHBM argues, it functions like a medical school or a national university, accepting correspondence from interested parties and making some limited communications with a wide swath of individuals from around the nation. In fact, the NHBM argues that it has less contact with out-of-state individuals than a national university because it does not actively recruit applicants. (*Id.*) Isaacs does not refute any of these assertions or arguments but instead argues that because the NHBM sent him correspondence concerning the license application, they have at least established the minimum contacts required to attain specific personal

jurisdiction. (Pl.'s Resp. in Opp'n to Mot. to Dismiss and Req. for Appointment of Counsel 3.) The NHBM has shown that, like Dartmouth College and MHMH, it lacks the "continuous and systematic" contacts with the forum state of Pennsylvania required for general personal jurisdiction and its limited correspondence with applicants across the nation fails to showcase any particular conduct aimed specifically at the forum state. *See e.g., Goodyear Dunlop Tires Operations, S.A.,* 131 S.Ct. at 2851; *Gehling,* 773 F.2d at 541–43; *Corrales Martin,* 2007 WL 4531028, at *5–8.

**\*15** Additionally, Isaacs' only claim against the NHBM is a claim for Injunctive Relief based on the NHBM's request in February 2014 for Isaacs to attend a hearing over whether it was an improper action on Isaacs' part not to disclose his California history in his residency application and Isaacs' resultant fear of an adverse ruling. (Am.Compl.¶¶ 33, 55.) Isaacs argues that the NHBM's letter communications are sufficient to establish minimum contacts, however, the sparse letter correspondence to Isaacs here is *de minimis,* and does nothing to show that the NHBM aimed its actions at the forum state as opposed to Isaacs himself or availed itself of any of the benefits or protections of the state of Pennsylvania. *See e.g., Walden,* 134 S.Ct. at 1122–23; *Remick,* 238 F.3d at 255; *Marten,* 499 F.3d at 299. As a result, of these deficiencies, Isaacs cannot establish specific personal jurisdiction under minimum contacts analysis or the *Calder* effects test.

***D. Defendants Arizona Board of Regents ("ABOR"), University of Arizona Health Science Center ("UAHSC"), and Dr. Amy Waer ("Dr.Waer") (collectively, "Arizona Defendants")***

The Arizona Defendants [3] argue that Isaacs' claims against ABOR and UAHSC are barred under the Eleventh Amendment. Additionally, the Arizona Defendants argue that Dr. Waer is located in the state of Arizona and has no connection to the Commonwealth of Pennsylvania for the purposes of personal jurisdiction. Lastly, they argue that Isaacs' Complaint fails to state a claim upon which relief can be granted. Isaacs makes no effort to counter the Arizona Defendants and has failed to submit any response to oppose the Arizona Defendants' arguments.

**This Court Lacks Subject Matter Jurisdiction Over All Arizona Defendants**

Exhibit 8 - Page 77

2014 WL 4186536

It is well-settled that, due to Eleventh Amendment immunity, a state is not a citizen for purposes of diversity jurisdiction. *Moor v. Alameda Cnty.,* 411 U.S. 693, 717, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Ramada Inns, Inc. v. Rosemount Memorial Park Ass'n,* 598 F.2d 1303, 1306 (3d Cir.1979); *Harvey v. Blockbuster, Inc.,* 384 F.Supp.2d 749, 754 (D.N.J.2005). Isaacs' Amended Complaint claims diversity jurisdiction under 28 U.S.C. § 1332 as a means of supporting this Court's subject matter jurisdiction over the Arizona Defendants. (Am.Compl.¶ 1.) Additionally, Isaacs presents no federal claims under which jurisdiction may be established apart from diversity citizenship. (*Id.* at ¶¶ 34–56.) The Arizona Defendants argue that because ABOR (and UAHSC resting under it) are arms of the state of Arizona, they cannot be sued in this Court due to Eleventh Amendment immunity. (Arizona Defs.' Mem. of Law in Supp. of Mot. to Dismiss 5–7.) Moreover, the Arizona Defendants claim that due to the same immunity, Dr. Waer, who was employed by ABOR at all relevant times, cannot be sued in this Court in her official capacity. (Arizona Defs .' Mem. of Law in Supp. of Mot. to Dismiss 7–12; Waer Aff. ¶¶ 3–6 .) Isaacs fails to challenge any of these claims. As the Arizona Defendants here do not challenge any of the factual allegations upon which jurisdiction rests, this Court will look at this as a facial attack to subject matter jurisdiction. *See e.g., Mortensen,* 549 F.2d at 891.

**\*16** The Arizona Defendants present ample citation to Arizona federal and state courts, holding that ABOR is a part of the state of Arizona and is therefore protected by Eleventh Amendment immunity. *See Ansel Adams Publishing Rights Trust v. PRS Media Partners, LLC,* 502 Fed.Appx. 659, 660–62 (9th Cir.2012) (ABOR, as the governing body of Arizona's public universities, is immune from federal law suits pursuant to the Eleventh Amendment); *Gorney v. Arizona Bd. of Regents,* No. CV–13–00023–TUC–CKJ(HCE), 2013 WL 5348304, \*3 (D.Ariz. Sept.24, 2013) ("The [Arizona Board of Regent]'s funds consist of state funds and it is treated as the State of Arizona pursuant to Arizona law."); *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345, 1349 (9th Cir.1981) *abrogated on other grounds by Haygood v. Younger,* 769 F.2d 1350 (9th Cir.1985) (en banc) ("The Arizona Board of Regents is treated as the State of Arizona under Arizona law."); *Ronwin v. Shapiro,* 657. F.2d 1071, 1073 (9th Cir.1981) ("[W]e conclude that the [Arizona] Board of Regents is protected by the eleventh amendment, and further, that the Board is not a "citizen" within the meaning of 28 U.S.C. § 1332."); *Arizona Bd. of Regents v. Arizona York Refrigeration Co.,* 115 Ariz. 338, 565 P.2d 518 (Ariz.1977).

It should be noted also that UAHSC is a non jural entity and cannot be sued in its own name. *See Ansel Adams Publishing Rights,* 502 Fed.Appx. at 660 ("As a non jural entity under Arizona law, the University cannot be sued in its own name; rather, the Arizona Board of Regents (Board), as the governing body for Arizona's public universities, is the proper defendant for all actions against the University."). Even assuming this was not the case, UAHSC is an entity under the jurisdiction and control of ABOR and as such would also be barred from suit by Eleventh Amendment immunity. *See* Arizona Revised Statutes §§ 15–1601, 15–1625.

Dr. Waer, in her official capacity as an employee of UAHSC, an entity operated by ABOR, is also entitled to Eleventh Amendment immunity. *Betts v. New Castle Youth Development Center,* 621 F.3d 249, 254 (3d Cir.2010) ("Individual state employees sued in their official capacity are also entitled to Eleventh Amendment immunity because official-capacity suits generally represent only another way of pleading an action against the state.") (citation and quotation marks omitted); *Smith v. Sec'y of Dep't of Envtl. Prot. of Pennsylvania,* 540 Fed.Appx. 80, 82 (3d Cir.2013).

**This Court Lacks Personal Jurisdiction Over Dr. Waer**
Defendant Dr. Waer has shown that she is a resident of Tucson, Arizona and was at the relevant time and is currently employed by UAHSC, an entity operated by ABOR. (*See* Waer Aff. ¶¶ 3–6.) Dr. Waer has also shown that she has had no contact with Pennsylvania in connection with Isaacs and can recall no professional or personal contact in the state at all since a brief medical studies visit in the 1990s. (*Id.* at ¶¶ 11–17.) Dr. Waer maintains that she has not sought business in Pennsylvania, does not conduct business in the state, has had no personal or professional activities in the state in the last ten years, has no telephone listing or mailing address in the state, has never filed a state or local tax return in the state, and has never owned, used, possessed, rented, controlled, maintained, or had any other interest in any real property, personal property, bank account or other account in Pennsylvania. (*Id.*) Dr. Waer claims no professional or other licenses in Pennsylvania, no earnings from professional or business activities in the state, and

Exhibit 8 - Page 78

Case 2:19-cv-08000-DSF-RAO    Document 64-2    Filed 11/04/19    Page 80 of 264    Page
ID #:1755
Isaacs v. Trustees of Dartmouth College, Not Reported in F.Supp.3d (2014)
2014 WL 4186536

no involvement with Isaacs' residency application to UAHSC. (*Id.* at ¶¶ 18–21.) Isaacs makes no effort to refute any of these claims.

**\*17** Here, Dr. Waer's extremely limited interaction with the state of Pennsylvania prevents the finding of general personal jurisdiction. *See Goodyear Dunlop Tires Operations, S.A.,* 131 S.Ct. at 2851 (noting general personal jurisdiction is established when "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."); *Clark,* 811 F.Supp. at 1067 (noting general jurisdiction contacts must be "extensive and pervasive."). Moreover, specific personal jurisdiction is unavailing. Isaacs' claims against Dr. Waer are based on her supposed involvement in a conspiracy to prevent Isaacs from practicing medicine and the alleged emotional harm that conspiracy caused. (Am.Compl.¶¶ 34–42.) There is nothing in Isaacs' Amended Complaint that alleges Dr. Waer made any attempt to direct her activities into the forum state of Pennsylvania. *See e .g., Walden,* 134 S.Ct. at 1122–23; *Remick,* 238 F.3d at 255; *Marten,* 499 F.3d at 299. Isaacs does not specify the whereabouts of John Does # 1 or # 2, nor does he specify who allegedly initiated the communication with Dr. Waer. Also, as noted above, the fact that Isaacs felt some injury in the state of Pennsylvania does not evidence intent on Dr. Waer's part to cause injury in the forum state. *See Corrales Martin,* 2007 WL 4531028, at \*8 ("[T]he proper focus is on the time of the [injurious] act, not the point at which the consequences of the act become painful."). As a result of these conclusions, Isaacs cannot sustain specific personal jurisdiction against Dr. Waer under minimum contacts analysis or the *Calder* effects test and cannot maintain personal jurisdiction at all against Dr. Waer in any capacity.

**IV. CONCLUSION**

For the reasons more fully set forth above, the Court will the grant the Motions to Dismiss submitted by the MHMH Defendants, the Dartmouth Defendants, the NHBM, and the Arizona Defendants. An appropriate order follows.

**ORDER**

**AND NOW,** this _____ day of _____, 2014, upon consideration of Defendants Marc Bertrand, Edward Kaplan, and Mary Hitchcock Memorial Hospital's Motion to Dismiss for Lack of Jurisdiction (Doc. 24), Defendants Jim Yong Kim and Trustees of Dartmouth College's Motion to Dismiss for Lack of Jurisdiction (Doc. 25), Defendants Arizona Board of Regents, University of Arizona Health Sciences Center, and Amy Waer's Motion to Dismiss (Doc. 26), Defendant Arizona Board of Regents et al.'s Declaration in Support of Motion to Dismiss (Doc. 27), Defendant Arizona Board of Regents et al.'s First Affidavit in Support of Motion to Dismiss (Doc. 28), Defendant Arizona Board of Regents et al.'s Second Affidavit in Support of Motion to Dismiss (Doc. 29), Defendant Arizona Board of Regents et al.'s Memorandum of Law in Support of Motion to Dismiss (Doc. 30), Plaintiff David Isaacs' Response in Opposition to Motions to Dismiss by Dartmouth Defendants (Doc. 32), Plaintiff Isaacs' Default Entry for Emergency Injunction (Doc. 33), Plaintiff Isaacs' Amendment to Response in Opposition to Motions to Dismiss by Dartmouth Defendants (Doc. 34), Defendant Arizona Board of Regents et al.'s Response to Plaintiff's Request for Default (Doc. 36), Defendant New Hampshire Board of Medicine's Objection to Application for Default (Doc. 37), Defendant New Hampshire Board of Medicine's Motion to Dismiss (Doc. 42), Plaintiff Isaacs' Response in Opposition to Motion to Dismiss and Request for Appointment of Counsel (Doc. 44), and Plaintiff Isaacs' Addendum to Response to Motion to Dismiss for Lack of Jurisdiction (Doc. 47), and along with affidavits, declarations, and additional filings by the parties, it is hereby **ORDERED AND DECREED** that:

**\*18** 1. This Court lacks personal or subject matter jurisdiction over all of the named Defendants and may not opine on Plaintiff's request for emergency injunction (Doc.33) or Plaintiff's request for appointment of counsel (Doc. 44);

2. Defendants Marc Bertrand, Edward Kaplan, and Mary Hitchcock Memorial Hospital's Motion to Dismiss for Lack of Jurisdiction (Doc. 24) is **GRANTED;**

3. Defendants Jim Yong Kim and Trustees of Dartmouth College's Motion to Dismiss for Lack of Jurisdiction (Doc. 25) is **GRANTED;**

2014 WL 4186536

4. Defendants Arizona Board of Regents, University of Arizona Health Sciences Center, and Amy Waer's Motion to Dismiss (Doc. 26) is **GRANTED;** and

5. Defendant New Hampshire Board of Medicine's Motion to Dismiss (Doc. 42) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of Court shall mark this matter as **CLOSED** for statistical purposes.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4186536

Footnotes

1   Although one case in this district did find that a national university had established sufficient contacts upon which to base jurisdiction, in that case the university had registered to do business in Pennsylvania, had operated an office in Pennsylvania for forty five years, had full time and part time staff at its Pennsylvania office, paid state and local taxes, leased property, and advertised in the state using a billboard featuring the university name. *See Duchesneau v. Cornell University,* Civil Action No. 08–4856, 2009 WL 3152125, at *4 (E.D.Pa. Sept.20, 2009). These types of specific and significant contacts are absent in this case and in the cases previously cited.

2   As this Court finds that Isaacs' claim fails on personal jurisdictional grounds, it declines to address the NHBM's arguments with regard to subject matter jurisdiction or abstention doctrine. This Court's discretion to do so is supported by ample precedent. In *Ruhrgas AG v. Marathon Oil Co.,* the Supreme Court held that federal courts are not generally obligated to address "jurisdictional issues" in any particular order. 526 U.S. 574, 584, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999).

"[A] court that dismisses on ... non-merits grounds such as ... personal jurisdiction, before finding subject-matter jurisdiction, makes no assumption of law-declaring power that violates the separation of powers principles ... It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."

*Id.* at 584–86 (citing *In re Papandreou,* 139 F.3d 247, 255 (D.C.Cir.1998)); *see also In re Hechinger Inv. Co. of Delaware, Inc.,* 335 F.3d 243, 251 (3d Cir.2003) ("The language of the Court in *Ruhrgas* makes it clear that, by 'jurisdictional issues,' the Court meant those issues that a federal court must address before it possesses the power to reach the merits of an action.").

3   The University of Arizona Health Science Center is referred to by the Arizona Defendants as "the College of Medicine of the University of Arizona" in their briefings. (Donzuso Decl. ¶ 1.)

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 8 - Page 80

Case 2:19-cv-08000-DSF-RAO  Document 64-2  Filed 11/04/19  Page 82 of 264  Page
ID #:1757
Isaacs v. Arizona Bd. of Regents, 608 Fed.Appx. 70 (2015)
319 Ed. Law Rep. 695

608 Fed.Appx. 70
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Dr. Jeffrey David ISAACS, Appellant

v.

ARIZONA BOARD OF REGENTS; Dr. Marc
Bertrand; Dr. Jim Yong Kim; Edward Kaplan; Dr.
Amy Waer; Mary Hitchcock Memorial Hospital;
University of Arizona Health Sciences Center;
John Doe # 1 & # 2; New Hampshire Board
of Medicine; Trustees of Dartmouth College.

No. 14–3985.
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) April 1, 2015.
|
Opinion filed: April 7, 2015.

**Synopsis**
**Background:** Medical school graduate, as former surgery
resident at University of Arizona Health Sciences Center
and former psychiatry resident at another college and
teaching hospital in New Hampshire, sued Arizona Board
of Regents, college trustees, hospital, health sciences
center, New Hampshire Board of Medicine, and various
officials, claiming conspiracy, intentional infliction of
emotional distress, breach of contract, and obstruction of
justice, and seeking injunctive relief. The United States
District Court for the Eastern District of Pennsylvania,
Petrese B. Tucker, Chief Judge, 2014 WL 4186536,
dismissed for lack of personal jurisdiction or based on
sovereign immunity. Appeal was taken.

**Holdings:** The Court of Appeals held that:

[1] personal jurisdiction was lacking over hospital and
board;

[2] personal jurisdiction was lacking over college; and

[3] center and board of regents were immune from suit.

Affirmed.

West Headnotes (3)

[1]  **Constitutional Law**
     👉 Non-profit, charitable, and educational
     organizations
     **Constitutional Law**
     👉 Public entities, employees, and officials
     **Federal Courts**
     👉 Contract disputes
     **Federal Courts**
     👉 Torts in general
     New Hampshire teaching hospital and
     New Hampshire Board of Medicine lacked
     sufficient minimum contacts with forum state
     of Pennsylvania, as required to exercise
     personal jurisdiction over hospital and board,
     comporting with due process requirements, in
     lawsuit by former psychiatry resident claiming
     conspiracy to terminate his medical training,
     intentional infliction of emotional distress,
     and breach of contract; resident received letter
     in Pennsylvania that was sent from board
     and he completed his residency and license
     applications in Pennsylvania, but allegations
     in his complaint had nothing to do with
     Pennsylvania, alleged harms did not occur in
     Pennsylvania, and neither hospital nor board
     purposely availed themselves of privileges
     of conducting activities in Pennsylvania
     to degree necessary to confer jurisdiction.
     U.S.C.A. Const.Amend. 14.

     5 Cases that cite this headnote

[2]  **Constitutional Law**
     👉 Particular Parties or Circumstances
     **Federal Courts**
     👉 Contract disputes
     **Federal Courts**
     👉 Torts in general

New Hampshire college lacked sufficient minimum contacts with forum state of Pennsylvania, as required to exercise personal jurisdiction over college, comporting with due process requirements, in lawsuit by former psychiatry resident claiming conspiracy to terminate his medical training, intentional infliction of emotional distress, breach of contract, and obstruction of justice; college's contacts of recruiting athletes and faculty in Pennsylvania, targeting Pennsylvania high school students through e-mails and its website, and admitting those students to college were de minimis and did not relate to allegations in resident's complaint, Pennsylvania was not focal point of harm to resident, and college did not expressly aim any tortious conduct at Pennsylvania. U.S.C.A. Const.Amend. 14.

5 Cases that cite this headnote

[3]   **Federal Courts**
      👉 Higher education;colleges and universities

Arizona Board of Regents and University of Arizona Health Sciences Center were protected by sovereign immunity, under Eleventh Amendment, from lawsuit by former surgery resident claiming intentional infliction of emotional distress and conspiracy to terminate his medical training. U.S.C.A. Const.Amend. 11.

Cases that cite this headnote

**\*71** On Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C.Civ. No. 13–cv–05708), Chief District Judge: Honorable Petrese B. Tucker.

**Attorneys and Law Firms**

Dr. Jeffrey D. Isaacs, West Chester, PA, pro se.

Peter T. Shapiro, Esq., Lewis, Brisbois, Bisgaard & Smith, New York, NY, Eric A. Weiss, Esq., Marshall, Dennehey, Warner, Coleman & Goggin, Neil J. Hamburg, Esq.,

Hamburg & Golden, Jodi S. Wilenzik, Esq., Eckert, Seamans, Cherin & Mellott, Claudia M. Tesoro, Esq., Office of Attorney General of Pennsylvania, Philadelphia, PA, Nancy J. Smith, Esq., Attorney General's Office, Concord, NH, for Arizona Board of Regents; Dr. Marc Bertrand; Dr. Jim Yong Kim; Edward Kaplan; Dr. Amy Waer; Mary Hitchcock Memorial Hospital; University of Arizona Health Sciences Center; John Doe # 1 & # 2; New Hampshire Board of Medicine; Trustees of Dartmouth College.

Before: FISHER, KRAUSE and VAN ANTWERPEN, Circuit Judges.

**\*72** OPINION [*]

PER CURIAM.

Jeffrey Isaacs appeals from an order of the District Court dismissing his amended complaint. For the reasons that follow, we will affirm.

On September 30, 2013, Isaacs filed suit in the United States District Court for the Eastern District of Pennsylvania and later amended his complaint. Isaacs alleged that, after graduating from a Caribbean medical school in 2010, he was accepted to a surgery residency at the University of Arizona Health Sciences Center. After he began this residency, he believes someone communicated with University of Arizona officials about his "confidential" attendance at and departure from a California medical school that predated his attendance at the Caribbean medical school. Isaacs claimed that he was told on the second day of his surgical residency by Program Director Amy Waer, M.D. that he was not qualified for the residency, but, based on his suspicion that University of Arizona officials improperly had communicated with his California medical school, he decided to resign within six weeks of his arrival. In his view, University of Arizona officials constructively terminated him. He did not sue the University at this time.

In 2011, Isaacs accepted a position as a psychiatry resident at Dartmouth College and the Mary Hitchcock Memorial Hospital in New Hampshire. As part of his application for the residency, Isaacs submitted an application for a training license to the New Hampshire Board of Medicine, and on that application he listed his prior surgical residency at the University of Arizona. Isaacs began

his psychiatry residency in June, 2011. On February 3, 2012, Isaacs, who suffers from a neuropsychiatric illness, filed a disability discrimination and wrongful termination complaint pro se in the United States District Court for the District of New Hampshire, *see Isaacs v. Dartmouth–Hitchcock Medical Center,* D.C. Civ. No. 12–cv–00040, against Dartmouth College and the Mary Hitchcock Memorial Hospital. Dartmouth and the Hospital were represented by Edward M. Kaplan.

Isaacs was subjected to an investigation as a result of his failure to disclose, on his 2010 Electronic Residency Application Service ("ERAS") application, his prior enrollment at the California medical school, his prior residency experience at the University of Arizona, and his Arizona training license. In March 2012, Isaacs was terminated from his Dartmouth psychiatry residency, in part because he omitted this information when he applied to Dartmouth and because he did not disclose his California history on his New Hampshire training license application. At his request, he was granted the opportunity to participate in the Fair Hearing process by Dr. Marc Bertrand, a Dartmouth dean. Hearings were scheduled in New Hampshire but Isaacs declined to attend; he had returned home to Pennsylvania.

The New Hampshire Board of Medicine also commenced an investigation to determine whether Isaacs committed professional misconduct in failing to disclose that he had attended the California medical school and the circumstances of his departure from that school. The Board scheduled an adjudicatory/disciplinary hearing against Isaacs and sent him a Notice of Hearing, which ordered him to travel to Concord to participate in the proceeding and, if appropriate, be subjected to sanctions. **\*73** Isaacs declined and his New Hampshire training license was revoked.

In April 2014, the District Court in Isaacs' New Hampshire case granted the defendants' motion for summary judgment. The Court of Appeals for the First Circuit affirmed on January 5, 2015, C.A. No. 14–1544.

The amended complaint that Isaacs filed in the Eastern District of Pennsylvania in September 2013 contained four tort or contract causes of action and a request for injunctive relief. Isaacs alleged in Count I that all defendants, other than the New Hampshire Board of Medicine, conspired against him to terminate his medical

training in New Hampshire. Count II alleged that all defendants, except the Board of Medicine, intended to cause him severe emotional distress. Count III alleged that the Trustees of Dartmouth College and the Mary Hitchcock Memorial Hospital breached a contract by offering him a hearing at an inconvenient location (New Hampshire) after he had already been terminated, and Count IV alleged that the Dartmouth defendants obstructed justice in his New Hampshire litigation. Count V alleged that Isaacs is entitled to injunctive relief in the form of an order enjoining the defendants from continuing their conspiracy to deny him medical training. As a result of the unlawful conspiracy, Isaacs claimed, his federal training subsidy has been exhausted and he has no further opportunity to become a licensed physician in the United States. Moreover, he contended that information relating to his attendance and departure from the California medical school is confidential pursuant to a settlement agreement [1] and under the Family Educational Rights & Privacy Act ("FERPA"), 20 U.S.C. § 1232g.

With respect to diversity jurisdiction in the Pennsylvania federal court, Isaacs alleged that he completed his ERAS applications to the University of Arizona and Dartmouth College in Pennsylvania; that the Dartmouth College defendants mailed two letters to him in Pennsylvania, one terminating him from his psychiatry residency and one offering him a fair hearing in New Hampshire concerning this termination; that he completed license application documents while in Pennsylvania which later became the subject of misconduct allegations made by the New Hampshire Board of Medicine; and that the Board mailed a letter to his home in Pennsylvania, demanding that he attend a hearing in New Hampshire over whether it was an improper action on his part not to disclose his California history on his license application.

All defendants—Marc Bertrand, Edward Kaplan, the Mary Hitchcock Memorial Hospital, former Dartmouth President Jim Yong Kim, the Trustees of Dartmouth College, the Arizona Board of Regents, the University of Arizona Health Sciences Center, Dr. Amy Waer, and the New Hampshire Board of Medicine—filed motions to dismiss the amended complaint based on a lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) or sovereign immunity. After Isaacs submitted his opposition to these motions, the District Court, in an order entered on August 25, 2014, granted the motions, holding that personal jurisdiction in the

Exhibit 9 - Page 83

Eastern District of Pennsylvania was lacking as to seven of the defendants, and that the Arizona Board of Regents and University of Arizona Health Sciences Center are protected from suit in **\*74** federal court by the Eleventh Amendment.

Isaacs appeals. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's determination to grant a motion to dismiss. *See Spruill v. Gillis,* 372 F.3d 218, 226 (3d Cir.2004). A plaintiff must allege sufficient facts to establish personal jurisdiction when a defendant raises the defense of a lack of personal jurisdiction. *See Mellon Bank v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992). If the defendant contradicts the plaintiff's allegations through opposing affidavits, as the defendants did here, a plaintiff must present particular evidence in support of personal jurisdiction. *Id.* The District Court's findings of facts with respect to personal jurisdiction are reviewed for clear error. *Strahan Gear Co., Inc. v. NL Industries, Inc.,* 800 F.2d 53, 56 (3d Cir.1986).

We will affirm. A federal court sitting in diversity must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant, and then must determine whether the exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment. *See IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 258–59 (3d Cir.1998). Because Pennsylvania has chosen to exercise jurisdiction to the fullest extent possible, 42 Pa. Cons.Stat. Ann. § 5322(b), the federal due process principle of "minimum contacts" with the forum state and the requirement that the exercise of jurisdiction comport with "traditional notions of fair play and substantial justice" control. *Remick v. Manfredy,* 238 F.3d 248, 255 (3d Cir.2001) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Such minimum contacts are established when there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

These due process principles have been characterized as falling under either specific or general jurisdiction. General jurisdiction grants courts the ability to hear "any and all claims" against out-of-state defendants "when their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Op., S.A. v. Brown,* ––– U.S. ––––, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011). General jurisdiction is invoked when the plaintiff's cause of action arises from the defendant's non-forum related activities. *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 150 (3d Cir.1996) (internal quotation marks and citation removed). Specific jurisdiction, in contrast, is present where the plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant "should reasonably anticipate being haled into court" in that forum. *Id.* at 151 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). The exercise of specific jurisdiction is permissible where: (1) the defendant purposely directed his activities at the forum state; (2) the plaintiff's claim arises out of and relates to at least one of those specific activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice. *See Marten v. Godwin,* 499 F.3d 290, 296 (3d Cir.2007).

A separate route to specific personal jurisdiction is available to victims of intentional torts; this is the "effects test" stemming from the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 788–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), which **\*75** holds that intentional torts aimed at a forum state and causing injury within that state can subject a tortfeasor to jurisdiction in that state. *Id.* The effects test requires the plaintiff to show that: "(1) [t]he defendant committed an intentional tort; (2)[t]he plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) [t]he defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *Marten,* 499 F.3d at 297 (quoting *IMO Indus., Inc.,* 155 F.3d at 265–67).

In analyzing the general and specific personal jurisdiction and *Calder* effects test issues raised by Isaacs' suit against the New Hampshire and Arizona defendants, the District Court made thorough findings of fact with respect to each of the seven defendants who were dismissed for lack of personal jurisdiction, and then applied those facts to the governing law. Because the parties are familiar with the facts of this case, and because Isaacs in his

brief on appeal has failed to persuade us that even one of the Court's findings was clearly erroneous, we will only summarize those findings necessary to illustrate why personal jurisdiction in the Eastern District of Pennsylvania, under any of the three separate routes identified, is so plainly lacking here.

[1]   Mary Hitchcock Memorial Hospital is a teaching hospital located in New Hampshire, organized under the laws of that state and with its principal place of business in that state. It does not serve patients or maintain any programs in Pennsylvania, and does not pay taxes in Pennsylvania. Mark Bertrand does not teach or practice medicine in Pennsylvania or conduct any business there. Edward Kaplan is not licensed to practice law in Pennsylvania, does not pay taxes there, and does not target clients from Pennsylvania. Dartmouth College is an institution of higher learning located in New Hampshire, with its principal place of business there. Dartmouth College does not maintain an office or facility in Pennsylvania, has no officers or employees there, maintains no registered agent for service of process there, and does not own any real property there. Dr. Kim does not now reside in nor has he ever resided in Pennsylvania, he does not own real property or lease property there, and he has never been employed by an institution or organization there. The New Hampshire Board of Medicine, located in Concord, New Hampshire, is authorized to take action only regarding the practice of medicine in New Hampshire. Amy Waer is a resident of Tucson, Arizona and has no business, professional or personal association with Pennsylvania.

These seven defendants' contacts with Pennsylvania do not even approach the level of contact needed to attain general or specific personal jurisdiction, or personal jurisdiction under the effects test, in the Eastern District of Pennsylvania. The allegations in the amended complaint have nothing to do with Pennsylvania, the alleged harms did not occur in Pennsylvania, and these defendants do not purposely avail themselves of the privileges of conducting activities within Pennsylvania to the degree necessary to confer jurisdiction. Personal jurisdiction is not established by the mailing of a few letters to Isaacs after he returned to his home in Pennsylvania, or by the fact that he completed his ERAS and license applications in Pennsylvania. *See Goodyear Dunlop Tires Op.,* 131 S.Ct. at 2851; *Marten,* 499 F.3d at 299. In addition, Isaacs' vague assertion that he has experienced an injury

in Pennsylvania due to his termination from his New Hampshire residency and alleged constructive discharge from his University of Arizona residency will not suffice to establish **\*76** jurisdiction under the effects test, for the reasons given by the District Court.

[2]   Specifically with respect to Dartmouth College, where the assertion of personal jurisdiction is at least not frivolous, the District Court found that it recruits athletes and faculty in Pennsylvania, and targets highly-qualified Pennsylvania high school students through emails and its website and admits them, among other similar things. Nevertheless, as the District Court correctly determined, these *de minimis* contacts, which any national university may have, do not relate to the allegations in Isaacs' amended complaint and are insufficient to establish personal jurisdiction in the Eastern District of Pennsylvania. *Cf. Gehling v. St. George's School of Medicine, Ltd.,* 773 F.2d 539, 541–43 (3d Cir.1985) (fact that some of school's students are Pennsylvania residents does not signify a relevant business contact). *See also Gallant v. Trustees of Columbia University,* 111 F.Supp.2d 638, 641–42 (E.D.Pa.2000) ("While the plaintiff here has presented more contacts than those considered ... in *Gehling,* none of these additional contacts demonstrate that Columbia has purposefully directed its activities to, or availed itself of, Pennsylvania[; rather,] they are the result of Columbia's general participation in the type of interstate activity in which any nationally prominent educational institution would engage."). The District Court properly held that *Duchesneau v. Cornell University,* 2009 WL 3152125 (E.D.Pa. Sept. 30, 2009), which in any event we are not bound by, could be distinguished on its facts because, unlike Dartmouth College, Cornell University registered with the Pennsylvania Secretary of State and obtained a license to do business in Pennsylvania, operated a long-standing Mid–Atlantic Regional Office in Pennsylvania, and paid state and local taxes for its Pennsylvania employees. *Id.* at *4. Moreover, to the extent that Isaacs was harmed, Pennsylvania is not the focal point of the harm, nor did Dartmouth College expressly aim tortious conduct at Pennsylvania.

[3]   As to the Arizona Board of Regents and University of Arizona Health Sciences Center, the District Court properly held that these defendants are entitled to immunity from suit pursuant to the Eleventh Amendment, which immunizes States and their agencies from suits for damages in federal court, *see Pennhurst State School*

Isaacs v. Arizona Bd. of Regents, 608 Fed.Appx. 70 (2015)

319 Ed. Law Rep. 695

*v. Halderman,* 465 U.S. 89, 100–02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Eleventh Amendment extends to the Arizona Board of Regents and the University, *see Rutledge v. Ariz. Bd. of Regents,* 660 F.2d 1345, 1349 (9th Cir.1981), *abrogated on other grounds by Haygood v. Younger,* 769 F.2d 1350, 1356 (9th Cir.1985) (en banc).

For the foregoing reasons, we will affirm the order of the District Court dismissing the amended complaint as to all defendants.

**All Citations**

608 Fed.Appx. 70, 319 Ed. Law Rep. 695

Footnotes

\*      This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1      Isaacs filed suit in federal court in California against his medical school. The case settled.

---

**End of Document**                                                 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Isaacs v. Trustees of Dartmouth College, Not Reported in Fed. Supp. (2018)
2018 WL 734182, 2018 DNH 016

2018 WL 734182

NOT FOR PUBLICATION
United States District Court, D. New Hampshire.

Dr. Jeffrey ISAACS

v.

TRUSTEES OF DARTMOUTH
COLLEGE, NH Board of Medicine, and
Dartmouth-Hitchcock Medical Center

Civil No. 17-cv-040-LM
|
Signed 02/05/2018

**Attorneys and Law Firms**

Keith A. Mathews, John F. Skinner, III, Associated
Attorneys of New England, Manchester, NH, for Dr.
Jeffrey Isaacs.

Jeffrey Isaacs, Newtown Square, PA, pro se.

Pierre A. Chabot, Wadleigh Starr & Peters PLLC,
Manchester, NH, Seth Michael Zoracki, NH Attorney
General's Office, William D. Pandolph, Sulloway & Hollis
PLLC, Concord, NH, for Trustees of Dartmouth College,
NH Board of Medicine, and Dartmouth-Hitchcock
Medical Center.

**ORDER**

Landya McCafferty, United States District Judge

**\*1** Dr. Jeffrey Isaacs was a resident in psychiatry at
Dartmouth-Hitchcock Medical Center ("DHMC") from
June of 2011 until March of 2012, when DHMC dismissed
him from its residency program. Dr. Isaacs challenged his
dismissal in a previous action in this court, which resulted
in summary judgment in favor of all defendants. See Isaacs
v. Dartmouth-Hitchcock Med. Ctr., No. 12-CV-040-LM,
2014 WL 1572559 (D.N.H. Apr. 18, 2014).

In March of 2014, after conducting a hearing, the New
Hampshire Board of Medicine ("Board") reprimanded
Dr. Isaacs for omissions and misrepresentations in the
application for a training license he had submitted to
it. According to plaintiff's First Amended Complaint
("FAC"), which is the operative complaint in this case,

his claims "arise out of the [Board's] February 5, 2014
Hearing, and their March 2014 Final Decision and
Order." Doc. no. 40 at ¶ 6.

In his FAC, plaintiff asserted nine claims. In previous
orders, the court: (1) dismissed with prejudice all of the
claims plaintiff asserted in Counts II, III, IV, V, VI, VII,
and IX of the FAC, and all but one of the claims he
asserted in Count VIII; (2) allowed plaintiff to move for
leave to amend his FAC to reassert the one potentially
viable claim in Count VIII, a claim for retaliation under
the Americans With Disabilities Act ("ADA"), 42 U.S.C.
§ 12101-12213, asserted against DHMC and the Trustees
of Dartmouth College ("Trustees"), arising from the
disposition of his 2016 application for a residency; and
(3) directed plaintiff to show cause why the constitutional
claims he asserted against the Board and Attorney Jeff
Cahill in Count I, by means of 42 U.S.C. § 1983, should
not be dismissed as time barred.

Currently before the court are: (1) plaintiff's response to
the show cause order, to which the Board has replied;
and (2) plaintiff's motion for leave to amend his FAC, to
which the Trustees, the Board, and DHMC all object. [1]
In the seven count proposed Second Amended Complaint
("SAC") that plaintiff has attached to his motion for leave
to amend, he asserts what he purports to be a timely § 1983
claim against the Board and Attorney Jeff Cahill (Count
I) and an ADA retaliation claim against the Dartmouth
defendants (i.e., the Trustees and DHMC) based upon the
decision not to give him an interview when he applied
for a residency in 2017 (Count V). [2] He also asserts five
new claims: (1) a claim under Title IX of the Education
Amendments of 1972, against the Dartmouth defendants
(Count II of the proposed SAC); (2) a state law claim
for fraud against the Board (Count III of the SAC); (3) a
state law claim for civil conspiracy against the Dartmouth
defendants and the Board (Count IV of the SAC); (4)
a claim for retaliation, in violation of the Rehabilitation
Act, 29 U.S.C. § 701 et seq., against the Dartmouth
defendants (Count VI of the SAC); and (5) claims for
disability discrimination under both the Rehabilitation
Act and the ADA, against the Dartmouth defendants
(Count VII of the SAC).

**I. Section 1983 Claims (Count I)**

A. Background

**\*2** Unless otherwise indicated, the facts recited below are drawn from plaintiff's FAC or previous orders in this case.

Shortly after DHMC dismissed Dr. Isaacs from its residency program, it notified the Board that it had done so, and it also informed the Board that it believed that Dr. Isaacs had omitted material facts from the license application he had submitted to the Board. Those omissions concerned plaintiff's attendance at the University of Southern California ("USC") medical school. In October of 2013, the Board notified Dr. Isaacs that it would hold a hearing on February 5, 2014, to determine whether he had committed professional misconduct by omitting information from, and making misrepresentations in, his application for a training license. On January 29, 2014, Dr. Isaacs asked the Board to stay his hearing, pending the outcome of a suit he had filed against it in the Eastern District of Pennsylvania, where he was then residing. He also asked to appear at his hearing remotely, because he was unable to drive to New Hampshire due to an unidentified medical condition.

The Board denied both of Dr. Isaacs's requests. In denying his request for a stay, the Board reasoned that Dr. Isaacs's pending action in the Eastern District of Pennsylvania had no bearing on the matter before it and further noted that under New Hampshire law, it was immune from suit. See doc. no. 7-1 at 5 (citing N.H. Rev. Stat. Ann. ("RSA") § 329:17, IX). On the morning of the day of his hearing, Dr. Isaacs notified the Board that he would be unable to attend because of inclement weather that precluded him from driving from Pennsylvania to New Hampshire that day. The hearing went on without him. Attorney Jeff Cahill served as the Board's hearing counsel.

After Dr. Isaacs's hearing, the Board issued a Final Decision and Order ("Order") which was signed by the Board's Administrator, Penny Taylor, and dated March 11, 2014. In its Order, the Board pointed out that Dr. Isaacs's training license had been cancelled by operation of law when he was dismissed from the DHMC residency program. But, the Board went on to reprimand Dr. Isaacs for omissions and misrepresentations in his application for that license.

With regard to how he learned of the Board's Order, plaintiff alleges: "The Board ... failed to serve the final Order and Plaintiff did not receive the order by mail or email. Plaintiff found out about the Board's decision

online, well after the date was up to appeal." Doc. no. 40 at ¶ 42. However, plaintiff does not allege either the date on which the Board posted its Order online or the date on which he first saw it. For its part, the Board has produced: (1) a declaration from Taylor stating that she mailed Dr. Isaacs a copy of the Board's Order on March 11, 2014, see doc. no. 66-1 at ¶ 2; and (2) a copy of a transmittal letter addressed to Dr. Isaacs, which was dated March 11, 2014, and which purported to enclose the Order. In any event, plaintiff now "acknowledges" the Board's production of an e-mail that he sent to Attorney Cahill and Taylor on March 26, 2014, which referred to the Board's decision, thus demonstrating that he knew of the decision no later than that date. See doc. no. 62 at ¶ 1; doc. no. 52 at ¶ 6; doc. no. 52-1. [3] Moreover, plaintiff has produced a copy of an e-mail he sent to Lynn Salvo on March 16, 2014, in which he stated that he had read the Board's decision, online, on March 15. See doc. no. 68-3. [4]

**\*3** In October of 2014, plaintiff filed a motion with the Board that stated, in full: "Hereby Dr Jeffrey Isaacs motions to NH Board to cease the publication of disciplinary action, pending appeal of NH RSA 329:18-a noncompliance by the Board." Doc. no. 49 at ¶ 7. RSA 329:18-a outlines the procedures the Board must follow when conducting disciplinary hearings, and it appears that in his October 2014 motion, Dr. Isaacs was suggesting that the Board had violated RSA 329:18-a, IV, which provides that the Board's "decisions shall not be [made] public until they are served upon the parties." The Board's violation, according to plaintiff, was publishing its Order online before serving him with a copy of it. The Board denied Dr. Isaacs's motion in November of 2014, and he appealed that decision to the U.S. Supreme Court, which denied certiorari on May 21, 2015.

Dr. Isaacs filed his original complaint in this case on February 3, 2017. In July 2017, he filed his FAC, in which he first asserted claims, by means of § 1983, that Cahill, Taylor, and the individual members of the Board had violated his rights to procedural and substantive due process by:

    a. Employing confidential out of state and inaccurate settlement documents to [d]eprive [him] of his livelihood and publicly embarrass him;

    b. Failing to consider the relevant documents provided by [him] in his defense;

Exhibit 10 - Page 88

Case 2:19-cv-08000-DSF-RAO     Document 64-2     Filed 11/04/19     Page 90 of 264     Page ID #:1765

Isaacs v. Trustees of Dartmouth College, Not Reported in Fed. Supp. (2018)

2018 WL 734182, 2018 DNH 016

c. Failing to honor the solemnity of a confidential Court Settlement Agreement;

d. Failing to honor [his] reasonable request to continue the hearing for medical reasons;

e. Failing to honor [his] reasonable request to continue the hearing for inclement weather; [and]

f. Fail[ing] to allow [his] reasonable request to participate electronically.

FAC ¶ 52. The injury plaintiff claims is not the loss of his training license, which had been cancelled by operation of law before his hearing. Instead, the injury he claims is damage to his reputation, and to his ability to practice medicine, resulting from the publication of the Board's Order. See doc. no. 40 at ¶¶ 42, 45, 46, 49, 66.

Finally, while the § 1983 claims that plaintiff asserts in his SAC are identical to those in his FAC, he adds these new factual allegations to his SAC: "Dr. Isaacs moved to reconsider [the Board's March 11] order, a motion that was denied in April of 2014." Doc. no. 51-1 at¶ 64.

### B. Discussion

In this section, the court discusses both the § 1983 claims in Count I of the FAC, as well as the proposed amendment to those claims in Count I of the SAC. For the reasons explained below, Count I of the FAC is dismissed as time barred. With respect to Count I of the SAC, and for the reasons explained below, the court orders further briefing.

The court begins its discussion with Count 1 of the FAC, and then turns to the same count in the SAC.

### 1. Show Cause Briefing (Count I of FAC)

Plaintiff first asserted his § 1983 claims against Cahill, Taylor, and the individual members of the Board in his FAC, which he filed on May 1, 2017. In its show cause order, the court explained that on the record and arguments before it, plaintiff was not entitled to the benefit of the relation back doctrine, which, had it applied, would have established February 3, 2017, as the filing date for his § 1983 claims. Plaintiff does not argue the point in his show cause memorandum. Thus, the question before the court is whether May 1, 2017, falls within or outside

the limitations period prescribed by New Hampshire law for personal injury actions. See Martínez-Rivera v. Puerto Rico, 812 F.3d 69, 74 (1st Cir. 2016) (explaining that "[b]ecause section 1983 does not have its own statute of limitations ... courts use the personal-injury limitations period adopted by the state where the injury supposedly occurred") (citations removed).

In New Hampshire, the statute that establishes the limitations period for personal-injury actions provides that:

> **\*4** [A]ll personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

RSA 508:4, I. While federal courts adjudicating § 1983 claims "use the personal-injury limitations period adopted by the state where the injury supposedly occurred," Martínez-Rivera, 812 F.3d at 74, they "use federal law ... to figure out when the limitation clock starts ticking," id. The federal "rule is that the ticking starts when [the plaintiff] knew or had reason to know of the injury on which [his] claim rests." Id.; see also Asociación de Suscripción Conjunta del Segura de Responsabilidad Obligatorio v. Jaurbe-Jiminez, 659 F.3d 42, 50 (1st Cir. 2011) ("Section 1983 claims accrue when the plaintiff knows, or has reason to know of the injury on which the action is based...." (internal quotation marks removed)). And, "just as [the court] borrow[s] the state's limitations period in section—1983 cases, so too [does it] borrow the state's tolling rulings—unless of course they are hostile to federal interests." Martínez-Rivera, 812 F.3d at 77-75 (citing Rodríguez v. Mun. of San Juan, 659 F.3d 168, 173

Isaacs v. Trustees of Dartmouth College, Not Reported in Fed. Supp. (2018)

2018 WL 734182, 2018 DNH 016

Case 2:19-cv-08000-DSF-RAO    Document 64-2    Filed 11/04/19    Page 91 of 264    Page ID #:1766

(1st Cir. 2011); López-González v. Mun. of Comerio, 404 F.3d 548, 552 (1st Cir. 2005)).

Finally, as a general matter, "the statute of limitations is an affirmative defense with the defendant bearing the burden of establishing that a claim against it is time-barred." Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 216 (1st Cir. 2016) (citing Asociación de Subscripción Conjunta del Seguro de_Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 50 n.10 (1st Cir. 2011)). The defendant's "burden ... is met by a showing that the action was not brought within 3 years of the act or omission complained of." Beane v. Dana S. Beane & Co., 160 N.H. 708, 712 (2010) (internal quotation marks removed). With the foregoing principles in mind, the court turns to plaintiff's show cause memorandum.

In his memorandum, plaintiff posits two possible starting dates for the running of the limitations period on his § 1983 claims: (1) the date in November of 2014 on which the Board denied his motion to cease the publication of its March 11 Order; and (2) May 21, 2015, the date on which the U.S. Supreme Court denied certiorari on his appeal from the Board's November 2014 decision. In his reply to the Board's response to his show cause memorandum, plaintiff appears to change course, focusing not on when the limitations period began to run but rather, suggesting that the running of the limitations period was tolled until the date on which the Board denied his motion in November of 2014. In the discussion that follows, the court begins by establishing when the limitations period began to run and then turns to the question of tolling.

According to the Board, plaintiff's § 1983 claims accrued on March 11, 2014, the date on which Penny Taylor signed the Board's Order. But according to plaintiff, his injury resulted not from the Board's decision itself, but from the publication of the Board's Order online. The Board has not indicated when the Order was published, much less that Dr. Isaacs knew of its publication on the day it was signed. Thus the limitations period did not begin to run on March 11. However, plaintiff has produced evidence that he knew of the publication of the Board's Order by March 15, 2014. [5] Therefore, any cause of action that plaintiff might have against the Board arising from the manner in which it conducted his hearing and drafted its Order accrued on that date.

**\*5** Plaintiff did not file his § 1983 claims against Cahill, Taylor, and the individual members of the Board until May 1, 2017. That is more than three years after any such claims would have accrued. Accordingly, the Board has carried its burden of proving that, to the extent that plaintiff had any cognizable § 1983 claims in the first instance, those claims were time barred by the time he filed them on May 1, 2017.

Because the Board has carried its burden of proving that plaintiff's § 1983 claims are time barred, those claims can survive only if plaintiff can establish that the limitations period was tolled for an amount of time long enough to have kept it running past May 1, 2017. The availability of tolling is a question of New Hampshire law. See Martínez-Rivera, 812 F.3d at 74-75.

In his show cause memorandum, without identifying any legal authority, plaintiff argues that the running of the limitations period was tolled by the motion he filed with the Board in October of 2014. In his reply, after identifying Dobe v. Commissioner, New Hampshire Department of Health and Human Services, 147 N.H. 458 (2002), as the legal authority entitling him to the benefit of tolling, plaintiff argues:

> By filing a request for administrative appeal, that was subsequently denied, the damages he incurred began at the date of the denial and therefore equitable tolling is appropriate here. Moreover, the Board's denial of the motion, to some degree, concedes they didn't comply with RSA, and had no intent of correcting the matter. In such a case, willful noncompliance with RSA should certainly toll the statute of limitations.

Doc. no. 62 at ¶ 6.

Plaintiff's reliance upon Dobe is misplaced. In Dobe, the New Hampshire Department of Health and Human Services ("DHHS") "issued a notice [on July 9, 1996] stating that [a] report of child abuse [against Christopher Dobe] was founded, notwithstanding the lack of any

Isaacs v. Trustees of Dartmouth College, Not Reported in Fed.Supp. (2018)

2018 WL 734182, 2018 DNH 016

physical evidence that [his] daughter [the alleged victim] had been sexually abused." 147 N.H. at 459. In a subsequent divorce proceeding, the marital master made an award of custody that was favorable to Dobe, and raised numerous concerns about the investigation on which DHHS relied to determine that the abuse allegations against Dobe were founded. See id. Dobe then "appealed the [July 1996] DHHS finding to the DHHS Office of Program Support Administrative Hearings Division," id., which ultimately "reversed the earlier finding that the report of plaintiff's sexual abuse of his daughter was founded," id. at 460. In February of 2000, Dobe sued DHHS and various individuals asserting claims arising from the investigation that led to the July 1996 finding. Id. The trial court dismissed the claim against all defendants as time barred, explaining that Dobe's cause of action had accrued on July 9, 1996, the day that DHHS issued its adverse finding, which was more than three years before Dobe filed suit. Id.

On appeal, Dobe argued that his "administrative appeal of the July 1996 finding tolled the running of the statute of limitations." Id. After explaining that "the statute of limitations period [may be] 'tolled during a pending administrative proceeding [if] that proceeding is a prerequisite to pursuit of the civil action,' " id. at 461-62 (quoting N.H. Div. of Human Servs. v. Allard, 138 N.H. 604, 606 (1994)), the New Hampshire Supreme Court affirmed the trial court, explaining that tolling was not warranted because Dobe's administrative appeal "was not a prerequisite to [his] civil lawsuit," id. at 462.

 *6  Here, in plaintiff's view, the "request for administrative appeal," doc. no. 62 at ¶ 6, that he filed in October of 2014 entitles him to tolling under the general principle stated in Dobe, i.e., that "the statute of limitations period [may be] tolled during a pending administrative proceeding [if] that proceeding is a prerequisite to pursuit of the civil action." 147 N.H. at 461-62 (internal quotation marks removed). There are several problems with plaintiff's reliance on Dobe.

First, the pleading that plaintiff filed with the Board in October of 2014 was not a request for an administrative appeal of the Board's Order. Rather, it was, in its own words, a "motion[ ] [asking the] Board to cease the publication of disciplinary action, pending appeal of NH RSA 329:18-a noncompliance by the Board." Doc. no. 49 at ¶ 7 (emphasis added). In other words, plaintiff's

pleading was more like a motion to stay the execution of a judgment than a substantive appeal of a judgment.

Second, not only was plaintiff's October filing with the Board not an appeal of the Board's March 11 Order, the appeal to which plaintiff's motion referred was an appeal of an issue entirely unrelated to the § 1983 claims that plaintiff asserts in Count I of his FAC. In his October 2014 motion, plaintiff referred to a pending appeal of the Board's failure to send him a copy of its Order before it published that Order online, in violation of RSA 329:18-a, IV. In Count I, plaintiff claims that he was denied due process by the manner in which the Board handled his hearing and drafted the Order that resulted therefrom, but he does not claim that the Board violated his right to due process by publishing its Order online before mailing it to him. Thus, this case is on all fours with Dobe, in which the New Hampshire Supreme Court held that the limitations period on the plaintiff's claim was not tolled because the administrative proceeding on which the plaintiff based his tolling argument did not involve any claim that the plaintiff was making in his civil suit. See 147 N.H. at 462.

There is a third problem with plaintiff's reliance upon Dobe. Dobe says that "the statute of limitations period is not tolled during a pending administrative proceeding unless that proceeding is a prerequisite to pursuit of the civil action." 147 N.H. at 461-62 (internal quotation marks removed). Here, the administrative proceeding in which plaintiff engaged was not a prerequisite to his filing a civil action to challenge the Board's handling of his disciplinary proceeding. To the contrary, the statute governing the Board's disciplinary proceedings expressly provides that:

> [N]o civil action shall be maintained against the board or any member of the board or its agents or employees with regard to any action or activity taken in the performance of any duty or authority established by this chapter.

RSA 329:17, IX (emphasis added). So, rather than providing a basis for tolling the limitations period for plaintiff's § 1983 claims, the statute governing the Board's

Exhibit 10 - Page 91

Isaacs v. Trustees of Dartmouth College, Not Reported in Fed. Supp. (2018)

2018 WL 734182, 2018 DNH 016

disciplinary process would appear to affirmatively bar such claims in the first place.

Because the limitations period for the § 1983 claims plaintiff asserts in his FAC started to run no later than March 15, 2014, and was never tolled, plaintiff had until March 15, 2017, to file those claims. See RSA 508:4, I. He did not file them until May 1, 2017, approximately six months after the limitations period had run. Therefore, those claims are time barred. Accordingly, Count I of plaintiff's FAC is dismissed.

2. Second Amended Complaint (Count I of SAC)

**\*7** In addition to addressing the § 1983 claim from his FAC in his show cause briefing, plaintiff also includes a slightly revised § 1983 claim in his proposed SAC. In the interest of completeness, the court will address plaintiff's revised § 1983 claim under the standard applicable to motions to amend.

At this juncture, plaintiff "may amend [his FAC] only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Leave to amend should be freely given "when justice so requires." Id. Even so, "a district court may deny leave to amend when the request is characterized by 'undue delay, bad faith, futility, or the absence of due diligence on the movant's part.' " Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 20 (1st Cir. 2017) (quoting Nikitine v. Wilmington Trust Co., 715 F.3d 388, 390 (1st Cir. 2013); citing Foman v. Davis, 371 U.S. 178, 182 (1962)) (internal brackets removed). For the purposes of Rule 15(a)(2), " '[f]utility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) (citing 3 Moore's Federal Practice ¶ 15.08[4], at 15-80 (2d ed. 1993); Vargas v. McNamera, 608 F.2d 15, 17 (1st Cir. 1979)).

A complaint fails to state a claim upon which relief can be granted when "viewing all the factual allegations in the complaint as true ... [and] drawing all reasonable inferences in [the plaintiff's] favor," it still does not present "sufficient factual material to state a facially plausible claim." Vargas-Colón v. Fundación Damas, Inc., 864 F.3d 14, 23 (1st Cir. 2017) (citing O'Shea ex rel. O'Shea v. UPS Ret. Plan, 837 F.3d 67, 77 (1st Cir. 2016)). "[I]f the proposed amendment would be futile because, as thus

amended, the complaint still fails to state a claim, the district court acts within its discretion in denying the motion to amend." Abraham v. Woods Hole Ocean. Inst., 553 F.3d 114, 117 (1st Cir. 2009) (quoting Bos. & Me. Corp. v. Hampton, 987 F.2d 855, 868 (1st Cir. 1993)).

As the court has noted, plaintiff makes two new allegations in Count I of his SAC: that he moved for reconsideration of the Board's March 11 Order, and that his motion was denied in April of 2014. Based upon those allegations, there is an argument to be made that Count I of the SAC is not time barred, presuming that the limitations period on the § 1983 claims asserted therein did not begin to run until some time in May of 2014, at the end of the period for appealing the Board's denial of reconsideration to the New Hampshire Supreme Court ("NHSC"). See RSA 329:17, VIII (providing that appeals of Board decisions to the NHSC are governed by RSA 541); RSA 541:6 (establishing 30 day deadline for appealing Board's denial of a request for rehearing to the NHSC). However, even if the § 1983 claims in plaintiff's SAC are not time barred, it is difficult to see how they would survive RSA 329:17, IX, which bars civil actions arising from Board actions. Accordingly, plaintiff shall have until March 7,2018, to show cause why his motion to amend, as to Count I, should not be denied as futile.

II. ADA Retaliation Claim (Count V)

In a previous order, the court dismissed, with prejudice, plaintiff's claims that the Dartmouth defendants retaliated against him for asserting an ADA claim against them in 12-cv-40-LM by failing to interview him after he submitted applications for a residency at DHMC in 2013, 2014, 2015, and 2016. Dismissal, in turn, was based upon plaintiff's failure to plead that he had exhausted the administrative remedies available to him to challenge defendants' asserted retaliation. However, as to Dr. Isaacs's 2016 application, dismissal was without prejudice. On the chance that the time to exhaust a claim based upon the disposition of Dr. Isaacs's 2016 application had not yet expired, the court allowed plaintiff "to file a motion for leave to amend his FAC to assert a properly exhausted ADA retaliation claim based upon his most recent rejection for a residency." Doc. no. 48 at 39.

**\*8** In Count V of his proposed SAC, plaintiff asserts that in retaliation for his having brought an ADA

2018 WL 734182, 2018 DNH 016

claim against the Dartmouth defendants in 12-cv-40-LM, they responded to his 2017 application for a residency by declining to give him an interview.[6] He does not, however, allege that he has exhausted the administrative remedies available to him through the Equal Employment Opportunity Commission ("EEOC"). Exhaustion is a necessary prerequisite for making a claim that defendants retaliated against him for exercising his rights under Title I of the ADA, see Rivera-Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 389 (1st Cir. 2014), and it is beyond dispute that plaintiff's ADA claim in 12-cv-40-LM arose under Title I of the ADA. Plaintiff acknowledges that he has not alleged that he has exhausted his administrative remedies, but he asserts that the exhaustion requirement does not apply to his claim and that, if it does, the time for filing a charge with the EEOC has not yet expired.

For reasons that the court explained in a previous order, document no. 48, the exhaustion requirement does apply to the retaliation claim that plaintiff asserts in Count V of his proposed SAC. Because he has not alleged that he has filed a timely charge with the EEOC or that he has received a right-to-sue letter from the EEOC, plaintiff has not alleged that he has exhausted his administrative remedies. See Rivera-Díaz, 748 F.3d at 390. As a result, Count V of plaintiff's proposed SAC does not state a claim upon which relief can be granted. For that reason, as to plaintiff's ADA retaliation claim, his motion to amend is denied as futile. See Abraham, 553 F.3d at 117. That said, if at some point in the future, plaintiff should happen to file a timely charge with the EEOC and receive a right-to-sue letter, then he may file an ADA retaliation claim in a separate action.

### III. Counts II, III, IV, VI, and VII

In addition to seeking to amend the two claims from his FAC that were not dismissed, plaintiff also seeks leave to assert five new claims in his SAC. As for those five new claims, DHMC argues that:

> Plaintiff's attempt to file his second amended complaint should be summarily denied because it was filed in contravention of the Court's prior order allowing him to amend his first amended complaint solely to "assert a properly exhausted ADA retaliation claim based upon the rejection of his 2016 application to DHMC for a residency."

Doc. no. 59 at ¶ 1 (quoting doc. no. 48 at 8). The Trustees and Board also note that plaintiff's SAC goes beyond the scope of the court's invitation to amend the FAC and further argue that plaintiff's motion for leave to amend should be denied, in its entirety, on grounds of undue delay. However, all three defendants address plaintiff's five new claims on the merits by arguing that it would be futile for plaintiff to amend his FAC by adding them. For that reason, and out of abundance of caution, in deference to plaintiff's pro se status, and in recognition of the importance of the interests at issue, the court will consider each of the five new claims plaintiff seeks to add to his FAC.

### A. Title IX (Count II)

Count II of plaintiff's proposed SAC is a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), against the Dartmouth defendants. Plaintiff claims that defendants are liable to him under Title IX for failing to investigate a complaint he made in March of 2014, to the president of Dartmouth College, that during the first week of his DHMC residency, one of his supervisors, Dr. Simon Khagi, sexually assaulted him by ordering "him [to] perform two prostate exams [on patients] under false pretenses." Doc. no. 51-1 at ¶ 83.

**\*9** Plaintiff's Title IX claim has a long history. The purported sexual assaults on which that claim is premised occurred in June of 2011. In a pleading in 12-cv-40-LM, plaintiff: (1) identified Dr. Khagi's orders as the factual predicate for a claim for intentional infliction of emotional distress; and (2) referred to a pending Title IX claim in a case in the U.S. District Court for the Eastern District of Pennsylvania based on defendants' failure to investigate the prostate exams. See Emergency Mot. for Recons. Add. at 8, Isaacs v. Dartmouth-Hitchcock Med. Ctr., No. 12-cv-40-LM (Apr. 19, 2014), ECF No. 148. To his motion in 12-cv-40-LM, plaintiff attached an undated letter to the U.S. Department of Education Office for Civil Rights in which he: (1) characterized the order to perform unnecessary prostate exams as "hazing," id., Ex. B, ECF No. 148-2; (2) indicated that Dartmouth's former and current presidents had refused to investigate the matter, id.; and (3) represented that he was litigating "a Title IX claim for failure to investigate the assault and hazing" in the Eastern District of Pennsylvania, id.

Exhibit 10 - Page 93

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 95 of 264   Page
ID #:1770
Isaacs v. Trustees of Dartmouth College, Not Reported in Fed. Supp. (2018)
2018 WL 734182, 2018 DNH 016

In his original complaint in this case, plaintiff included a claim that the Dartmouth defendants violated Title IX when they failed to investigate the prostate exams. That claim was not asserted in plaintiff's FAC, but has reappeared in his proposed SAC.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Moreover:

> Sexual harassment in schools can constitute prohibited sex-based discrimination actionable under Title IX where there is a "hostile environment," such that "acts of sexual harassment [are] sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students," and relevant school officials with actual knowledge of the harassment "exhibit[ ] deliberate indifference to [the harassment]." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52] 65, 66 [ (1st Cir. 2001) ].... The purportedly illegal acts must be taken "on the basis of sex." See Frazier, 276 F.3d at 66 ("Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case, and a failure to plead that element is fatal.").

Morgan v. Town of Lexington, 823 F.3d 737, 745 (1st Cir. 2016). To state a sexual harassment claim under Title IX, a plaintiff must allege "(1) that [he] was a student, who was (2) subjected to harassment (3) based upon sex; (4) that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and (5) that a cognizable basis for institutional liability exists." Frazier, 276 F.3d at 66 (citing Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 540 (1st Cir. 1995)).

Plaintiff is not claiming that the Dartmouth defendants are liable for a Title IX violation based upon Dr. Khagi's conduct in 2011; he is claiming Title IX liability arising from defendants' failure to investigate his 2014 complaint about Dr. Khagi's conduct. Title IX, however, does not expressly impose on educational institutions a duty to investigate claims of sexual harassment, nor does it expressly give students a claim against institutions that fail to do so. That said, even if the court presumes that Title IX does impose liability for failure to investigate, "[i]n the absence of conduct creating a sex-based hostile educational environment, ... [such a failure] is not actionable under Title IX." Frazier, 276 F.3d at 67

(emphasis added) (citing Karibian v. Columbia Univ., 930 F. Supp. 134, 137 (S.D.N.Y. 1996) ("If what occurs is an employer's failure to investigate and take remedial measures in response to a complaint of discrimination [based upon Title VII], and if it turns out that no actual discrimination has occurred, then there is nothing which actually constitutes any conduct banned by the statute.") (emphasis added)). Thus, to state a Title IX claim for failure to investigate, a plaintiff must adequately allege that what the defendant failed to investigate was discrimination in the form of sexual harassment; failure to investigate something that was not sexual harassment does not violate Title IX.

**\*10** The problem with plaintiff's Title IX claim is that even if ordering Dr. Isaacs to perform two unnecessary prostate exams was sufficiently severe or pervasive to create a hostile environment, plaintiff has failed to make any allegations that, if proven, would establish that Dr. Khagi's conduct toward him constituted harassment "on the basis of [his] sex," Morgan, 823 F.3d at 745. In his SAC, plaintiff alleges that at some point after Dr. Khagi ordered him to perform the two prostate exams at issue, he "learned that no medical necessity existed for those exams." SAC ¶ 74. He then alleges that "[k]nowing that these examinations were unnecessary, [he] suffered knowing that he had been ordered to take part in the indecent assault of a patient." SAC ¶ 75 (emphasis added). Subsequently in his SAC, when describing his e-mail to Dartmouth's president, plaintiff alleges that he "informed Dartmouth that he had been the victim of a sexual assault because Dr. Khagi had him perform two prostate exams under false pretenses." SAC ¶ 83 (emphasis added). But merely calling himself the victim of a sexual assault, in the absence of any factual allegations that would support such a conclusion, is insufficient to state a claim that defendants failed to investigate a claim of sexual harassment. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("A pleading that offers labels and conclusions ... will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal citations and quotation marks removed). At worst, defendants may have failed to investigate Dr. Isaacs's claim that Dr. Khagi ordered him to perform an unnecessary medical procedure. But given plaintiff's factual allegations about Dr. Khagi's conduct, defendants did not fail to investigate a claim that Dr. Khagi sexually assaulted or sexually harassed Dr. Isaacs, and it is a failure to investigate harassment of Dr. Isaacs, based upon his sex, that could,

2018 WL 734182, 2018 DNH 016

potentially, expose the Dartmouth defendants to Title IX liability.

In sum, there are no allegations in Count II of plaintiff's SAC that, if proven, would entitle him to prevail on a Title IX sexual harassment claim against the Trustees or DHMC. Thus, amending his FAC to add such a claim would be futile.

### B. Fraud (Count III)

Count III of plaintiff's proposed SAC is a claim for fraud against the Board, arising from various alleged "mistruths and half-truths about [him]," doc. no. 51-1 at ¶ 93, that the Board included in its March 11, 2014, Order. The Board argues that as to Count III, amendment would be futile for two different reasons, Eleventh Amendment sovereign immunity and lack of subject matter jurisdiction. Even if the Board is not entitled to sovereign immunity, and even if the court has subject matter jurisdiction over plaintiff's fraud claim, amending his FAC to add Count III of his proposed SAC would be futile because Count III does not state an actionable claim for fraud.

Under the common law of New Hampshire, the elements of a claim for fraud, or intentional misrepresentation, are as follows:

> " '[O]ne who fraudulently makes a misrepresentation ... for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.' " Gray v. First NH Banks, 138 N.H. 279, 283 (1994) (quoting Restatement (Second) of Torts § 525, at 55 (1977)).

Tessier v. Rockefeller, 162 N.H. 324, 331–32 (2011) (internal citations removed). It is well established, and plaintiff acknowledges, that to prevail on a claim of intentional misrepresentation, "a plaintiff must demonstrate justifiable reliance." SAC ¶ 92 (quoting Snierson v. Scruton, 145 N.H. 73, 77 (2000)). Moreover, the reliance at issue is reliance by the plaintiff. See Tessier, 162 N.H. at 332.

Here, plaintiff does not allege that he ever relied upon the purported mistruths and half-truths in the Board's March 11 Order. Rather, he alleges that false statements in the Order have caused him continuing injury because

no hospital to which he has applied for a residency has given him an interview, and that "[t]he availability of [the March 11 Order] and the extent of the falsehood [in it] indicates that the hospitals denying [him] interviews] are relying on those falsehoods." Doc. no. 51-1 at ¶ 96. In other words, plaintiff is not claiming pecuniary loss as a result of his justifiable reliance upon the alleged misrepresentations in the March 11 Order; he is claiming that he has suffered a loss as a result of reliance by the hospitals that have declined to interview him. But to state a claim for intentional misrepresentation, plaintiff must allege "pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." Tessier, 162 N.H. at 332 (emphasis added).

Because Count III of plaintiff's proposed SAC does not allege that he suffered pecuniary loss resulting from his justifiable reliance upon any statement made by the Board, he has failed to state a claim against the Board for intentional misrepresentation. Cf. Isaacs, 2014 WL 1572559, at *24 ("[T]here is no evidence that Dr. Isaacs relied, to his detriment, on any of the statements that form the basis for his fraud claim. Thus, defendants are entitled to judgment as a matter of law on [that] claim."). Accordingly, amending plaintiff's FAC to add a claim for intentional misrepresentation would be futile.

### C. Civil Conspiracy (Count IV)

*11 Count IV of plaintiff's proposed SAC is a claim for civil conspiracy against the Trustees, the Board, and DHMC. Count IV is supported by the following allegations:

> It is alleged ... that Dartmouth agents could not help themselves from willfully participating in a joint prosecution with the State against Dr. Isaacs, manipulating the Board adjudicatory process, providing confidential sealed documents, and prejudicing the Board, resulting in the deprivation of rights as described more fully herein. Essentially, the State Board, and individuals connected therewith were doing the bidding of Dartmouth as they worked together hand in hand to

Exhibit 10 - Page 95

violate and deny the Plaintiff his
rights.

Doc. no. 51-1 at ¶ 15. Based upon the foregoing, plaintiff
asserts that the three defendants conspired to: (1) publish
a sealed settlement agreement that had resulted from
his lawsuit against the USC medical school "in order to
publicly humiliate [him] and destroy his medical career,"
id. ¶ 99; and (2) refuse to investigate his claim that he was
subjected to sexual harassment when Dr. Khagi ordered
him to perform two unnecessary prostate exams.

Under New Hampshire law, to state a claim for civil
conspiracy, a plaintiff must allege facts sufficient to
establish five elements:

> (1) two or more persons ...; (2) an
> object to be accomplished (i.e., an
> unlawful object to be achieved by
> lawful or unlawful means or a lawful
> object to be achieved by unlawful
> means); (3) an <u>agreement</u> on the
> object or course of action; (4) one
> or more unlawful overt acts; and
> (5) damages as the proximate result
> thereof.

In re Armaganian, 147 N.H. 158, 163 (2001) (quoting Jay
Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987)).

Here, plaintiff's civil conspiracy claim founders on the
third element. While Count IV uses a quotation from
Jay Edwards to define civil conspiracy, see doc. no. 51-1
at ¶ 98, plaintiff does not set out the elements of such
a claim, and, as a general matter, paragraph 15 of his
SAC is a textbook example of "naked assertion[s] devoid
of further factual enhancement," Iqbal, 556 U.S. at 678
(internal quotation marks removed). More specifically,
his complaint does not allege facts that, if proven,
would establish the existence of an agreement among the
three purported coconspirators, or an agreement between
any two of them. That is fatal to both components
of plaintiff's claim. See Vargas-Colón, 864 F.3d at
22 (affirming dismissal of claim where "the amended
complaint contain[ed] absolutely no factual allegations
with respect to the first element of the brothers' derivative

claim") (citing Portugués-Santana v. Rekomdiv Int'l, Inc.,
725 F.3d 17, 26-27 (1st Cir. 2013) (affirming dismissal
under Rule 12(b)(6) where complaint's allegations failed
to establish element necessary to make out plausible
claim)).

There is also a problem with the second element of
a civil conspiracy claim as to plaintiff's assertion that
defendants conspired to refuse to investigate his claims of
sexual harassment. To state a claim for civil conspiracy,
a plaintiff must allege "an object to be accomplished (i.e.,
an unlawful object to be achieved by lawful or unlawful
means or a lawful object to be achieved by unlawful
means)." In re Armaganian, 147 N.H. at 163. As the
court has already explained, because plaintiff has failed
to adequately allege that Dr. Khagi subjected him to
sexual harassment in 2011, he has failed to allege that the
Dartmouth defendants owed him a duty, under Title IX,
to investigate his claims against Dr. Khagi. Furthermore,
plaintiff has not identified any other legal authority under
which defendants owed him a duty to investigate his
claims against Dr. Khagi. Nor has plaintiff alleged that
defendants engaged in any illegal act that caused DHMC
to not investigate his harassment claim. Thus, he has
failed to adequately allege the second element of a civil
conspiracy claim.

**\*12** DHMC also suggests that plaintiff's proposed civil
conspiracy claim is time barred, and that is certainly
correct with respect to plaintiff's claim that defendants
conspired to publish a sealed settlement agreement
from his USC litigation. The settlement agreement was
published no later than March 15, 2014. Plaintiff first
asserted his civil conspiracy claim in his proposed SAC,
which was filed on November 14, 2017. Even if plaintiff
were to be given the benefit of the relation back doctrine,
which does not seem to apply, his original complaint was
still filed after the expiration of the limitations period.
Given that the other object to be accomplished on which
plaintiff bases his civil conspiracy claim is an inaction
rather than an action, i.e., refusing to investigate his sexual
harassment claim against Dr. Khagi, it is more difficult
to determine when the limitations period began to run
on that part of plaintiff's claim but, as the court has
explained, plaintiff has provided the court with no basis to
conclude that defendants' alleged failure to act was either
something unlawful achieved through lawful or unlawful
means, or something lawful achieved through unlawful
means.

Exhibit 10 - Page 96

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 98 of 264   Page
ID #:1773

Isaacs v. Trustees of Dartmouth College, Not Reported in Fed. Supp. (2018)
2018 WL 734182, 2018 DNH 016

In sum, because Count IV of plaintiff's proposed SAC does not state a claim upon which relief can be granted for civil conspiracy, amending plaintiff's FAC to add such a claim would be futile.

### D. Disability Discrimination (Count VII)

Count VII of plaintiff's proposed SAC is a claim that the Dartmouth defendants violated both the Rehabilitation Act and the ADA by failing to consider his applications for a residency because they regarded him as being disabled.

Section 504 of the Rehabilitation Act prohibits discrimination based upon a person's disability by programs or activities receiving federal financial assistance. See 29 U.S.C. § 794(a). "[T]o prevail on [a] § 504 claim, [plaintiff] must prove ... (1) that [he] is disabled; (2) that [he] sought services from a federally funded entity; (3) that [he] was 'otherwise qualified' to receive those services; and (4) that [he] was denied those services 'solely by reason of [his] ... disability.' " Lesley v. Hee Man Chie, 250 F.3d 47, 52-53 (1st Cir. 2001).

The ADA, in turn, prohibits disability discrimination in employment (Title I), in the provision of public services (Title II), and in places of public accommodation operated by private entities (Title III). In an attempt to avoid the exhaustion requirement that applies to Title I claims, plaintiff asserts the ADA claim in Count VII under Title III of the ADA. Be that as it may, to state a claim under either Title I or Title III, plaintiff must allege that he is disabled. See Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 20 (1st Cir. 2002) (Title I failure to hire claim); Dudley v. Hannaford Bros. Co., 333 F.3d 299, 307 (1st Cir. 2003) (Title III claim).

The Rehabilitation Act defines the term "individual with a disability" to mean "any person who has a disability as defined in section 12102 of Title 42." 29 U.S.C. § 705(20)(B). That statutory provision, which is a part of the ADA, defines the term "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), or "being regarded as having such an impairment," § 12102(1)(C), so long as "the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental

impairment whether or not the impairment limits or is perceived to limit a major life activity," § 12102(3). [7]

Plaintiff's sole allegation concerning his status as a person with a disability is that "[u]pon information and belief Dartmouth is refusing to consider [his] applications because they believe him to be disabled." Doc. no. 51-1 at ¶ 123. In other words, he relies upon the ADA's "regarded as" definition of disability. [8] To prove disability under that definition, a plaintiff "must present evidence ... that [the defendant] subjectively believed either (1) [the plaintiff] 'has a substantially limiting impairment' that he doesn't have, or (2) [the plaintiff] 'has a substantially limiting impairment when, in fact, the impairment is not so limiting.' " EEOC v. BNSF Ry. Co., 853 F.3d 1150, 1155-56 (10th Cir. 2017) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)). "Under both tests, [the court] ask[s] whether the employer mistakenly believed that the plaintiff was substantially limited in performing a major life activity." BNSF, 853 F.3d at 1156 (citing Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1086 (10th Cir. 2008)).

**\*13** Here, plaintiff makes no factual allegations about what any defendant believed about his limitations. He merely asserts that "[u]pon information and belief Dartmouth is refusing to consider [his] applications because they believe him to be disabled." SAC ¶ 123. But, he alleges no facts that would support his belief, such as the reasons given for the disposition of his applications or statements made by decisionmakers that indicate or imply beliefs about his capacities or limitations. In other words, plaintiff merely "tenders naked assertions[ ] devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (internal quotation marks removed). That is not enough to nudge his disability discrimination claims "across the line from conceivable to plausible." Iqbal, 556 U.S. at 680 (internal quotation marks removed). (quoting Twombly, 550 U.S. at 570). Accordingly, amending plaintiff's FAC to add Count VII of his SAC would be futile.

### E. Rehabilitation Act Retaliation (Count VI)

In Count VI of his proposed SAC, plaintiff alleges that "[i]n March of 2013 [he] effectively filed a Rehabilitation Act claim with OCR," doc. no. 51-1 at ¶ 115, and that in retaliation for doing so, DHMC responded to his 2013, 2014, 2015, 2016, and 2017 applications for a residency by declining to give him an interview.

The elements of a Rehabilitation Act retaliation claim are as follows:

> To establish a prima facie claim for retaliation under ... the Rehabilitation Act, [plaintiff] would have to show that [he] "engaged in protected conduct," [was] "subjected to an adverse action by the defendant," and "there was a causal connection between the protected conduct and the adverse action."

Lebrón v. Puerto Rico, 770 F.3d 25, 31 (1st Cir. 2014) (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012)) (footnote removed).

The first problem with plaintiff's claim concerns the element of protected conduct. Plaintiff alleges that in March of 2013, he "effectively filed a Rehabilitation Act claim with OCR." Doc. no. 51-1 at ¶ 115 (emphasis added). But he does not say what he means by "effectively" filing a Rehabilitation Act claim, as opposed to actually filing such a claim. Nor does he indicate what OCR stands for. That, in turn, makes it difficult to know whether OCR has any role in adjudicating Rehabilitation Act claims in the first place, and if OCR does not adjudicate Rehabilitation Act claims, it is difficult to see how filing a Rehabilitation Act claim with that entity, either effectively or actually, would be protected conduct under the Rehabilitation Act.

In light of the vagueness of plaintiff's SAC, the court has scoured the record to gain a better understanding of the conduct he means to allege to satisfy the first element of his Rehabilitation Act retaliation claim. In his original complaint, plaintiff alleged that "[o]n March 16ᵗʰ [2013] the Office of Civil Rights notified Defendant Dartmouth of a pending HIPPA [Health Insurance Portability and Accountability Act] investigation." Doc. no. 1 at ¶ 94. If, indeed, Dr. Isaacs took some action that led the Office of Civil Rights to initiate a HIPPA investigation, and if the Office of Civil Rights is the "OCR" to which plaintiff refers in Count VI of his complaint, it would not appear that filing a HIPPA complaint is protected conduct for the purposes of a Rehabilitation Act retaliation claim.

There is one other possibility. In 12-cv-40-LM, plaintiff submitted to the court an undated letter he had addressed to the U.S. Department of Education Office for Civil Rights.[9] In that letter, he stated:

> The nature of my complaint is that I was hazed and abused by my supervisors and professors, because they wanted to oust me for being a student who had previously filed ADA litigation pertaining to a head injury I sustained from an intoxicated Dartmouth student back in 1997.

Isaacs, No. 12-cv-40-LM, doc no. 148-2. Nowhere does the letter quoted above say anything about the Rehabilitation Act, much less charge either of the Dartmouth defendants with violating it. Thus, if the above quoted letter is, in fact, the OCR complaint that plaintiff claims to be his protected conduct, it does not qualify as such.

*14 In sum, plaintiff has failed to state a Rehabilitation Act retaliation claim because he has not adequately alleged that he ever engaged in any protected conduct. However, even assuming that plaintiff did engage in protected conduct by filing a Rehabilitation Act claim with the OCR, he has failed to adequately allege the third element, a causal link between his protected conduct and the adverse actions taken against him.

With respect to causation, "for an ... action to be retaliatory, the person taking that action must have known about the ... protected conduct at the time he or she took the allegedly retaliatory action." Taite v. Shineski, No. 08-cv-258-SM, 2010 WL 745160, at *19 (D.N.H. Mar. 1, 2010) (citing Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 85 (1st Cir. 2006)).

Here, while plaintiff alleges that he "effectively filed a Rehabilitation Act claim with OCR," SAC ¶ 115, he does not allege anything about the substance of that claim or the party or parties against whom he asserted it. That matters because plaintiff is not asserting a typical retaliation claim, in which the protected conduct was directly targeted at the defendant, as when an employee claims that her employer retaliated against her for asking for a reasonable accommodation for a disability. Because plaintiff does not allege protected conduct that was directly targeted at any defendant, there is no basis for

Exhibit 10 - Page 98

Isaacs v. Trustees of Dartmouth College, Not Reported in Fed. Supp. (2018)

2018 WL 734182, 2018 DNH 016

assuming that any defendant ever knew about the claim plaintiff says he effectively filed with OCR. Yet, plaintiff does not allege that he ever served any defendant with his OCR complaint, or that OCR ever forwarded his complaint to any defendant. Indeed, he alleges that his OCR "claim was later dismissed for being untimely," doc. no. 51-1 at ¶ 115, an action that OCR could well have taken without ever notifying any defendant of the claim it was dismissing.

The Trustees have identified the causation problem with Count VI, arguing that

> Dr. Isaacs does not allege that he named the Trustees of Dartmouth College [in his OCR complaint], or that the Trustees were aware of the Office of Civil Rights Complaint that he asserts gives rise to his retaliation claim, such that the Trustees or any of their agents could plausibly be said to have taken any adverse action against him in retaliation for the complaint.

Doc. no. 54-1 at 8. Plaintiff responds:

> Defendant brings the argument that no evidence that the Trustees of Dartmouth College were aware of the Office of Civil Rights complaint has been given. The Defendant does not claim that the Trustees of Dartmouth College were not aware of the complaint, just that it has not been stated. This kind of illogical argument not found supported by the record has no place here. If the Defendant would like to present evidence that they did not receive notice they are free to do so at Summary Judgment, however the amount of ink the Defendant has spent discussing the other aspects of Plaintiff's previous actions indicates that they have been following his

activities very closely, making it unlikely that they would not be aware of that action.

Doc. no. 61 at ¶ 17. Plaintiff mischaracterizes the Trustees' argument. They do not argue that no evidence has been produced; they argue that plaintiff has not adequately alleged that they knew about his OCR complaint, which is essential to state a retaliation claim. They are correct. Because plaintiff has not adequately alleged that the Dartmouth defendants knew about his OCR complaint, amendment to add the retaliation claim asserted in Count VI of his SAC would be futile.

## IV. Conclusion

*15 For the reasons described above, the court issues the following set of rulings:

### Show Cause Briefing re: Count I of FAC

Plaintiff has failed to show cause why the § 1983 claims in his FAC are not time barred. Accordingly, Count I of the FAC is dismissed with prejudice.

### Motion for Leave to Amend FAC

Amending plaintiff's FAC to add the claims he asserts in Counts II, III, IV, V, VI, and VII of his SAC, or an ADA retaliation claim based upon the disposition of his 2017 residency application, would be futile. Accordingly, as to those claims, plaintiff's motion for leave to amend his FAC, document no. 51, is denied, but with the proviso that he is free to assert a properly exhausted ADA retaliation claim in a subsequent action.

After denying plaintiff's motion for leave to amend with respect to the above claims, all that remains are the § 1983 claims that plaintiff asserts in Count I of his SAC. As to those claims, plaintiff shall have until March 7, 2018, to show cause why they are not barred by RSA 329:17, IX. Plaintiff's show cause briefing shall be limited to that single issue. If plaintiff fails to show cause why Count I of his SAC is not barred by that statute, the court will deny plaintiff's motion for leave to amend in full and will direct the clerk of the court to close the case.

2018 WL 734182, 2018 DNH 016

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 734182, 2018 DNH 016

Footnotes

1    In document no. 61, plaintiff moved to strike the Trustees' objection to his motion for leave to amend. The court denied that motion, in an endorsed order dated January 3, 2018, but will construe it as a reply to the Trustees' objection.

2    While enumerated as Count V in his proposed SAC, plaintiff's ADA retaliation claim is enumerated as Count VIII in his FAC.

3    In his March 26 e-mail, Dr. Isaacs stated: "Please take notice that I will be appealing the February decision by the board. Please also take this email as a procedural request for reconsideration regarding the adverse weather conditions that prevented me from attending the hearing...." Doc. no. 52-1. While plaintiff uses the term "reconsideration," his e-mail is better characterized as a request for a rehearing. See RSA 329:17, VIII (providing that appeals of Board decisions to the NHSC are governed by RSA 541); RSA 541:3 (establishing that application for a rehearing is the first step in the appeal process).

4    Regarding plaintiff's allegation that he did not find out about the Board's decision until "well after the date was up to appeal," doc. no. 40 at ¶ 42, the court notes that: (1) plaintiff has produced an e-mail he wrote on March 16, 2014, in which he stated that he had read the Board's decision; and (2) the statutes governing appeals from decisions made by the Board gave him until April 11, 2014, to begin the appeal process by applying to the Board for a rehearing, see RSA 329:17, VIII; RSA 541:3.

5    Plaintiff does say that "[t]he confusion resulting from the lack of publication to [him] led to confusion for him about the issue through November of 2014," doc. no. 49 at ¶ 6, and "that the Board's failure to send the document to him in the normal course caused him reasonable confusion for some time after the order had been entered," doc. no. 62 at ¶ 1. Plaintiff does not say anything further about his confusion or its consequences, and he does not dispute the fact that the Board had published its Order online by March 15, 2014. There is also no dispute that the publication of that Order is the act that triggered the injury he claims to have suffered as a result of the alleged constitutional violations on which he based his § 1983 claims.

6    In other words, plaintiff is not seeking to amend his FAC to assert a properly exhausted ADA retaliation claim arising from the disposition of his 2016 application; he is seeking to add an entirely new claim arising from the disposition of his 2017 application.

7    While the following definition has no application to this case, the ADA also defines "[t]he term 'disability' [to] mean[ ] ... a record of [a physical or mental] impairment [that substantially limits one or more major life activities]." 42 U.S.C. § 12102(1)(B).

8    In his motion to strike the Trustees' objection to his motion to amend, which the court has construed as a reply, plaintiff appears to abandon his reliance upon the "regarded as" definition of disability. Instead, he contends that "[D]artmouth's own summary judgment documents [presumably in 12-cv-40-LM] assert that Plaintiff had a neuropsychiatric disability," Doc. no. 61 at ¶ 15, and argues that under principles of res judicata, defendants' assertions in 12-cv-40-LM are sufficient to establish the disability element of his claims under the Rehabilitation Act and the ADA. However, the question before the court concerns what plaintiff alleges in his SAC about what defendants believed about his limitations when deciding whether to interview him for a residency, not what may have been written in some unidentified summary judgment document in another case.

9    In a complaint that plaintiff filed against the U.S. Department of Education in the U.S. District Court for the District of Massachusetts, Dr. Isaacs appears to indicate the letter he submitted to the court in 12-cv-40-LM was dated April 19, 2014. See doc. no. 65-1 at ¶ 5.

Exhibit 10 - Page 100

2018 WL 1257760
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Jeffrey ISAACS, Plaintiff,
v.
UNITED STATES DEPARTMENT
OF EDUCATION, Defendant.

Civil Action No. 17-11221-FDS
|
Signed 03/12/2018

**Attorneys and Law Firms**

Mark L. Josephs, Law Office of Mark L. Josephs, LLC,
Boston, MA, for Plaintiff.

Annapurna Balakrishna, U.S. Attorney's Office, Boston,
MA, for Defendant.

MEMORANDUM AND ORDER ON
DEFENDANT'S PARTIAL MOTION TO DISMISS

F. Dennis Saylor IV, United States District Judge

 *1  This matter arises out of a long-standing dispute
between a former medical resident and a medical school.
Plaintiff Jeffrey Isaacs has brought suit against the
Department of Education alleging, among other things,
that its Office for Civil Rights ("OCR") failed to
investigate the circumstances surrounding his termination
from Dartmouth-Hitchcock Medical Center in New
Hampshire. Isaacs has asserted two claims under the
Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)
(A). In Count 1, he contends that OCR's decision to deny
his appeal to investigate his administrative complaint was
an "arbitrary and capricious" agency action in violation
of the APA. In Count 2, he contends that the Office
of Federal Student Aid's decision to deny his appeal to
discharge more than $200,000 in student loan debt was
similarly "arbitrary and capricious."

Defendant has moved to dismiss Count 1 on the grounds
of sovereign immunity and failure to state a claim
pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated
below, the Court finds that sovereign immunity has not
been waived, and the motion will be granted.

## I. Background

### A. Factual Background

The facts are set forth as described in the amended
complaint and public record. Because the government has
only moved to dismiss Count 1 of the amended complaint,
this memorandum and order will not address factual
allegations solely related to plaintiff's claim concerning
the Office of Federal Student Aid.

Dr. Jeffrey Isaacs is a resident of Pennsylvania. (Compl. ¶
14). In 1997, while he was an undergraduate at Dartmouth
College, he suffered a head injury because of an incident
with an intoxicated student. (*Id.* ¶ 18). The head injury
caused long-lasting effects, including "post-concussion
syndrome," and hindered his ability to finish his pre-med
course requirements. (*Id.*). He dropped several difficult
classes and ultimately obtained a degree in computer
science. (*Id.*). He went on to attend the Wharton School
at the University of Pennsylvania and received a Masters
in Business Administration there. (*Id.* ¶¶ 14, 19). By 2005,
he had completed the premed course requirements that he
did not finish at Dartmouth. (*Id.* ¶ 19).

In 2005, Isaacs enrolled at the Keck School of Medicine at
the University of Southern California. (*Id.* ¶ 20). However,
during his first year, there was what he calls "[a]n
unfortunate series of circumstances." (*Id.*). The complaint
states that there was an allegation of unprofessionalism
brought by one of his classmates. (*Id.*).[1] Keck suspended
Isaacs in February 2006, and ultimately expelled him.
*See In re: Jeffrey D. Isaacs, M.D.*, N.H. Bd. of Med.,
Docket No. 13-07, (Mar. 11, 2014).[2] Isaacs subsequently
sued Keck, and ultimately two settlements were reached.
(Compl. ¶ 21). The first settlement, which was agreed to
in September 2007, sealed certain school records relating
to Isaacs. (*Id.*). The second settlement, which was entered
into in 2008, "discharge[d] all contracts and agreements"
relating to his time at Keck. (*Id.*).

 *2  In order to pursue a medical degree, Isaacs enrolled
in the American University of the Caribbean Medical
School. (*Id.* ¶ 22). He received a degree from that
institution in 2010. (*Id.*). He received more than $200,000
in federal student aid to pay for his tuition. (*Id.*). He took
the United States Medical Licensing Examination, and

Exhibit 11 - Page 101

2018 WL 1257760

his score "exceeded that of the average neurosurgeon, his desired specialty." (*Id.*).

After graduating, Isaacs began a surgical program residency at the University of Arizona. (*Id.* ¶ 23). By his third day, supervisors described him as "far behind his peers" and lacking "technical ability." (*Id.*). The complaint alleges that Isaacs had "perfectly completed the only procedure, a sub-cuticular suture, that he had been required to perform." (*Id.*). He resigned from the residency after approximately six weeks. (*Id.*).

Isaacs then received a psychiatric residency position at Dartmouth-Hitchcock Medical Center in New Hampshire in 2011. (*Id.* ¶ 24). In his application, he "omitted both his attendance at [Keck] and his aborted residency at [the University of Arizona]." *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014) (granting summary judgment to defendants).[3] The complaint alleges that immediately upon his arrival at Dartmouth-Hitchcock, he was "subject to mistreatment and abuse." (Compl. ¶ 25). Specifically, it alleges that he was ordered to "perform two unnecessary prostate examinations" and was treated differently from other residents. (*Id.*). Nevertheless, according to the complaint, he received "predominately positive reviews during [his] psychiatry rotations." (*Id.* ¶ 26).

It appears that relatively early in his tenure at Dartmouth-Hitchcock, Isaacs was placed on probation. (*Id.*). "[T]he stress of being placed on probation," coupled with "criticism from superiors" "led to the development of significant health problems." (*Id.*). The complaint alleges that he developed a severe sleep disorder and requested medical leave to recuperate. (*Id.* ¶ 27). However, his supervisors denied his request for leave. (*Id.*). The complaint alleges that the sleep disorder also stemmed from his head injury that he suffered at Dartmouth College in 1997. (*Id.* ¶ 29).

In January 2012, a supervisor discovered that Isaacs had previously been a resident at the University of Arizona. (*Id.* ¶ 30). A confrontation with the supervisor led to Isaacs suffering a "psychological crisis." (*Id.*). On March 19, 2012, Dartmouth-Hitchcock issued a letter to Isaacs stating that he was being terminated for his failure to disclose his record at Keck and his Arizona residency. (*Id.* ¶ 31). Isaacs acknowledges that he never disclosed his record at Keck, but contends that he did so because he

believed his prior litigation sealed all documents relating to his attendance there. (*Id.* ¶ 44). The complaint alleges that he has since applied for a residency at "nearly every hospital in the country," but that he has been denied each time. (*Id.* ¶ 47).

The New Hampshire Board of Medicine revoked Isaacs's medical license and found that his termination from Dartmouth-Hitchcock was appropriate because he concealed material information in his residency application. *See In re: Jeffrey D. Isaacs, M.D.*, at 8. The Board of Medicine further reprimanded him for not only failing to provide any "credible evidence" in support of his position, but also "knowingly" making a false statement. *Id.* at 8-9.

**\*3** Isaacs alleges that he "repeatedly attempted to have Dartmouth investigate his claims" that he was terminated "without any of the administrative procedures established by Dartmouth policies." (Compl. ¶¶ 31-32). The complaint alleges that Dartmouth-Hitchcock declined to investigate his claims for two years. (*Id.* ¶ 32). Frustrated with what he perceived to be "obfuscations and denials," Isaacs filed two suits *pro se*: the first was in the District of New Hampshire, and the second was in the Eastern District of Pennsylvania. (*Id.* ¶¶ 32-33).[4] Both actions were eventually resolved against him; the former on summary judgment, and the latter for lack of personal jurisdiction over the named defendants. (*Id.* ¶ 33).

On April 19, 2014, Isaacs e-mailed a complaint to OCR. (*Id.* ¶ 34). The e-mail suggested that Dartmouth-Hitchcock had engaged in "assault in hazing" and that then-Dartmouth College President Jim Yong Kim participated in "evidence destruction." (Compl. Ex. A at 2). The e-mail further stated that all federal judges in New Hampshire were biased and would not fairly adjudicate his claims. (*Id.*).

Approximately six months elapsed before OCR replied. On October 16, 2014, Jane Lopez, an OCR attorney, attempted to reach Isaacs by telephone. (Compl. ¶ 35).[5] She then sent Isaacs an e-mail to set up a phone call, which occurred the next day. (*Id.*). During the call, Lopez purportedly stated that there had previously been complaints against Dartmouth-Hitchcock, and that the Department of Education was investigating the hospital in response to OCR-related complaints. (*Id.*).

Exhibit 11 - Page 102

Case 2:19-cv-08000-DSF-RAO Document 64-2 Filed 11/04/19 Page 104 of 264 Page ID #:1779

Isaacs v. United States Department of Education, Not Reported in Fed. Supp. (2018)

2018 WL 1257760

However, soon afterward, Isaacs received a letter dated October 17, 2014, which stated that OCR was "closing" his complaint. (*Id.* ¶ 36; Compl. Ex. B). The letter stated that the complaint was untimely because "OCR generally does not investigate allegations [of discrimination] that are filed more than 180 days after the date of the alleged discrimination," and Isaacs filed his complaint in April 2014, more than two years after the purported misconduct. (Compl. Ex. B at 2).

According to the OCR Case Processing Manual then in effect, a waiver of the 180-day filing requirement could be granted for good cause shown. (*Id.*).[6] OCR stated that Isaacs had not presented any information that would warrant such a waiver. (*Id.*). Specifically, OCR stated that Isaacs had not established that he was "unable to file a complaint with OCR earlier due to incapacitation." (*Id.*). The letter noted that as early as January 2012, he had contacted the police, sent letters to the former president of Dartmouth College, and filed multiple suits. The letter concluded by stating that any additional questions should be directed to Lopez, with whom Isaacs had already spoken. (*Id.* at 3).

**\*4** Isaacs e-mailed Lopez on November 5, 2014, and explained that he would appeal OCR's decision. (Compl. ¶ 38). He claimed that he had shown good cause for a waiver because he had two pending federal lawsuits when the complaint was filed. In addition, he claimed that he only learned in early 2014 that "Dartmouth never initiated an internal grievance investigation, after informing [him] that one would occur." (*Id.*). Lopez replied that she would treat his e-mail as an appeal and that he should submit any additional documents or information he thought relevant by December 16, 2014. (*Id.* ¶ 39; Compl. Ex. C).

Isaacs submitted a letter to OCR on December 12, 2014, alleging that OCR incorrectly determined that the "last discriminatory act against [him] occurred in 2012." (Compl. Ex. D at 1). The letter claimed that Dartmouth-Hitchcock and the Dartmouth College administration were "openly flaunting the fact that they would not investigate [his] claims." (*Id.*). Included in the letter were excerpts from depositions with various hospital and Dartmouth College officials that he claimed supported his claims of discrimination. (*Id.* at 2).[7] OCR sent a letter to Isaacs dated August 14, 2017, finding that "the issues raised in your appeal do not warrant a change in OCR's disposition of your case." (Compl. Ex. E).

**B. Procedural Background**

Isaacs filed suit against the Department of Education on June 30, 2017. An amended complaint was then filed on November 7, 2017, asserting two claims against defendant: a claim for violation of the APA by OCR (Count 1) and a claim for violation of the APA by the Department of Education's Office of Federal Student Aid (Count 2). Defendant has moved to dismiss Count 1 on the basis of sovereign immunity and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

**II. Analysis**

"Under settled principles of sovereign immunity, 'the United States, as sovereign, is immune from suit, save as it consents to be sued and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *United States v. Dalm*, 494 U.S. 596, 608 (1990) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)) (internal quotation marks and alterations omitted); *see also* Charles A. Wright & Arthur R. Miller, 14 Fed. Prac. & Proc. § 3654 (4th ed.) ("[T]he absence of consent by the United States to suit has been treated by courts as a fundamental defect that deprives the district court of subject matter jurisdiction."). Defendant, an as an agency of the United States, is also entitled to sovereign immunity. *Sarit v. U.S. Drug Enforcement Admin.*, 987 F.2d 10, 16 (1st Cir. 1993). A plaintiff bears the "burden of proving [that] sovereign immunity has been waived." *Mahon v. United States*, 742 F.3d 11, 14 (1st Cir. 2014).

The Administrative Procedure Act provides an explicit waiver of sovereign immunity for individuals seeking equitable relief if they have suffered "a legal wrong because of agency action." 5 U.S.C. § 702; *see also Sarit*, 987 F.2d at 16. Here, plaintiff appears to seek an order from this Court directing OCR to investigate Dartmouth-Hitchcock. In addition, judicial review is available where there is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. However, the APA further specifies that sovereign immunity is not waived where "agency action is committed to agency discretion by law." *Id.* § 701(a)(2).

**\*5** Plaintiff contends that judicial review is possible because OCR's Case Processing Manual "created standards by which to evaluate OCR's refusal to investigate" his complaint. (Mem. in Opp. at 3). However,

Isaacs v. United States Department of Education, Not Reported in Fed. Supp. (2018)

2018 WL 1257760

this "fails to account for the applicable language which accords the OCR, not the Court, the responsibility and discretion to award a waiver of the filing time limit." *Kamps v. Baylor Univ.*, 2013 WL 12100452, at *5 (W.D. Tex. Oct. 30, 2013). "Both 34 C.F.R. § 110.31(a) and Article I, § 107 of the OCR Case Processing Manual provide that *the Department of Education may*, for good cause shown, extend the 180-day time limit for filing a complaint of discrimination." *Id.* (emphasis in original) (internal quotation marks omitted).

The complaint alleges that Dartmouth-Hitchcock discriminated against plaintiff in 2011 and early 2012. (Compl. ¶¶ 24-31). No complaint was filed with OCR until April 2014, well past the 180-day deadline for filing a complaint. (*Id.* ¶ 34). It was within OCR's discretion whether to grant a waiver for the 180-day deadline. Accordingly, OCR's decision to deny plaintiff's appeal is an agency action "committed to agency discretion by law," and sovereign immunity has not been waived. *See* 5 U.S.C. § 701(a)(2); *Sherman v. Black*, 315 Fed. Appx. 347, 348 (2d Cir. 2009) ("the OCR's decision not to commence enforcement proceedings is discretionary"); *Mass. Pub. Interest Research Grp. v. U.S. Nuclear Regulatory Comm'n*, 852 F.2d 9, 14 (1st Cir. 1988).

In addition, plaintiff's suggestion that he lacks an adequate alternative remedy is incorrect. He has filed no fewer than four separate actions against Dartmouth-Hitchcock, the Trustees of Dartmouth College, former Dartmouth President Kim, the New Hampshire Board of Medicine, and various other defendants in the District of New Hampshire. *See Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-cv-040-LM; *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-cv-413-SM; *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 14-cv-007-LM; *Isaacs v.*

*Dartmouth-Hitchcock Med. Ctr.*, No. 17-cv-040-LM. [8] In these suits, he brought a litany of claims against defendants, including substantive and procedural due process violations, disability discrimination, retaliation, wrongful discharge, violation of the New Hampshire Law Against Discrimination, breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, violation of Section 504 of the Rehabilitation Act of 1973, violation of the ADA, and common-law fraud. *See, e.g., Isaacs v. Trustees of Dartmouth College*, 2018 WL 734182 (D.N.H. Feb. 5, 2018); *Isaacs v. Trustees of Dartmouth College*, 2017 WL 4857433 (D.N.H. Oct. 24, 2017); *Isaacs v. Trustees of Dartmouth College*, 2017 WL 2881130 (D.N.H. July 12, 2017); *Isaacs*, 2014 WL 1572559. The fact that essentially all claims have been dismissed or resolved against plaintiff on summary judgment does not undermine the fact that he had an adequate remedy: "a suit against the [entity engaged in the alleged discrimination]." *See Pudlin v. Office for (Not of) Civil Rights of the U.S. Dep't of Educ.*, 186 F. Supp. 3d 288, 293 (S.D.N.Y. 2016). Therefore, OCR's handling of plaintiff's administrative complaint is not subject to judicial review, and Count 1 will be dismissed.

### III. Conclusion

For the foregoing reasons, defendant's partial motion to dismiss is GRANTED.

**So Ordered.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1257760

Footnotes

1   Isaacs was accused of harassment. *See Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014).

2   On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court normally cannot consider evidence outside the complaint and attached exhibits without converting the motion into a motion for summary judgment. However, the First Circuit has recognized "narrow exceptions" to that rule, including "official public records." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

3   The complaint alleges that Isaacs had disclosed his prior residency before joining Dartmouth-Hitchcock. (Compl. ¶¶ 24, 30).

4   Exhibit A to the amended complaint indicates that Isaacs had also filed suit in the Western District of Texas to obtain evidence from the federal judiciary's PACER system. In addition, as described later in this memorandum and order, plaintiff has filed four separate actions in the District of New Hampshire.

Exhibit 11 - Page 104

2018 WL 1257760

5    The complaint incorrectly states that Lopez called Isaacs on October 16, 2017. (Compl. ¶ 35).

6    The reasons provided in the manual are the following:

(a) The complainant could not reasonably be expected to know the act was discriminatory within the 180-day period, and the complaint allegation was filed within 60 days after the complainant became aware of the alleged discrimination (note that lack of previous awareness of OCR or the civil rights laws enforced by OCR is not a basis for a waiver);

(b) The complainant was unable to file a complaint because of incapacitating illness or other incapacitating circumstances during the 180-day period, and the complaint allegation was filed within 60 days after the period of incapacitation ended;

(c) The complainant filed a complaint alleging the same discriminatory conduct within the 180-day period with another federal, state, or local civil rights enforcement agency, or federal or state court, and filed a complaint with OCR within 60 days after the other agency had completed its investigation or, in the case of a court, reached a determination, or the agency or court notified the complainant that it would take no further action;

(d) The complainant filed, within the 180-day period, an internal grievance with a recipient of federal financial assistance, or a due process hearing, alleging the same discriminatory conduct that is the subject of the OCR complaint, and the complaint is filed no later than 60 days after the internal grievance is concluded; or

(e) Unique circumstances generated by OCR's action have adversely affected the complainant.

(Compl. Ex. B at 2).

7    For example, plaintiff cited a portion of a deposition with his direct supervisor at Dartmouth-Hitchcock, Dr. Christine Finn. The quoted portion is as follows:

Question: Do you know if anyone's ever investigated that unnecessary DREs [digital rectal exams] have been alleged?
Answer: Not that I'm aware of.

8    It appears that civil action nos. 12-413-SM and 14-007-LM were consolidated with 12-040-LM.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

Exhibit 11 - Page 105

EXHIBIT 1



**Dartmouth-Hitchcock**

**Dartmouth-Hitchcock Medical Center**
One Medical Center Drive
Lebanon, NH 03756-0001
Phone (603) 650-5748
Fax (603) 650-5754
Dartmouth-Hitchcock.org

**GRADUATE MEDICAL EDUCATION**

March 19, 2012



Dr. Isaacs:

This letter is to inform you of your dismissal from the adult psychiatry residency training program at the Dartmouth Hitchcock Medical Center effective March 19, 2012. Given that you have not taken advantage of the voluntary resignation option previously provided, and as you are currently on leave and no longer available to meet directly, this letter shall serve as written notice of the academic and non-academic deficiencies that have resulted in your dismissal.

The decision to dismiss you from your position in the residency is based on academic deficiency issues as well as behavior incompatible with the role of a physician including the omission of material information from your Electronic Residency Application Service (ERAS) application, falsification of information provided to the New Hampshire Board of Medicine, and false reporting in a patient's electronic medical record as well as other substantiated competency and integrity concerns.

Specifically, your ERAS application lacked information regarding your prior residency training in Arizona as well as time served as a medical student at the University of Southern California. You also failed to divulge your dismissal from medical school at USC in information provided to the New Hampshire Board of Medicine in support of a NH training license. Concerns have been raised during rotations on both psychiatry and internal medicine regarding false reporting in the medical record and appropriation of medical student notes as your own.

You received feedback regarding academic performance concerns beginning in your first week of residency training and were subsequently removed from internal medicine rotations on two separate occasions due to deficits in knowledge, professionalism issues, and inability to perform basic PGY-1 level tasks when caring for patients. Furthermore, you have failed to achieve a performance level in psychiatry that would allow progression to PGY-2 year duties.

The Office of Graduate Medical Education will continue your salary through March 31, 2012 to facilitate your transition from the adult psychiatry residency program. Consistent with your termination of employment effective March 19, 2012 your life and disability insurance will end.

Dartmouth-Hitchcock Clinic | Mary Hitchcock Memorial Hospital | Dartmouth Medical School | V.A. Medical Center, White River Junction, VT

Exhibit 12
Page 106

Dartmouth-Hitchcock will extend medical and dental benefits to you through to April 30, 2012.
Effective May 1, 2012, you will be offered COBRA coverage for medical and dental insurance.
Included with this notice of termination is a copy of our GME grievance process and procedures.
Should you choose to pursue the grievance option described in these attachments you must notify
Dr. Bertrand in the Office of Graduate Medical Education within five days of receipt of this
notice.  We wish you the best in your future endeavors.


Christine T. Finn, MD                    Marc L. Bertrand, MD
Program Director                         Associate Dean for Graduate Medical Education
Psychiatry Residency Program             Designated Institutional Official


Dartmouth-Hitchcock

Exhibit 12
Page 107



## Dartmouth-Hitchcock

LEBANON (DHMC) | CONCORD | KEENE | MANCHESTER | NASHUA | CHILDREN'S HOSPITAL AT DARTMOUTH (CHAD) | NORRIS
COTTON CANCER CENTER |

| PATIENTS & VISITORS | HEALTH CARE PROFESSIONALS | RESIDENTS & FELLOWS | DONORS & VOLUNTEERS | CAREERS |
| EMPLOYEES | | | | |

# Policies & Procedures

Home ▸ Residents & Fellows ▸ Policies & Procedures ▸ Policies and Procedures Manual ▸ GME
Policies ▸ Grievance Policy ▸ Procedures

## Procedures

1. **Academic Deficiency**

   **Definition:** Academic deficiency shall include, but not be limited to: a) insufficient fund of medical
   knowledge, (b) inability to use knowledge effectively, and/or (c) behavior detrimental to the
   educational process or the care of patients.

   **Length and Goals of Remediation:** A Resident whose academic performance does not meet
   departmental standards may be entitled to a defined period of remedial training in order to allow the
   Resident to improve academically and remain in the program.

2. **Non-academic Deficiency**

   **Definition:** Medical and surgical disciplines require unique abilities and talents which are unrelated
   to intellect, motivation or other academic qualities common to the physician. When a Resident's non-
   academic abilities and talents are judged insufficient by the Program Director, notification should be
   offered at an early stage, when a change in career direction will be least disruptive to the Resident.

   **Length and Goal of Remediation:** A Resident whose non-academic performance does not meet
   department standards may be offered a defined period of remedial training in order to allow the
   Resident to improve and remain in the program. If correction is not deemed feasible by the Program
   Director, the Resident's exploration of career alternatives and Program Director's assistance in
   finding a position more in keeping with the Resident's abilities and talents will take place.

3. **Behavior Incompatible with the Role of the Physician**

   **Definition:** Some behavior may be judged by the Program Director to be illegal, immoral, unethical
   or so objectionable as to be incompatible with the role of the physician. When such behavior on the
   part of a Resident has been alleged and not refuted to the Program Director's satisfaction, the
   Program Director, after discussion with the Director of GME, may recommend the Resident's
   dismissal without an intervening probationary period.

   **Length and Goal of Remediation:** There is no right to remediation under these circumstances.

4. **Procedure for Notification of Non-renewal, Dismissal or Other Concerns**

   1. The Resident shall be informed in writing of the documented deficiencies or allegations and of
      the recommendation for non-renewal, dismissal or remedial training in a private meeting with
      the Program Director or a duly appointed representative. At this meeting or as soon thereafter
      as possible, the Resident shall be provided with a copy of said evaluation.

   2. The Program Director shall submit written notification of the deficiencies, allegations and
      recommendation for non-renewal or dismissal to the Resident, the Director of Graduate
      Medical Education, the Chief of Staff of the Veterans Affairs Medical Center (White River
      Junction, Vermont) and the GMEC where appropriate.

   3. The Resident shall have five days, or within a mutually agreed upon time, from the date of this
      written notification to either (a) agree to the remedial plan (b) submit a resignation effective
      at a mutually acceptable date within the context of these guidelines, or (c) request a review of
      the case from the Director of Graduate Medical Education.

Page 2 of 2

4. If the Resident does not reach resolution after meeting with the Director of GME and attempted mediation, the Resident may request a review in a written request for the Fair Hearing Process, as described below, to be followed.

Copyright © 2012 Dartmouth-Hitchcock. All Rights Reserved.

About This Site | Notice of Privacy Practices | Website Privacy Policy | Feedback

Page 1 of 2



**Dartmouth-Hitchcock**

LEBANON (DHMC) | CONCORD | KEENE | MANCHESTER | NASHUA | CHILDREN'S HOSPITAL AT DARTMOUTH (CHAD) | NORRIS COTTON CANCER CENTER |

PATIENTS & VISITORS | HEALTH CARE PROFESSIONALS | RESIDENTS & FELLOWS | DONORS & VOLUNTEERS | CAREERS

EMPLOYEES

# Policies & Procedures

Home ▸ Residents & Fellows ▸ Policies & Procedures ▸ Policies and Procedures Manual ▸ GME Policies ▸ Grievance Policy ▸ Grievance Process

## Grievance Process

At any time during this process, the Resident may resign. Once a written resignation has been delivered to the Program Director, however, the Resident shall be deemed to have waived all rights to a hearing or to a continuance of their appointment.

## Hearing Procedure

1. Upon notification by the Resident that a review is requested, the Director of Graduate Medical Education or his designee shall form a committee consisting of the Director of Graduate Medical Education or his designee, a Hospital administrator, a house officer and two program directors or one program director and one physician faculty member selected by the Director of Graduate Medical Education or his designee (hereafter called the Committee.) The Director shall not select any person having a direct working relationship with the Resident. The Director of Graduate Medical Education or his designee shall chair the Committee.

2. The Committee shall schedule a hearing to occur within 14 days, or within a reasonable period of time based upon availability of the Resident, Program Director and Committee, but not less than seven days from the date of the Resident's request for review. In the interim, the GME Office shall obtain all relevant evaluation and academic records.

3. All evidence available to the Committee shall be provided to the Resident and Program Director at least three *working* days prior to the hearing. The specification of reasons for non-renewal or dismissal or other factors in the original written notice shall not prevent the Committee from relying on other reasons which are presented at the hearing; provided that the Committee may, at the request of the Resident and without special notice, recess the hearing and reconvene later in order to allow the Resident adequate opportunity to address reasons not included in the notice. The Committee may also, at its sole discretion and without special notice, recess the hearing and reconvene later in order to study new evidence presented by the Resident at the hearing.

4. The Resident shall be present and prepared to proceed at the scheduled hearing or shall be deemed to have waived all rights to a hearing and to have accepted any adverse recommendation or decision made by the Committee. Another hearing may be scheduled at the Committee's sole discretion if the Resident presents good cause for failing to appear or proceed. Hearings scheduled under these Guidelines shall be postponed only for good cause and at the sole discretion of the Committee.

5. The Resident and the Program Director may invite up to five witnesses each to present before the Committee. The Resident and Program Director may also ask others not invited to speak to submit written statements which will be collected for the GME Office at least five days prior to the hearing date.

6. The GME Director may appoint a separate hearing officer or designate a member of the Committee to preside over the hearing, to determine the order of procedure, to assure that all participants have a reasonable opportunity to present relevant oral and documentary evidence, to maintain decorum and to make any necessary procedural rulings.

7. The hearing need not be conducted strictly according to the rules of law relating to the examination of witnesses or the presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be considered.

Page 2 of 2

8. The Resident shall be entitled to submit, either prior to or during the hearing, memoranda concerning any issue of procedure or fact and such memoranda shall become part of the hearing record.

9. The order of presentation shall be determined by the Chair of the Committee. The Program Director shall be responsible for presenting appropriate evidence in support of the decision being questioned by the Resident. The Resident shall be responsible for presenting evidence which contradicts the Program Director's evidence or indicates that the Program Director's decision was arbitrary, unreasonable or capricious.

10. The Resident, the Program Director and the Committee may be entitled to consult with legal counsel in preparation for the hearing or with regard to other related matters.

11. Neither the Resident nor the Program Director shall be represented at the hearing by an attorney.

12. The Resident or Program Director may utilize a DHMC physician or staff member as an advisor during the Fair Hearing Process. This advisor may be present throughout the hearing.

13. The Committee may, without special notice, recess the hearing and reconvene the same for the convenience of the participants or for the purpose of obtaining new or additional evidence or consultation. Upon conclusion of the presentation of oral and written evidence, the hearing shall be closed.

14. The hearing may not be tape-recorded.

## Post-Hearing Procedure

1. The Committee shall conduct its deliberations in closed sessions. Only Committee members will be permitted to observe or participate in the deliberations.

2. Within 14 days, or a reasonable period of time after the conclusion of the hearing, the Committee shall make its final decision and shall deliver written notice thereof to the Program Director and the Resident. The notice shall indicate the reasons relied upon by the Committee in reaching its decision.

3. In the event the Committee should not concur with the Program Director's recommendation for non-renewal or dismissal or other issues regarding the Resident, the Program Director may be asked to accept the Resident in the departmental program for an additional period of specified duration during which remedial efforts may be continued on the Resident's behalf. The Resident's appointment shall be continued under such conditions as shall be defined in writing by the Program Director to the Resident and to the Director of Graduate Medical Education.

4. There shall be no appeal from the decision of the Committee.

Copyright © 2012 Dartmouth-Hitchcock. All Rights Reserved.

About This Site | Notice of Privacy Practices | Website Privacy Policy | Feedback

Case 2:19-cv-08000-DSF-RAO Document 64-2 Filed 09/16/19 Page 44 of 80 Page ID #:108
Case 2:19-cv-08000-DSF-RAO Document 61-1 Filed 11/04/19 Page 113 of 264
Page ID #:1788

# ASSOCIATED ATTORNEYS

## OF NEW ENGLAND

USC OFFICE OF GENERAL COUNSEL
Via Email:

RE: Jeffrey Isaacs v. USC

To Whom It May Concern,

I represent Dr. Jeffrey Isaacs and am authorized to send you this brief outline of my client's position with the intention of scheduling a meeting to discuss possible resolution short of litigation. You will find the complaint filed against you by my client attached. This matter originates with Dr. Isaacs time as a Keck medical student. He was dismissed from the program while undergoing treatment for a head injury. He signed two settlement agreements with Keck to allow him a chance to start again in his pursuit a career in medicine. Despite the sealed nature of these records they were disclosed to Dartmouth, via the actions of John Doe, and needlessly ended the career of a talented physician. The unacceptable result is that Dr. Isaacs currently faces lifelong career and reputational assassination.

I anticipate discovery will show that the Keck SPC individual faculty members never would have imagined their actions would effectively punish Dr Isaacs for ultimately excelling in medical school, which is what has happened.Though they were acting as agents of the college at the time it is expected that Ball and Henderson's retaliation and the intended effects of the same were hidden from USC and other institutions. Given the behavior of Ball and Henderson and the eventual release of Dr. Isaacs' records by USC Keck is liable for the horrific events that Dr. Isaacs has suffered for the last ten years.

The New Hampshire Board, a competent authority, found that USC breached their

587 Union Street, Manchester, New Hampshire 03104
Tel: 603-622-8100 Fax: 888-912-1497

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 114 of 264   Page ID #:1789
Case 2:19-cv-08000-DSF-RAO   Document 61-2   Filed 09/16/19   Page 45 of 50   Page ID #:109
Page ID #:1789

Associated Attorneys of New England
August 3, 2018
Page 2 of 3

settlement promises to Dr Isaacs by failing to discharge his negative administrative record. The NH Board order has withstood review at both the New Hampshire Supreme Court and the United States Supreme Court. In view of the breached contract and your apparent liability for John Doe's disclosure of sealed academic records, we submit that this matter is very much ongoing and unsettled. Keck has an opportunity to correct damages inflicted from their past mistake of favoring a student who had, in her own words, been admitted only through her NIH connections and contributions to the Dean. Dr. Isaacs was undergoing treatment for a concussion at the time of the SPC dismissal; any jury will find it unconscionable if Keck continues to assert that Dr. Isaacs, who later excelled in medical school, deserves lifelong punishment because of a student whose place in medical school was obtained through *quid pro quo*. It is also expected that discovery will show what Dr. Isaacs always claimed, that the discipline Dr. Isaacs suffered was particularly harsh because that student's father oversaw government funding to the institution.

Admittedly, Keck USC is in an interesting position with regards to this case. On the one hand, the actions of Attorney Ball and others mentioned are retaliation in violation of RICO, but on the other, it does not appear that it was ever USC faculty's intention to bar Dr. Isaacs from rehabilitating and practicing medicine. This point, before service of the complaint offers us a short lived opportunity to resolve these issues.

Local Rule 16-15 states that it is the policy of the Court to have the parties discuss settlement. I am reaching out to you with the intention of conducting in person settlement discussions via a California licensed mediator/ADR, prior to requiring your answer or response to the complaint. Dr. Isaacs is a promising physician who has been looking for an opportunity to pursue his chosen career, and he is hopeful that the school where he began that path will reverse course and aid him in fulfilling that goal. USC is in a unique position to remedy the wrongs that,

19-cv-2011 Isaacs v. USC                              Exhibits Page 39

Exhibit 13
Page 113

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 09/16/19   Page 46 of 80   Page ID #:110
Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 04/19   Page 115 of 264
Page ID #:1790

Associated Attorneys of New England
August 3, 2018
Page 3 of 3

as we can detail in the ADR, lead to a chain of misinformation and mistreatment at downstream institutions, and ultimately, White House factfinding and the World Bank President's resignation.[1]

In 2007, Dr Isaacs, *pro se*, appeared at the scheduling conference with United States District Judge Feess. He stated he wanted nothing from the lawsuit other than readmission to Keck. Feess, apparently incredulous that the matter had reached his courtroom, asked the parties to work out a settlement. Keck, apparently at the direction of Ball and Henderson, chose not to do the right thing. One can only hope, after over a decade of my client's suffering, we will not be making the same argument to United States District Judge Fischer.

In efforts to advance prompt exchange of information and reduce litigation costs, my client is willing to pay for the proposed ADR/mediation.[2] Kindly, accept or decline his offer at your earliest convenience.


Regards,



Atty. Keith A. Mathews

---

[1] USC's incoming President was also Jim Yong Kim's successor at Dartmouth, and had some duty to investigate the matter that ultimately, we believe, lead to White House questioning and said resignation. These matters will be detailed in discovery in the event Dr. Isaacs' RICO claims progress.

[2] If he would be willing/able to take the case, we propose Judge Gary A. Feess as an ADR mediator at Phillips ADR. We believe his potential; recollection of the case, at a relatively early time in the current dispute, would be beneficial to both sides. Alternatively, please provide us three other mediators to choose from.

19-cv-2011 Isaacs v. USC                          Exhibits Page 40

Exhibit 13
Page 114

 Gmail

## [FWD: Re: Isaacs matter]

**keith@aaone.law** <keith@aaone.law>
To: Jeffrey Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu>

Fri, May 31, 2019 at 8:08 AM

Not good, let me think about the best way to handle.

Keith

> -------- Original Message --------
> Subject: Re: Isaacs matter
> From: Andreas Joerg Meyer <andreasm@usc.edu>
> Date: Thu, May 30, 2019 8:15 pm
> To: "Keith Mathews, Esq." <keith@aaone.law>
>
> Mr. Mathews,
> I am in receipt of your correspondence and the complaint filed by your client.
>
> The University of Southern California (USC) unequivocally rejects your client's request to engage in mediation. Not only does the University dispute the facts set forth in the complaint and in your letter, but we believe the complaint to suffer from so many legal deficiencies and factual inaccuracies that it is not only inviable but also frivolous and harassing. We demand that the complaint be dismissed in its entirety immediately. If your client proceeds with the complaint, USC will not only mount a vigorous defense, but we will also pursue all remedies available to the University, including sanctions under Rule 11 and a counterclaim for liquidated damages, costs, and attorneys' fees caused by your client's breach of more than one provision contained in the Confidential Settlement Agreement and Release he entered into with the University in 2008.
>
> Sincerely,
>
> Andreas J. Meyer
> University Counsel
> University of Southern California
> Office of the General Counsel
> Tel: (213) 740-7922
> Asst: Erin Snyder (erinsnyd@usc.edu)

**From:** Keith Mathews, Esq. <keith@aaone.law>
**Sent:** Friday, May 24, 2019 4:06:22 PM
**To:** Andreas Joerg Meyer
**Subject:** Isaacs matter

We had spoken a few weeks ago regarding Mr. Isaacs. I have attached a letter explaining his position as well as the suit that has recently been filed. Please do not hesitate to contact me if additional information would be useful to you. I look forward to speaking with you further about the case.
Regards,
Keith

*Atty. Keith A. Mathews*
*Associated Attorneys of New England*
*587 Union Street*
*Manchester, NH 03104*
*************************

*www.AAONE.law*
*Tel: (603) 622-8100*
*Fax: (888)912-1497*

CONFIDENTIALITY NOTICE:
This e-mail and any files transmitted with it are confidential, may be protected by the attorney-client privilege, and are intended for use by the addressee(s) only. If you are not the intended recipient or the person responsible for delivering e-mail for the intended recipient, be advised that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you believe you have received this e-mail in error, please destroy it immediately and notify me at 603-622-8100. Thank you.

19-cv-2011 Isaacs v. USC

Exhibit 14
Page 116

Exhibits Page 42

Case 2:19-cr-08000-DSF-RAO Document 64-2 09/16/19 Page 28 of 82 Page ID #:142
Case 2:19-cv-08000-DSF-RAO Document 64-2 Filed 11/04/19 Page 118 of 264
Page ID #:1793

7/30/19, 2:11 PM

 Gmail

## Service of Process- URGENT

**Jeffrey** <jeffreydi@gmail.com>                                              Fri, May 31, 2019 at 11:53 PM
To: andreasm@usc.edu, Keith <keith@aaone.law>

Andreas:

Your letter is shameful. USC apparently has no remorse for allowing a med student to be admitted
through NIH connections, and moreover, to collude with your less than perfect (2 felons I believe) med
school deans to mislead the faculty (in violation of RICO) and harm my life and career to simply serve
others as a doctor. We thought after a decade, USC administration might do the right thing. We were
wrong.

It is frankly not surprising you are charged in dozens of RICO claims alleging similar activity.

You should be ashamed for your letter to Atty Mathews. Moreover, I advise you that I consider the
threats contained therein it to be further violations of the RICO statute.

Please advise , within 1 business day, who you have authorized (name & location & phone) to accept
formal summons service. We have waited patiently for your response re ADR but further delays in
service of process shall not be tolerated.

Please direct further correspondence on this matter to me at this point as the Plaintiff in pro per. Please
be advised any correspondence I receive from you shall be part of the record, I reserve the right to re-
publish it, forward it to appropriate entities; we are in no way engaged in privileged settlement
discussions at this point as you declined ADR.

Dr Jeffrey Isaacs


Subject: Re: Isaacs matter
From: Andreas Joerg Meyer <andreasm@usc.edu>
Date: Thu, May 30, 2019 8:15 pm
To: "Keith Mathews, Esq." <keith@aaone.law>

Mr. Mathews,
I am in receipt of your correspondence and the complaint filed by your client.

The University of Southern California (USC) unequivocally rejects your client's request to engage in mediation. Not
only does the University dispute the facts set forth in the complaint and in your letter, but we believe the complaint to
suffer from so many legal deficiencies and factual inaccuracies that it is not only inviable but also frivolous and
harassing. We demand that the complaint be dismissed in its entirety immediately. If your client proceeds with the
complaint, USC will not only mount a vigorous defense, but we will also pursue all remedies available to the
University, including sanctions under Rule 11 and a counterclaim for liquidated damages, costs, and attorneys' fees
caused by your client's breach of more than one provision contained in the Confidential Settlement Agreement and
Release he entered into with the University in 2008.

19-cv-2011 Isaacs v. USC                                              Exhibits Page 72

Exhibit 15
Page 117

Sincerely,

Andreas J. Meyer
University Counsel
University of Southern California
Office of the General Counsel
Tel: (213) 740-7922

Case 2:19-cv-02011-DSF-RAO Document 64-2 Filed 03/18/19 Page 120 of 264
Case 2:19-cv-02011-DSF-RAO Document 1 Filed 03/13/19 Page 1 of 48 Page ID #:1795
FEE PAID



UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

## LACV1902011-DSF-RAOx

DR. JEFFREY ISAACS )
                Plaintiff, )       Case No.
                         )
vs. )
                         )
DARTMOUTH HITCHCOCK MEDICAL CENTER, )
GEISEL SCHOOL OF MEDICINE AT DARTMOUTH, )
USC KECK SCHOOL OF MEDICINE, )
NH BOARD OF MEDICINE (individually) )
             and )
JOHN or JANE DOE )
                Defendants. )
                         )

RECEIVED
CLERK, U.S. DISTRICT COURT

MAR 13 2019

CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

### I.     INTRODUCTION

1. This case describes a small group of individuals with a nexus as academic medicine leaders from Harvard Medical School, who, owing to a personal vendetta, coordinated predicate acts over more than a decade to successfully ruin the Plaintiff's medical career and reputation.

2. In their small world controlling billion dollar NIH grants and coveted Ivy league medical school spots, they successfully recruited new actors each time Plaintiff went to a new institution where they had influence. They subverted institutional policies and generally pulled strings, as evidence will show, without having to answer to anyone for years, until, upon information and belief, the Executive Branch began to ask questions.

3. Specifically, this matter originated with a dispute dating back to 2005, between Plaintiff, a promising young medical student, and one Robert Baughman, a former NIH director,

Exhibit 16
Page 119

Harvard professor, and member of the White House Committee on Counterterrorism. Baughman had overseen a substantial $40 million dollar grant to the Keck School of Medicine, where his child was subsequently accepted with Dr. Isaacs into the MD Class of 2009. A dispute arose between Isaacs and the younger Baughman, and the school was alleged to have improperly yielded to the NIH donor, when they severely disciplined the Plaintiff. After protracted litigation in this District, a settlement agreement was reached that sealed all disciplinary records, dismissed all administrative charges, and cancelled all contracts between the parties. Years went by; Isaacs excelled without further incident at international medical school with training in London, Singapore, and New York and Florida, and achieved a top decile national board score higher than the average neurosurgeon.

4. His achievement and persistence fueled an organized and relentless retaliation against him that continues to the present day. With his newly achieved medical diploma, Dr. Isaacs began residency training at Dartmouth. Knowledge of the sealed USC controversy, through John Doe, reached Dartmouth's medical school some five years after it began. John Doe's identity has been never been revealed by the Defendants and the Defendants have taken steps to conceal his or her identity. Motivated by John Doe's influence, Isaacs's arrival at Dartmouth was met with the strongest resistance. He was treated unethically and suffered extraordinary stress. Representative of the actions intended to break him down, he was ordered to conduct two unnecessary prostate exams his first two days of residency. Dartmouth terminated Isaacs without the normal peer review hearing process required by hospital bylaws.

Exhibit 16
Page 120

5. Former Dartmouth & World Bank President Jim Yong Kim was notified to preserve evidence for federal court review of the circumstances. Within a week, Dr. Isaacs' emails and medical records at Dartmouth completely disappeared. Ultimately, the corruption extended from high academia to government officials. Dartmouth sent the sealed Keck records to the New Hampshire Board of Medicine. The Board, in turn, published the false, sealed records on the internet, declaring them to have never been sealed.

6. Such activity precisely captures why Congress enacted the RICO Act – to prevent and expose the infiltration of legitimate institutions by corrupt individuals. To be sure, each institution named in this lawsuit is an otherwise venerable institution where the Plaintiff did, and does, seek to resume his medical research career. The Defendants executed constant, longstanding, and corrupt schemes intended to deprive Plaintiff of his medical career. Indeed, Plaintiff's fourteen year saga to practice medicine is unheard of for a physician with his top academic ranking and no other bar to employment.

7. As a jury shall determine, Defendants willfully violated RICO statutes over a fourteen year period by recruiting new individuals to carry out an orchestrated pattern of retaliations, due process violations, and judicial obstructions meant to prevent Dr Isaacs from ever becoming a doctor.

## II.    JURISDICTION AND VENUE

12. Venue in the California Southern District is proper because the dispute transpired and originated in the district. Additionally, the settlement agreement and disclosures by John or Jane Doe, central to this case, necessarily stemmed from this district. The Plaintiff was retaliated against, for fourteen years, because he was a witness in an official proceeding in this district.

Exhibit 16
Page 121

13. Jurisdiction in this Court arises under 28 U.S.C. § 1331, for federal questions presented pursuant to 18 U.S.C. § 1965 (RICO). Jurisdiction for injunctive and other causes of action is invoked pursuant to 28 U.S.C. § 1332.

### III.   PARTIES

14. Plaintiff Dr. Jeffrey Isaacs is a citizen of the Commonwealth of Pennsylvania. Dr. Isaacs holds an A.B. from Dartmouth College, an MBA from Wharton/Insead, and an M.D. issued in 2010 from the American University of the Caribbean. He began medical training with Defendant Keck in 2005. Fourteen years after federal controversy commenced, the Defendants continue to improperly prevent him from obtaining necessary federally funded residency (GME) training for medical licensure.

15. Defendant New Hampshire Board of Medicine is a group of individuals who convene at 121 South Fruit Street, Suite 301, Concord, NH 03301-2412 under the color of New Hampshire state law. The individuals, specifically, include prosecutor and investigator Jeff Cahill, administrator Penny Taylor, and the voting members of the Board. The individuals shall be considered to be enumerated defendants in the caption of this lawsuit, and shall be served and noticed in accordance with local and FRCP.

16. Defendant Dartmouth Hitchcock Medical Center is a non-profit corporation with a principal address of One Medical Center Drive, Lebanon, NH 03756. Defendant Dartmouth Hitchcock Medical Center does not have a registered agent in the State of New Hampshire. Plaintiff was a salaried employee of Mary Hitchcock Memorial Hospital, related to DHMC, but was a student trainee of Dartmouth College.

17. Defendant Geisel School of Medicine is a DBA for Trustees of Dartmouth College which has a principal office address at 63 South Main Street, Ste. 301, Hanover, NH 03755 and

Exhibit 16
Page 122

no registered agent. According to its webpage, the Board of Trustees "has ultimate responsibility for the financial, administrative and academic affairs of [Dartmouth] College.' Plaintiff's applications to study GME have been declined as recently as November 2018 by faculty employed by or associated with the College.

18. Defendant USC Keck School of Medicine ("Keck") is located at 1975 Zonal Avenue in Los Angeles, in the Southern California District. In 2008, Plaintiff and Keck settled a lawsuit in this district, CV-06-3338-GAF. This complaint alleges witness retaliation to present day for disclosure of federal violations in said settled litigation.

19. Information about John and/or Jane Doe will be amended when available.

## IV.  **FACTUAL HISTORY**

20. In August 2005, the Plaintiff matriculated into the Class of 2009 M.D. program at the Keck School of Medicine at University of Southern California.

21. During the first semester, a relationship with a fellow Keck Classmate, one A.B., turned sour. A.B. made threatening statements to the Plaintiff, such as "I got into Keck through my connections, I'll get a residency through my connections, don't mess with me." [1]

22. At the time, email return receipt technology was new and developing. An electronic message Plaintiff had sent to A.B. started registering return receipts at NIH headquarters and the Zilkha Neuroscience Center Executive Office at Keck.

23. Shortly thereafter, USC Security served Plaintiff with a "stay-away" order from classmate A.B.

---

[1] Indeed, A.B. has attained faculty appointment at Harvard Medical School, while Plaintiff – with his higher merit scores – has spent well over a decade trying to correct the wrongs inflicted by the Defendants.

Exhibit 16
Page 123

24. At the suggestion of the Keck Administration, A.B. sought to press charges with the LAPD for a paragraph of electronic written messages, sent by the Plaintiff, which she purported to be insulting. The LAPD, however, declined to press charges related to the petty dispute.

25. At the time, Plaintiff alleged the "stay-away" order was being used to embarrass him amongst his classmates. Plaintiff had difficulty complying with said order given that there were only three lecture rooms used by the one hundred members of the Class of 2009 M. D. program.

26. As evidenced by the return receipts, in conjunction with A.B.'s statement concerning connections, Plaintiff realized A.B.s father, head of Neurological NIH, was communicating with Keck's new Dean, Brian Henderson, who had recently been promoted after securing millions in funding for the new Zilkha Neuroscience Center.

27. Plaintiff's academic performance began to deteriorate because of the distraction created by the stay away order. He telephoned A.B. and offered his apology for his role in the aforementioned dispute, hoping to de-escalate the situation. A.B. initially accepted the apology.

28. However, the Junior Keck Dean, Peter Katsufrakis, brought Plaintiff before the Keck Student Performance Committee, and expelled him for apologizing to A.B. while the stay-away order was under effect.

29. Plaintiff was hospitalized with what appears to have been an Adjustment Disorder, stemming from the trauma of being expelled.

30. Plaintiff filed a federal lawsuit, CV-06-3338-GAF, against Keck, Henderson, Katsufrakis, and A.B's father.

Exhibit 16
Page 124

31. For unknown reasons, in 2006 Deans Henderson and Katsufrakis left their Deanship posts at Keck. Additionally, A.Bs father left the NIH to move to Okinawa, Japan.

32. After two years of alleged discovery evasion taking advantage of Isaacs' *pro se* status, Keck finally agreed to settle the claims with Isaacs.

33. Dr. Isaacs executed the first settlement agreement with the University of Southern California in 2007. AR 000032 (See Attached). That settlement dismissed the individual defendants from the suit, including the USC Dean and a National Institutes of Health official. Paragraph 2 of that Agreement was entitled "Sealing of Disciplinary Records," and read:

> "In exchange for the Dismissal with Prejudice of the Individual Defendants, referenced above, Defendant USC agrees that commencing immediately upon the execution of this Settlement Agreement and receipt of the signed Dismissal with Prejudice, *USC will not release or disclose Isaacs' disciplinary records to any third party*, including but limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order."

34. The only consideration Isaacs received for dismissing his case under the first settlement agreement was the sealing of his disciplinary records.

35. The intent of the settlement was to allow Isaacs, who was already well in his second year of medical school at AUC, to move on and continue his career in medicine.

36. A second settlement agreement between USC and Dr. Isaacs ended the litigation with that institution. AR 000031 (See Exhibit). The excerpted paragraph 8 of that agreement stated that, "[a]s a material inducement to Isaacs to enter into this Agreement, USC does

Exhibit 16
Page 125

hereby irrevocably release, acquit and forever discharge Isaacs from any and all charges . . . obligations, promises, agreements . . . of any nature whatsoever, known or unknown . . ." *Id.*

37. This settlement agreement further dismissed any outstanding administrative charges against Dr. Isaacs.  AR 000462 (See Attached).

38. Based primarily on the quoted language of the two settlement agreements and the advice of his attorney at the time, Dr. Isaacs understood that anything relating to his attendance at Keck was sealed and could not be disclosed by anyone, *including Dr. Isaacs*.

39. There are very few cases of sealed disciplinary academic records, and little legal precedent as to how they should be handled by the courts.

40. Here, the authoritative federal statutory regulation is 20 U.S. Code § 1232g - Family educational and privacy rights.

41. Specifically, the provision dealing with disciplinary records is instructive:

(h)Disciplinary records; disclosure

Nothing in this section shall prohibit an educational agency or institution from—

(1) including appropriate information in the education record of any student concerning disciplinary action taken against such student for conduct that posed a significant risk to the safety or well-being of that student, other students, or other members of the school community; or (2) disclosing such information to teachers and school officials, including teachers and school officials in other schools, who have legitimate educational interests in the behavior of the student. (i) Drug and alcohol violation disclosures

Exhibit 16
Page 126

42. In simple terms, FERPA and other routine liability laws normally would grant Keck an absolute right and duty to disclose a student's disciplinary records to another university with a vested interest.

43. By "sealing" the disciplinary records so that future disclosure would be prohibited, and hence outside the realm of FERPA, Keck expunged Isaacs' student record.

44. If they hadn't intended to expunge those records with these settlement agreements, Keck would be in violation of FERPA and other routine liability laws by failing to report the discipline to an educational institute with an interest in knowing.

45. With the knowledge that the settlement agreements placed his issues at Keck behind him, Isaacs proceeded in an international medical program, and finished ahead of schedule in 3 ½ years without incident.

46. His medical training included clerkship training at St. George's University London, Cleveland Clinic and Mt. Sinai School of Medicine (NY). Dr. Isaacs received strong reviews, mostly honors, from supervising professors at more than twelve different clerkships at the aforementioned institutions.

47. Dr. Isaacs received his medical degree in 2010 after he placed in the top decile on the highly competitive United States Medical Licensure Exam Step 1.

48. In July 2011, Isaacs was admitted to a federally funded Graduate Medical Education program ("medical residency") at Dartmouth Medical School, and their associated teaching hospital, DHMC/Hitchcock.

49. Within days of arriving at Dartmouth, Isaacs's health took an immediate and substantial turn for the worse. Previously able to work thirty hour surgery shifts, suddenly Isaacs had difficulty staying awake for more than three hours at a time.

Exhibit 16
Page 127

50. Isaacs additionally had new chest palpitations and shortness of breath which persisted even upon returning home from work.

51. Another resident, who Isaacs has never met to this day, sent a complaint to Dartmouth's Internal Medicine Program Director, Harley Friedman, asserting she heard about Isaacs' mistreatment and felt his supervisor, Dr. Khagi, should be replaced.

52. Dr. Friedman wrote back to the complainant, dismissing her concern, and coercing her to turn on Isaacs. This evidences the beginning of Dartmouth's involvement in a longstanding pattern of predicate acts, by recruiting others individuals at Dartmouth to violate and suppress Isaacs's rights as a student physician.

53. Dr. Khagi ordered Isaacs to conduct two digital rectal exams (DREs) during his first 2-3 days of residency.

54. The exams were unnecessary for medical treatment. One patient had terminal metastatic cancer, and to this day, Isaacs recalls the patient's shock when he was informed he needed a prostate exam to look for a "cancer source" per Dr. Khagi's instruction.

55. The exams were not for medical training.

56. The exams were meant to humiliate Isaacs for his past at Keck.

57. A plethora of other false situations were created for Isaacs. He was often left in silence as his supervisors watched him not knowing what to do in a new hospital, and purposefully failed to instruct him.

58. Dartmouth accepted federal funds to train Isaacs.

59. Their schemes to humiliate Isaacs denied him any semblance of reasonable training. As such, Dartmouth benefitted inappropriately from receipt of federal funds.

Exhibit 16
Page 128

60. At least six Dartmouth administrators, under oath in federal depositions, falsely stated they learned of Keck at the end of Isaacs' six months of internship employment, no earlier than January 2012. (See Exhibit).

61. These administrators committed perjury in order to further the enterprise of revenging Isaacs, assassinating his reputation, and ending his medical career. Had Dartmouth admitted they possessed knowledge of the sealed Keck records in June 2011, it would support the timeline alleged by Isaacs' claims of mistreatment. Thus, they had to submit perjured testimony that they only learned about Keck in January 2012.

62. In fact, in early November 2011, Harley Friedman interviewed Isaacs's replacement from his same Caribbean medical program, one Jeremy Whyman MD. Until then, Dartmouth had never accepted a student from the Caribbean.

63. Upon information and belief, no later than November 2011, Dartmouth sought Isaacs' medical records from Keck, the Caribbean, and other places he had studied.

64. Dartmouth directly communicated with the schools Isaacs had previously attended.

65. Dartmouth even emailed Isaacs' Wharton MBA program subsidiary in France to obtain records.

66. Dartmouth was obtaining these records to research the information they had from John Doe concerning Keck.

67. Upon information and belief, at the time Dartmouth attempted to verify the situation with, but Keck refused to release the expunged disciplinary records to Dartmouth.

68. Dartmouth was left with a dilemma of both having information about the sealed records, causing the ongoing situation of widespread mistreatment of Isaacs at his internship, and their knowledge in fact that their sealed legal status was improper to use against Isaacs. In

Exhibit 16
Page 129

short, the dilemma escalated over six months with Dartmouth unable to handle the situation in any ethical or legal fashion.

69. Dartmouth refuses to answer, despite years of discovery requests, how and when exactly they had learned that Dr. Isaacs attended Keck.

70. Around Thanksgiving 2011, one Jeffrey Simon MD told Plaintiff "I don't know what you did in your past, but you're right, they're trying to get rid of you."

71. On October 12, 2011, Dr. Isaacs completed an actigraph study with Dartmouth's Sleep Medicine program to address his inability to stay awake. The results of this study were that Dr. Isaacs was unable to stay awake for more than 3 hours at work due to hazing and mistreatment.

72. The results of this actigraph study would later disappear under questionable circumstances.

73. Dartmouth violated numerous state and federal medical records and patient rights regulations when they intentionally deleted his sleep study. RICO is one of the laws violated by this instance of medical records deletion.

74. The Plaintiff became aware of the illegal situation in early January 2012, and informed Dartmouth that there would be a Federal lawsuit filed and that all evidence should be preserved.

75. Plaintiff made this request through an email letter to College President Jim Yong Kim, notifying him of pending litigation in the United States District Court. The email specifically indicated that all ESI evidence should be preserved.

76. The college had a duty under Federal Law to preserve relevant evidence and was noticed of this duty no later than January 15, 2012.

Exhibit 16
Page 130

77. Despite that notice, the Plaintiff's computer and email accounts with Dartmouth Hitchcock Medical Center were disabled on January 17, 2011 and scheduled for deletion.

78. Isaacs noticed his account login was disabled and telephoned DHMC IT support on or around January 17, 2011.

79. IT support told Isaacs that his supervisors ordered the deletion of his electronic accounts.

80. IT support further informed Isaacs that automatic safety mechanisms were preventing the deletion for approximately another week.

81. Isaacs desperately emailed Finn, Jim Yong Kim, and others, pleading to reverse their order to destroy his electronic login and email access.

82. Finn was aware of Isaacs' litigation notice to Jim Yong Kim at the time she ordered deletion of Isaacs' electronic (eDH) files. (See Exhibit).

83. Finn had referenced the litigation and complaints to Jim Yong Kim in emails she sent to others in her department on or around January 15, 2012.

84. Finn and Kim, with coordination from Dartmouth attorneys, formed a consortium that worked to commit felonious evidence destruction.

85. There can be no doubt, *res ipsa loquitor*, that Finn and Jim Yong Kim purposefully and intentionally ignored Isaacs' pleas not to delete his eDH accounts.

86. Normally, an eDH account would only be deleted after an employee is properly terminated through due process including a fair hearing. As such, this email destruction occurred at least two months earlier than it should have.

87. The willful destruction of Isaacs' eDH accounts constitutes a felony under United States Code. 18 U.S.C 1519.

Exhibit 16
Page 131

88. Dartmouth, via its attorneys, would later argue to the Court that automatic processes caused the destruction of Isaacs' eDH accounts.

89. Dartmouth knew that the felony code has exemptions for ESI deletions caused by automatic processes.

90. As stated, the only relevant automatic processes in this case were safety mechanisms to prevent the deletion of the ESI.

91. No automatic process caused the deletion of Isaacs' eDH ESI.

92. Finn and Jim Yong Kim's decision to delete Isaacs' eDH files caused the deletion.

93. Dartmouth, via statements made by their attorneys, defrauded the Court by suggesting automatic processes were to blame.

94. The deletion of Dr. Isaacs' electronic accounts severely limited his ability to support his well-founded claims in the District Court and in administrative proceedings.

95. Dartmouth used fraudulent means and information to prevent the further discovery and prosecution of their felonious email destruction. As a result, legal determinations based upon said fraudulent means are invalid.

96. Dartmouth terminated Isaacs in March 2012, without having ever placed him on formal probation.

97. Probation is a due process guaranteed by various contractual and accreditation guidelines applicable to Isaacs' residency at Dartmouth.

98. Defendant Finn and Kim sought to deny Isaacs this right.

99. Dartmouth terminated Isaacs in March 2012, without having ever allowing him a "Fair Hearing" amongst Dartmouth peer physicians.

Exhibit 16
Page 132

100.    "Fair Hearing" is a due process guaranteed by various contractual and accreditation guidelines applicable to Isaacs' residency at Dartmouth.

101.    Defendant Finn and Kim sought to deny Isaacs this right.

102.    Dartmouth terminated Isaacs by sending him a letter via US Mail, falsely accusing him of concealing his Keck records, and falsely accusing him of not disclosing other records from Arizona.

103.    Dartmouth knew the Keck records in fact had been expunged. Dartmouth had an absolute, unfettered right via FERPA to confirm or deny the expungement of the Keck records.

104.    As such, Dartmouth's letter via US Mail constitutes Mail Fraud under the United States Code.

105.    At least one civil federal lawsuit was concluded adversely to Plaintiff, as a result of Dartmouth defendants submitting knowingly false and fraudulent information to the court.

106.    One such case was in the New Hampshire district, lawsuit CV-12-40-LM.

107.    That lawsuit alleged that Plaintiff had become disabled from mistreatment at Dartmouth. The lawsuit concluded (with missing emails and medical records) when Plaintiff's request to obtain spoliated evidence was ignored by the court, which entered summary judgment. As such, a summary judgment was entered in Dartmouth's favor, stating they did not violate the ADA by not accommodating Isaacs disability (which was alleged to have been caused by Dartmouth itself).

Exhibit 16
Page 133

108.    Nothing in the summary judgment declared that Isaacs was permanently barred from practicing medicine, nor that his future applications to Dartmouth shouldn't be given all due consideration.

109.    Indeed, uncontested witness statements in that lawsuit's record included senior program directors' statements that "Isaacs medical knowledge was perfectly acceptable," and that "most of his reviews were quite positive." In fact, there were only several specific performance faults attributed to Isaacs in the record of cv-12-40, and they themselves are alleged to have been issued in mockery. They are 1) that he forgot a pager at lunch, and 2) that he forgot to listen to a patient with a stethoscope.

110.    In one deposition in cv-12-40, Dr Christine Finn testified that she would "defer to the AAMC" and other competent authorities, with regards to interpretation of the Keck settlements.

111.    The NHES, New Hampshire Employment tribunal, is a competent authority. The NHES determined that Isaacs non-disclosure of Keck records was permissible, because he believed it to have been expunged.

112.    Similarly, the AAMC closed an investigation, in Isaacs' favor, upon legal review of the Keck settlements.

113.    In short, Dartmouth and the NH Board of Medicine (see below) defied two prior competent authorities, when they faulted Isaacs for non-disclosure of Keck.

114.    Under an applicable standard of willful falsification and gross misrepresentation, Dartmouth and the NH Board incorrectly faulted Isaacs for interpreting the Keck settlement agreements the same way as the AAMC and NHES.

Exhibit 16
Page 134

*115.*    In other words, they continue to accuse Isaacs of dishonesty for *simply believing the legal interpretations of the AAMC and NHES (and numerous other attorneys) were possible.*

116.    In sum, at the conclusion of cv-12-40, Isaacs believed that despite the setback at Dartmouth, he still had a future medical career. This would especially be the case if his medical conditions, caused by Dartmouth, improved.

117.    Commonly, resident physicians who suffer medical ailments forcing them to abandon a medical residency, are then permitted to return to federal GME training after being rehabilitation.

118.    Hence after cv-12-40's MSJ, there existed no reason Isaacs could not hope and expect he would at some point be able to return.

119.    However, years of applications to Dartmouth and appeals of the NH Board false orders (see below) have made it apparent that the Defendants have succeeded in permanently barring Isaacs from residency and licensure.

120.    It is exceptionally rare, if not unheard of, for someone with Isaacs credentials, and no criminal record or other bar to employment, to be kept out of training for seven years.

121.    Indeed, Dartmouth didn't even acknowledge receipt of Isaacs most recent application to GME in September, 2018. Such treatment is now obvious to be consistent with Dartmouth's vendetta against Isaacs ever becoming a doctor.

122.    Dartmouth has even pleaded several times, in related lawsuits, that Isaacs cannot "resuscitate claims against Dartmouth by reapplying each year."

123.    Such a statement means that Dartmouth does not welcome Isaacs' 2018 application to their federally funded program.

Exhibit 16
Page 135

124.     Such a statement means that Dartmouth believes Isaacs should be permanently barred from GME medical training at their facility.

125.     Such a statement means that Dartmouth believes that an improvement in the medical situation that caused him to leave 2011 residency would never warrant consideration of a reapplication.

126.     Such a statement means that Dartmouth continues to accuse Isaacs of guilt for interpreting the Keck settlement agreements in the same fashion as NHES and AAMC.

127.     Such a statement is in fact evidence that Dartmouth's official stance is one of permanent, illegal retaliation against Isaacs, in violation of federal witness retaliation laws.

128.     Such a statement evidences the overall scheme, and simplest explanation: that Isaacs has been subject to longstanding, repetitive and deliberate violations of RICO, owing to a vendetta  by some of the highest members of academic medicine, the Defendants. *The Defendants lawyers in fact have plainly issued a statement that Isaacs should never reapply to federal GME programs because he sued them, multiple times, and obtained valid settlement expungements.*

129.     In 2014, no less than three Dartmouth officials testified under oath that the unnecessary DREs had never been investigated.

130.     In 2017-2018, Dartmouth made numerous, false assertions to dismiss a civil Title IX claim. Amongst these false assertions, Dartmouth refuted the Title IX claims as false, despite the well known fact they had never been investigated.

131.     Dartmouth's pattern of perjury and false pleading statements goes well beyond defense "lawyering" and, in and of itself, represents obstruction of justice.

Exhibit 16
Page 136

132. Dartmouth similarly caused a false letter to be sent to the New Hampshire Board, transmitted false/expunged records from Keck.

133. Dartmouth's materially false letter to the NH Board, disguised as FERPA-proper educational records, constitutes Mail Fraud under United States Code. Dartmouth knew Keck was not releasing the sealed discipline history, but mislead the NH Board of Medicine to believe otherwise.

134. The NH Board received the Keck information and immediately assigned the matter to Defendant Cahill. Cahill, in 2013, telephoned Isaacs and said "Just so you are aware, this was placed on my desk from someone above. I don't want to make a mountain out of a molehill."

135. Dartmouth had recruited individuals at the NH Board to scheme and defraud, and retaliate against, Isaacs.

136. Cahill made no less than six attempts, over two years, to coerce Isaacs to settle. In one email, he even said "I don't think this will affect your lawsuit with Dartmouth," but that he "needed" Isaacs to admit wrongdoing via Keck.

137. The New Hampshire Board of Medicine (the "Board") found that Dr. Isaacs had improperly failed to disclose his "criminal stalking" and Keck enrollment on his residency application. AR 000042; AR 000022-30.

138. Setting aside its incorrect claim that Dr. Isaacs had a criminal record, which he did/does not, the Board not only rejected Dr. Isaacs' reliance on the settlement agreements but also disclosed the facts of the Keck circumstances contained in documents that the agreements had sealed. AR 000022-30.

Exhibit 16
Page 137

139.    In so doing, the Board violated the court-entered settlement agreements and, worse, forever tarnished Dr. Isaacs' reputation.

140.    The Board withheld critical exonerating evidence from the public, namely, the first Keck settlement agreement.

141.    The Board falsely stated to the public that "there is no provision sealing the records."

142.    The Board also declared that, upon information and belief, USC failed to complete their end of the settlement agreement, specifically, they failed to release any outstanding administrative charges. Releasing outstanding administrative charges was one of the plain-text requirements of the second Keck settlement agreement.

143.    If true, Defendant USC's failure to release administrative charges against Isaacs represents an additional predicate act of obstruction of justice and/or due process violations.

144.    Counterintuitively, the Board blamed Isaacs for USC's failure to release administrative charges, despite conceding that USC had breached their contractual duty.

145.    Such an argument goes beyond mere error, and represents Cahill and the Board's ongoing attempt to participate in the predicate acts and scapegoat Isaacs. The Board order itself evidences a *mens rea* to join and please the high academia enterprise begun all those years ago by the Defendants.

146.    Given Cahill's statements, and two year timeframe scrutinizing the record, the evidence shows his intention to obstruct justice and due process by issuing false statements and withholding key evidence from a state proceeding.

Exhibit 16
Page 138

147.     To date, the Board's only defense, argued in recent federal court motions, is that there was "no clearly established right" for Cahill to include the Keck settlement exonerating evidence in his order. In other words, the Board doesn't contest their Order is false. They merely contest that Isaacs had any right to a true Order, or an order that took into consideration favorable to Isaacs.

148.     Further evidencing their corrupt involvement pursuant to RICO, the Board failed to investigate Khagi for the unnecessary DREs he ordered. Plaintiff sent repeat requests for investigation, over a two year period, which were ignored.

149.     By failing to investigate any of Isaacs' claims, and issuing knowingly false documents against him, the NH Board, via its officers, repeatedly obstructed justice and denied Plaintiff due process, in the act of joining the co-Defendants efforts to end Isaacs' medical career.

150.     In mid-2014, the Board first published the above false orders on the internet, and national medical board sanction action databases/clearinghouses.

151.     The Board continues to publish these documents in late 2018. The Board is aware they contain materially false and damaging information.

152.     As a result of false declarations of "stalking crimes," the years following 2014 publication, Isaacs became further ostracized from former colleagues, friends, neighbors, and even had AirBNB reservations cancelled.

153.     Despite being reasonably optimistic that justice would prevail in a timely fashion, over time, Isaacs had to reasonably conclude that the actions of the Board and other Defendants permanently ended his medical career and caused severe reputational harm.

Exhibit 16
Page 139

154.     It would be unrealistic and unfair to have expected Isaacs to have fully realized this injury in 2014, at the first instance of publication of a related order. Indeed, Isaacs never reasonably anticipated an appeals process where the Board would admit their Order was false, but not retract it.

155.     Reputational and career harm of this magnitude are extraordinary and took months to years to fully process and understand the implications thereof.

156.     Isaacs has applied to Dartmouth's residency program for each year inclusive, 2013, 2014, 2015, 2016, 2017, 2018, and 2019. As previously discussed, only recently in 2017 did Isaacs learn that Dartmouth did not welcome further applications and any attempt to "resuscitate" his medical career.

157.     Dartmouth's own Dr Friedman and Dr West testified that Isaacs had "good" medical knowledge and was a good resident, respectively.

158.     However, the co-Defendants wish to permanently prevent Isaacs from ever being a practicing physician.

159.     As such, they have not considered seven separate residency applications over seven years.

160.     Each residency refusal is an illegal retaliation under 18 U.S.C. § 1513, and/or other anti-retaliation laws.

161.     Likewise, each and every adverse event referenced above is an illegal retaliation, deprivation of due process, and or obstruction of justice intended to thwart a 2007 federal court ordered settlement agreement, a 2012 New Hampshire United States District lawsuit, or other related processes and appeals.

Exhibit 16
Page 140

162.     Plaintiff has diligently sought to uncover the predicate acts via federal discovery that began in January 2012.

163.     RICO has both civil and criminal causes of actions.

164.     Plaintiff seeks both civil and criminal prosecution of the herein described RICO violations.

165.     Plaintiff has properly noticed the Department of Justice of these civil and criminal RICO claims.

166.     Jim Yong Kim offered his resignation from his appointment as President of the World Bank, upon information and belief, after the Executive Branch raised questions pertaining to the RICO violations detailed herein.

167.     Because Defendants employed fraudulent means to spoliate evidence and offer false testimony, res judicata and double jeopardy rules do not apply in this instance.

168.     Defendants, to the best of Plaintiff's knowledge, have never been subject to criminal prosecution for the alleged offenses, under RICO or any other statute.

169.     The Defendants enacted schemes to fraudulently conceal the discovery of their illicit acts.

170.     Specifically, the Defendants destroyed email evidence, destroyed medical records, perjured themselves in depositions, and reached out to local government officials with whom they had influence, including, but not limited to , the NH Board of Medicine and the NH USDC.

171.     Similarly, the NH Board of Medicine only recently declared that despite Cahill's clear error in withholding the first settlement agreement, they would not correct the

Exhibit 16
Page 141

record because there was no "clearly established right" for Plaintiff to have due process and a true public board order.

172. As a result of the aforementioned fraudulent concealment, and lengthy delays in the previous related lawsuits, the full nature of Plaintiff's injuries have been difficult to precisely ascertain.

173. A jury shall determine that Dr Isaacs' currently cannot practice medicine as a result of a pattern of illegal, retaliatory behaviors initiated by John Doe in connection with the Keck, spanning over fourteen years, ultimately involving Dartmouth and the NH Board officers.

## V.  CAUSES OF ACTION

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)
### 18 U.S.C. § 1962(c)
#### (All Defendants)

174. Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

175. RICO's reach is broad and includes otherwise law-abiding businesses and persons who violate its provisions. (*Sedima, S.P.R.L.* v. *Imrex Co., supra,* 473 U.S. at pp. 499-500 [87 L.Ed.2d at pp. 360-361]; *Cianci* v. *Superior Court, supra,* 40 Cal.3d at pp. 908-909.) Gerase v. Superior Court, 31 Cal. App. 4th 1218, 1229 (CA 3rd 1995).

176. As defined by RICO, the Defendants formed an enterprise under at least one of several parallel, non-exclusive theories. First, the Defendants all participated in, and made a living from, federally and state funded medical training activities. Second, the Defendants all had a reputational and commercial stake in the national health care provider network. Third, all Defendants had some stake in, or authority over, Plaintiff's

Exhibit 16
Page 142

medical and/or professional career. Fourth, all Defendants had authoritative control and or publishing rights in nationwide medical training databases, including board licensure & reprimand databases which now contain false, retaliatory information. Fifth, all Defendants directly had some nexus as Harvard Medical School faculty, alumni, and/or social and professional or interests in affiliated academic medicine posts such as those at Dartmouth and Keck. Finally, the Defendants formed a *de facto* enterprise with the sole purpose of carrying out a vendetta and negatively impacting Dr. Isaacs's medical-professional career. Per <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981), where the court upheld a RICO conviction even though the only purpose of the enterprise was to engage in a pattern of racketeering activity.

177.     The Count I Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering and activity described herein, in violation of 18 U.S.C. § 1962(c).

178.     The Defendants committed numerous predicate acts, spanning no less than twelve years, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

179.     Representative predicate acts are enumerated below for each defendant. This list is not exhaustive and shall be refined during discovery. Predicate acts have also been pleaded earlier in this complaint.

180.     The predicate acts described in this complaint all violate one or more of the following federal statutes:

   a. 18 U.S.C. § 1513 (hereafter "witness retaliation"), which forbids conduct that "damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for--  the attendance of a witness or party at

Exhibit 16
Page 143

an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or, Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, …Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both."

b. 18 U.S.C. § 1503, (hereafter "obstruction of justice"), which forbids obstruction of process, generally, including actions taken "corruptly" to "influence, obstruct, or impede the due administration of justice."

c. 18 U.S.C. § 1512, (hereafter "witness tampering"), Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to— influence, delay, or prevent the testimony of any person in an official proceeding (2)cause or induce any person to—withhold testimony, or withhold a record, document, or other object, from an official proceeding; alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; evade legal process summoning that person to appear as

Exhibit 16
Page 144

a witness, or to produce a record, document, or other object, in an official
proceeding;

d.   18 U.S.C. § 1343, (hereafter "wire fraud"), forbids any scheme or artifice to
defraud, or for obtaining money or property by means of false or fraudulent
pretenses, representations, or promises, transmits or causes to be transmitted by
means of wire, radio, or television communication in interstate or foreign
commerce, any writings, signs, signals, pictures, or sounds for the purpose of
executing such scheme or artifice. Per statute, this shall include any scheme to
deprive another of honest services.

e.   18 U.S.C. § 1341, (hereafter "mail fraud"), forbids any scheme or artifice to
defraud .. by means of false or fraudulent pretenses, representations, or promises
… for the purpose of executing such scheme or artifice or attempting so to do,
places in any post office or authorized depository for mail matter, any matter or
thing whatever to be sent or delivered by the Postal Service.

I.      **Dartmouth Defendants/ Jim Yong Kim**

181.        The factual history describes a pattern of adverse actions taken by Dartmouth and
Jim Yong Kim meant to interfere with Plaintiff's livelihood and property. Predicate acts
began as soon as Isaacs arrived at Dartmouth for training in July 2011. Specifically,
through the unknown communication with John or Jane Doe, Dartmouth began to
retaliate against Isaacs for his complaints against Keck and the NIH. Plaintiff was, and
should have been, protected from such treatment pursuant to federal witness retaliation
code (see, supra). Based upon information and belief, John Doe formed a nexus and

Exhibit 16
Page 145

enterprise with Dartmouth officials which jointly retaliated against Plaintiff. No later than January 2012, Isaacs had commenced federal proceedings against Dartmouth itself. Adverse actions which occurred after January 2012 violated witness tampering and obstruction of justice statutes, in addition to witness retaliation code.

182.     Representative actions violating these statutes have been described in the factual history. Such actions include, but are not limited to, ordering Isaacs to conduct unnecessary prostate exams, silencing other staff who spoke out against mistreatment, blatantly depriving Isaacs of institutional due process, and falsely accusing Isaacs of medical mistakes and errors. Each of these acts was meant to retaliate against a federal witness, and/or interfere with a proceeding, in violation of the cited statutory authority. In layman's terms, it is well known that Isaacs was, in violation of RICO, persona non grata in the academic medicine field after suing several Harvard Medical School leaders.

183.     Once Isaacs notified Dartmouth of pending federal litigation, his emails were deleted by Jim Yong Kim or Christine Finn. A warning that emails were being deleted was ignored by Jim Yong Kim. As such, Kim either assented to, or directly ordered, the email destruction. Isaacs' medical records were also destroyed during the same month in January 2012. Isaacs was denied a fair hearing later in 2012, as required by hospital bylaws. Based upon the proximate sequence of retaliatory events following Defendant Kim's receipt of a federal lawsuit notice, evidence shows he either ordered, or assented to, separate acts of email destruction, medical records destruction, and multiple internal due process violations. Dartmouth College and DHMC are legally culpable, having assented to these improper actions carried out by Kim and other administrators.

Exhibit 16
Page 146

184.    Multiple instances of evidence spoliation form the basis of a pattern of predicate acts that violated federal witness tampering and obstruction of justice laws. The Dartmouth defendants took repeated steps, over an extended period of time, to destroy the written record of evidence that was be critical to litigation due process in the federal courts. Plaintiff did not receive due process in prior lawsuits and administrative processes as a direct and foreseeable result of criminal witness tampering and evidence destruction.

185.    In March 2012, a NH process server noted that Jim Yong Kim appeared to have evaded summons service by issuing false statements. Such activity constitutes a willful and deliberate pattern by Dartmouth defendants to violate federal witness tampering and obstruction of process laws.

186.    During a dozen depositions of Dartmouth physicians taken in 2012-2013, not a single witness was able to recall or describe how they learned about Plaintiff's sealed Keck records. Likewise, most witnesses outright denied, falsely, any knowledge of the sealed records. Similarly, key witnesses had no recollection of the reasons why they ordered Plaintiff to conduct the unnecessary prostate exams. Discovery will produce a detailed register of false statements made by Dartmouth defendants meant to obstruct justice and tamper with witnesses. Plaintiff has been unable to obtain correct closure of this matter as a direct and foreseeable result of Dartmouth defendants witness tampering and obstruction of justice.

187.    As part of their enterprise, Dartmouth entered false statements into interstate computer systems. For example, Dartmouth entered false reasons for termination, and false information about Keck, into interstate computer systems. During a deposition of one Natalie Riblet, Riblet challenged the authenticity of one such purported incident

Exhibit 16
Page 147

entered into these databases. Such false entries constitute wire fraud, per the above referenced authority.

188.    Likewise, Finn transmitted false letters to the NH Board of Dartmouth, Isaacs, and others via US Mail. The documents contained knowingly false information about expunged falsities from Keck. These actions constituted mail fraud as per the above referenced authority.

## II.    Dartmouth New Hampshire Board of Medicine

189.    The NH Board of Medicine engaged in multiple actions in violation of federal obstruction of justice code, federal anti-retaliation code, and wire and mail fraud statutes:

190.    First, the Board refused to investigate reports of felonious sexual assault, namely, that Khagi ordered him to conduct unnecessary prostate exams, solely for the intent to humiliate Isaacs for his non-disclosure of Keck. To this day, the Board has not investigated the exams. A proper investigation would have been critical to refer the matter to appropriate authorities, and/or take Board action against Khagi and Dartmouth.

191.    The Board, specifically Jeff Cahill, withheld exonerating evidence – the Keck Settlement agreements – and revoked Isaacs medical license for non-disclosure of the annulled Keck records. They did so with intent to obstruct justice and due process in both their own hearing and related federal lawsuits. They did so to appease and work in conjunction with the enterprise that formed between them and Dartmouth; Cahill told Plaintiff by phone that he had been instructed by a superior to take on the false allegation. The Board also retaliated against Isaacs because he had named them in a PAED lawsuit in 2013. To this day, the Board falsely publishes on nationwide databases that the Keck agreements do not exist.

Exhibit 16
Page 148

192.     The Board even went so far as to blame Isaacs for Keck's failure to retract administrative charges, which Keck was contractually bound to do from the settlement agreements.

193.     The Board went ahead with a hearing despite the fact that 8 inches of snow prevented Isaacs from attending. The Board did so with the intent of obstructing due process in both their own hearing and pending federal litigation.

194.     Likewise, the Board failed to accommodate Isaacs disability request for a trial by videoconferencing, suggesting an intent to obstruct process.

195.     The NH Board's only training facility is operated by Dartmouth, the only academic medical center in New Hampshire. Dartmouth has a liaison physician to the Board, and the Board consists largely of accredited physicians. As such, despite being held under the auspices of a state entity, the Board as defined as its individuals was very much involved, ultimately, in the RICO nexus described herein.

**III.    Keck School of Medicine and John or Jane Doe**

196.     Keck was the origination of the enterprise to retaliate against Dr. Isaacs as a witness of a federal crime (improper NIH influence on Keck).

197.     Keck engaged in multiple predicate acts, which were the subject of a federal lawsuit in 2007. The Plaintiff settled (civil claims) against Keck via the two aforementioned settlement agreements.

198.     Nonetheless, John or Jane Doe followed him, over a span of some five years, and disclosed the sealed records to Dartmouth. Based upon information and belief, John or Jane Doe necessarily must have had some connection to Defendant USC, given their knowledge of the sealed records.

Exhibit 16
Page 149

199.    In any event, the New Hampshire Board of Medicine determined that USC breached the settlement agreement, as they never retracted "administrative charges" against Isaacs, including a charge of Unprofessional Conduct that lead to his suspension , and later, expulsion.

200.    As such, USC has violated anti-retaliation and wire and mail fraud provisions, with predicate acts spanning over a decade. Specifically, they continue to issue false transcript reports via wire and mail. USC has had knowledge of Plaintiff's continued legal struggles to practice medicine. USC could have easily intervened and clarified that the records had been sealed, annulled, and discharged. When they could have so easily helped conclude a decade of litigation in over a dozen venues, USC's inaction alone evidences continued intent to retaliate.

201.    These Defendants, all involved in RICO violations, progress an enterprise whose primary focus was to destroy Dr. Isaacs's career, through his mistreatment at Keck, Dartmouth and later with his mistreatment at the New Hampshire Board of Medicine and several federal courts. Generally, there is one unifying explanation for Plaintiff's fourteen year predicament: 1) in 2006, he reported activity concerning the improper NIH/Keck relationship, 2) such report included notice of federal litigation, 3) as a federal witness, and party to an official proceeding, Plaintiff should have been protected from retaliation, however 4) clearly Plaintiff has suffered an extensive retaliation that ended his medical career for being a party to said proceeding. The entire retaliation originated with an attempt to discredit him, then a promising medical student, from bringing claims against several of the most senior physicians in the nation. Forced to go "offshore," he completed his medical training and again resumed a promising path, based on his top ranking

Exhibit 16
Page 150

medical school achievement and national boards. John or Jane Doe transmitted the sealed Keck records to Dartmouth, which Dartmouth does not dispute, and the predicate act pattern of revenging the perceived litigious medical student resumed.

202.     These actors are all well connected members of the medical profession and used that power in order to hide their intentions and use the courts and board of medicine in order to make sure that Dr. Isaacs can never practice medicine again. Particularly reprehensible is how Defendants, over more than a decade, used their status within venerable institutions to discredit Plaintiff and deny him any semblance of due process. Defendants planned to continue said mistreatment in perpetuity, forever denying Isaacs a medical career; it only appears questions raised by the Executive Branch finally halted Defendants' abuse of power. Punitive damages and/or substantial criminal penalties are particularly appropriate under RICO law.

203.     This behavior is particularly nefarious when one considers all of the effort it took Isaacs to pursue his singular goal of being a doctor. He worked diligently to help others as a student physician, with the understanding that his settlement agreements would protect him and allow him to move on with his life.

204.     These Defendants, through criminal enterprise, thwarted for good Dr. Isaacs's pursuit of being a medical Doctor and need to be held accountable for their crimes.

## COUNT II
## INJUNCTIVE RELIEF

Defendants shall be enjoined and restrained from interfering with Plaintiff's property, specifically, his medical licensure and right to enroll in federally funded medical training. The injunction shall also enforce the terms of the USC Keck and CADC settlement agreements.

Exhibit 16
Page 151

Case 2:19-cv-02085-DSF-RAO Document 64-2 Filed 03/18/19 Page 34 of 34 Page ID #:1834
Case 2:19-cv-02085-DSF-RAO Document 64-2 Filed 11/04/19 Page 153 of 264
Page ID #:1828

WHEREFORE, The Plaintiff respectfully requests that this Honorable Court:

A.  Order damages in excess of $18,000,000 under the jurisdictional authority of this Court;

B.  Award triple damages, under the so-called private attorney general provisions of RICO, costs and attorneys' fees;

C.  Await the United States Attorney as a criminal prosecutor for RICO criminal violations,

D.  Permit discovery of RICO civil and criminal claims to proceed pending appointment of the AUSA;

E.  Grant any further relief as may be fair and just.


03/12/2019                                    Respectfully Submitted,



                                              /s/ Dr. Jeffrey D. Isaacs
                                              Dr. Jeffrey D. Isaacs, Pro se
                                              3553 W Chester Pk #177
                                              Newtown Square, PA 19073
                                              Jeffreydi@gmail.com
                                              (610) 202-1460

Exhibit 16
Page 152

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

       Jeffrey Isaacs ("Isaacs"), on the one hand, and University of Southern California ("USC"), on the other hand, have agreed to enter into this Confidential Settlement Agreement and Release (the "Agreement").

**1.**      <u>Dismissal With Prejudice.</u>

       Isaacs agrees that he will execute and deliver for filing to counsel of record for USC, Robin D. Dal Soglio of Dal Soglio & Martens LLP, the Dismissal with Prejudice (attached hereto as Exhibit A) of Robert Baughman, Brian E. Henderson, Peter J. Katsufrakis and James M.H. Ball (together, the "Individual Defendants") from United States District Court Case No. CV-06-3338 GAF (Ex). Counsel for USC will file the Dismissal with Prejudice with the Court.

**2.**      <u>Sealing of Disciplinary Records.</u>

       In exchange for the Dismissal with Prejudice of the Individual Defendants, referenced above, Defendant USC agrees that commencing immediately upon the execution of this Settlement Agreement and receipt of the signed Dismissal with Prejudice, USC will not release or disclose Isaacs' disciplinary records to any third party, including but not limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order.

**3.**      <u>Non-Admission of Liability.</u>

       This Agreement shall not in any way be construed as an admission by USC or any of the Individual Defendants that they have harassed, discriminated against or retaliated against Isaacs in any way, or otherwise acted wrongfully with respect to Isaacs. USC and the Individual Defendants specifically deny that they have any liability to or have done any wrongful acts against Isaacs.

**4.**      <u>No Other or Future Lawsuits, Charges, Claims.</u>

       With the exception of United States District Court Case No. CV-06-3338 GAF (Ex) (the "Lawsuit"), Isaacs represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against the Individual Defendants or any other persons or entities released herein, and he agrees that he will not file any lawsuits, charges, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.

       If Isaacs's representations in this paragraph prove to be false, or if he violates the promises made in this paragraph and files a lawsuit, charge, complaint, or appeal of any kind with any court or administrative or governmental agency against the Individual Defendants, based on any events, acts or omissions through and including the date hereof, Isaacs will pay for all costs and losses, including actual attorneys' fees, incurred by Defendants in connection with said lawsuit, charge, complaint, or appeal.

Initialed JDI

1

USC 2

Exhibit 16
Page 153

5.     **Complete Release by Isaacs.**

As a material inducement to USC to enter into this Agreement, Isaacs hereby irrevocably and unconditionally waives and releases all rights and claims, known and unknown, which he may have against each and all of the Individual Defendants and each of their respective assigns, agents, representatives, attorneys, spouses, children and other family members, and all persons acting by, through, under or in concert with any of them, from the beginning of time to the date Isaacs signs this Agreement. This includes but is not limited to a release of all rights and claims Isaacs may have against the Individual Defendants under any federal or state anti-discrimination statutes, including but not limited to the Americans with Disabilities Act and the Rehabilitation Act of 1973, as well as all claims, known and unknown, which he may have for breach of contract, express or implied; breach of the covenant of good faith and fair dealing; and retaliation, defamation, conspiracy, infliction of emotional distress, invasion of privacy, assault, battery, misrepresentation, or any other tort.

6.     **Knowing and Voluntary Waiver of Known and Unknown Claims**

Isaacs agrees that, as a condition of this Agreement, he expressly releases all rights and claims that he does not know about, as well as those he knows about. Thus, consistent with the terms of his release, Isaacs expressly waives all rights under Section 1542 of the Civil Code of the State of California, which reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

7.     **Encouragement to Consult With Attorney**

Counsel for USC has strongly encouraged Isaacs to consult with an attorney before signing this Agreement, and Isaacs hereby acknowledges that he has either fully consulted with an attorney prior to signing or has knowingly and voluntarily decided not to do so.

8.     **No Representations**

The parties hereto represent and agree that no promises, statements or inducements have been made to them which caused them to sign this Agreement other than those expressly stated in this Agreement.

9.     **Successors**

This Agreement shall be binding upon the parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the parties and others released herein, their representatives, executors, successors and assigns.

Initialed JDI

2

USC 3

Exhibit 16
Page 154

10. **Confidentiality of This Agreement**

    a.    As a material inducement for USC to enter into this Agreement, Isaacs agrees not to disclose the negotiation, terms, or conditions of this Agreement to anyone other than Isaacs's attorneys and parents (hereafter referred to as "Isaacs's Confidants") and, even as to such a person, only if such persons agree to honor this confidentiality requirement. Violation of this confidentiality requirement by any of Isaacs's Confidants will be treated as a violation of this Agreement by Isaacs.

    b.    This section does not prohibit disclosure of the negotiation, terms or conditions of this Agreement to the extent necessary legally to enforce this Agreement, nor does it prohibit disclosures to the extent otherwise required by law (but only if the enforcing party notifies the other party and its attorneys of a disclosure obligation or request within three business days after he/it learns of it and does not actively oppose the party taking all steps it deems to be appropriate to prevent or limit the required disclosure).

    c.    If Isaacs is asked about his claims against the Individual Defendants, and only if asked, he may state only that "the matter has been resolved."

11. **Newly Discovered Facts**

    Isaacs acknowledges that he might hereafter discover facts different from or in addition to those he now knows or believes to be true with respect to a claim or claims released herein, and he expressly agrees to assume the risk of possible discovery of additional or different facts, and agrees that this Agreement shall be and remain effective in all respects regardless of such additional or different discovered facts.

12. **Voluntary Participation in This Agreement**

    The parties acknowledge that they have thoroughly discussed all aspects of their rights and this Agreement with their respective attorneys, or have knowingly and voluntary chosen not to do so, and that they have carefully read and fully understand all of the provisions of this Agreement, that they have been given a reasonable period of time to consider signing this Agreement, and that they are voluntarily signing this Agreement.

13. **Governing Law**

    This Agreement is made and entered into in the State of California and shall in all respects be interpreted, enforced and governed under the laws of said State.

14. **Further Necessary Actions**

    The parties agree, without further consideration, to sign and/or cause to be signed, and to deliver to counsel for one another, any other documents and to take any other action as may be necessary to fulfill their obligations under this Agreement, including, but not limited to, effecting the dismissal of all outstanding administrative charges.



Initialed JDI

3

USC 4

Exhibit 16
Page 155

15.     **Severability**

Should any of the provisions in this Agreement, other than the Release set forth in Paragraph 5, be declared or be determined to be illegal or invalid, all remaining parts, terms or provisions shall be valid, and the illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

16.     **Proper Construction**

a.  The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the parties.

b.  As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

c.  The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions hereof.

17.     **Entire Agreement**

This Agreement is the entire agreement between Isaacs and USC and fully supersedes any and all prior agreements or understandings between the parties pertaining to its subject matter.

**PLEASE READ CAREFULLY. THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.**

Executed at <u>Berwyn Pennsylvania</u>, this 29th day of August 2007.

By: _____
    Jeffrey Isaacs

Executed at Los Angeles, California, this **31**[st] day of August 2007.

UNIVERSITY OF SOUTHERN CALIFORNIA

By: _____
    Dennis F. Dougherty
    Senior Vice President for Finance

Initialed JDI

4

USC 5

Exhibit 16
Page 156

# CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

The University of Southern California ("USC") and Jeffrey Isaacs ("Isaacs") have agreed to enter into this Confidential Settlement Agreement and Mutual Release (the "Agreement").

### 1. Dismissal With Prejudice.

Isaacs agrees that he will execute and deliver for filing to counsel of record for USC, Robin D. Dal Soglio of Dal Soglio & Martens LLP, the Stipulation of Dismissal with Prejudice (attached hereto as Exhibit A) of USC from United States District Court Case No. CV-06-3338 GAF (Ex). Counsel for USC will file the Dismissal with Prejudice with the Court.

### 2. No Future Application to University.

Isaacs understands and agrees that his education at USC has ended irrevocably and forever and will not be resumed again at any time in the future. Isaacs further agrees that he will not apply for or otherwise seek admission to USC or any related or affiliated entity at any time in the future, under any circumstances whatsoever.

### 3. Non-Admission of Liability.

This Agreement shall not in any way be construed as an admission by USC that it has discriminated against or retaliated against Isaacs in any way, or otherwise acted wrongfully with respect to Isaacs or any other person, or that Isaacs has any rights whatsoever against it. USC specifically denies that it has any liability to or has done any wrongful acts against Isaacs or any other person.

### 4. Benefits for Isaacs.

Within fourteen (14) days of USC's receipt of the original of this Agreement signed by Isaacs and including executed copies of Exhibits A and B, USC will transmit to Isaacs one check made payable to Isaacs in the gross amount of Ten Thousand Dollars ($10,000).

### 5. Responsibility for Taxes.

Isaacs understands and acknowledges that USC will report the payment described in paragraph 4 to the appropriate taxing authorities as required by law. Isaacs agrees that he is solely responsible for all tax obligations, including, but not limited to, all payment obligations which may arise as a consequence of this Agreement. Isaacs further agrees promptly to pay and to indemnify and hold USC and others released herein harmless from and against any and all loss, cost, damage or expense, including, without limitation, attorneys' fees, interest, assessments, withholding and penalties, arising out of any dispute over underwithholding or other tax treatment of any of the proceeds received by Isaacs as a result of this Agreement. Isaacs further agrees not to seek or make any claim against USC or others released herein for any loss, cost, damage or expense if a claim or adverse determination is made in connection with underwithholding or other tax treatment of any of the proceeds of this Agreement or any portion

Initialed

1

USC 6

Exhibit 16
Page 157

thereof. Isaacs understands and agrees that neither USC nor others released herein has any duty to defend against any claim or assertion in connection with underwithholding or other tax treatment of the proceeds of this settlement or any portion thereof, and Isaacs agrees to assume full responsibility for defending against any such claim or assertion.

### 6. No Other or Future Lawsuits, Charges, Claims for Arbitration or Complaints of Any Nature Whatsoever.

With the exception of United States District Court Case No. CV-06-3338 GAF (Ex), which is fully and finally settled herein, Isaacs represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, and he agrees that he will not file any lawsuits, charges, claims for arbitration, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.

If Isaacs's representations in this paragraph prove to be false, or if he violates the promises made in this paragraph and files a lawsuit, charge, claim for arbitration, complaint, or appeal of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, based on any events, acts or omissions through and including the date hereof, Isaacs will pay for all costs and losses, including actual attorneys' fees, incurred by USC in connection with said lawsuit, charge, complaint, or appeal.

### 7. Complete Release by Isaacs.

As a material inducement to USC to enter into this Agreement, Isaacs hereby irrevocably and unconditionally waives and releases all rights and claims, known and unknown, which he may have against USC, the Keck School of Medicine, and each of their respective successors, assigns, agents, trustees, officers, administrators, faculty, students, current and former employees, representatives, attorneys, divisions, subsidiaries, affiliates (and agents, trustees, officers, administrators, faculty, current and former employees, representatives and attorneys of such divisions, subsidiaries, and affiliates), and Robert Baughman and each of his family members, and all persons acting by, through, under or in concert with any of them (collectively, the "Releasees") from the beginning of time to the date Isaacs signs this Agreement from any and all claims, demands, contracts, expenses, liens, covenants, debts, attorney's fees, causes of action, damages, judgments, orders, and liabilities (collectively "Claims") of whatever kind or nature in law, equity, or otherwise, whether now known or unknown, suspected, or unsuspected, and whether or not concealed or hidden, which Isaacs now owns or holds or had at any time heretofore owned or held against the Releasees.

Initialed ____

2

USC 7

Exhibit 16
Page 158

8. **Release by USC**

 As a material inducement to Isaacs to enter into this Agreement, USC does hereby irrevocably and unconditionally release, acquit and forever discharge Isaacs from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, grievances, costs, losses, and expenses (including attorneys' fees and costs) of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, including but not limited to any claim for malicious institution of civil proceedings, and abuse of process. Notwithstanding any other provision herein, this release by the University is not intended to, and does not, release debts unrelated to the lawsuit, including but not limited to tuition or loans.

9. **Knowing and Voluntary Waiver of Known and Unknown Claims**

 Consistent with the terms of their respective releases in paragraphs 7 and 8, Isaacs and USC acknowledge and agree that, as a condition of this Agreement, they expressly release all rights and claims that they do not know about, as well as those they know about. Thus, consistent with the terms of their respective releases, Isaacs and USC expressly waive all rights under Section 1542 of the Civil Code of the State of California, which reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

10. **Ownership of Claims**

 Isaacs represents and agrees that he has not assigned or transferred, or attempted to assign or transfer, to any person or entity, any of the claims he is releasing in this Agreement.

11. **Encouragement to Consult With Attorney**

 USC encourages Isaacs to consult with an attorney before signing this Agreement, and Isaacs hereby acknowledges that he has had the opportunity to consult with an attorney prior to signing, and has either done so or voluntarily chosen not to do wo.

12. **No Representations**

 The parties represent and agree that no promises, statements or inducements have been made to them which caused them to sign this Agreement other than those expressly stated in this Agreement.



3

USC 8

Exhibit 16
Page 159

### 13. Successors

This Agreement shall be binding upon the parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the parties and others released herein, their representatives, executors, successors and assigns.

### 14. Confidentiality of This Agreement

a. As a material inducement for USC to enter into this Agreement, Isaacs agrees not to disclose the negotiation, terms, conditions, or amount of this Agreement to anyone other than Isaacs's attorneys and tax adviser (hereafter referred to as "Isaacs's Confidants") and, even as to such a person, only if the person agrees to honor this confidentiality requirement. Violation of this confidentiality requirement by any of Isaacs's Confidants will be treated as a violation of this Agreement by Isaacs.

b. This section does not prohibit Isaacs's disclosure of the negotiation, terms, conditions, or amount of this Agreement to the extent necessary legally to enforce this Agreement, nor does it prohibit disclosures to the extent otherwise required by law (but only if Isaacs notifies USC and its attorneys of a disclosure obligation or request within three business days after he learns of it and does not actively oppose USC's taking all steps it deems to be appropriate to prevent or limit the required disclosure).

c. If Isaacs is asked about his claims against USC, including breach of enrollment contract and wrongful dismissal, and only if asked, he may state only that "the matter has been resolved." However, the parties further agree that Isaacs is not required to disclose this matter to anyone.

### 15. Damages for Isaacs's Breach of Confidentiality

A breach of paragraph 14 will be deemed a material breach of this entire Agreement. Isaacs agrees to pay USC the sum of Five Thousand Dollars ($5,000) as liquidated damages for each violation in the event USC obtains a judgment, ruling, award, or decision that paragraph 14 has been violated. The parties to this Agreement agree that this liquidated damages provision is appropriate with regard to any breach of paragraph 14 because: (1) paragraph 14 is essential for the protection of USC's interests; (2) damages for breach of paragraph 14 would be difficult to prove with certainty; and (3) the sum of Five Thousand Dollars ($5,000) per breach represents a reasonable estimate of the harm likely to result from each such breach.

### 16. Newly Discovered Facts

Isaacs acknowledges that he might hereafter discover facts different from or in addition to those he now knows or believes to be true with respect to a claim or claims released herein, and he expressly agrees to assume the risk of possible discovery of additional or different facts, and agrees that this Agreement shall be and remain effective in all respects regardless of such additional or different discovered facts.

Initialed 

4

**USC 9**

Exhibit 16
Page 160

**17. Voluntary Participation in This Agreement**

      The parties acknowledge that they have thoroughly discussed all aspects of their rights and this Agreement with their respective attorneys, or have knowingly and voluntary chosen not to do so, and that they have carefully read and fully understand all of the provisions of this Agreement, that they have been given a reasonable period of time to consider signing this Agreement, and that they are voluntarily signing this Agreement.

**18. Governing Law**

      This Agreement is made and entered into in the State of California and shall in all respects be interpreted, enforced and governed under the laws of said State.

**19. Further Necessary Actions**

      The parties agree, without further consideration, to sign and/or cause to be signed, and to deliver to counsel for one another, any other documents and to take any other action as may be necessary to fulfill their obligations under this Agreement, including, but not limited to, effecting the dismissal of all outstanding administrative charges.

**20. Severability**

      Should any of the provisions in this Agreement, other than the Release set forth in Paragraph 7, be declared or be determined to be illegal or invalid, all remaining parts, terms or provisions shall be valid, and the illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

**21. Proper Construction**

      a. The language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, and not strictly for or against any of the parties.

      b. As used in this Agreement, the term "or" shall be deemed to include the term "and/or" and the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

      c. The paragraph headings used in this Agreement are intended solely for convenience of reference and shall not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions hereof.

**22. Entire Agreement**

      This Agreement is the entire agreement between Isaacs and USC and fully supersedes any and all prior agreements or understandings between the parties pertaining to its subject matter.

Initialed _____

5

**USC 10**

Exhibit 16
Page 161

Case 2:19-cv-08000-DSF-RAO Document 64-2 Filed 11/04/19 Page 163 of 264
Case 2:19-cv-02021-DSF-RAO Document 1-1 Filed 03/18/19 Page 44 of 49 Page ID #:44
Page ID #:1838

**PLEASE READ CAREFULLY. THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

Executed at <u>Saint-Jean, FRANCE</u> this 31st day of March 2008.

By: *Jeffrey D Isaacs*

Jeffrey Isaacs

Executed at Los Angeles, California, this _____ APR 0 4 _____ 2008.

UNIVERSITY OF SOUTHERN CALIFORNIA

By: *Dennis F Dougherty*

Dennis F. Dougherty
Senior Vice President for Finance

USC 11

6

Exhibit 16
Page 162

Jeffrey D. Isaacs, M.D. v.
Dartmouth Hitchcock Medical Center, et al

Christine Finn, M.D.
January 15, 2014

---

**Page 57**

1  disorders, helps you understand different
2  approaches that you might take to them. So
3  while I would say I would not lie to a patient,
4  I think that there are ways that you might
5  deliver information that varies from patient to
6  patient based on their diagnoses. And perhaps
7  in that context that we were talking about it
8  or having that sense of transference and
9  counter transference, that you took something
10  away from that session.
11  Q. So could that transference or counter
12  transference have ever made you uncomfortable
13  to narcissistic patients to the point where you
14  felt queasy or almost thinking about vomiting.
15  A. No. I would say that would not be the
16  case.
17  Q. Okay. So when I identified Traum,
18  Shindler and Nunberg, would I have been the
19  fourth unexpected vacancy in those six months
20  if I had been fired or quit?
21  MR. CHABOT: I'm just going to object
22  to the form of that question.
23  A. Yes. Again, I would need to look at

---

**Page 58**

1  the records to determine the dates.
2  Q. Would that have a pretty big budget
3  impact for the department if there were four
4  vacancies?
5  MR. CHABOT: Objection, foundation.
6  A. There are no budgetary impact on the
7  department as far as I know.
8  Q. Doesn't the department or the hospital
9  receive Medicare direct GME subsidies for each
10  resident?
11  A. I'm not aware of the specifics of the
12  Medicare reimbursement for training.
13  Q. So you don't know that Medicare pays
14  about $100,000 a year for residents to train
15  them?
16  MR. CHABOT: Object to the form. It's
17  leading and also assumes facts.
18  A. I do not know that.
19  Q. Do you think most program directors
20  would know where the funding comes from for
21  their program?
22  MR. CHABOT: Objection, foundation.
23  A. I don't know what most program

---

**Page 59**

1  directors know. I just know that that is not
2  relevant to my day-to-day functioning as a
3  program director.
4  Q. Doesn't the U.S. Government invest a
5  sizable amount of money in the training of
6  resident physicians?
7  MR. CHABOT: Objection, foundation.
8  A. Yes. The government is a major source
9  of funding for graduate medical education in
10  the U.S.
11  Q. Would it be fair to say that the
12  plastic surgeon fired from DHMC two days before
13  she finished, that DHMC received about half a
14  million dollars of government funding to train
15  her?
16  MR. CHABOT: Objection, foundation.
17  MR. KAPLAN: I'm going to object to
18  the question as well, and I appreciate the fact
19  that you can finally differentiate between
20  Dartmouth and DHMC.
21  DR. ISAACS: She wasn't with the
22  psychiatry department, she was with the plastic
23  surgery department. That's actually why I did

---

**Page 60**

1  that, Attorney Kaplan.
2  A. Again, I don't know the specifics of
3  the reimbursement of the medical center by
4  Medicare for training.
5  Q. Okay. You are salaried by Dartmouth
6  College, correct?
7  A. Correct.
8  Q. How much of that salary comes from
9  DHMC?
10  A. With my current job description I
11  believe that the 50 percent covering my program
12  director role.
13  Q. Okay. So roughly would that be
14  roughly in the range of $150,000 a year from
15  Dartmouth Hitchcock?
16  A. I wish. No, not at all, so--
17  Q. Would the vacancy of four residents
18  just cause logistical problems in training?
19  A. It would have the potential to,
20  depending on what year they were or what
21  services they were rotating on at the time.
22  Q. Was this part of the reason you didn't
23  fire the Plaintiff when you learned about

---

Exhibit 16
Page 163

Page 61

1  Arizona and USC?
2      MR. CHABOT: Object to the form.
3  A.  In terms of the timing, I was not
4  aware of the Arizona residency training until
5  we sat down at that meeting in January, that
6  week in January where we made the decision to
7  place you on administrative leave. And I was
8  not aware of the USC Medical School issue until
9  sometime several weeks after that.
10  Q.  How did you learn about USC?
11  A   Attorney Kaplan told me.
12  Q.  Why would you ask Attorney Kaplan to
13  research that?
14      MR. CHABOT: I am going to object to
15  the form. That's misrepresenting prior
16  testimony.
17  A.  I did not ask him to research that.
18  Q.  Did anyone at Dartmouth know about my
19  enrollment at USC prior to that?
20  A.  Not to my knowledge. Sorry.
21      MR. CHABOT: That's okay.
22  Q.  Would you know if someone did?
23      MR. CHABOT: I am going to object on

Page 62

1  the grounds of foundation.
2  A.  If someone knew and never mentioned it
3  to me, I would have no way of knowing that they
4  knew.
5  Q.  Actually now you may have learned
6  things through the lawsuit, have you learned
7  since then that someone knew before you?
8  A.  No.
9  Q.  Do you know any psychiatrists at the
10  UCLA Neuropsychiatric Institute in Los Angeles?
11  A.  I don't think so.
12  Q.  Have you ever spoken to a Dr. Wayne
13  Sandler?
14  A.  Not that I'm aware of.
15  Q.  Do you know any psychiatrists at the
16  University of Miami Teaching Program?
17  A.  Yes, I think I do.
18  Q.  Who do you know there?
19  A.  Jorge Sortello.
20  Q.  Anyone else?
21  A.  I don't think so.
22  Q.  Do you know anyone who's ever treated
23  the Plaintiff medically aside from Dartmouth

Page 63

1  Hitchcock?
2  A.  Not that I'm aware of.
3  Q.  Do you know a Dr. Ben Boswell?
4  A.  No.
5  Q.  Have you ever heard that name, a
6  psychiatry resident?
7  A.  No.
8  Q.  Did you know any Dr. Graves in the
9  southern hemisphere?
10  A.  No.
11  Q.  Do you know Dr. Greenaw in the sleep
12  department?
13  A.  Yes.
14  Q.  How do you know him?
15  A.  He's one of my colleagues at DHMC.
16  Q.  Are you closer to him than other
17  colleagues, or is he just kind of an adjunct
18  colleague?
19      MR. KAPLAN: Object to the form.
20  A.  We have relatively little professional
21  overlap other than his being the fellowship
22  director for the sleep program, so most of our
23  connection is through our interest in resident

Page 64

1  and fellowship education.
2  Q.  Did you ever speak to him about the
3  Plaintiff's sleep studies with him?
4  A.  No.
5  Q.  Do you know a Dr. Amy Baughman?
6  A.  No.
7  Q.  Have you ever heard that name?
8  A.  No.
9  Q.  Do you know a Dr. Robert Baughman?
10  A.  No.
11  Q.  You don't know, do you know what the
12  NINDH is of the NIH?
13  A.  No.
14  Q.  Could you guess what NINDS stands for?
15  A.  That's what I'm trying to figure out.
16      MR. CHABOT: I'm going to instruct you
17  not to guess. We're not here to provide
18  guesses or speculation.
19  Q.  Do you know anyone at Dartmouth
20  Hitchcock or Dartmouth College that might know
21  Dr. Robert Baughman?
22      MR. CHABOT: Objection to foundation.
23  A.  I don't know who he is, so it's hard

Exhibit 16
Page 164

from **Jeffrey Isaacs** jdi@bakerisaacs.com       Feb 6
sender- Sent at 1:41 PM (GMT-05:00). Current time
time there: 8:08 PM. v
    to president's.office@dartmouth.edu,
    jim.y.kim@dartmouth.edu

    cc George Baker <cavu96@gmail.com>

   date Mon, Feb 6, 2012 at 1:41 PM
  subject Investigation
mailed-by bakerisaacs.com
Dear President Kim,

I am pleading that you help investigate a matter that is causing me
the worst distress I have ever suffered in life. As a proud alumni of
the College, it is my hope that a proper investigation will yield the
truth and clear my name. For some background, I am attaching a civil
suit filed Friday in the United States District Court. However, I
believe that Dartmouth possesses evidence which goes well beyond the
allegations in the lawsuit. Basically, [REDACTED PREVIOUS LITIGATION] six years ago.
Subsequently, I believe that I am a victim
of fraud and blackmail, perpetrated by several Dartmouth College
psychiatry professors. This is not just my belief, it is the strong
suspicion of my parents, friends, and others, whom I give you full
permission to speak to as part of any investigation ordered by
yourself or the Trustees.

I am asking the College for help on this matter
[redacted]

Please consider my request and do not hesitate to contact me for any
further information.


Regards,
Jeffrey Isaacs

Exhibit 16
Page 165

Case 2:19-cv-02000-PSG-RAO Document 64-2 Filed 11/04/19 Page 167 of 264 Page ID #:1842
Case 2:19-cv-02000-PSG-RAO Document 64-2 Filed 03/16/11 Page 48 of 48 Page ID #:48
Page ID #:1842

Page 293

1    A.  It does say that.
2    Q.  So wouldn't it be assumed they didn't
3  find anything wrong, or do you think they found
4  something wrong and just chose to honor my
5  request?
6        MR. CHABOT: Objection, foundation.
7        MR. KAPLAN: Objection, foundation.
8    A.  I can't really say.
9    Q.  So you think it's possible that they
10  determined against me but chose not to tell
11  anyone?
12        MR. CHABOT: Same objection.
13    A.  I'm not familiar with their policies
14  or procedures regarding the application
15  requirements.
16    Q.  If they agreed with my interpretation
17  of the two settlement agreements, would you
18  believe that you were wrong on your termination
19  letter regarding USC?
20        MR. KAPLAN: Note my objection.
21    A.  I think that the USC information was
22  in line with other previous concerns about
23  lying, but again, was not found out until

Page 294

1  significantly after the decision was already
2  made.
3    Q.  But you do have to answer the
4  question. Do you think you were wrong on the
5  USC matter and the termination letter if
6  indeed ERAS agreed with interpretation of the
7  settlement?
8        MR. KAPLAN: I'm going to object to
9  the question because it calls for a conclusion
10  I don't believe this witness is qualified to
11  make, but you can go ahead.
12    A.  I think the general omission was the
13  concern. It was never specific to the USC
14  complaint.
15    Q.  I'll rephrase the question. Is ERAS
16  or is AAMC the administrator for ERAS? Do they
17  have authority over their service?
18    A   I don't know.
19    Q.  Don't they have an investigation unit
20  called ERAS Investigations?
21    A.  I don't know.
22    Q.  So would you trust, if they do have an
23  investigation unit, would you trust their

Page 295

1  decisions?
2    A.  Yes.
3    Q.  So if they decided that there was no
4  problem with USC on my application, would your
5  statement on the termination letter be wrong?
6        MR. CHABOT: I'm going to object to
7  the question for the reasons stated by Attorney
8  Kaplan earlier.
9    A.  What was the question?
10    Q.  I'll just repeat it.
11      (The record was read as requested.)
12        MR. CHABOT: Did you get that, Dr.
13  Finn?
14    A.  I guess I'm still not clear what
15  statement you're referring to, the statement,
16  that that together with the other concerns.
17    Q.  So you enumerated certain items in
18  the termination letter. One of them was you
19  failed to disclose USC Keck on your ERAS
20  application. So there's that statement which
21  is an enumerated cause of termination among
22  about six others. But that statement is what
23  I'm referring to. And we can go back and look,

Page 296

1  but that statement, if ERAS investigations
2  determined differently, would you say you were
3  wrong or would you disagree with ERAS?
4        MR. CHABOT: Hypothetically speaking?
5    Q.  I don't think it's hypothetical. She
6  just doesn't know who ERAS investigations is,
7  but it's not really hypothetical.
8        MR. CHABOT: That's also not what the
9  document says. Just note my objection.
10        MR. KAPLAN: Note my objection as well.
11    Q.  Well, I don't think it's a
12  hypothetical, but if that's how she wants to
13  answer it.
14    A.  It's hypothetical in the sense that
15  this information was not available to me at
16  that time.
17    Q.  I'm saying now. Now if you agree that
18  they made that determination but you don't seem
19  to know but if that was proven to you, would
20  you then believe your letter, that enumerated
21  item was wrong or would you think they were
22  incorrect, ERAS?
23        MR. CHABOT: Objection to the form of

Exhibit 16
Page 166



Exhibit 16
Page 167

1   James P. Fogelman, SBN 161584
    Shannon E. Mader, SBN 235271
2   Katarzyna Ryzewska, SBN 300386
    GIBSON, DUNN & CRUTCHER LLP
3   333 South Grand Avenue
      Los Angeles, California 90071-3197
4   Telephone: (213) 229-7000
      Facsimile: (213) 229-7520
5   JFogelman@gibsondunn.com
    SMader@gibsondunn.com
6   KRyzewska@gibsondunn.com

7

8
    Attorneys for Defendant
9   USC Keck School of Medicine

10                    UNITED STATES DISTRICT COURT

11                   CENTRAL DISTRICT OF CALIFORNIA

12

13  DR. JEFFREY ISAACS,                    CASE NO. 2:19-CV-02011-DSF-RAO

14              Plaintiff,                  **DEFENDANT USC KECK SCHOOL
                                           OF MEDICINE'S NOTICE OF
                                           MOTION AND MOTION TO DISMISS**
15        v.                               **PLAINTIFF'S COMPLAINT; AND
                                           MEMORANDUM OF POINTS AND
16  DARTMOUTH HITCHCOCK                     AUTHORITIES IN SUPPORT OF
    MEDICAL CENTER, GIESEL                  MOTION TO DISMISS**
17  SCHOOL OF MEDICINE AT
    DARTMOUTH, USC KECK SCHOOL             [Defendant's Request for Judicial Notice,
18  OF MEDICINE, NH BOARD OF               Declaration of Katarzyna Ryzewska, and
    MEDICINE (individually) and JOHN or    Certification of Interested Parties and
    JANE DOE,                              Corporate Disclosure Statement Filed
19                                         Concurrently herewith]
              Defendants.
20
                                           **Hearing**
21                                         Date:      August 12, 2019
                                           Time:      1:30 PM
22                                         Location:  Courtroom 7D
                                           Judge:     Hon. Dale S. Fischer
23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 12, 2019, at 1:30 p.m. in Courtroom 7D of the United States District Court for the Central District of California at First Street Courthouse, 350 West 1st Street, Los Angeles, Defendant USC Keck School of Medicine ("Keck") will and hereby does move the Court to dismiss with prejudice all claims against Defendant asserted by Plaintiff Dr. Jeffrey Isaacs ("Plaintiff") in the above-captioned action under Federal Rules of Civil Procedure 12(b)(6) on the following grounds:

1.     Plaintiff's claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, fails as a matter of law because Plaintiff has failed to adequately allege standing under RICO, a RICO enterprise, racketeering activity, a pattern of racketeering activity, or "operation" or "management" of the purported enterprise by Keck.  Further, Plaintiffs' RICO claims are barred by the four-year statute of limitations, the doctrine of res judicata, and a release signed by Keck and the Plaintiff in 2008.  Finally, Plaintiffs have failed to plead with particularity the alleged acts of mail and wire fraud, as required by Rule 9(b).

2.     Plaintiff's claim for injunctive relief fails as a matter of law because it identifies no basis for such relief.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities included herein, the accompanying Request for Judicial Notice, any other matter of which judicial notice may be taken, the declaration of Shannon E. Mader, all further pleadings which will be filed by Defendants herein, the paper and records on file herein, and on such further evidence and argument as the Court may permit or require at or prior to the time of the hearing on this Motion.

This Motion is made following the telephonic conference of counsel pursuant to Local Rule 7-3, which took place on June 17, 2019.

1

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
Exhibit 17 - Page 169

Gibson, Dunn & Crutcher LLP

1                             **RELIEF SOUGHT**

2        Keck seeks an order dismissing Plaintiff's claims with prejudice.

3

4

5 Dated: June 26, 2019               GIBSON, DUNN & CRUTCHER LLP

6

7                             By:       */s/ James P. Fogelman*
                                   James P. Fogelman

8                          Attorney for Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 170

# CONTENTS

I.     INTRODUCTION ...................................................................................... 1

II.    LEGAL STANDARD ............................................................................... 2

III.   BACKGROUND AND ALLEGATIONS .............................................. 3

IV.   ARGUMENT ............................................................................................ 6

    A.   Plaintiff's RICO Claim Is Barred by the Statute of Limitations ............... 6

    B.   The 2008 Settlement Agreement Bars Plaintiff's RICO Claim ................ 6

    C.   Plaintiff's RICO Claims Fail as a Matter of Law ..................................... 7

        1.   The Complaint Fails to Plead Conduct Sufficient to Establish "Operation or Management" of a RICO Enterprise. ....................... 7

        2.   The Complaint Fails to Plead a RICO Enterprise ............................ 7

        3.   The Complaint Fails to Plead Racketeering Activity ...................... 9

        4.   The Complaint Fails to Plead a *Pattern* of Racketeering Activity ......................................................................................... 10

        5.   The Complaint Fails to Plead RICO Standing ............................... 12

    D.   Plaintiff's Claims Are Barred by Res Judicata ....................................... 13

    E.   The Complaint Fails to Plead a Claim for Injunctive Relief .................. 15

V.    CONCLUSION ...................................................................................... 16

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Exhibit 17 - Page 171

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
 483 U.S. 143 (1987)..................................................................................... 1, 5, 6

*Airframe Sys., Inc. v. Raytheon Co.*,
 601 F.3d 9 (1st Cir. 2010)................................................................................ 14, 15

*Anza v. Ideal Steel Supply Corp.*,
 547 U.S. 451 (2006)........................................................................................... 13

*Ashcroft v. Iqbal*,
 556 U.S. 662, 173 L. Ed. 2d 868, 129 S. Ct. 1937 (2009) ........................................ 3

*Bartlett v. Bartlett*,
 2018 WL 1211818 (S.D. Ill. Mar. 8, 2018) .............................................................. 15

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544, 167 L. Ed. 2d 929, 127 S. Ct. 1955 (2007) ........................................ 2

*Boyle v. United States*,
 556 U.S. 938 (2009)............................................................................................. 8

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
 519 F.3d 969 (9th Cir. 2008) ............................................................................... 12

*Choudhuri v. Wells Fargo Bank, N.A.*,
 2011 WL 5079480 (N.D. Cal. Oct. 25, 2011) ........................................................ 12

*Davis v. HSBC Bank Nevada, N.A.*,
 691 F.3d 1152 (9th Cir. 2012) .............................................................................. 3

*Diaz v. Gates*,
 420 F.3d 897 (9th Cir. 2005) ............................................................................... 12

*Eclectic Props. East v. Marcus & Millichap Co.*,
 751 F. 3d 990 (9th Cir. 2014) ............................................................................... 9

*First Capital Asset Mgmt., Inc. v. Brickelbush, Inc.*,
 150 F. Supp. 2d 624 (S.D.N.Y. 2001) .................................................................. 11

ii

Gibson, Dunn &
Crutcher LLP

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ......................................................................... 11

*Gerritsen v. Warner Bros. Entm't Inc.*,
    116 F. Supp. 3d 1104 (C.D. Cal. 2015) ..................................................... 15

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
    492 U.S. 229 (1989)............................................................................... 10, 11

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992).................................................................................... 13

*Isaacs v. Dartmouth-Hitchcock Med. Ctr.*,
    No. 12-CV-040-LM, 2014 WL 1572559 (D.N.H. Apr. 18, 2014)......... 3, 4, 5, 13, 14

*Isaacs v. Trustees of Dartmouth Coll.*,
    No. 17-CV-040-LM, 2018 WL 734182 (D.N.H. Feb. 5, 2018), *motion
    for relief from judgment denied*, No. 17-CV-040-LM, 2018 WL
    2225097 (D.N.H. May 15, 2018)................................................................. 5

*Isaacs v. Trustees of Dartmouth Coll.*,
    No. CIV.A. 13-5708, 2014 WL 4186536 (E.D. Pa. Aug. 25, 2014),
    *aff'd sub nom. Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70 (3d
    Cir. 2015) ................................................................................................. 5, 6

*Isaacs v. United States Dep't of Educ.*,
    No. CV 17-11221-FDS, 2018 WL 1257760, at *1 (D. Mass. Mar. 12,
    2018) .......................................................................................................... 5

*In re Jeffrey D. Isaacs M.D.*,
    New Hampshire Board of Medicine, Final Decision and Order (Mar.
    11, 2014) ............................................................................................... 4, 13

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) .................................................................... 7

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
    940 F.2d 397 (9th Cir. 1991) ...................................................................... 9

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ...................................................................... 6

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) ...................................................................... 3

iii

Gibson, Dunn &
Crutcher LLP

*Mpoyo v. Litton Electro-Optical Sys.*,
    430 F.3d 985 (9th Cir. 2005) ........................................................................ 14

*O'Malley v. N.Y.C. Transit Auth.*,
    896 F.2d 704 (2d Cir. 1990) ........................................................................ 10

*Owens v. Kaiser Found. Health Plan, Inc.*,
    244 F.3d 708 (9th Cir. 2001) ...................................................................... 13

*Pincay v. Andrews*,
    238 F.3d 1106 (9th Cir. 2001) ...................................................................... 6

*Religious Tech. Ctr. v. Wollersheim*,
    971 F.2d 364 (9th Cir. 1992) ...................................................................... 11

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)...................................................................................... 7

*Rich v. Shrader*,
    2010 WL 3717373 (S.D. Cal. 2010)........................................................... 12

*Robateau v. Wells Fargo Home Mortg.*,
    No. CV 15-504-R, 2015 WL 12765587 (C.D. Cal. May 7, 2015)............... 15

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ........................................................................ 9

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985).............................................................................. 7, 9, 10

*Sepehry-Fard v. Nationstar Mortg. LLC*,
    No. 14-CV-03218-LHK, 2015 WL 332202 (N.D. Cal. Jan. 26, 2015).................... 15

*Sever v. Alaska Pulp Corp.*,
    978 F.2d 1539 (9th Cir. 1992) .................................................................... 11

*Stewart v. U.S. Bancorp*,
    297 F.3d 953 (9th Cir. 2002) ...................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 168 L. Ed. 2d 179, 127 S. Ct. 2499 (2007) ........................... 3

*United Bhd. of Carpenters & Joiners v. Building & Constr. Trades Dep't*,
    770 F.3d 834 (9th Cir. 2014) ........................................................................ 7

iv

Gibson, Dunn &
Crutcher LLP

*United States v. Metcalf*,
   435 F.2d 754 (9th Cir. 1970) ................................................................. 10

*United States v. Turkette*,
   452 U.S. 576 (1981) ..................................................................... 7, 8

*Yourish v. Cal. Amplifier*,
   191 F.3d 983 (9th Cir. 1999) ............................................................. 9

**Statutes**

18 U.S.C. § 1503 ........................................................................... 10

18 U.S.C. § 1513(e) ..................................................................... 9 ,10

18 U.S.C. § 1961(5) .................................................................... 9, 10

18 U.S.C. § 1964(c) ......................................................................... 12

Cal. Civ. Code § 337(a) .................................................................... 15

**Rules**

Fed. R. Civ. P. 9(b) ......................................................................... 9

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 175

# I.   INTRODUCTION

This lawsuit is the fifth in a string of lawsuits that Plaintiff has filed in an attempt to punish the institutions and individuals that he blames for his failed medical career. Since 2012, Plaintiff has sued Defendant New Hampshire Board of Medicine (the "Board of Medicine"), Defendant Dartmouth Hitchcock Medical Center ("DHMC"), the Trustees of Dartmouth College, the United States Department of Education, and numerous other individuals and entities for allegedly causing DHMC to terminate his residency in 2012 and the Board of Medicine to revoke his New Hampshire medical license in 2014.   Now, Plaintiff seeks to embroil Defendant USC Keck School of Medicine ("Keck") in his unending litigation campaign.  But Keck has had nothing to do with Plaintiff since 2006, when he was expelled for harassing a student and violating a "stay away" order.  Indeed, in 2007 and 2008, Plaintiff entered into binding settlement agreements with Keck in which he "waive[d] and release[d] all rights and claims" against Keck and agreed not to file any lawsuits against Keck "based on, referring to, or incorporating any events, acts or omissions through and including the date hereof." Compl. at 40.  Yet by basing his RICO claim on alleged predicate acts that "were the subject of a federal lawsuit in 2007," Plaintiff has breached the agreements.  Compl. ¶ 197.  Besides being barred by the terms of the 2007 and 2008 settlement agreement, Plaintiff's claims fail for a host of reasons:

- First, Plaintiff's RICO claim is time barred.  The statute of limitations on RICO claims is four years.  *See, e.g.*, *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  Plaintiff, however, admits that he "became aware of the illegal situation ***in early January 2012***," and that he has "sought to uncover the predicate acts via federal discovery that began in ***January 2012***."  Compl. ¶¶ 74, 162 (emphases added).  These admissions doom his RICO claim.

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Exhibit 17 - Page 176

- Second, Plaintiff's RICO claim is barred by the 2007 and 2008 settlement agreements because he purports to base it on pre-2008 conduct.
- Third, Plaintiff fails to plead any of the essential elements of a RICO claim. He has failed to allege a cognizable RICO enterprise. He has failed to plead any facts showing that Keck operated or managed the alleged RICO enterprise. He has failed to allege at least two acts of racketeering: his wire and mail fraud allegations are wholly conclusory; he pleads no facts to support his witness retaliation allegation; and his obstruction of justice claim fails because he does not allege a pending federal judicial proceeding. He has failed to plead a pattern of racketeering activity because the alleged predicate acts are not related or continuous. And he has failed to plead a cognizable injury or that the alleged predicate acts caused his harm.
- Fourth, Plaintiff's RICO claim is barred by res judicata. In 2012, Plaintiff filed suit against the Trustees of Dartmouth College based on the same set of facts, and summary judgment was entered against him. As such, the judgment in the 2012 action bars Plaintiff's RICO claim here.
- Finally, Plaintiff fails to allege any legal basis for his claim for injunctive relief, which is not a valid cause of action in any event.

For all these reasons and those set forth below, Plaintiff's Complaint should be dismissed with prejudice.

## II.  LEGAL STANDARD

A complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 167 L. Ed. 2d 929, 949, 127 S. Ct. 1955, 1974 (2007). To satisfy this standard, a complaint must plead *facts*, not mere legal conclusions. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements

2

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Exhibit 17 - Page 177

Gibson, Dunn & Crutcher LLP

Case 2:19-cv-03000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 179 of 264
Case 2:19-cv-02033-DSF-RAO   Document 14   Filed 06/26/19   Page 11 of 24   Page ID #:99
Page ID #:1854

of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 173 L. Ed. 2d. 868, 884, 129 S. Ct. 1937, 1949 (2009). Further, a complaint must plead facts that give rise to a *plausible* claim for relief. *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. *See also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."). In determining whether a complaint satisfies Rule 12(b)(6), "a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (internal quotations omitted). In particular, a court "may take into account documents whose contents are alleged in a complaint." *Id.* (internal citations omitted). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 168 L. Ed. 2d 179, 193, 127 S. Ct. 2499, 2509 (2007).

## III.   BACKGROUND AND ALLEGATIONS

In 2005, Plaintiff enrolled at Keck.  Compl. ¶ 20.  He was later expelled for harassing a classmate and violating a "stay-away" order.  *Id.* at ¶ 28.  *See also Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-CV-040-LM, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014) (summary judgment order deeming certain facts admitted by Plaintiff) (Declaration of Katarzyna Ryzewska, Ex. 1)  In response, Plaintiff sued Keck.  Compl. ¶ 30.  The lawsuit resulted in two settlements.  *Id.* at ¶ 32.  The first settlement, which was entered into in 2007, sealed Plaintiff's disciplinary records.  Compl. at 35-38.  Through the second settlement, which was entered into in 2008, Plaintiff "waiv[ed] and release[d] all rights and claims . . . against the . . . Keck School of Medicine." *Id.* at 40.  Pursuant to the settlements, Plaintiff released and waived all claims against Keck and

3

1    agreed not to asset any claims against Keck "based on, referring to, or incorporating any

2    events, acts or omissions through and including the date hereof." *Id.*

3        In 2010, Plaintiff received his medical degree from a different program. *Id.* at

4    ¶ 47. After graduating, Plaintiff began a surgical residency at the University of Arizona,

5    from which he resigned after six weeks. *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014

6    WL 1572559, at *2. In September of 2010, Plaintiff submitted an application to DHMC,

7    where he omitted both his attendance at Keck and the aborted residency at the University

8    of Arizona. *Id.* In 2011, Plaintiff began a residency at DHMC, which he alleges was

9    administered by the Trustees of Dartmouth College. Compl. at ¶ 48.

10       In January 2012, a supervisor at DHMC discovered that the Plaintiff had

11   previously been a resident at the University of Arizona. *Isaacs v. Dartmouth-Hitchcock*

12   *Med. Ctr.*, 2014 WL 1572559, at *4. On March 19, 2012, DHMC issued a letter to the

13   Plaintiff stating that he was being terminated for academic deficiency issues, and his

14   failure to disclose his attendance at Keck and his Arizona residency. *Id.* at *5. On March

15   11, 2014, the New Hampshire Board of Medicine ("Board of Medicine") revoked

16   Plaintiff's medical license and found that his termination from DHMC was appropriate

17   because he concealed material information in his application. *See In re Jeffrey D. Isaacs*

18   *M.D.*, New Hampshire Board of Medicine, Final Decision and Order, at 8-9 (Mar. 11,

19   2014) (incorporated by reference in Plaintiff's Complaint at ¶¶ 5, 113, 114, 119, 137,

20   138, 141) (Ryzewska Decl., Ex. 2). The Board of Medicine further reprimanded Plaintiff

21   for failing to provide any "credible evidence" in support of his position and for

22   "knowingly" making a false statement. *Id.*

23       Since his termination from DHMC, Plaintiff has pursued claims against multiple

24   defendants in multiple jurisdictions. On February 3, 2012, shortly before his termination

25   from DHMC, Plaintiff filed a case against DHMC, the Mary Hitchcock Memorial

26   Hospital, and the Trustees of Dartmouth in a New Hampshire District Court for claims

27   arising out of his residency and pending termination. *Isaacs v. Dartmouth-Hitchcock*

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 179

*Med. Ctr.*, 2014 WL 1572559, at *1 (granting summary judgment in favor of defendants).  Next, on September 30, 2013, Plaintiff filed a case against the Trustees of Dartmouth, the Arizona Board of Regents, the New Hampshire Board of Medicine, the Mary Hitchcock Memorial Hospital, the University of Arizona Health Sciences Center and various other individuals.  *Isaacs v. Trustees of Dartmouth Coll.*, No. CIV.A. 13-5708, 2014 WL 4186536, at *1 (E.D. Pa. Aug. 25, 2014) (Ryzewska Decl., Ex. 3), *aff'd sub nom. Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70 (3d Cir. 2015) (affirming dismissal of complaint based on lack of personal jurisdiction and immunity) (Ryzewska Decl., Ex. 4).  Again, on February 3, 2017, Plaintiff sued the New Hampshire Board of Medicine, the Trustees of Dartmouth College, and DHMC for claims arising out of his dismissal from the DHMC residency and the revocation of his medical license.  *Isaacs v. Trustees of Dartmouth Coll.*, No. 17-CV-040-LM, 2018 WL 734182, at *1 (D.N.H. Feb. 5, 2018) (Ryzewska Decl., Ex. 5), *motion for relief from judgment denied*, No. 17-CV-040-LM, 2018 WL 2225097 (D.N.H. May 15, 2018) (dismissing certain claims with prejudice and denying Plaintiff's request to amend his complaint to add additional claims).

Plaintiff next sued the United States Department of Education on June 30, 2017, when the Office of Civil Rights declined to investigate the circumstances surrounding his termination from DHMC in New Hampshire.  *Isaacs v. United States Dep't of Educ.*, No. CV 17-11221-FDS, 2018 WL 1257760, at *1 (D. Mass. Mar. 12, 2018) (dismissing complaint based on sovereign immunity) (Ryzewska Decl., Ex. 6).  Now, unwilling to take responsibility for his own actions and omissions, Plaintiff has manufactured a federal RICO claim to further harass Defendants and waste judicial time and resources. Plaintiff's frivolous claims should be dismissed.

5

## IV.   ARGUMENT

### A.   Plaintiff's RICO Claim Is Barred by the Statute of Limitations

Plaintiff was required to bring his RICO claim within four years of when he knew or should have known of his alleged injuries.  *See, e.g.*, *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005); *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001).  Here, by his own admission, Plaintiff knew or should have known of his alleged injuries more than four years ago.[1]  The Complaint expressly alleges that (1) "Plaintiff became aware of the illegal situation ***in early January 2012***, and informed Dartmouth that there would be a Federal lawsuit filed and that all evidence should be preserved," (2) Plaintiff "has diligently sought to uncover the predicate acts via federal discovery that began in ***January 2012***," (3) "Dartmouth terminated [him] in ***March 2012***," and (4) that the Board of Medicine "first published the above false orders on the internet" in "***mid-2014***."  Compl. ¶¶ 74, 96, 150, 162, 196 (emphases added).  Thus, Plaintiff was required to file suit as early as January 2016 and  by no later than mid-2018.  Because he waited until March 2019, his RICO claim is hopelessly time barred.[2]

### B.   The 2008 Settlement Agreement Bars Plaintiff's RICO Claim

Plaintiff's RICO claim is barred by the 2008 Settlement Agreement.  In March 2008, Plaintiff entered into a binding and valid Settlement Agreement with Keck.  As

---

[1]  The injury of which Plaintiff complains is his inability to practice medicine.  *See* Compl. ¶¶ 202 ("Defendants planned to continue said mistreatment in perpetuity, forever denying Isaacs a medical career . . . ."); 204 ("These Defendants . . . thwarted for good Dr. Isaacs's pursuit of being a medical Doctor . . . ."); Count II ("Defendants shall be enjoined and restrained from interfering with Plaintiff's property, specifically, his medical licensure . . . .").

[2]  Plaintiff has been suing over the same alleged injuries since at least September 2013.  *Isaacs v. Trustees of Dartmouth Coll.*, 2014 WL 4186536, at *15 (E.D. Pa. Aug. 25, 2014).  Plaintiff added the New Hampshire Board of Medicine to the 2013 lawsuit when they went forward with his license revocation hearing without him, after he failed to attend.  *Id.*

Gibson, Dunn &
Crutcher LLP

part of the agreement, Plaintiff "waive[d] and release[d] all rights and claims, known and unknown, which [Plaintiff] may have against" USC, Keck, and their successors, officers, agents, administrators, employees, faculty, and students, *inter alia*, "from the beginning of time to" the date Plaintiff executed the agreement.  See Compl. at 40 (2008 Settlement Agreement ¶ 7).  Accordingly, Plaintiff cannot assert any claims based on pre-2008 conduct.  The Complaint, however, expressly alleges that "Keck engaged in multiple predicate acts, ***which were the subject of a federal lawsuit in 2007***."  Compl. ¶ 197 (emphasis added).  This allegation is fatal to Plaintiff's RICO claim.  Plaintiff released and waived all claims based on pre-2008 conduct.

## C.    Plaintiff's RICO Claims Fail as a Matter of Law

The elements of a civil RICO claim are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to the plaintiff's business or property (i.e., RICO standing).  *See, e.g.*, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017); *United Bhd. of Carpenters & Joiners v. Building & Constr. Trades Dep't*, 770 F.3d 834, 837 (9th Cir. 2014).  Plaintiff fails to allege *any* of these elements.

### 1.    The Complaint Fails to Plead Conduct Sufficient to Establish "Operation or Management" of a RICO Enterprise.

To satisfy the conduct element, Plaintiff must plead that Keck played "*some part in directing the enterprise's affairs*."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original).  To do so, Plaintiff must allege that Keck "participated in the operation or management of the enterprise itself."  *Id.* at 183.  Here, the Complaint is devoid of any allegations that Keck operated or managed the alleged enterprise.

### 2.    The Complaint Fails to Plead a RICO Enterprise

Plaintiff fails to plead a cognizable enterprise.  An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," and is "proved by evidence of ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United*

Gibson, Dunn &
Crutcher LLP

1   *States v. Turkette*, 452 U.S. 576, 583 (1981).  To be actionable, an associated-in-fact

2   enterprise must have "three structural features:  a purpose, relationships among those

3   associated with the enterprise, and longevity sufficient to permit these associates to

4   pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).

5   Critically, the enterprise must have an existence separate and distinct from "the

6   connected 'pattern of racketeering activity.'"  *Turkette*, 452 U.S. at 583.  Plaintiff's

7   allegations fail to satisfy *any* of these requirements.

8        First, Plaintiff alleges that Defendants formed an enterprise because they

9   participated in "federally and state funded medical training activities," have a

10  "reputational and commercial stake in the national health care provider network," and

11  have "authoritative control and or [sic] publishing rights in nationwide medical training

12  database."  Compl. ¶ 176.  But to the extent these allegations are even intelligible, they

13  are true of virtually every medical school, hospital, or medical training facility in the

14  United States and do not suggest Defendants functioned as a "continuing unit."

15       Second, Plaintiff alleges that all Defendants formed an enterprise because they

16  have "some nexus as Harvard Medical School faculty, alumni, and/or social and

17  professional or interests in affiliated academic medicine posts such as those at

18  Dartmouth and Keck."  *Id.*  Plaintiff's allegation renders the concept of a RICO

19  enterprise meaningless – it would encompass literally thousands of individuals and

20  entities.  The faculty and alumni of Harvard Medical School do not comprise a RICO

21  enterprise.

22       Third, Plaintiff alleges that Defendants formed a "de facto enterprise with the sole

23  purpose of carrying out a vendetta and negatively impacting Dr. Isaac's medical-

24  professional career."  *Id.*  But this allegation fails because it is not distinct from the

25  alleged pattern of racketeering activity.

26

27

28

### 3.     The Complaint Fails to Plead Racketeering Activity

RICO requires at least two acts of racketeering activity within the last 10 years. 18 U.S.C. § 1961(5).  But "while two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 496 n.14.  Here, Plaintiff has not adequately alleged even a single predicate act.

### a.     Wire and Mail Fraud

Plaintiff's mail and wire fraud allegations fail as a matter of law.  To plead wire and mail fraud, Plaintiff must allege (1) the formation of a scheme to defraud, (2) the use of the mail or the wires in furtherance of the scheme, and (3) the specific intent to defraud.  *See Eclectic Props. East v. Marcus & Millichap Co.*, 751 F. 3d 990, 997 (9th Cir. 2014).  Further, these elements must be pled with particularity.  *See* Fed. R. Civ. P. 9(b); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).  To plead fraud with particularity, Plaintiff must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (internal quotations omitted).  In addition, Plaintiff "must set forth . . . an explanation as to why the disputed statement was untrue or misleading when made."  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (internal quotations omitted).

The Complaint's wire and mail fraud allegations are completely conclusory. Plaintiff alleges only that Keck "continue[s] to issue false transcript reports via wire and mail."  Compl. ¶ 200.  But Plaintiff fails to state the time, place, and specific content of the allegedly false transcripts.  Nor does Plaintiff explain why the transcripts were false or how the mere issuance of a transcript can constitute a scheme to defraud.

### b.     Retaliating Against a Witness

Plaintiff's retaliation allegations fail as a matter of law.  *See* Compl. ¶¶ 160-61, 180(a), 200.  To plead a violation of 18 U.S.C. § 1513(e), Plaintiff must allege that Keck (1) knowingly took an action (2) harmful to Plaintiff (3) with the intent to retaliate against Plaintiff (4) for providing to a law enforcement officer any truthful information

9

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 184

relating to the commission or the possible commission of any federal offense. See 18 U.S.C. § 1513(e). Plaintiff pleads none of these things. There is no allegation that Keck has taken any actions against Plaintiff since the parties entered into the 2007 and 2008 Settlement Agreements. There are no facts to suggest that Keck intended to retaliate against Plaintiff. And there is no allegation anywhere in the Complaint that Plaintiff provided information to any law enforcement officer at any time regarding any federal offense—let alone that Keck knew about any such communication.

### c.    Obstruction of Justice

Plaintiff's suggestion that Keck somehow obstructed justice by allegedly failing to release administrative charges against him fails as a matter of law. Compl. ¶ 143. Obstruction of justice requires a pending *federal* judicial proceeding, which is not alleged here. *See, e.g.*, 18 U.S.C. § 1503; *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 708 (2d Cir. 1990); *United States v. Metcalf*, 435 F.2d 754, 756 (9th Cir. 1970).

### 4.    The Complaint Fails to Plead a *Pattern* of Racketeering Activity

To plead a pattern of racketeering activity, Plaintiff must allege at least two acts of racketeering activity within the last ten years. *See* 18 U.S.C. § 1961(5). But "while two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 479. Plaintiff must also allege that the acts "are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original). "It is this factor of *continuity plus relationship* which combines to produce a pattern." *Id.* (internal quotations omitted) (emphasis in original).

### a.    Relatedness

Relatedness requires that the predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission." *Id.* at 240 (internal quotations omission). Here, Plaintiff fails to explain how his expulsion from *Keck* in 2006 is related to the termination of his residency in 2012 or the revocation of his medical license in

10

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 185

Case 2:19-cv-08068-DSF-RAO  Document 64-2  Filed 11/04/19  Page 187 of 264
Case 2:19-cv-02018-DSF-RAO  Document 14  Filed 06/26/19  Page 19 of 22  Page ID #:107
Page ID #:1862

1    2014.  The only apparent relationship is *Plaintiff's* failure to disclose his attendance at

2    Keck, which Keck had nothing to do with.

3                        **b.      Continuity**

4          Continuity requires *either* a series of related acts extending over a substantial

5    period of time (close-ended continuity) *or* past conduct that by its nature projects into

6    the future with a threat of repetition (open-ended continuity).  *Id.* at 241-42.   To plead

7    closed-ended continuity, Plaintiff must allege "a series of related predicates extending

8    over a substantial period of time."  *Id.*  To plead open-ended continuity, Plaintiff must

9    allege fact showing "past conduct that by its nature projects into the future with a threat

10   of repetition."  *Id.* at 241.

11         Plaintiff cannot plead open-ended continuity because the alleged "enterprise" had

12   an inherent end-point—the revocation of Plaintiff's medical license.  *See, e.g., First*

13   *Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180-81 (2d Cir. 2004)

14   (bankruptcy fraud is "'inherently terminable'"); *Religious Tech. Ctr. v. Wollersheim*,

15   971 F.2d 364, 366 (9th Cir. 1992) ("Since the only goal of the Greene defendants was

16   the successful prosecution of the Wollersheim state tort suit, there was no threat of

17   activity continuing beyond the conclusion of that suit."); *First Capital Asset Mgmt., Inc.*

18   *v. Brickelbush, Inc.*, 150 F. Supp. 2d 624, 634 (S.D.N.Y. 2001) ("[T]he scheme here is

19   'inherently terminable' in that it necessarily ended with the bankruptcy to which it

20   related.").  *See also* Compl. ¶¶ 6 (alleging Defendants "intended to deprive Plaintiff of

21   his medical career"), 191 ("The Board . . . revoked [Plaintiffs] medical license").

22         Nor does Plaintiff plead closed-ended continuity.  Congress' concern "in RICO

23   [was] with long-term criminal conduct."  *H.J. Inc.*, 492 U.S. at 242.  Here, "[a]lthough

24   [Plaintiff] alleges a number of 'acts,' [Defendants'] collective conduct is . . . a single

25   episode having the singular purpose of" harming a "single victim."  *Sever v. Alaska Pulp*

26   *Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992).  *See also* Compl. ¶¶ ("The case describes a

27   small group of individuals . . . who . . . coordinated predicate acts over more than a

28

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 186

Case 2:19-cv-08092-DSF-RAO   Document 64-2   Filed 06/26/19   Page 20 of 24   Page ID #:108
Case 2:19-cv-02052-DSF-RAO   Document 14   Filed 11/04/19   Page 188 of 264
Page ID #:1863

1  decade to successfully ruin the Plaintiff's medical career and reputation."); 201 (alleging

2  an "enterprise whose primary focus was to destroy Dr. Isaac's career").

### 5.  The Complaint Fails to Plead RICO Standing

4  An individual only has standing to bring a civil RICO claim if he can show:

5  (1) that he suffered an injury to a business or property interest; and (2) that the alleged

6  RICO violation caused his claimed injury.  *See Canyon Cnty. v. Syngenta Seeds, Inc.*,

7  519 F.3d 969, 972 (9th Cir. 2008); 18 U.S.C. § 1964(c).

8  In the Ninth Circuit, to show an injury to business or property, a plaintiff must

9  allege a "concrete financial loss." *Canyon Cnty.*, 519 F.3d at 975.  "Financial loss alone,

10  however, is insufficient."  *Id.*  "Without a harm to a specific business or property

11  interest—a categorical inquiry typically determined by reference to state law—there is

12  no injury to business or property within the meaning of RICO." *Diaz v. Gates*, 420 F.3d

13  897, 900 (9th Cir. 2005).

14  Here, Plaintiff does not allege any concrete financial loss—only "[r]eputational

15  and career harm."  Compl. ¶ 155.  But courts in the Ninth Circuit repeatedly have held

16  that reputational harm does not suffice.  *See, e.g., Choudhuri v. Wells Fargo Bank, N.A.*,

17  2011 WL 5079480, at *10 (N.D. Cal. Oct. 25, 2011) ("[I]njury to reputation is a personal

18  injury and, therefore, is beyond the purview of RICO."); *Rich v. Shrader*, 2010 WL

19  3717373, at *16 (S.D. Cal. 2010) ("Nor does RICO compensate for intangible harm to

20  one's business reputation or the potential for future income."); *Diaz*, 420 F.3d at 910

21  ("Had Congress intended to create a federal treble damages remedy for cases involving

22  bodily injury, injury to reputation, mental or emotional anguish, or the like, *all of which

23  will cause some financial loss,* it could have enacted a statute referring to injury

24  generally, without any restrictive language.") (internal citation omitted).

25  Nor does Plaintiff plead any facts establishing a direct relationship between the

26  alleged reputational harm and Keck's alleged predicate acts.  To plead causation,

27  Plaintiff must allege "some *direct* relation between the injury asserted and the injurious

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 187

1    conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)

2    (emphasis added).  Accordingly, "[w]hen a court evaluates a RICO claim for proximate

3    causation, the central question it must ask is whether the alleged violation led *directly* to

4    the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)

5    (emphasis added).  Yet, Plaintiff fails to explain how the alleged transmission of his

6    Keck transcripts led directly to his termination from the DHMC residency program and

7    the revocation of his medical license.  It was not Keck's transmission of his transcript

8    that prompted the revocation of his license, but rather *his* failure to disclose his

9    attendance at Keck that led to his reprimand and the revocation of his license.  *In re*

10   *Jeffrey D. Isaacs M.D.*, Final Decision and Order, at 8-9.    USC did not "cause"

11   Plaintiff's intentional omissions.

12   **D.    Plaintiff's Claims Are Barred by Res Judicata**

13            Res judicata bars Plaintiff's complaint because it arises from exactly the same

14   facts alleged in his 2012 lawsuit against the Trustees of Dartmouth College, which was

15   resolved against him.  *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at

16   *1-2.  "Res judicata, or claim preclusion, prohibits lawsuits on any claims that were

17   raised or could have been raised in a prior action." *Stewart v. U.S. Bancorp*, 297 F.3d

18   953, 956 (9th Cir. 2002) (quotation omitted).  "Res judicata applies when there is: (1) an

19   identity of claims; (2) a final judgment on the merits; and (3) identity or privity between

20   parties." *Id.*  Here, all three elements are present.

21            ***First***, there is an identity of claims.  "The central criterion in determining whether

22   there is an identity of claims between the first and second adjudications is whether the

23   two suits arise out of the same transactional nucleus of facts." *Owens v. Kaiser Found.*

24   *Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001) (quotations omitted).  Whether the

25   "common nucleus criterion" is met depends on "whether [the events] are related to the

26   same set of facts and whether they could conveniently be tried together." *Stewart*, 297

27   F.3d at 987 (quotation omitted).

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 188

Case 2:19-cv-08000-DSF-RAO    Document 64-2  Filed 06/26/19   Page 190 of 264
Case 2:19-cv-02013-DSF-RAO    Document 14   Filed 06/26/19   Page 22 of 29   Page ID #:110
Page ID #:1865

1   There, as here, Plaintiff alleged that the Trustees of Dartmouth College terminated
2   his residency after they discovered Plaintiff's attendance at Keck.  Isaacs 2012 Mtn. for
3   Preliminary Inj., No. 1:12-cv-00040-JL, ECF 34, at 3, June 4, 2012 (Ryzewska Decl.,
4   Ex. 7); *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at \*1-2; Compl.
5   ¶¶ 60, 66, 68, 74-92, 96.  *See generally* Isaacs 2012 Compl., No. 1:12-cv-00040-JL, ECF
6   1, February 3, 2012 (Ryzewska Decl., Ex. 8).  In his 2012 request for preliminary
7   injunction, Plaintiff attempted to justify his application omissions by stating that
8   "Dartmouth has terminated Plaintiff for merely complying with [the Keck] settlement
9   agreement," and that DHMC "had been looking for pretextual [sic] reasons to terminate"
10  Plaintiff's residency.  Isaacs 2012 Mtn. for Preliminary Inj., at 3;  Isaacs 2012 Amend.
11  Compl., No. 1:12-cv-00040-JL, ECF 13, February 3, 2012, ¶ 22 (Ryzewska Decl., Ex.
12  9).  As the 2012 pleadings make clear, Plaintiff's current allegations against Keck and
13  the Trustees of Dartmouth College arises out of exactly the same set of facts that gave
14  rise to his 2012 claims.

15  ***Second***, there was a final judgment on the merits.  "The second res judicata
16  element is satisfied by a summary judgment dismissal which is considered a decision on
17  the merits for res judicata purposes."  *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d
18  985, 988 (9th Cir. 2005).  Here, Plaintiff's 2012 lawsuit was resolved at summary
19  judgment.  *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at \*1.

20  ***Third***, there is privity between the parties.  "The third element of the res judicata
21  test requires identical parties or privies in the two actions."  *Mpoyo*, 430 F.3d at 988.
22  The Trustees of Dartmouth College were named in the 2012 lawsuit, and they are named
23  in this suit by way of their trade name, Geisel School of Medicine at Dartmouth; Keck
24  is named as a co-conspirator.  *Id.*; Compl. ¶¶ 17, 176.[3]

25  _____

26  [3]  Although Keck was not a named defendant in the 2012 lawsuit, Keck is alleged to be
27  a co-conspirator.  Compl. ¶ 176 ("[T]he Defendants formed a de facto enterprise with
    the sole purpose of carrying out a vendetta and negatively impacting Dr. Isaacs's
28  medical-professional career.").  Alleged co-conspirators may be considered in privity
    with one another for the purposes of res judicata.  *See, e.g., Airframe Sys., Inc. v.*

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 17 - Page 189

**E.      The Complaint Fails to Plead a Claim for Injunctive Relief**

Count II of the Complaint asks the Court to "enjoin[] and restrain[]" Defendants "from interfering with Plaintiff's property, specifically, his medical licensure and right to enroll in federally funding medical training." Compl. at 33. But injunctive relief is not a cause of action, and the Complaint identifies no basis for seeking such relief. *Robateau v. Wells Fargo Home Mortg.*, No. CV 15-504-R, 2015 WL 12765587, at \*3 (C.D. Cal. May 7, 2015).

Count II also asks the Court to "enforce the terms of" the Settlement Agreements. Comp. at 33. But Plaintiff nowhere explains what terms he wants enforced. Indeed, the Complaint does not even allege that Keck breached the Settlement Agreements. At most, it alleges that "John or Jane Doe . . . disclosed the sealed records to Dartmouth," and that "John or Jane Doe necessarily must have had some connection to Defendant Keck, given their knowledge of the seal records." Compl. ¶ 198. This does not suffice. *Gerritsen v. Warner Bros. Entm't Inc.*, 116 F. Supp. 3d 1104, 1126 (C.D. Cal. 2015) (reviewing plaintiff's complaint under various theories of vicarious liability, each of which must be pled with sufficient specificity). Regardless, any claim for breach of contract would be time barred for the same reasons set forth above. *See* Cal. Civ. Code § 337(a).

---

*Raytheon Co.*, 601 F.3d 9, 17 (1st Cir. 2010) ("[W]here some alleged conspirators are sued in the first (unsuccessful) action and the remainder in a second suit based on the same allegations . . . courts have held the later defendants could raise claim preclusion as a defense." (quotation omitted)); *Sepehry-Fard v. Nationstar Mortg. LLC*, No. 14-CV-03218-LHK, 2015 WL 332202, at \*14 (N.D. Cal. Jan. 26, 2015) ("[T]he fact that defendants were not named in a prior lawsuit does not bar the application of *res judicata* if privity exists between the newly-named defendants and a defendant in a prior action."); *Bartlett v. Bartlett*, 2018 WL 1211818, at \*5 (S.D. Ill. Mar. 8, 2018) ("If a party brings a lawsuit against a few co-conspirators and loses, there is no reason why he should be able to re-litigate that dispute against the winners simply by tossing another party into the ring.").

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Exhibit 17 - Page 190

Case 2:19-cv-08909-DSF-RAO   Document 64-2   Filed 11/04/19   Page 192 of 264
Case 2:19-cv-02019-DSF-RAO   Document 14   Filed 06/26/19   Page 24 of 24   Page ID #:112
Page ID #:1867

# V.   CONCLUSION

For the foregoing reasons, Keck respectfully requests that the Court grant the Motion to Dismiss and dismiss Plaintiff's Complaint with prejudice.[4]

Dated:  June 26, 2019                GIBSON, DUNN & CRUTCHER LLP


By:  _____/s/ James P. Fogelman_____
                James P. Fogelman

Attorney for USC Keck School of Medicine

---

[4] By filing the instant action, Plaintiff has breached the Settlement Agreements. Compl. at 35 (2007 Agreement ¶ 4); *Id.* at 40 (2008 Agreement ¶ 6).  Under the terms of the Settlement Agreements, Keck is entitled to recover its "costs and losses, including actual attorneys' fees." *Id.*  Keck reserves its right to seek such recovery.

16

Case 2:19-cv-08809-DSF-RAO   Document 64-2   Filed 11/04/19   Page 193 of 264
Case 2:19-cv-02011-DSF-RAO   Document 62   Filed 09/13/19   Page 1 of 189   Page ID #:2586
Page ID #:1868

James P. Fogelman, SBN 161584
Shannon E. Mader, SBN 235271
Katarzyna Ryzewska, SBN 300386
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
JFogelman@gibsondunn.com
SMader@gibsondunn.com
KRyzewska@gibsondunn.com

Attorneys for Defendant
USC Keck School of Medicine

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. JEFFREY ISAACS,<br><br>   Plaintiff,<br><br>  v.<br><br>DARTMOUTH HITCHCOCK MEDICAL CENTER, GIESEL SCHOOL OF MEDICINE AT DARTMOUTH, USC KECK SCHOOL OF MEDICINE, NH BOARD OF MEDICINE (individually) and JOHN or JANE DOE,<br><br>   Defendants. | CASE NO. 2:19-CV-02011-DSF-RAO<br><br>**DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND HIS FIRST AMENDED COMPLAINT**<br><br>[Proposed Order, Request for Judicial Notice and Declaration of Katarzyna Ryzewska Filed Concurrently herewith]<br><br>**Hearing**<br>Date:  October 7, 2019<br>Time:  1:30 PM<br>Location: Courtroom 7D<br>Judge:  Hon. Dale S. Fischer |

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO
AMEND HIS FIRST AMENDED COMPLAINT
Exhibit 18 - Page 192

Case 2:19-cv-08009-DSF-RAO Document 64-2 09/15/19 Page 2 of 189 Page ID #:2587
Case 2:19-cv-02011-DSF-RAO Document 62 Filed 11/04/19 Page 194 of 264
Page ID #:1869

# I.   INTRODUCTION

Plaintiff's Motion for Leave to Amend ("Motion") should be denied. While Plaintiff purports to have filed a dismissal of this case, Keck is filing this opposition as a precaution in the event the Court deems the request for dismissal improper.

All of Plaintiff's new claims and allegations fail for the same reasons as his old ones, and the Proposed Second Amended Complaint ("PSAC") is nothing more than a bad faith attempt to delay a ruling on Keck's pending motion to dismiss and to prejudice Keck by naming its counsel of record, Gibson, Dunn & Crutcher ("Gibson Dunn"), as a defendant and by threatening to call Gibson Dunn attorneys as witnesses. Plaintiff even admitted to Keck's counsel that causing the disqualification of Gibson Dunn was his intention. Plaintiff seeks to sue Gibson Dunn for simply doing their job, and the only reason Plaintiff has filed this Motion is to harass Keck and their counsel.

Further, the PSAC includes purportedly "new" allegations that Plaintiff has known about for years, as evidenced by his prior lawsuits. Plaintiff has offered no explanation for why he failed to include these allegations in any of his prior complaints. For all of these reasons and those set forth below, the Motion should be denied.

# II.   LEGAL STANDARD

After a responsive pleading is filed, a party may amend the pleading only by leave of court or written consent of the adverse party. Fed. R. Civ. P. 15(a)(2). "District courts have substantial discretion in determining when an amendment should be allowed." *Butler v. Robar Enters., Inc.*, 208 F.R.D. 621, 622 (C.D. Cal. 2002) (citing *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 439 (9th Cir. 1997)). Courts in the Ninth Circuit consider five factors in deciding a motion for leave to amend:  (1) undue delay; (2) bad faith; (3) prejudice to the opposing party; (4) futility; and (5) whether the plaintiff has previously amended the complaint. *See Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). Any of the first four factors—without more—justifies denial of leave. *See Chudacoff v. Univ. Med. Ctr. of So. Nev.*, 649 F.3d 1143, 1152 (9th Cir. 2011). Further, the court's discretion is particularly broad where the plaintiff has previously

Gibson, Dunn & Crutcher LLP

1

DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO AMEND HIS FIRST AMENDED COMPLAINT
Exhibit 18 - Page 193

1    amended the complaint. *See Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149,

2    1160 (9th Cir. 1989). Here, all five factors weigh heavily in favor of the Court denying

3    Plaintiff's Motion.

### III.    ARGUMENT

#### A.    Plaintiff's New Claims and Allegations Are Futile

6    Futility alone justifies denying a motion for leave to amend. *Ahlmeyer v. Nevada*

7    *Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009). "A proposed amended

8    complaint is futile if it would be immediately 'subject to dismissal.'" *Nordyke v. King*,

9    644 F.3d 776, 788 n.12 (9th Cir. 2011), *on reh'g en banc*, 681 F.3d 1041 (9th Cir. 2012)

10   (citations omitted) (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th

11   Cir. 1998)). "Thus, the 'proper test to be applied when determining the legal sufficiency

12   of a proposed amendment is identical to the one used when considering the sufficiency

13   of a pleading challenged under Rule 12(b)(6).'" *Id.* (quoting *Miller v. Rykoff–Sexton*,

14   *Inc.*, 845 F.2d 209, 214 (9th Cir. 1988)).

15   The PSAC seeks to add two new claims against Keck (Fraud and Rescission) and

16   to add Keck's counsel of record as a defendant to four separate claims, one of which is

17   entirely new (Intentional Infliction of Emotional Distress, Intentional Interference with

18   Contractual Relations, RICO, and Due Process and First Amendment Violations). For

19   the reasons set forth in Keck's pending Motion to Dismiss, all of Plaintiff's existing

20   claims fail as a matter of law because they are barred by the settlement agreements, the

21   doctrine of res judicata, the applicable statutes of limitations, and for various other

22   reasons. Plaintiff's proposed amendment does not cure any of these deficiencies, and its

23   new claims suffer from these same (and other) deficiencies.

#### 1.    Plaintiff's New Claims Are Time Barred

25   Plaintiff's new claims for rescission and fraud are futile because they are barred

26   by the applicable statutes of limitations. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183,

27   188 (9th Cir. 1987). As explained in Keck's pending Motion to Dismiss, Plaintiff's

28   breach of contract claim is barred by the four-year statute of limitations. *See* Cal. Civ.

Gibson, Dunn &
Crutcher LLP

2

DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO
AMEND HIS FIRST AMENDED COMPLAINT
Exhibit 18 - Page 194

1  Proc. Code § 337(1). For this same reason, Plaintiff's rescission claim, which is based

2  on the same exact factual allegations (ECF 52-1 ¶¶ 321-24), is barred by the statute of

3  limitations. *Galen v. Mobil Oil Corp.*, 922 F. Supp. 318, 320 (C.D. Cal. 1996) (applying

4  the four-year statute of limitations to a rescission claim) (citing Cal. Civ. Proc. Code

5  § 337).

6        Plaintiff's new fraud claim is barred by the three-year statute of limitations. *See*

7  Cal. Civ. Proc. Code § 338; *Sun'n Sand, Inc. v. United Cal. Bank*, 21 Cal. 3d 671,

8  701 (1978). A claim for fraud accrues when the aggrieved party discovers the facts

9  constituting the fraud. *See* Cal. Civ. Proc. Code § 338(d); *Austin v. Medicis*, 21 Cal. App.

10  5th 577, 588 (2018). By Plaintiff's own admission, he became aware of the facts

11  constituting the alleged fraud as early as 2012. In his original Complaint, Plaintiff

12  expressly alleged that he "became aware of the illegal situation *in early January 2012*,"

13  and "has diligently sought to uncover the predicate acts via federal discovery that began

14  in *January 2012*." ECF 1 ¶¶ 74, 162 (emphases added). In an obvious attempt to plead

15  around the statute of limitations, Plaintiff deleted these allegations from the FAC. *See*

16  ECF 33 ¶¶ 79, 155. However, the FAC still alleges that "Dartmouth terminated Isaacs

17  in *March 2012*," and that the Board of Medicine "first published the above false

18  [revocation] orders on the internet" in "*mid-2014*." *Id.* at ¶¶ 102, 147 (emphases added).

19  These allegations conclusively establish that Plaintiff knew of the alleged disclosure of

20  his Keck records as early as 2012 and by no later than 2014.[1]

21        **2.**    **Plaintiff's New Claims Are Barred as Res Judicata**

22        Plaintiff's fraud and rescission claims (ECF 52-1 ¶¶ 321-24, 333-41) are barred

23  as res judicata. Under California law, res judicata precludes a party from relitigating (1)

24  the same claim, (2) against the same party, (3) when that claim proceeded to a final

25  _____

26  [1]  In the PSAC, Plaintiff attempts yet again to plead around the statute of limitations by
    claiming he did not become aware of the alleged fraud until 2019 when he discovered

27  an AAMC profile referencing his attendance. ECF 52-1 ¶¶ 55, 193, 221, 341. But the
    AAMC profile is irrelevant. Plaintiff admits he was terminated by Dartmouth in 2012

28  and that his medical license was revoked by the Board of Medicine in 2014 based in
    part on the fact that he failed to disclose his attendance at Keck. *Id.* at ¶¶ 116, 164.

1  judgment on the merits in a prior action. *Adam Bros. Farming v. Cty. of Santa Barbara*,
2  604 F.3d 1142, 1148–49 (9th Cir. 2010).

3         This is not the first time that Plaintiff has challenged the validity of the settlement
4  agreements. In *Isaacs v. University of Southern California*, Keck was forced to file a
5  motion to enforce the settlement agreements when Plaintiff refused to dismiss the action,
6  as required by the agreements. *See* Declaration of Katarzyna Ryzewska, Ex. 1, at 3 (Mot.
7  to Enforce Settlement Agreement, Case No. CV-06-3338 GAF, ECF 77.) In his
8  opposition, Plaintiff argued that the agreements were invalid due to lack of
9  consideration, his alleged lack of knowledge regarding the agreement's meaning,
10 illegality and/or impracticability, duress, unclean hands, undue influence, and
11 unconscionability. *See* Ryzewska Decl. Ex. 2, at 82-84 (Isaacs Opp. to Mot. to Enforce
12 Settlement Agreement, Case No. CV-06-3338 GAF, ECF 78) ("2008 Opposition").
13 Plaintiff makes the identical arguments here:

14         ***Lack of consideration***: In his 2008 Opposition, Plaintiff claimed the agreements
15         lacked consideration because they did not completely clear his academic record
16         or refund his tuition. Ryzewska Decl. Ex. 2, at 82. In his new rescission claim,
17         Plaintiff alleges that "[t]he contract was unlawful in that no consideration was
18         granted to Plaintiff." ECF 52-1 ¶ 324.

19         ***Lack of full knowledge***: In his 2008 Opposition, Plaintiff claimed he signed the
20         agreements "without full knowledge of [their] meaning." Ryzewska Decl. Ex. 2,
21         at 82. In his new rescission claim, Plaintiff alleges that "Plaintiff's consent was
22         by mistake." ECF 52-1 ¶ 324.

23         ***Illegality***: In his 2008 Opposition, Plaintiff claimed the agreements were illegal
24         because he could not truthfully answer questions about his attendance on future
25         applications. Ryzewska Decl. Ex. 2, at 82-83. In his new rescission claim, Plaintiff
26         alleges that the agreements are unlawful. ECF 52-1 ¶ 324.

27         ***Unclean Hands/Fraud***: In his 2008 Opposition, Plaintiff claimed that Keck did
28         not enter into the agreements in good faith. Ryzewska Decl. Ex. 2, at 83.

Gibson, Dunn &
Crutcher LLP

4

DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO
AMEND HIS FIRST AMENDED COMPLAINT
Exhibit 18 - Page 196

Plaintiff's new fraud claim is based on the allegation that Keck did not intend to honor the agreements. ECF 52-1 ¶¶ 334-35.

***Unconscionability***: In his 2008 Opposition, Plaintiff claimed that the "consideration offered is so obviously inadequate that to enforce the contract would be unfair." Ryzewska Decl. Ex. 2, at 84. Plaintiff's new rescission claim states that the settlements "clearly deprived Plaintiff of any consideration." ECF 52-1 ¶ 324.

All of these argument were rejected by Judge Gary Feess in 2008. *See* Ryzewska Decl. Ex. 3, at 95-98 (Order Re: Motion to Enforce Settlement Agreement, Case No. CV-06-3338 GAF, ECF 81) ("2008 Order"). In granting the motion to enforce the settlements and dismissing the case with prejudice, the Court noted that Plaintiff presented "no grounds on which to void the [agreement]" and that he was "bound by its terms." *Id.* at 98.

The 2008 Order constitutes a final judgment on the merits because it resulted in the dismissal with prejudice of the entire matter, and because the time for appeal has long passed. *See Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 793 (2010) ("[A] dismissal with prejudice is the equivalent of a final judgment on the merits, barring the entire cause of action").

### 3. Plaintiff's New Claims Fail as a Matter of Law

All of Plaintiff's proposed claims are futile because they fail as a matter of law, and "would be immediately 'subject to dismissal.'" *Nordyke*, 644 F.3d at 788 n.12.

First, Plaintiff's claim for Due Process and First Amendment Violation against Gibson Dunn fails because it is based on litigation conduct and thus barred by *Noerr–Pennington*, and because Gibson Dunn is not a state actor. *See, e.g., Sosa v. DirecTV, Inc.*, 437 F.3d 923, 933–39 (9th Cir. 2006) (*Noerr–Pennington* applies to pre-litigation demand letters); *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991) (*Noerr–Pennington* applies to a decision to accept or reject a settlement offer); *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1159 (N.D. Cal. 2014)

Case 2:19-cv-08098-DSF-RAO Document 64-2 09/13/19 Page 7 of 109 Page ID #:2592
Case 2:19-cv-08098-DSF-RAO Document 61 Filed 11/04/19 Page 199 of 264
Page ID #:1874

1   (*Noerr–Pennington* applies to the filing of a motion to dismiss); *Jackson v. Metro.*
2   *Edison Co.*, 419 U.S. 345, 349 (1974) (stating that the "Fourteenth Amendment offers
3   no shield" against "private conduct, however discriminatory or wrongful") (internal
4   quotation marks omitted); *Apao v. Bank of New York*, 324 F.3d 1091, 1093 (9th Cir.
5   2003) ("The Fourteenth Amendment provides: 'No state shall ... deprive any person of
6   life, liberty, or property, without due process of law.' It thus shields citizens from
7   unlawful governmental actions, but does not affect conduct by private entities.");
8   *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019) (applying the
9   state action doctrine to first amendment claims).

10          Second, Plaintiff's IIED claim fails for the same reasons stated in Keck's pending
11   motion to dismiss. *See* ECF 41 at 19-21. *See also Madrigal v. Allstate Indem. Co.*, No.
12   CV 14-4242 SS, 2015 WL 12747906, at *19 (C.D. Cal. Sept. 30, 2015) (failure to accept
13   an offer of settlement was not outrageous conduct); *Moss v. Bank of New York Tr.*, No.
14   C 10-01734 JSW, 2011 WL 13243802, at *3 (N.D. Cal. Oct. 13, 2011) (claim based on
15   "activities related to the unlawful detainer action in state court, including any filings by
16   the process server" are "protected by the litigation privilege"); *Chang v. Lederman*, 172
17   Cal. App. 4th 67, 86-88 (2009) (it was not extreme or outrageous conduct for attorney
18   to direct a wife to vacate residence she had shared with husband without notifying her
19   of homestead rights, and was protected by litigation privilege).

20          Third, Plaintiff's IICR claim is barred by the litigation privilege. *Schick v. Lerner*,
21   193 Cal. App. 3d 1321, 1329, 238 Cal. Rptr. 902, 907 (Ct. App. 1987) ("[A]bsent
22   extraordinary circumstances, an attorney may not be held liable for urging a client to
23   breach a contract with some third party."). *See also* 52-1 ¶ 245 (alleging that Gibson
24   Dunn "filed false or misleading legal pleadings meant to subvert the consideration and
25   legal rights Plaintiff obtained from the settlement agreements"). It also fails because
26   Gibson Dunn, as Keck's agent, cannot be liable for tortiously interfering with a contract
27   to which Keck is a party. *See, e.g.*, *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321,
28   325–26 (9th Cir. 1982) (stating that attorney, acting in "his fiduciary capacity as an

Gibson, Dunn &
Crutcher LLP

6

DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO
AMEND HIS FIRST AMENDED COMPLAINT
Exhibit 18 - Page 198

Case 2:19-cv-08000-DSF-RAO    Document 64-2   Filed 11/04/19    Page 200 of 264
Case 2:19-cv-02013-DSF-RAO    Document 62   Filed 09/13/19    Page 8 of 189   Page ID #:2593
Page ID #:1875

agent, officer or director" could claim "manager's privilege," which would allow the attorney to "counsel his principal to breach a contract that he reasonably believes to be harmful to his principal's best interests"); *Mintz v. Blue Cross of Cal.*, 127 Cal. App. 4th 1594, 1604 (2009); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 513-14 (1994). *See also Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 963-64 (2013) ("'a stranger,' as used in *Applied Equipment*, means one who is not a party to the contract or an agent of a party to the contract"). In any event, there is absolutely nothing in either settlement agreement that grants Plaintiff unfettered access to campus facilities.

Fourth, Plaintiff's RICO claim against Gibson Dunn fails for the same reasons stated in the pending Motion to Dismiss and is also barred by the *Noerr–Pennington* doctrine. *See* ECF 41 at 7-15. *See also Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643–48 (9th Cir. 2009) (applying *Noerr–Pennington* in a RICO action brought against attorneys); *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1159 (N.D. Cal. 2014) (*Noerr–Pennington* applies to RICO actions and the filing of a motion to dismiss).

Finally, Plaintiff's fraud claim is not only time barred but is not pleaded with particularity. *See* Fed. R. Civ. P. 9(b).

## B.    Plaintiff's Motion Is in Bad Faith and Would Cause Prejudice

"A party acts in bad faith when it seeks to amend its pleadings solely for a 'wrongful motive' such as unnecessary delay or harassment." *Leitner v. Sadhana Temple of New York, Inc.*, No. CV 13-07902, 2014 WL 12591666 at * 4 (C.D. Cal. May 8, 2014) (quoting *Delgado v. Orchard Supply Hardware Corp.*, No. 1:09-cv-01839 SMS, 2011 WL 4627073 at *3 (E.D. Cal. Oct. 3 2011) (further citations omitted)). Here, there can be no question that Plaintiff's Motion was filed for the improper purpose of delaying a final ruling on Keck's pending Motion to Dismiss and harassing Keck and its counsel.[2]

---

[2]  Plaintiff has a well-established history of filing amended complaints for purposes of delay. *See, e.g.*, ECF 40-13, FAC at ¶¶ 6-9, No. 1:17-cv-00040-LM (United States District Court, District of New Hampshire).

Gibson, Dunn & Crutcher LLP

7

DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO AMEND HIS FIRST AMENDED COMPLAINT
Exhibit 18 - Page 199

First, Plaintiff's Motion is clearly a tactic to force a third round of briefing and avoid dismissal. *See Schlacter–Jones v. General Telephone of Cal.*, 936 F.2d 435, 443 (9th Cir. 1991) ("Where, as here, a party proposes amendments while a summary judgment motion is pending, the court must look closely to determine whether the proposed amendment is a tactic to prevent termination of the case on summary judgment."). Plaintiff filed the First Amended Complaint rather than respond to Keck's original motion to dismiss and is attempting to do the same here. The deadline for Plaintiff to oppose Keck's motion was August 26, 2019. L.R. 7-9. Rather than file an opposition, Plaintiff improperly filed an amended complaint without leave of the Court. ECF 50. When the amended complaint was stricken (ECF 51), Plaintiff simply repackaged it as a Motion for Leave (ECF 52). Keck should not be forced to go through another round of briefing when Plaintiff has never even opposed any of Keck's motions to dismiss.

Second, Plaintiff's Motion is clearly a tactical move by the Plaintiff to manufacture a conflict of interest between Keck and its counsel of record, in order to set up a scenario whereby Plaintiff can seek the disqualification of Keck's counsel. *See Yumul v. Smart Balance, Inc.*, No. CV-10-00927 MMM AJWX, 2010 WL 4352723, at *3 (C.D. Cal. Oct. 8, 2010) (citing *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985)) (discussing concern regarding disqualification motions as tactical tools meant to harass opposing counsel). In the PSAC, Plaintiff seeks to add Gibson Dunn as a defendant and to assert four claims against Gibson Dunn. All four claims are based on Gibson Dunn's representation of Keck in this lawsuit and relate to Plaintiff's communications with Gibson Dunn as counsel of record for Keck. Indeed, Plaintiff has made his intentions abundantly clear. On August 20, 2019, Plaintiff emailed lead counsel for Keck stating that he intends to call him as a witness, and informing him that Gibson Dunn's "immediate recusal and disqualification from this case is appropriate." Ryzewska Decl., Ex. 4, at 99. Plaintiff may be proceeding *pro se*, but he has years of

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 202 of 264
Case 2:19-cv-02013-DSF-RAO   Document 52   Filed 09/13/19   Page 10 of 10   Page ID #:2595
Page ID #:1877

experience in filing federal lawsuits and is hardly unsophisticated. His attempt to prejudice Keck is blatant and should not be allowed.

### C.    Plaintiff's Undue Delay Weighs Against Granting Leave to Amend

While undue delay is not a dispositive factor in the amendment analysis, it is relevant, "especially when no reason is given for the delay." *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999). Here, Plaintiff fails to explain why he did not include the new allegations in his prior complaints, even though he alleges to have learned of them in prior lawsuits. Indeed, Plaintiff even admits that he discovered the AAMC profile in a prior lawsuit. ECF 52-1 ¶ 65.

## IV.    CONCLUSION

For the foregoing reasons, Keck respectfully requests that the Court deny Plaintiff's Motion for Leave to Amend.


Dated: September 13, 2019            GIBSON, DUNN & CRUTCHER LLP


                                     By:    */s/ James P. Fogelman*
                                            James P. Fogelman

                                            Attorney for USC Keck School of
                                            Medicine

DEFENDANT USC KECK SCHOOL OF MEDICINE'S OPPOSITION TO PLAINTIFFS MOTION FOR LEAVE TO
AMEND HIS FIRST AMENDED COMPLAINT
Exhibit 18 - Page 201

Case 2:19-cv-08000-DSF-RAO Document 64-2 Filed 11/04/19 Page 203 of 264
Case 2:19-cv-02011-DSF-RAO Document 41 Filed 08/02/19 Page 1 of 369 Page ID #:1692
Page ID #:1878

James P. Fogelman, SBN 161584
Shannon E. Mader, SBN 235271
Katarzyna Ryzewska, SBN 300386
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
  Los Angeles, California 90071-3197
Telephone: (213) 229-7000
  Facsimile: (213) 229-7520
JFogelman@gibsondunn.com
SMader@gibsondunn.com
KRyzewska@gibsondunn.com

Attorneys for Defendant
USC Keck School of Medicine

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. JEFFREY ISAACS,<br><br>Plaintiff,<br><br>v.<br><br>DARTMOUTH HITCHCOCK MEDICAL CENTER, GIESEL SCHOOL OF MEDICINE AT DARTMOUTH, USC KECK SCHOOL OF MEDICINE, NH BOARD OF MEDICINE (individually) and JOHN or JANE DOE,<br><br>Defendants. | CASE NO. 2:19-CV-02011-DSF-RAO<br><br>**DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>[Defendant's Request for Judicial Notice, and Declaration of Katarzyna Ryzewska Filed Concurrently herewith]<br><br>**Hearing**<br>Date:    September 16, 2019<br>Time:    1:30 PM<br>Location: Courtroom 7D<br>Judge:   Hon. Dale S. Fischer |

Gibson, Dunn & Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 16, 2019, at 1:30 p.m. in Courtroom 7D of the United States District Court for the Central District of California at First Street Courthouse, 350 West 1st Street, Los Angeles, California Defendant USC Keck School of Medicine ("Keck") will and hereby does move the Court to dismiss with prejudice all claims asserted by Plaintiff Dr. Jeffrey Isaacs ("Plaintiff") against Keck in the above-captioned action under Federal Rule of Civil Procedure 12(b)(6) on the following grounds:

- First, Plaintiff's claims are barred by res judicata. In 2012, Plaintiff filed suit against the Trustees of Dartmouth College based on the same set of facts, and summary judgment was entered against him. As such, the judgment in the 2012 action bars all of Plaintiff's claims.

- Second, Plaintiff's RICO claim fails because it is barred by the four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Plaintiff's own allegations establish that he learned of his alleged injuries more than four years ago. He expressly admits that "Dartmouth terminated [him] in ***March 2012***," and that the Board of Medicine "first published the above false [revocation] orders on the internet" in "***mid-2014***." First Amended Complaint ("FAC") at ¶¶ 102, 147 (emphases added).

- Third, Plaintiff's RICO claim fails because it is barred by the 2007 and 2008 settlement agreements, which released Keck from liability for any and all claims based on pre-2008 conduct.

- Fourth, Plaintiff fails to plead any of the essential elements of a RICO claim. He fails to allege a RICO enterprise, the operation or management of the RICO enterprise, and at least two acts of racketeering activity: his wire and mail fraud allegations are wholly conclusory and not pleaded with particularity; he pleads

1

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 203

no facts to support his witness retaliation allegation; and his obstruction of justice claim fails because he does not allege a pending federal judicial proceeding. He also fails to plead a pattern of racketeering activity, a cognizable injury, and causation. Additionally, statements by Keck's counsel are immunized from liability under the *Noerr-Pennington* doctrine. *See Sosa v. DirecTV, Inc.*, 437 F.3d 923, 933-39 (9th Cir. 2006) (*Noerr-Pennington* applies to pre-litigation demand letters); *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991) (*Noerr-Pennington* applies to a decision to accept or reject a settlement offer); *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1159 (N.D. Cal. 2014) (*Noerr-Pennington* applies to the filing of a motion to dismiss).

- Fifth, Plaintiff's claims of retaliation under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act fail because refusing to acquiesce to litigation demands is not an "adverse action," nor is filing a motion to dismiss. *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 833 (N.D. Ill. 2006). *See also Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998) ("[I]t will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation."). These actions are also immunized from liability under the *Noerr-Pennington* doctrine.

- Sixth, Plaintiff's *Bivens* claim fails because a *Bivens* claim cannot be brought against a private entity, even if the entity allegedly acted under the color of federal law. *See Papa v. United States*, 281 F.3d 1004, 1009 (9th Cir. 2002); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001).

- Seventh, Plaintiff's breach of contract claim fails because it is barred by the four-year statute of limitations, and because Plaintiff fails to allege any breach. *See* Cal. Civ. Proc. Code § 337(1). This claim is also barred by the litigation privilege. *See, e.g., Blanchard v. DirecTV, Inc.*, 123 Cal. App. 4th 903 (2004)

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 204

1         ("The [litigation] privilege has been broadly applied to demand letters and
2         other prelitigation communications by attorneys."); Cal. Civ. Code § 47(b).

3   •  Eighth, Plaintiff's Intentional Infliction of Emotional Distress ("IIED") and
4         Negligent Infliction of Emotional Distress ("NIED") claims fail because they
5         are barred by the two-year statute of limitations, and because Plaintiff fails to
6         plead essential elements of each claim. *See* Cal. Civ. Proc § 335.1. Plaintiff's
7         IIED claim is also barred by the litigation privilege. *See, e.g., Blanchard.*, 123
8         Cal. App. 4th 903; Cal. Civ. Code § 47(b).

9   •  Ninth, Plaintiff's claim for constructive fraud fails because it is barred by the
10        three-year statute of limitations, because Plaintiff fails to allege any fraud on
11        the part of Keck, and because it is not pleaded with particularity. Cal. Civ.
12        Proc. Code § 338(d).

13   •  Finally, Plaintiff's declaratory judgment claim fails because there is no
14        genuine, ongoing dispute. *See Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036,
15        1064 (C.D. Cal. 2014).

16      This Motion is based on this Notice of Motion and Motion, the Memorandum of
17 Points and Authorities included herein, the accompanying Request for Judicial Notice,
18 any other matter of which judicial notice may be taken, the declaration of Katarzyna
19 Ryzewska, all further pleadings that will be filed by Defendant Keck herein, the paper
20 and records on file herein, and on such further evidence and argument as the Court may
21 permit or require at or prior to the time of the hearing on this Motion.

22      This Motion is made following the telephonic conference of counsel pursuant to
23 Local Rule 7-3, which took place on July 25, 2019.

24
25
26
27
28

1

<div align="center">

**RELIEF SOUGHT**

</div>

2    Keck seeks an order dismissing Plaintiff's claims with prejudice.

3

4

Dated: August 2, 2019          GIBSON, DUNN & CRUTCHER LLP

5

6

By:    */s/ James P. Fogelman*

7                             James P. Fogelman

8                  Attorney for Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 206

1

# TABLE OF CONTENTS

2

Page

3    I.      INTRODUCTION ..................................................................................... 1

4    II.     LEGAL STANDARD ............................................................................... 2

5    III.    BACKGROUND AND ALLEGATIONS .................................................. 3

6    IV.     ARGUMENT ............................................................................................ 5

7            A.    Plaintiff's Claims Are Barred by Res Judicata ............................. 5

8            B.    Plaintiff's RICO Claim Is Barred by the Statute of Limitations............... 7

9            C.    Plaintiff's RICO Claim Is Barred by the 2008 Settlement
                   Agreement ..................................................................................... 8

10           D.    Plaintiff's RICO Claim Fails as a Matter of Law ...................................... 8

11
                   1.    The FAC Fails to Plead Conduct Sufficient to Establish
12                       "Operation or Management" of a RICO Enterprise. ........................ 9

13                 2.    The FAC Fails to Plead a RICO Enterprise...................................... 9

14                 3.    The FAC Fails to Plead Racketeering Activity ............................. 10

15                 4.    The FAC Fails to Plead a *Pattern* of Racketeering Activity ......... 12

16                 5.    The Complaint Fails to Plead RICO Standing............................... 14

17           E.    Plaintiff's Retaliation Claim Fails as a Matter of Law ........................... 15

18           F.    Plaintiff's *Bivens* Claim Fails as a Matter of Law .................................. 17

19           G.    Plaintiff's Breach of Contract Claim Is Time Barred ............................. 17

20           H.    Plaintiff's Breach of Contract Claim Fails as a Matter of Law .............. 18

21           I.    Plaintiff's IIED and NIED Claims Are Barred by the Statute of
                   Limitations .................................................................................. 19

22
             J.    Plaintiff's IIED Claim Fails as a Matter of Law.................................... 20
23
             K.    Plaintiff's NIED Claim Fails as a Matter of Law .................................. 21
24
             L.    Plaintiff's Constructive Fraud Fails as a Matter of Law........................ 22
25
             M.    Plaintiff's Declaratory Judgment Claim Fails as a Matter of Law ......... 23
26
      V.     CONCLUSION ...................................................................................... 24
27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 19 - Page 207

Case 2:19-cv-08069-DSF-RAO   Document 64-2   Filed 11/04/19   Page 209 of 264
Case 2:19-cv-02019-DSF-RAO   Document 41   Filed 08/02/19   Page 7 of 369   Page ID #:1698
Page ID #:1884

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
  483 U.S. 143 (1987)..................................................................................7

*Airframe Sys., Inc. v. Raytheon Co.*,
  601 F.3d 9 (1st Cir. 2010)........................................................................7

*Angie M. v. Superior Court*,
  37 C.A. 4th 1217 (1995)..........................................................................20

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)................................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................2

*Austin v. Medicis*,
  21 Cal. App. 5th 577 (2018)....................................................................23

*Bartlett v. Bartlett*,
  2018 WL 1211818 (S.D. Ill. Mar. 8, 2018).............................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................2, 19

*Beltran v. Brentwood N. Healthcare Ctr., LLC*,
  426 F. Supp. 2d 827 (N.D. Ill. 2006)......................................................16

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971)................................................................................17

*Blanchard v. DirecTV, Inc.*,
  123 Cal. App. 4th 903 (2004)..................................................................19

*Boyle v. United States*,
  556 U.S. 938 (2009).................................................................................9

*Bro v. Glaser*,
  22 Cal. App. 4th 1398 (1994)..................................................................22

*Burgess v. Superior Court*,
  2 Cal. 4th 1064 (1992)............................................................................22

*Campanano v. California Med. Ctr.*,
  38 Cal. App. 4th 1322 (1995), *as modified* (Oct. 10, 1995)..................19

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008)...................................................................14

ii

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO DISMISS

Exhibit 19 - Page 208

*Carlson v. Green*,
446 U.S. 14 (1980) ..................................................................................... 17

*Chang v. Lederman*,
172 Cal. App. 4th 67 (2009) ................................................................ 20, 21

*Choudhuri v. Wells Fargo Bank, N.A.*,
2011 WL 5079480 (N.D. Cal. Oct. 25, 2011) .................................... 14, 15

*Christensen v. Superior Court*,
54 Cal. 3d 868 (1991) ............................................................................... 22

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*,
944 F.2d 1525 (9th Cir. 1991) .................................................................. 12

*Coons v. Sec'y of U.S. Dept. of Treasury*,
383 F.3d 879 (9th Cir. 2004) .................................................................... 16

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) .................................................................................... 17

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) .................................................................... 3

*Dealertruck, Inc. v. Huber*,
460 F. Supp. 2d 1177 (C.D. Cal. 2006) .................................................... 23

*Diaz v. Gates*,
420 F.3d 897 (9th Cir. 2005) ............................................................... 14, 15

*Eclectic Props. East v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .................................................................... 11

*Empress LLC v. City and County of San Francisco*,
419 F.3d 1052 (9th Cir. 2005) .................................................................. 12

*First Capital Asset Mgmt., Inc. v. Brickelbush, Inc.*,
150 F. Supp. 2d 624 (S.D.N.Y. 2001) ...................................................... 13

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004) ..................................................................... 13

*Glass v. IDS Fin. Servs., Inc.*,
778 F. Supp. 1029 (D. Minn. 1991) .......................................................... 17

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
492 U.S. 229 (1989) ............................................................................ 13, 14

*Harmar v. United Airlines, Inc.*,
No. 95 C 7665, 1996 WL 199734 (N.D. Ill. Apr. 23, 1996) .............. 16, 17

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992) .................................................................................. 15

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 209

*Hughes v. Pair*,
46 Cal. 4th 1035 (2009) .......................................................................... 21

*Isaacs v. Dartmouth-Hitchcock Med. Ctr.*,
No. 12-CV-040-LM, 2014 WL 1572559 (D.N.H. Apr. 18, 2014), *aff'd*
*Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 14-1544 (1st Cir. 2015)....... 3, 4, 5, 6

*Isaacs v. Trustees of Dartmouth Coll.*,
No. 17-CV-040-LM, 2018 WL 734182 (D.N.H. Feb. 5, 2018),
*motion for relief from judgment denied*, No. 17-CV-040-LM,
2018 WL 2225097 (D.N.H. May 15, 2018) .............................................. 5

*Isaacs v. Trustees of Dartmouth Coll.*,
No. CIV.A. 13-5708, 2014 WL 4186536 (E.D. Pa. Aug. 25, 2014),
*aff'd sub nom. Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70
(3d Cir. 2015)............................................................................................. 4, 8

*Isaacs v. United States Dep't of Educ.*,
No. CV 17-11221-FDS, 2018 WL 1257760 (D. Mass. Mar. 12, 2018)..... 5

*IV Sols., Inc. v. United Healthcare*,
2015 WL 4127823 (C.D. Cal. July 7, 2015) ............................................ 18

*Jolley v. Chase Home Fin., LLC*,
213 Cal. App. 4th 872, 909 (2013). ......................................................... 23

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ................................................................ 8

*Kailikole v. Palomar Cmty. Coll. Dist.*,
2019 WL 1877186 (S.D. Cal. Apr. 26, 2019) ......................................... 16

*Kearney v. Foley & Lardner, LLP*,
590 F.3d 638 (9th Cir. 2009) .................................................................. 12

*Kiseskey v. Carpenters' Trust for So. California*,
144 Cal. App. 3d 222 (1983) ................................................................... 20

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
940 F.2d 397 (9th Cir. 1991) .................................................................. 11

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005) .................................................................. 7

*Madrigal v. Allstate Indem. Co.*,
No. CV 14-4242 SS, 2015 WL 12747906 (C.D. Cal. Sept. 30, 2015)..... 20

*Molien v. Kaiser Found. Hosps.*,
27 Cal. 3d 916, 616 P.2d 813 (1980)....................................................... 22

*Moss v. Bank of New York Tr.*,
No. C 10-01734 JSW, 2011 WL 13243802 (N.D. Cal. Oct. 13, 2011) ... 20

*Moss v. U.S. Secret Serv.*,
572 F.3d 962 (9th Cir. 2009) .................................................................. 2

iv

Gibson, Dunn &
Crutcher LLP

Case 2:19-cv-08365-DSF-RAO Document 64-2 Filed 11/04/19 Page 212 of 264
Case 2:19-cv-02013-DSF-FAO Document 41 Filed 08/02/19 Page 10 of 30 Page ID #:1701
Page ID #:1887

*Mpoyo v. Litton Electro-Optical Sys.*,
   430 F.3d 985 (9th Cir. 2005) ........................................................................ 6

*O'Malley v. N.Y.C. Transit Auth.*,
   896 F.2d 704 (2d Cir. 1990) ...................................................................... 12

*Owens v. Kaiser Found. Health Plan, Inc.*,
   244 F.3d 708 (9th Cir. 2001) ....................................................................... 5

*Papa v. United States*,
   281 F.3d 1004 (9th Cir. 2002) ................................................................... 17

*Perez-Encinas v. AmerUs Life Ins. Co.*,
   468 F. Supp. 2d 1127 (N.D. Cal. 2006) ..................................................... 18

*Pincay v. Andrews*,
   238 F.3d 1106 (9th Cir. 2001) ..................................................................... 7

*Potter v. Firestone Tire & Rubber Co.*,
   6 Cal. 4th 965 (1993) ................................................................................ 22

*Religious Tech. Ctr. v. Wollersheim*,
   971 F.2d 364 (9th Cir. 1992) ..................................................................... 13

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) .................................................................................... 9

*Reynolds v. Shure*,
   148 F. Supp. 3d 928 (E.D. Cal. 2015) ....................................................... 20

*Rich v. Shrader*,
   2010 WL 3717373 (S.D. Cal. 2010) .......................................................... 15

*Richman v. Hartley*,
   224 Cal. App. 4th 1182 (2014) ................................................................. 18

*Rupert v. Bond*,
   68 F. Supp. 3d 1142 (N.D. Cal. 2014) ...................................................... 12

*Sanford v. MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) ..................................................................... 11

*Schwarz v. Regents of Univ. of California*,
   226 Cal. App. 3d 149 (1990) ..................................................................... 22

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) ............................................................................. 8, 10

*Sepehry-Fard v. Nationstar Mortg. LLC*,
   No. 14-CV-03218-LHK, 2015 WL 332202 (N.D. Cal. Jan. 26, 2015) ....... 7

*Sever v. Alaska Pulp Corp.*,
   978 F.2d 1529 (9th Cir. 1992) ................................................................... 14

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 211

Gibson, Dunn &
Crutcher LLP

Case 2:19-cv-08000-DSF-RAO    Document 64-2    Filed 11/04/19    Page 213 of 264
Case 2:19-cv-02013-DSF-RAO    Document 41    Filed 08/02/19    Page 21 of 30    Page ID #:1702
Page ID #:1888

*Simo v. Union of Needletrades*,
   322 F.3d 602 (9th Cir. 2003) ....................................................................................... 20

*So v. Shin*,
   212 Cal. App. 4th 652 (2013) ................................................................................... 20

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ...................................................................................... 12

*Steffes v. Stepan Co.*,
   144 F.3d 1070 (7th Cir. 1998) .................................................................................... 16

*Stewart v. U.S. Bancorp*,
   297 F.3d 953 (9th Cir. 2002) .................................................................................... 5, 6

*Tatung Co. v. Shu Tze Hsu*,
   43 F. Supp. 3d 1036 (C.D. Cal. 2014) ...................................................................... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................................... 3

*United Bhd. of Carpenters & Joiners v. Building & Constr. Trades Dep't*,
   770 F.3d 834 (9th Cir. 2014) ........................................................................................ 8

*United Safeguard Distributors Ass'n, Inc. v. Safeguard Bus. Sys., Inc.*,
   145 F. Supp. 3d 932 (C.D. Cal. 2015) ...................................................................... 24

*United States v. Erickson*,
   561 F.3d 1150 (10th Cir. 2009) .................................................................................. 12

*United States v. Metcalf*,
   435 F.2d 754 (9th Cir. 1970) ...................................................................................... 12

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006) ....................................................................................... 12

*United States v. Turkette*,
   452 U.S. 576 (1981) ...................................................................................................... 9

*United States v. Weber*,
   320 F.3d 1047 (9th Cir. 2003) .................................................................................... 12

*Wassmann v. S. Orange Cty. Cmty. Coll. Dist.*,
   24 Cal. App. 5th 825 (2018) ...................................................................................... 19

*Wong v. Jing*,
   189 Cal. App. 4th 1354 (2010) ............................................................................. 21, 22

*Wu v. Thomas*,
   996 F.2d 271 (11th Cir. 1993) .................................................................................... 16

*Wyatt v. Union Mortg. Co.*,
   24 Cal. 3d 773 (Cal. 1979) ......................................................................................... 22

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 212

Case 2:19-cv-08000-DSF-RAO    Document 64-2   Filed 08/02/19   Page 214 of 264
Case 2:19-cv-02013-DSF-RAO    Document 41   Filed 08/02/19   Page 12 of 30   Page ID #:1703
Page ID #:1889

*Yourish v. Cal. Amplifier*,
   191 F.3d 983 (9th Cir. 1999) ...................................................................................11

**Statutes**

18 U.S.C. § 1503 ...........................................................................................................12

18 U.S.C. § 1513(e) .......................................................................................................11

18 U.S.C. § 1961(5) .......................................................................................................10

18 U.S.C. § 1964(c) .......................................................................................................14

29 U.S.C. § 701 .............................................................................................................16

42 U.S.C. § 12101 .........................................................................................................16

Cal. Civ. Code § 47(b) ..................................................................................................19

Cal. Civ. Proc. Code § 335.1 ........................................................................................19

Cal. Civ. Proc. Code § 337(1) .......................................................................................17

Cal. Civ. Proc. Code § 338(d) .................................................................................22, 23

**Rules**

Fed. R. Civ. P. 9(b) ......................................................................................................... 1

**Other Authorities**

*In re Jeffrey D. Isaacs M.D.*, New Hampshire Board of Medicine,
   Final Decision and Order (Mar. 11, 2014) ...........................................4, 15, 21

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 213

# I.   INTRODUCTION

This lawsuit is the fifth in a series of lawsuits that Plaintiff has filed over his failed medical career. Unwilling to take responsibility for his own actions and omissions, Plaintiff has sued Defendant New Hampshire Board of Medicine ("Board of Medicine"), Defendant Dartmouth Hitchcock Medical Center ("DHMC"), the Trustees of Dartmouth College ("Trustees"), the Department of Education ("DOE"), and numerous other individuals and institutions for allegedly causing the termination of his medical residency in 2012 and the revocation of his medical license in 2014. Now, despite losing every one of these lawsuits, Plaintiff has filed yet another lawsuit, this time seeking to embroil Defendant USC Keck School of Medicine ("Keck") in his seemingly endless campaign to harass Defendants and waste judicial time and resources. Unable to defend his original complaint, which asserted two meritless and time-barred claims, Plaintiff filed the First Amended Complaint ("FAC") in an attempt to moot Keck's motion to dismiss.  The FAC, however, does not cure any of the myriad defects identified in Keck's motion to dismiss, but simply adds eight more meritless and time-barred claims. In addition, the FAC includes gratuitous attacks on Keck's counsel of record and in-house counsel for conduct that is clearly protected by the First Amendment and California's litigation privilege. Plaintiff's frivolous claims should be dismissed with prejudice and no further amendments should be allowed.

It defies common sense to suggest, as Plaintiff does, that Keck would engage in a decade-long enterprise to destroy Plaintiff's medical career and reputation, let alone that it would do so in conjunction with a medical school, a hospital, and a medical board in a different state. Indeed, Plaintiff does not even allege any conduct by Keck after 2008 other than the filing of the motion to dismiss and the refusal to engage in settlement discussions, both of which are protected activity.

The simple reality is that Keck has had nothing to do with Plaintiff since 2006, when he was expelled for harassing a student and violating a "stay-away" order. Indeed, in 2007 and 2008, Plaintiff entered into binding settlement agreements with Keck (the

Gibson, Dunn &
Crutcher LLP

1

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORADUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 214

Case 2:19-cv-02013-DSF-RAO    Document 64-2    Filed 11/04/19    Page 216 of 264
Case 2:19-cv-02013-DSF-RAO    Document 41    Filed 08/02/19    Page 14 of 30    Page ID #:1705
Page ID #:1891

"2007 Settlement Agreement" and the "2008 Settlement Agreement," respectively), in which he "waive[d] and release[d] all rights and claims" against Keck and agreed not to file any lawsuits against Keck "based on, referring to, or incorporating any events, acts or omissions through and including the date hereof."  Compl. at 40 (2007 Settlement Agreement ¶ 7).[1]

Yet, by basing his claims on alleged predicate acts that "were the subject of a federal lawsuit in 2007," Plaintiff has breached those agreements. FAC ¶ 243. Besides being barred by the terms of the 2007 and 2008 Settlement Agreements, Plaintiff's claims are implausible on their face, hopelessly time barred and fail for a host of other reasons, as detailed below.  For all the reasons set forth herein, Plaintiff's claims against Keck should be dismissed with prejudice.

## II.    LEGAL STANDARD

A complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this standard, a complaint must plead *facts*, not mere legal conclusions.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, a complaint must plead facts that give rise to a *plausible* claim for relief. *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. *See also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). In determining whether a complaint satisfies Rule 12(b)(6), "a court may look

---

[1]  The FAC incorporates by reference both the 2007 and 2008 Settlement Agreements. FAC ¶ 31 ("Exhaustive settlement discussions took place over nearly two years. *See Amended Complaint Exhibits* (Pages 1-63) & *Affidavit of Dr Jeffrey Isaacs*, both of which are hereby incorporated entirely herein as facts in this complaint.").

beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (internal quotations omitted). In particular, a court "may take into account documents whose contents are alleged in a complaint." *Id.* (internal citations omitted). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### III.   BACKGROUND AND ALLEGATIONS

In 2005, Plaintiff enrolled at Keck. Compl. ¶ 20.   He was later expelled for harassing a classmate and violating a "stay-away" order.  *Id.* at ¶ 28. *See also Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-CV-040-LM, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014) (granting summary judgment against Plaintiff and deeming certain facts admitted by Plaintiff), *aff'd Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 14-1544, (1st Cir. 2015). (Declaration of Katarzyna Ryzewska, Ex. 1). In response, Plaintiff sued Keck. FAC ¶ 30. The lawsuit resulted in two settlements. *Id.* at ¶ 32. The first settlement, which was entered into in 2007, sealed Plaintiff's disciplinary records.  *Id.* at ¶¶ 33-39. Through the second settlement, which was entered into in 2008, Plaintiff "waiv[ed] and release[d] all rights and claims . . . against the . . . Keck School of Medicine." *Id.* at ¶ 33. Pursuant to the settlements, Plaintiff released and waived all claims against Keck and agreed not to assert any claims against Keck "based on, referring to, or incorporating any events, acts or omissions through and including the date hereof." Compl. at 35 (2007 Settlement Agreement ¶ 4), 40 (2008 Settlement Agreement ¶ 6).

In 2010, Plaintiff received his medical degree from a different program.  *Id.* at ¶ 14.  After graduating, Plaintiff began a surgical residency at the University of Arizona, from which he resigned after six weeks.  *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *2. In September of 2010, Plaintiff submitted an application to DHMC, where he omitted both his attendance at Keck and the aborted residency at the University of Arizona.  *Id.*  In 2011, Plaintiff began a residency at DHMC.  Compl. at ¶ 54.

In January 2012, a supervisor at DHMC discovered that the Plaintiff had

3

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 216

previously been a resident at the University of Arizona. *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *4. On March 19, 2012, DHMC issued a letter to the Plaintiff stating that he was being terminated for academic deficiency issues, and for failing to disclose his attendance at Keck and his Arizona residency. *Id.* at *5. On March 11, 2014, the Board of Medicine revoked Plaintiff's medical license and found that his termination from DHMC was appropriate because he concealed material information in his application. *See In re Jeffrey D. Isaacs M.D.*, New Hampshire Board of Medicine, Final Decision and Order, at 8-9 (Mar. 11, 2014) (incorporated by reference in Plaintiff's FAC at ¶¶ 5, 113, 114, 117, 134, 135, 138) (Ryzewska Decl., Ex. 2). The Board of Medicine further reprimanded Plaintiff for failing to provide any "credible evidence" in support of his position and for "knowingly" making a false statement. *Id.*

Since his termination from DHMC, Plaintiff has pursued claims against multiple defendants in multiple jurisdictions. On February 3, 2012, shortly before his termination from DHMC, Plaintiff filed a case against DHMC, the Mary Hitchcock Memorial Hospital, and the Trustees for claims arising out of his residency and pending termination. *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *1 (granting summary judgment in favor of defendants). Next, on September 30, 2013, Plaintiff sued the Trustees, the Arizona Board of Regents, the Board of Medicine, the Mary Hitchcock Memorial Hospital, the University of Arizona Health Sciences Center, and various other individuals for claims arising out of his termination by DHMC and the revocation of his medical license by the Board of Medicine. *Isaacs v. Trustees of Dartmouth Coll.*, No. CIV.A. 13-5708, 2014 WL 4186536, at *1 (E.D. Pa. Aug. 25, 2014) (Ryzewska Decl., Ex. 3), *aff'd sub nom. Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70 (3d Cir. 2015) (affirming dismissal of complaint based on lack of personal jurisdiction and immunity) (Ryzewska Decl., Ex. 4). Again, on February 3, 2017, Plaintiff sued the Board of Medicine, the Trustees, and DHMC for claims arising out of his dismissal from the DHMC residency and the revocation of his medical license.

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 217

Case 2:19-cv-08000-DSF-RAO    Document 64    Filed 11/04/19    Page 219 of 264
Case 2:19-cv-02013-DSF-RAO    Document 41    Filed 08/02/19    Page 17 of 30    Page ID #:1708
Page ID #:1894

1 | *Isaacs v. Trustees of Dartmouth Coll.*, No. 17-CV-040-LM, 2018 WL 734182, at *1
2 | (D.N.H. Feb. 5, 2018) (Ryzewska Decl., Ex. 5), *motion for relief from judgment*
3 | *denied*, No. 17-CV-040-LM, 2018 WL 2225097 (D.N.H. May 15, 2018) (dismissing
4 | certain claims with prejudice and denying Plaintiff's request to amend his complaint to
5 | add additional claims). Plaintiff next sued the DOE on June 30, 2017, when the Office
6 | of Civil Rights declined to investigate the circumstances surrounding his termination
7 | from DHMC. *Isaacs v. United States Dep't of Educ.*, No. CV 17-11221-FDS, 2018 WL
8 | 1257760, at *1 (D. Mass. Mar. 12, 2018) (dismissing complaint based on sovereign
9 | immunity) (petition for writ of certiorari pending) (Ryzewska Decl., Ex. 6). Except as
10 | otherwise noted, all of the claims brought by Plaintiff have been dismissed on the
11 | pleadings or decided in favor of the named defendants through summary judgment.

## IV.   ARGUMENT

### A.   Plaintiff's Claims Are Barred by Res Judicata

Res judicata bars all of Plaintiff's claims because they arise from exactly the same facts alleged in his 2012 lawsuit against the Trustees, which was resolved against him. *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *1-2. "Res judicata, or claim preclusion, prohibits lawsuits on any claims that were raised or could have been raised in a prior action." *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002) (quotations omitted). "Res judicata applies when there is: (1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between parties." *Id.* Here, all three elements are present.

*First*, there is an identity of claims. "The central criterion in determining whether there is an identity of claims between the first and second adjudications is whether the two suits arise out of the same transactional nucleus of facts." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001) (quotations omitted). Whether the "common nucleus criterion" is met depends on "whether [the events] are related to the same set of facts and whether they could conveniently be tried together." *Stewart*, 297

28

5

Case 2:19-cv-02013-DSF-RAO    Document 64-2    Filed 11/04/19    Page 220 of 264
Case 2:19-cv-02013-DSF-RAO    Document 41    Filed 08/02/19    Page 18 of 30    Page ID #:1709
Page ID #:1895

1    F.3d at 987 (quotations omitted).

2    In his 2012 lawsuit, Plaintiff alleged (as he does here) that the Trustees improperly

3    terminated his residency after learning that Plaintiff had attended Keck. Isaacs 2012 Mtn.

4    for Preliminary Inj., No. 1:12-cv-00040-JL, ECF 34, at 3, June 4, 2012 (Ryzewska Decl.,

5    Ex. 7); *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *1-2; FAC

6    ¶¶ 66, 72, 74, 80-105. *See generally* Isaacs 2012 Compl., No. 1:12-cv-00040-JL, ECF 1,

7    February 3, 2012 (Ryzewska Decl., Ex. 8). In his 2012 request for preliminary

8    injunction, Plaintiff attempted to justify the omission of Keck in his application by

9    stating that "Plaintiff entered into a federal court ordered mutual release of claims and

10   confidentiality agreement with [Keck] . . . . Dartmouth has terminated Plaintiff for

11   merely complying with a settlement agreement." Isaacs 2012 Mtn. for Preliminary Inj.,

12   at 3; Isaacs 2012 Amend. Compl., No. 1:12-cv-00040-JL, ECF 13, February 3, 2012,

13   ¶ 22 (Ryzewska Decl., Ex. 9). *See also Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014

14   WL 1572559, at *2 ("In September of 2010, Dr. Isaacs submitted an ERAS application

15   to Dartmouth–Hitchcock. In that application, he omitted both his attendance at USC and

16   his aborted residency at UA."). Plaintiff's current allegations against Keck and the

17   Trustees arise out of exactly the same set of facts and include the same allegations

18   regarding the settlement agreements.

19   **Second**, there was a final judgment on the merits. "The second res judicata

20   element is satisfied by a summary judgment dismissal which is considered a decision on

21   the merits for res judicata purposes." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d

22   985, 988 (9th Cir. 2005). Here, Plaintiff's 2012 lawsuit was resolved at summary

23   judgment. *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, 2014 WL 1572559, at *1.

24   **Third**, the parties are identical or in privity with parties to the 2012 lawsuit.

25   Plaintiff was a party to the 2012 lawsuit and is a party here. The Trustees were named

26   in the 2012 lawsuit and are named here by way of their trade name, Geisel School of

27   Medicine at Dartmouth. FAC ¶ 17. And while Keck was not named in the 2012, it is

28

Gibson, Dunn &
Crutcher LLP

1    alleged to be a co-conspirator here and, thus, is in privity with the Trustees. *Id.* ¶ 220.[2]

2    **B.    Plaintiff's RICO Claim Is Barred by the Statute of Limitations**

3            Plaintiff was required to bring his RICO claim within four years of when he knew

4    or should have known of his alleged injuries. *See, e.g.*, *Agency Holding Corp. v. Malley-*

5    *Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *Living Designs, Inc. v. E.I. Dupont de*

6    *Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005); *Pincay v. Andrews*, 238 F.3d 1106,

7    1109 (9th Cir. 2001). Here, by his own admission, Plaintiff knew of his alleged injuries

8    more than four years ago.[3] In his original Complaint, Plaintiff expressly alleged that he

9    "became aware of the illegal situation ***in early January 2012***," and "has diligently

10   sought to uncover the predicate acts via federal discovery that began in ***January 2012***."

11   Compl. ¶¶ 74, 162 (emphases added). In an obvious attempt to plead around the statute

12   of limitations, Plaintiff deleted these allegations from the FAC.  *See* FAC ¶¶ 79, 155.

13   However, Plaintiff still alleges that "Dartmouth terminated Isaacs in ***March 2012***," and

14   that the Board of Medicine "first published the above false [revocation] orders on the

15   internet" in "***mid-2014***." *Id.* at ¶¶ 102, 147 (emphases added).[4] Indeed, Plaintiff

16

17   _____

18   2    Alleged co-conspirators may be considered in privity with one another for the
     purposes of res judicata. *See, e.g.*, *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9,
19   17 (1st Cir. 2010) ("[W]here some alleged conspirators are sued in the first
     (unsuccessful) action and the remainder in a second suit based on the same
20   allegations . . . courts have held the later defendants could raise claim preclusion as
     a defense." (quotations omitted)); *Sepehry-Fard v. Nationstar Mortg. LLC*, No. 14-
21   CV-03218-LHK, 2015 WL 332202, at *14 (N.D. Cal. Jan. 26, 2015) ("[T]he fact that
     defendants were not named in a prior lawsuit does not bar the application of *res*
22   *judicata* if privity exists between the newly-named defendants and a defendant in a
     prior action."); *Bartlett v. Bartlett*, 2018 WL 1211818, at *5 (S.D. Ill. Mar. 8, 2018)
23   ("If a party brings a lawsuit against a few co-conspirators and loses, there is no reason
     why he should be able to re-litigate that dispute against the winners simply by tossing
     another party into the ring.").
24
25   3    The injuries of which Plaintiff complains are his inability to practice medicine as
     result of the revocation of his medical license and the reputational harm allegedly
26   caused by the publication of the revocation orders.  *See* FAC ¶¶ 6, 67, 146-47, 149,
     174, 217, 224, 252, 254, 270.
27
     4    Plaintiff also alleges that (1) at "least six Dartmouth administrators . . . falsely stated
28   they learned of Keck . . . no earlier than ***January 2012***," (2) Plaintiff "learned about"
     the Dartmouth administrators' "perjured testimony" "in ***January 2012***," and

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 220

specifically alleges that as a direct result "of false declarations of 'stalking crimes,' the years following 2014 publication, Isaacs became further ostracized from former colleagues, friends, neighbors, and even had AirBNB reservations cancelled." *Id.* at ¶¶ 147-148. Thus, by Plaintiffs' admission, he knew of his alleged injuries by no later than March 2014, when his license was revoked and the Board of Medicine published the revocation order. Because he waited until March 2019 to file suit, his RICO claim is time-barred.[5]

## C.  Plaintiff's RICO Claim Is Barred by the 2008 Settlement Agreement

Plaintiff's RICO claim is barred by the 2008 Settlement Agreement. In March 2008, Plaintiff entered into a binding settlement agreement with Keck in which he "waive[d] and release[d] all rights and claims, known and unknown, which [Plaintiff] may have against" Keck and its officers, agents, administrators, employees, faculty, and students, *inter alia*, "from the beginning of time to" the date of the agreement.  *See* Compl. at 40 (2008 Settlement Agreement ¶ 7). Accordingly, Plaintiff cannot assert any claims based on pre-2008 conduct. Plaintiff's RICO claim, however, is based purely on pre-2008 conduct. The Complaint expressly alleges that "Keck engaged in multiple predicate acts, ***which were the subject of a federal lawsuit in 2007***." FAC ¶ 243 (emphasis added). This allegation is fatal to Plaintiff's RICO claim.

## D.  Plaintiff's RICO Claim Fails as a Matter of Law

The elements of a civil RICO claim are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to the plaintiff's business or property. *See, e.g.*, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017); *United Bhd. of Carpenters & Joiners v. Building & Constr. Trades Dep't*, 770 F.3d 834, 837 (9th Cir. 2014).

---

(3) Plaintiff "became aware of claims against Dartmouth ***early January 2012*** for IIED and fraud." FAC ¶¶ 66, 67 79.

[5]  Indeed, Plaintiff has been suing over these same alleged injuries since 2013. *Isaacs v. Trustees of Dartmouth Coll.*, 2014 WL 4186536, at *15 (E.D. Pa. Aug. 25, 2014).

Gibson, Dunn & Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 221

Case 2:19-cv-02888-DSF-RAO     Document 64-2     Filed 11/04/19     Page 223 of 264
Case 2:19-cv-02888-DSF-RAO     Document 41     Filed 08/02/19     Page 21 of 30     Page ID #:1712
Page ID #:1898

Plaintiff fails to allege *any* of these elements.

**1.    The FAC Fails to Plead Conduct Sufficient to Establish "Operation or Management" of a RICO Enterprise.**

To satisfy the conduct element, Plaintiff must plead that Keck played "*some* part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original). To do so, Plaintiff must allege that Keck "participated in the operation or management of the enterprise itself." *Id.* at 183. The FAC is devoid of any allegations that Keck operated or managed the alleged enterprise.

**2.    The FAC Fails to Plead a RICO Enterprise**

Plaintiff fails to plead a cognizable enterprise. An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," and is "proved by evidence of ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). To be actionable, an associated-in-fact enterprise must have "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Critically, the enterprise must have an existence separate and distinct from "the connected 'pattern of racketeering activity.'" *Turkette*, 452 U.S. at 583. Plaintiff's allegations fail to satisfy *any* of these requirements.

First, Plaintiff alleges that Defendants formed an enterprise because they participated in "federally and state funded medical training activities," have a "reputational and commercial stake in the national health care provider network," they "had some stake in . . . Plaintiff's . . . medical career," and have "authoritative control and or [sic] publishing rights in nationwide medical training database." FAC ¶ 220. But to the extent these allegations are even intelligible, they are true of virtually every medical school, hospital, or medical training facility in the United States and do not suggest Defendants functioned as a "continuing unit."

9

Gibson, Dunn &
Crutcher LLP

Case 2:19-cv-08000-DSF-RAO Document 64-2 Filed 11/04/19 Page 224 of 264
Case 2:19-cv-02013-DSF-RAO Document 41 Filed 08/02/19 Page 22 of 30 Page ID #:1713
Page ID #:1899

Second, Plaintiff alleges that Defendants formed an enterprise because they have "some nexus as Dartmouth, Keck or Harvard Medical School faculty, alumni, and/or professional." *Id.* But thousands of individuals and institutions have "some nexus" to Harvard Medical School faculty or alumni. They do not comprise a RICO enterprise.

Third, Plaintiff alleges that Defendants formed a "de facto enterprise with the sole purpose of carrying out a vendetta and negatively impacting Dr. Isaac's medical-professional career." *Id.* But this allegation fails to plead a cognizable enterprise because it is not distinct from the alleged pattern of racketeering activity.

Finally, Plaintiff's enterprise allegations are simply not plausible. It defies common sense to suggest, as Plaintiff does, that Keck would engage in a decade-long enterprise to destroy Plaintiff's medical career and reputation, let alone that it would do so in conjunction with a medical school, a hospital, and a medical board in a different state. Plaintiff alleges no connection between Keck and the other defendants. He alleges no coordination between them. And he alleges no communications between them. Indeed, Plaintiff does not even allege any conduct by Keck after 2008 other than the filing of the motion to dismiss and the refusal to engage in settlement discussions, both of which are protected activity and neither of which has anything to do with the other defendants.

Plaintiff's enterprise allegations fail.

### 3. The FAC Fails to Plead Racketeering Activity

RICO requires at least two acts of racketeering activity within the last 10 years. 18 U.S.C. § 1961(5). But "while two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 496 n.14. The FAC does not properly plead a single predicate act.

### a. Wire and Mail Fraud

Plaintiff's mail and wire fraud allegations fail as a matter of law. To plead wire and mail fraud, Plaintiff must allege (1) the formation of a scheme to defraud, (2) the use of the mail or the wires in furtherance of the scheme, and (3) the specific intent to

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 223

1  defraud. *See Eclectic Props. East v. Marcus & Millichap Co.*, 751 F. 3d 990, 997 (9th
2  Cir. 2014). Further, these elements must be pled with particularity. *See* Fed. R. Civ. P.
3  9(b); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir.
4  1991). To plead fraud with particularity, Plaintiff must "state the time, place, and
5  specific content of the false representations as well as the identities of the parties to the
6  misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010)
7  (internal quotations omitted). In addition, Plaintiff "must set forth . . . an explanation as
8  to why the disputed statement was untrue or misleading when made." *Yourish v. Cal.*
9  *Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (internal quotations omitted).

10      The FAC's wire and mail fraud allegations are completely conclusory. Plaintiff
11  alleges only that Keck "continue[s] to issue false transcript reports via wire and mail."
12  FAC ¶ 246. But Plaintiff fails to state the time, place, and specific content of the
13  allegedly false transcripts. Nor does Plaintiff explain why the transcripts are false or how
14  the mere issuance of a transcript can constitute a scheme to defraud.

15          **b.      Retaliating Against a Witness and Witness Tampering**

16      Plaintiff's retaliation allegations fail as a matter of law. *See* FAC ¶¶ 227(a). To
17  plead a violation of 18 U.S.C. § 1513(e), Plaintiff must allege that Keck (1) knowingly
18  took an action (2) harmful to Plaintiff (3) with the intent to retaliate against Plaintiff
19  (4) for providing to a law enforcement officer any truthful information relating to the
20  commission or the possible commission of any federal offense. *See* 18 U.S.C. § 1513(e).
21  Plaintiff pleads none of these things. There is no allegation that Keck has taken any
22  actions against Plaintiff since the parties entered into the 2007 and 2008 Settlement
23  Agreements. There are no facts to suggest that Keck intended to retaliate against
24  Plaintiff. And there is no allegation anywhere in the FAC that Plaintiff provided
25  information to any law enforcement officer at any time regarding any federal offense—
26  let alone that Keck knew about any such communication. Plaintiff also does not allege
27  that Keck participated in any witness tampering. FAC ¶¶ 231-33.

28

Gibson, Dunn & Crutcher LLP

11

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 224

Case 2:19-cv-08000-DSF-RAO    Document 64-2   Filed 11/04/19   Page 226 of 264
Page ID #:1901
Case 2:19-cv-02013-DSF-RAO   Document 41   Filed 08/02/19   Page 24 of 30   Page ID #:1715

1    Additionally, to the extent Plaintiff is basing his retaliation claim on Keck's

2    refusal to accede to his settlement demands and/or Keck's filing of the motion to dismiss,

3    his claim is barred by the *Noerr-Pennington* doctrine.[6] *See Sosa v. DirecTV, Inc.*, 437

4    F.3d 923, 933-39 (9th Cir. 2006) (*Noerr-Pennington* applies to pre-litigation demand

5    letters); *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*, 944 F.2d 1525,

6    1528 (9th Cir. 1991) (*Noerr-Pennington* applies to a decision to accept or reject a

7    settlement offer); *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1159 (N.D. Cal. 2014) (*Noerr-*

8    *Pennington* applies to the filing of a motion to dismiss).

9                    c.        **Obstruction of Justice**

10    Plaintiff's suggestion that Keck somehow obstructed justice by allegedly failing

11   to release administrative charges against him, or by allegedly breaching the 2007 and/or

12   2008 Settlement Agreements, fails as a matter of law. FAC ¶ 226-27. Obstruction of

13   justice requires a *pending federal* judicial proceeding, which is not alleged here. *See,*

14   *e.g.*, 18 U.S.C. § 1503; *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 708 (2d Cir.

15   1990); *United States v. Metcalf*, 435 F.2d 754, 756 (9th Cir. 1970). Plaintiff's reliance

16   on the omnibus clause of § 1503 is unavailing. *See, e.g.*, *United States v. Quattrone*, 441

17   F.3d 153, 170 (2d Cir. 2006) ("In order to convict for obstruction of justice under the

18   omnibus clause of Section 1503, the government must establish (1) that there is

19   a *pending* judicial or grand jury proceeding constituting the administration of

20   justice"); *accord United States v. Erickson*, 561 F.3d 1150, 1159 (10th Cir.

21   2009); *United States v. Weber*, 320 F.3d 1047, 1050 (9th Cir. 2003).

22                    4.        **The FAC Fails to Plead a *Pattern* of Racketeering Activity**

23

24   ───────────────

25   [6] "The *Noerr–Pennington* doctrine derives from the Petition Clause of the First
     Amendment and provides that 'those who petition any department of the government
26   for redress are generally immune from statutory liability for their petitioning
     conduct.' " *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643-44 (9th Cir. 2009)
27   (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006)); *see also*
     *Empress LLC v. City and County of San Francisco*, 419 F.3d 1052, 1056 (9th Cir.
28   2005) ("Under the *Noerr-Pennington* doctrine, those who petition all departments of
     the government for redress are generally immune from liability.").

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 225

To plead a pattern of racketeering activity, Plaintiff must allege that the predicate acts "are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original). "It is this factor of *continuity plus relationship* which combines to produce a pattern." *Id.* (internal quotations omitted) (emphasis in original).

Relatedness requires that the predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission." *Id.* at 240 (internal quotations omission). Here, Plaintiff fails to explain how his expulsion from *Keck* in 2006 is related to the termination of his residency in 2012 or the revocation of his license in 2014. The only apparent relationship is *Plaintiff's* failure to disclose his attendance at Keck, with which Keck had nothing to do.

Continuity requires *either* a series of related acts extending over a substantial period of time (close-ended continuity) *or* past conduct that by its nature projects into the future with a threat of repetition (open-ended continuity). *Id.* at 241-42. To plead close-ended continuity, Plaintiff must allege "a series of related predicates extending over a substantial period of time." *Id.* To plead open-ended continuity, Plaintiff must allege facts showing "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.

Plaintiff cannot plead open-ended continuity because the alleged enterprise had an inherent end-point–the revocation of Plaintiff's medical license. *See, e.g., First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180-81 (2d Cir. 2004) (bankruptcy fraud is "'inherently terminable'"); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992) ("Since the only goal of the Greene defendants was the successful prosecution of the Wollersheim state tort suit, there was no threat of activity continuing beyond the conclusion of that suit."); *First Capital Asset Mgmt., Inc. v. Brickelbush, Inc.*, 150 F. Supp. 2d 624, 634 (S.D.N.Y. 2001) ("[T]he scheme here is 'inherently terminable' in that it necessarily ended with the bankruptcy to which it

Gibson, Dunn &
Crutcher LLP

related."). *See also* FAC ¶¶ 6 (alleging Defendants "intended to deprive Plaintiff of his medical career"), 238 ("The Board . . . revoked [Plaintiffs] medical license").

Nor does Plaintiff plead close-ended continuity. Congress' concern "in RICO [was] with long-term criminal conduct." *H.J. Inc.*, 492 U.S. at 242. Here, "[a]lthough [Plaintiff] alleges a number of 'acts,' [Defendants'] collective conduct is . . . a single episode having the singular purpose of" harming a "single victim." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992). *See also* FAC ¶¶ 217 ("The case describes a small group of individuals . . . [who] . . . coordinated predicate acts over more than a decade to successfully ruin the Plaintiff's medical career and reputation."); 252 (alleging an "enterprise whose primary focus was to assassinate Dr. Isaac's career").[7]

### 5.    The Complaint Fails to Plead RICO Standing

An individual only has standing to bring a civil RICO claim if he can show: (1) that he suffered an injury to a business or property interest; and (2) that the alleged RICO violation caused his claimed injury. *See Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008); 18 U.S.C. § 1964(c).

In the Ninth Circuit, to show an injury to business or property, a plaintiff must allege a "concrete financial loss." *Canyon Cnty.*, 519 F.3d at 975. "Financial loss alone, however, is insufficient." *Id.* "Without a harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law—there is no injury to business or property within the meaning of RICO." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005).

Here, Plaintiff does not allege any financial loss caused by the purported predicate acts perpetrated by Keck—only "[r]eputational and career harm." FAC ¶ 151. But reputational harm does not suffice. *See, e.g., Choudhuri v. Wells Fargo Bank, N.A.*, 2011

---

[7]  To the extent that Plaintiff is alleging that Keck's actions in this lawsuit constitute an "open-ended threat," his allegation fails as a matter of law. FAC ¶ 248. First, Keck's litigation conduct is under the *Noerr Pennington* doctrine. *See*, *supra*, Section IV(D)(3)(b). Second, Keck's litigation conduct is not an alleged predicate act.

Gibson, Dunn &
Crutcher LLP

WL 5079480, at *10 (N.D. Cal. Oct. 25, 2011) ("[I]njury to reputation is a personal injury, and therefore, is beyond the purview of RICO."); *Rich v. Shrader*, 2010 WL 3717373, at *16 (S.D. Cal. 2010) ("Nor does RICO compensate for intangible harm to one's business reputation or the potential for future income."); *Diaz*, 420 F.3d at 910 ("Had Congress intended to create a federal treble damages remedy for cases involving bodily injury, injury to reputation, mental or emotional anguish, or the like, *all of which will cause some financial loss*, it could have enacted a statute referring to injury generally, without any restrictive language.") (internal citation omitted).[8]

Nor does Plaintiff plead any facts establishing a direct relationship between the alleged harm and Keck's alleged predicate acts. To plead causation, Plaintiff must allege "some *direct* relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (emphasis added). Accordingly, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added). Here, it was not Keck's transmission of Plaintiff's transcript that prompted the revocation of his license; rather, it was *Plaintiff's* failure to disclose his attendance that caused the termination of his residency and the revocation of his license. *In re Jeffrey D. Isaacs M.D.*, Final Decision and Order, at 8-9. Keck did not "cause" Plaintiff's intentional omissions.

### E.    Plaintiff's Retaliation Claim Fails as a Matter of Law

---

[8]   Plaintiff's new allegation that he "suffered" a "financial loss" because of "the tuition he paid to Keck" fails as a matter of law. FAC ¶ 253. First, the settlement agreements bar Plaintiff from asserting claims based on pre-2008 "damages" or "expenses." Compl. at 40 (2008 Settlement Agreement ¶ 7). Second, Plaintiff alleges no facts to suggest that he paid Keck's tuition "[a]s the result of" the alleged predicate acts. FAC ¶ 253. *See also* FAC ¶ 246 (alleging that the issuance of supposedly "false transcript reports" constituted wire and mail fraud). Finally, when Plaintiff paid the fees, he received something of value—medical training. Nothing prevented Plaintiff from seeking to transfer his Keck credits to his next medical school. The fact that Plaintiff decided to conceal his attendance at Keck does not transform the tuition he freely and voluntarily paid into "damages" supporting a federal RICO cause of action.

Gibson, Dunn &
Crutcher LLP

Case 2:19-cv-08000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 230 of 264
Case 2:19-cv-02013-DSF-PSO   Document 41   Filed 08/02/19   Page 28 of 30   Page ID #:1719
Page ID #:1905

1    Plaintiff's retaliation claim is nothing more than an improper attempt to tortify his
2    contract claim.  Incredibly, Plaintiff alleges that Keck's "refus[al]" to acquiesce in his
3    demands, including his demand that Keck accept his interpretation of the Settlement
4    Agreements, constitutes "unlawful retaliation." FAC ¶ 260-64. Indeed, Plaintiff even
5    cites Keck's prior motion to dismiss as evidence of Keck's supposed "retaliation." *Id.*
6    ¶ 262. These allegations do not remotely suffice to plead retaliation under 29 U.S.C.
7    § 701 and 42 U.S.C. § 12101.

8    To plead retaliation under the Rehabilitation Act, Plaintiff must allege that: (1) he
9    engaged in statutorily protected activity; (2) the defendant was aware of this activity;
10   (3) the defendant took adverse action against the plaintiff; and (4) a causal connection
11   exists between the protected activity and the adverse action. 29 U.S.C. § 701.  *See also*
12   *Coons v. Sec'y of U.S. Dept. of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004).

13   Similarly, to state a retaliation claim under the ADA, a plaintiff must plead that:
14   (1) he or she engaged in a protected activity; (2) the employer subjected him or her to
15   an adverse employment action; and (3) a causal connection existed between the
16   employee's protected activity and the employer's adverse action. 42 U.S.C. § 12101;
17   *Kailikole v. Palomar Cmty. Coll. Dist.*, 2019 WL 1877186, at *2 (S.D. Cal. Apr. 26,
18   2019). An adverse decision is one that imposes "tangible harm, such as loss of salary,
19   benefits, or position." *Id.* (citing *Wu v. Thomas*, 996 F.2d 271, 273 (11th Cir. 1993)).

20   Plaintiff does not even attempt to satisfy these elements. Nor can he. Refusing to
21   comply with an adversary's litigation demands is not an "adverse action," and filing a
22   motion to dismiss a meritless complaint is not "retaliation." As courts have recognized,
23   "[E]xcept in rare cases, conduct occurring within the scope of litigation does not provide
24   grounds for a retaliation claim." *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F.
25   Supp. 2d 827, 833 (N.D. Ill. 2006). *See also Steffes v. Stepan Co.*, 144 F.3d 1070, 1075
26   (7th Cir. 1998) ("[I]t will be the rare case in which conduct occurring within the scope
27   of litigation constitutes retaliation."); *Harmar v. United Airlines, Inc.*, No. 95 C 7665,

28

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 229

Gibson, Dunn &
Crutcher LLP

1996 WL 199734, at *1 (N.D. Ill. Apr. 23, 1996) ("Presenting an affirmative defense, even a frivolous one, will not support a retaliation claim."); *Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029, 1061 (D. Minn. 1991) ("[T]he anti-retaliation provisions of the ADEA and Title VII are designed principally to deal with retaliatory conduct that occurs outside the judicial system."). Indeed, Keck's litigation conduct, including its communications with Plaintiff in response to his demand letter and the filing of the motion to dismiss, are immunized from liability under the *Noerr-Pennington* doctrine. *See*, *supra* Section IV(D)(3)(b).

## F.   Plaintiff's *Bivens* Claim Fails as a Matter of Law

Plaintiff's *Bivens* claim fails as a matter of law. *Bivens* provides an implied cause of action for private citizens to recover for injuries arising from the violation of their constitutional rights by federal officers. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971); *Carlson v. Green*, 446 U.S. 14, 18 (1980). There is no *Bivens* cause of action against private entities acting under the color of federal law. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001). *Bivens* was designed to provide a remedy when no other remedy existed, whereas a private entity may be sued under tort law. *Id.* at 74. Here, Plaintiff does not bring his *Bivens* claim against a federal officer, but against a private university, which is what *Correctional Services* prohibits.[9]

## G.   Plaintiff's Breach of Contract Claim Is Time Barred

Breach of contract claims are subject to a four-year statute of limitations (Cal. Civ. Proc. Code § 337(1)), and generally "accrue at the time of the breach of contract . . . regardless of whether any damage is apparent or whether the injured party is aware

---

[9] Plaintiff's *Bivens* claim is also time barred.  *Bivens* claims have a one-year limitations period. *Papa v. United States*, 281 F.3d 1004, 1009 (9th Cir. 2002). Here, Plaintiff purports to base his *Bivens* claim on his having been denied admission to various federally funded programs, but Plaintiff does not allege that he applied to, and was denied admission to, any Keck program at any time. FAC ¶ 202-06. And the last time that Plaintiff had anything to do with Keck was when the 2008 Settlement Agreement was executed. FAC ¶ 18. Any alleged *Bivens* claim has long since expired.

17

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 230

of his right to sue." *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006); *IV Sols., Inc. v. United Healthcare*, 2015 WL 4127823, at *2 (C.D. Cal. July 7, 2015).

Here, any alleged breach necessarily occurred at some point prior to March 2012, when DHMC issued a letter to the Plaintiff stating that he was being terminated for failing to disclose his attendance at Keck. FAC ¶ 104. While Plaintiff conclusorily alleges that he did not learn of Keck's alleged breach until June 2015, his own allegations and the judicially noticeable facts establish that DHMC referenced his attendance at Keck in its termination letter in 2012 and that the Board of Medicine referenced his attendance at Keck in its revocation order in 2014. FAC ¶ 171. Indeed, Plaintiff expressly alleges that the Board of Medicine "found that Dr. Isaacs had improperly failed to disclose his 'criminal stalking' and Keck enrollment on his residency application," and published its "'false' findings on the internet" in "***mid-2014***." *Id.* at ¶¶ 134, 147 (emphases added). Thus, the statute of limitations on Plaintiffs' contract claim expired as early as March 2016 and certainly by no later than mid-2018.

## H. Plaintiff's Breach of Contract Claim Fails as a Matter of Law

Plaintiff pleads no facts to support his breach of contract claim. To state a claim for breach of contract, Plaintiff must plead (1) a contract, (2) performance of the contract or excuse for nonperformance, (3) breach of the contract, and (4) resulting damage. *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

Here, Plaintiff pleads *no* facts to support his allegation that Keck breached the 2007 and 2008 Settlement Agreements. To the contrary, Plaintiff expressly alleges that "***John Doe provided the Keck student records directly to Dartmouth***." FAC ¶ 73 (emphasis added). *See also id.* ¶¶ 4 ("Knowledge of the seal USC controversy through John Doe reached Dartmouth's medical school"), 65 ("Dartmouth learned about Isaacs' Keck enrollment and discipline . . . through John Doe"), 213 ("But for John Doe's transmission of the sealed records, none of the aforementioned injuries would have

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 231

Case 2:19-cv-02000-DSF-RAO   Document 64-2   Filed 11/04/19   Page 233 of 264
Case 2:19-cv-02000-DSF-RAO   Document 41   Filed 08/02/19   Page 31 of 36   Page ID #:1722
Page ID #:1908

occurred."). Plaintiff's speculation that, "in all probability," John Doe had some unknown and unexplained "connections with" Keck does not suffice. FAC ¶¶ 209, 244; *Twombly*, 550 U.S. at 555 (factual allegations must rise "about the speculative level").[10]

## I.  Plaintiff's IIED and NIED Claims Are Barred by the Statute of Limitations

The statute of limitations for IIED or NIED claims is two years.  Cal. Civ. P. Code § 335.1. A cause of action for IIED accrues once the plaintiff suffers severe emotional distress as a result of defendant's conduct. *Wassmann v. S. Orange Cty. Cmty. Coll. Dist.*, 24 Cal. App. 5th 825, 852-53 (2018). A cause of action for NIED accrues at the time of the injury-producing event. *Campanano v. California Med. Ctr.*, 38 Cal. App. 4th 1322, 1325 (1995), *as modified* (Oct. 10, 1995).

Here, the basis for Plaintiff's IIED and NIED claims is Keck's alleged breach of contract, which Plaintiff knew about as early as 2012 and no later than 2014. Any alleged breach necessarily occurred, if at all, prior to March 2012, when DHMC issued a letter to the Plaintiff stating that he was being terminated for failing to disclose his attendance at Keck.  FAC ¶ 104. While Plaintiff conclusorily alleges that he did not learn of Keck's alleged breach until June 2015, his own allegations and the judicially noticeable facts establish that DHMC referenced his attendance at Keck in its termination letter in 2012 and that the Board of Medicine referenced his attendance at Keck in its revocation order in 2014.  FAC ¶ 171. Indeed, Plaintiff specifically alleges that as a direct result "of false declarations of 'stalking crimes,' ***the years following 2014 publication***, [he] became further ostracized from former colleagues, friends, neighbors, and even had AirBNB reservations cancelled." *Id.* at ¶¶ 147-48 (emphasis added). The statute of limitations on Plaintiffs' IIED and NIED claims expired by no later than 2016.

---

[10]  To the extent Plaintiff purports to base his breach of contract claim on Keck's refusal to acquiesce to Plaintiff's litigation demands, *see* FAC ¶ 176, his claim is barred by the litigation privilege. *See, e.g.*, *Blanchard v. DirecTV, Inc.*, 123 Cal. App. 4th 903 (2004) ("The [litigation] privilege has been broadly applied to demand letters and other prelitigation communications by attorneys."); Cal. Civ. Code § 47(b).

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 232

Case 2:19-cv-02013-DSF-RAO    Document 64-2    Filed 11/04/19    Page 234 of 264
Case 2:19-cv-02013-DSF-RAO    Document 41    Filed 08/02/19    Page 32 of 36    Page ID #:1723
Page ID #:1909

## J.    Plaintiff's IIED Claim Fails as a Matter of Law

A claim of IIED has three elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Simo v. Union of Needletrades*, 322 F.3d 602, 621-22 (9th Cir. 2003). The FAC fails to plead any of these elements.

First, none of the conduct alleged amounts to "extreme and outrageous conduct." To constitute "extreme and outrageous conduct," the defendant's conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id. See, e.g.*, *So v. Shin*, 212 Cal. App. 4th 652, 672-73 (2013) (forcing a hospitalized woman who recently suffered a miscarriage to look at what she believed to be her dismembered fetus was extreme and outrageous); *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal. App. 3d 222, 229-30 (1983) (threats of personal harm, death, and harm to family if the plaintiff did not sign union agreement constituted outrageous conduct); *Angie M. v. Superior Court*, 37 C.A. 4th 1217, 1226, (1995) (allegations of eight-month sexual relationship initiated by physician with minor, including mutual oral copulation and use of alcohol and controlled substances, showed sufficiently outrageous conduct to send case to jury). Breaching a contract does not suffice. *See Reynolds v. Shure*, 148 F. Supp. 3d 928, 932 (E.D. Cal. 2015). Transmitting academic records does not suffice. FAC ¶¶ 178-80; *Simo*, 322 F.3d at 621-22. And declining to engage in mediation or settlement discussions does not suffice. FAC ¶¶ 181-84; *Madrigal v. Allstate Indem. Co.*, No. CV 14-4242 SS, 2015 WL 12747906, at *19 (C.D. Cal. Sept. 30, 2015) (failure to accept an offer of settlement not outrageous conduct); *Moss v. Bank of New York Tr.*, No. C 10-01734 JSW, 2011 WL 13243802, at *3 (N.D. Cal. Oct. 13, 2011) (claim based on "activities related to the unlawful detainer action in state court, including any filings by the process server" are "protected by the litigation privilege"); *Chang v. Lederman*, 172 Cal. App. 4th 67, 86-88 (2009) (it was not extreme or

20

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 233

1  outrageous conduct for attorney to direct a wife to vacate residence she had shared with
2  husband without notifying her of homestead rights, and was protected by litigation
3  privilege).[11]

4  　　　　Second, Plaintiff pleads no facts to suggest that Keck intended to cause, or
5  recklessly disregarded the probability of causing, emotional distress. *See Hughes v. Pair*,
6  46 Cal. 4th 1035, 1040 (2009).  His allegations are wholly conclusory. FAC ¶¶ 178-86.
7  Indeed, Plaintiff elsewhere alleges that the "***negligent*** actions of Keck officials . . . have
8  proximately caused Plaintiff's emotional distress."  FAC ¶ 197 (emphasis added).

9  　　　　Third, Plaintiff fails to plead severe emotional distress.  "Severe emotional
10 distress [is] emotional distress of such substantial quantity or enduring quality that no
11 reasonable [person] in a civilized society should be expected to endure it." *Wong v. Jing*,
12 189 Cal. App. 4th 1354, 1376 (2010) (citations and quotations omitted).  Stress,
13 discomfort and anxiety do not constitute distress that no reasonable person should be
14 expected to endure, even if caused by objectionable behavior. *See Hughes*, 46 Cal. 4th
15 at 1039 ("worry, anxiety, upset stomach, concern and agitation" do not constitute severe
16 emotional distress, even when they were the result of explicit, offensive, and threatening
17 comments and demands for sex).

18 　　　　Finally, Plaintiff fails to plead any facts to suggest that defendant's actions were
19 the actual and proximate cause of Plaintiff's alleged distress. It was *Plaintiff's* failure to
20 disclose his attendance at Keck that led to his reprimand and the revocation of his
21 license, not John Doe's alleged transmission of Plaintiff's records.  *In re Jeffrey D.*
22 *Isaacs M.D.*, Final Decision and Order, at 8-9.

23 **K.　Plaintiff's NIED Claim Fails as a Matter of Law**

24 　　　　Because NIED also requires severe mental distress and actual and proximate
25 causation, Plaintiff's NIED claim fails for these same reasons as well. *See, e.g.*, *Wong*,

27 [11] To the extent Plaintiff purports to base his IIED claim on Keck's refusal to acquiesce
28 to Plaintiff's litigation demands, *see* FAC ¶¶ 178-84, it is barred by the litigation privilege. *See, supra*, n.11.

Gibson, Dunn &
Crutcher LLP

Case 2:19-cv-02013-DSF-RAO   Document 64-2   Filed 11/04/19   Page 236 of 264
Case 2:19-cv-02013-DSF-RAO   Document 41   Filed 08/02/19   Page 34 of 36   Page ID #:1911
Page ID #:1911

1   189 Cal. App. 4th at 1378; *Hughes*, 46 Cal. 4th at 1051; *Christensen v. Superior Court*,

2   54 Cal. 3d 868, 900-1001 (1991). In addition, Plaintiff's NIED claim fails because the

3   FAC pleads no facts to suggest that Keck had a duty to avoid negligently causing

4   emotional distress to Plaintiff. Under California law, there is no duty to avoid negligently

5   causing emotional distress to another. *See Potter v. Firestone Tire & Rubber Co.*, (1993)

6   6 Cal. 4th 965, 984. Rather, a claim for NIED will lie only where the plaintiff suffers

7   serious emotional distress "as a result of a breach of duty owed the plaintiff that is

8   assumed by the defendant or imposed on the defendant as a matter of law, or that arises

9   out of a relationship between the two." *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1073

10   (1992). Importantly, the relationship must be a preexisting, consensual relationship

11   giving rise to a legally protectable interest in being free from emotional distress caused

12   by another's negligent conduct. *Bro v. Glaser*, 22 Cal. App. 4th 1398, 1441 (1994).

13   *Compare Christensen v. Superior Court*, 54 Cal. 3d 868, 885-86 (1991) (mortuary that

14   severely mishandled the deceased's remains had a duty of care to the deceased family);

15   *Molien v. Kaiser Found. Hosps.*, 27 Cal. 3d 916, 616 P.2d 813 (1980) (hospital and

16   physician, who erroneously diagnosed wife's condition as syphilis, owed a duty of care

17   to husband). Here, Keck had no legal duty to prevent Plaintiff's alleged emotional

18   distress. Plaintiff and Keck were litigation adversaries who entered into negotiated,

19   arms'-length settlement agreements. The mere existence of a contract between parties

20   does not suffice to impose a duty of care, *see Schwarz v. Regents of Univ. of California*,

21   226 Cal. App. 3d 149, 168 (1990), and there is nothing in those agreements that required

22   Keck to refrain from negligently causing severe emotional distress to Plaintiff.

## L.    Plaintiff's Constructive Fraud Fails as a Matter of Law

24       Plaintiff's constructive fraud claim fails as a matter of law. First, the claim is time-

25   barred. The statute of limitations for constructive fraud is three years. Cal. Civ. Proc.

26   Code § 338(d). *See also Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 786 n.2 (Cal. 1979).

27   The cause of action accrues when the aggrieved party discovers the facts constituting

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 235

Case 2:19-cv-02015-DSF-RAO    Document 64-2    Filed 11/04/19    Page 237 of 264
Case 2:19-cv-02015-DSF-RAO    Document 41    Filed 08/02/19    Page 35 of 36    Page ID #:1726
Page ID #:1912

the fraud.  Cal. Civ. Proc. Code § 338(d). *See also Austin v. Medicis*, 21 Cal. App. 5th 577, 588 (2018). Here, by his own admission, Plaintiff learned of Keck's alleged breach of contract (which is the basis for his fraud claim) in June 2015. *See* Compl. ¶ 195.[12] Thus, because he did not file suit until March 2019, his claim is time barred.

Second, Plaintiff fails to plead the elements of constructive fraud.  Constructive fraud requires (1) a fiduciary or confidential relationship, (2) an act, omission or concealment involving breach of that duty, (3) reliance, and (4) resulting damage. *Dealertruck, Inc. v. Huber*, 460 F. Supp. 2d 1177, 1183 (C.D. Cal. 2006). Plaintiff does not and cannot plead (let alone with particularity) that any confidential or fiduciary relationship existed at the time the parties negotiated the 2007 and 2008 Settlement Agreements, let alone that Keck breached any alleged duty to Plaintiff or that Plaintiff relied on anything that Keck supposedly said or did in connection with those agreements. As Plaintiff admits, the settlement agreements were the product of "protracted litigation and negotiations" and "[e]xhaustive settlement discussions." FAC ¶¶ 3, 31. And the settlements themselves contain express representations that the parties were not relying on any "promises, statements or inducements . . . other than those expressly stated," and that the parties "have thoroughly discussed all aspects of their rights and this Agreement with their attorneys, or have knowingly and voluntarily chosen not to so." Compl. at 36 (2007 Settlement Agreement ¶ 8); 41 (2008 Settlement Agreement ¶ 12). Thus, his constructive fraud claim should be dismissed with prejudice.

## M.    Plaintiff's Declaratory Judgment Claim Fails as a Matter of Law

Declaratory judgments are not a vehicle for "redress[ing] past wrongs." *Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1064 (C.D. Cal. 2014); *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 909 (2013). Rather, they are "designed to resolve

---

[12] Although it is far from clear, Plaintiff appears to be alleging that he was defrauded into entering into the 2007 and 2008 Settlement Agreements because Keck's alleged breach of those agreements supposedly deprived him of the "consideration" to which he was entitled.  *See* FAC ¶¶ 275-77.

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS
Exhibit 19 - Page 236

Case 2:19-cv-08000-DSF-RAO    Document 64-2    Filed 11/04/19    Page 238 of 264
Case 2:19-cv-02013-DSF-RAO    Document 41    Filed 08/02/19    Page 96 of 96    Page ID #:1727
Page ID #:1913

1   uncertainties and disputes that may result in future litigation" and operate

2   "prospectively." *Id*. Thus, a claim for declaratory relief will not lie where there is no

3   possibility of prospective relief. *See United Safeguard Distributors Ass'n, Inc. v.*

4   *Safeguard Bus. Sys.*, *Inc.*, 145 F. Supp. 3d 932, 961 (C.D. Cal. 2015) (dismissing

5   declaratory relief claim brought "not as a preventative measure, but as a remedial

6   measure to address previously alleged breach of contract claims"). Here, Plaintiff seeks

7   to redress an alleged breach that occurred, if at all, years ago and to establish his "factual

8   innocence" regarding events that, by his own admission, occurred more than a decade

9   ago. FAC ¶¶ 163, 270.

## V.   CONCLUSION

11      For the foregoing reasons, Keck respectfully requests that the Court grant the

12   Motion to Dismiss and dismiss Plaintiff's First Amended Complaint with prejudice.

14   Dated: August 2, 2019          GIBSON, DUNN & CRUTCHER LLP

16                     By:     */s/ James P. Fogelman*
                                 James P. Fogelman

18                       Attorney for USC Keck School of
                       Medicine

Gibson, Dunn &
Crutcher LLP

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS

Exhibit 19 - Page 237

| From: | Fogelman, James P. |
|---|---|
| To: | Jeffrey D. Isaacs |
| Cc: | Keith; Mader, Shannon; Ryzewska, Kat |
| Subject: | Re: Disqualification |
| Date: | Tuesday, August 20, 2019 4:51:13 AM |

You are hereby notified that you will be the subject of a Rule 11 motion for sanctions should you pursue any of the frivolous actions outlined in your email. Frankly, every action you have already taken in this matter, including the filing of both the complaint and amended complaint, subjects you to Rule 11 sanctions. But enough is enough. You should seek advice from an attorney before you proceed any further. JPF

**James P. Fogelman**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

On Aug 20, 2019, at 4:42 AM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

Attorney Fogelman:

You are hereby notified that you shall be called as a witness at the jury trial of Isaacs vs. Dartmouth Hitchcock et al, 19-cv-02011-DSF-RAO. You should be familiar with, and retain all documents concerning 1) your instructions to Plaintiff (Dr Isaacs) to "not step foot" and "not trespass...to boot" on USC public access facilities, including their medical clinics and hospitals, 2) your affirmation of General Counsel Andreas Meyer's refusal to comply with the Settlement Agreements, 3) your threats for attorneys fees, sanctions, or other claims against Dr Isaacs, 4) your receipt of Dr Isaacs' discovery preservation request itemization, and 5) any other matters deemed relevant to the Jury.

Pursuant to Rule 3.7 of the State Bar of California, your immediate recusal and disqualification from this case is appropriate.

Rule 3.7 Lawyer as Witness
(Rule Approved by the Supreme Court, Effective November 1, 2018)

 (a)  A lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless:

  (1)  the lawyer's testimony relates to an uncontested issue or matter;

  (2)  the lawyer's testimony relates to the nature and value of legal services

Exhibit 20
Page 238

rendered in the case; or

(3)  the lawyer has obtained informed written consent* from the client. If the lawyer represents the People or a governmental entity, the consent shall be obtained from the head of the office or a designee of the head of the office by which the lawyer is employed.

(b)  A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm* is likely to be called as a witness unless precluded from doing so by rule 1.7 or rule 1.9.

Comment

[1] This rule applies to a trial before a jury, judge, administrative law judge or arbitrator. This rule does not apply to other adversarial proceedings. This rule also does not apply in non-adversarial proceedings, as where a lawyer testifies on behalf of a client in a hearing before a legislative body.

[2] A lawyer's obligation to obtain informed written consent* may be satisfied when the lawyer makes the required disclosure, and the client gives informed consent* on the record in court before a licensed court reporter or court recorder who prepares a transcript or recording of the disclosure and consent. See definition of "written" in rule 1.0.1(n).

[3] Notwithstanding a client's informed written consent,* courts retain discretion to take action, up to and including disqualification of a lawyer who seeks to both testify and serve as an advocate, to protect the trier of fact from being misled or the opposing party from being prejudiced. (See, e.g., Lyle v. Superior Court (1981) 122 Cal.App.3d 470 [175 Cal.Rptr. 918].)

Exhibit 20
Page 239

| From: | Jeffrey D. Isaacs |
|---|---|
| To: | Fogelman, James P. |
| Cc: | Ryzewska, Kat; Keith |
| Subject: | Re: Please |
| Date: | Saturday, August 3, 2019 12:32:34 PM |

[External Email]

Please consider this a request to Meet & Confer pursuant to Rule 7.1

I am available anytime Monday, Tuesday, or Wednesday to discuss a proposed Motion to Disqualify Counsel and/or Hold In contempt of Court Ordered Settlement.

Specifically Mr Fogelman, your shady attempt to build a case against me will not work. You demand I conduct all business, ie follow up with USC Registrar and/or USC Police, through you, but then end each email with a threat that I am harassing you. I want to ascertain once and for all whether or not your client breached. The Registrar is a reasonable place to start. I want to file a USC police report as well. You are blocking me from contacting these groups by saying I am "threatening to trespass," which is absurd. I believe an in-person meeting is required for both of these complex issues, meeting with USC police & the registrar.
 If, indeed, your client breached the contract, then I may apply to USC programs again. Surely you understand the concept of breach. I will not tolerate your assertions that this is "ridiculous."  Moreover, the trespass letter should have been discharged long ago.


I expect a Meet & Confer by Wednesday under Local Rule 7.1
Thank you for your attention to the matter

On Sat, Aug 3, 2019 at 3:22 PM Fogelman, James P. <JFogelman@gibsondunn.com> wrote:
This is now just getting ridiculous. When was the last time you reviewed the settlement agreement you executed in 2008? Section 2 of that agreement expressly states that your affiliation with USC is over forever and that you will never apply to USC again. You have already breached the settlement agreement by filing your lawsuit against USC. USC is entitled to collect its attorneys fees from you as a result of that breach. And now you want to breach your agreement again by filing an application with USC? And threatening to trespass on the USC campus to boot? You should really consult your lawyer about these matters. But this firm will not be responding to any more of your emails unless it is required by court rules. JPF

**James P. Fogelman**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com


On Aug 3, 2019, at 11:32 AM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

Exhibit 21
Page 240

[External Email]

provide an answer within two business days as to how I may ascertain from the registrar my current academic status (i.e. acquitted/sealed/annulled/discharged charges)?

>>Additionally, what I would like the registrar to clarify, within 5 business days, whether my student records have been sealed, acquitted, dismissed, and annulled.
May I go directly to the registrar's office, or will your firm , or Andreas, handle this?

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

Exhibit 21
Page 241

| | |
|---|---|
| **From:** | Ryzewska, Kat |
| **To:** | "Keith Mathews" |
| **Cc:** | Fogelman, James P.; Mader, Shannon; MAustin@bwslaw.com |
| **Subject:** | RE: Isaacs v. USC - Meet and Confer |
| **Date:** | Wednesday, October 9, 2019 2:53:00 PM |

Great, I will send a dial-in and calendar invite.

**Kat Ryzewska**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7789 • Fax +1 213.229.6789
KRyzewska@gibsondunn.com • www.gibsondunn.com

**From:** Keith Mathews <keith@aaone.law>
**Sent:** Wednesday, October 9, 2019 2:52 PM
**To:** Ryzewska, Kat <KRyzewska@gibsondunn.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Mader, Shannon
<SMader@gibsondunn.com>; MAustin@bwslaw.com
**Subject:** Re: Isaacs v. USC - Meet and Confer

[External Email]
Works for me. Let me know what number to call.

Thanks,
Keith

Sent from my iPhone

On Oct 9, 2019, at 5:32 PM, Ryzewska, Kat <KRyzewska@gibsondunn.com> wrote:

> Keith,
>
> What time would work for you tomorrow?  Would 2PM PST work?
>
> **Kat Ryzewska**
>
> ## GIBSON DUNN
>
> Gibson, Dunn & Crutcher LLP
> 333 South Grand Avenue, Los Angeles, CA 90071-3197
> Tel +1 213.229.7789 • Fax +1 213.229.6789
> KRyzewska@gibsondunn.com • www.gibsondunn.com
>
> **From:** Keith Mathews <keith@aaone.law>
> **Sent:** Wednesday, October 9, 2019 1:59 PM
> **To:** Ryzewska, Kat <KRyzewska@gibsondunn.com>

Exhibit 22
Page 242

**Cc:** Ryzewska, Kat <KRyzewska@gibsondunn.com>; Fogelman, James P. <JFogelman@gibsondunn.com>; Mader, Shannon <SMader@gibsondunn.com>; MAustin@bwslaw.com
**Subject:** Re: Isaacs v. USC - Meet and Confer

[External Email]
Attorney Ryzewska,

Reaching out to schedule the meet and confer with your office. I have open availability tomorrow and Friday. Keep in mind I'm on the east coast what time would work for you?


Keith

Sent from my iPhone

On Oct 7, 2019, at 9:48 PM, Austin, Mark J. <MAustin@bwslaw.com> wrote:

> Thanks, Kat.  I'll be in touch.  In the meantime, I understand there is an email from your office to Mr. Isaacs that is at the heart of his claims against GD&C – something about Mr. Fogelman stating that Mr. Isaacs was banned from all USC properties?  Do you have a copy of that email you could send me as a courtesy?
>
> Also, as a general matter, it would be good for me to understand the basis for and extent of the property ban.  Have any specifics been provided to Mr. Isaacs regarding the properties to which it applies?  Does it apply to hospital or medical properties in which USC has an interest?  Just the campus?  And, without getting into any attorney-client privileged communications, is it possible for you to explain to me how and why the ban came about?  I assume some kind of determination was made by USC itself regarding my client, or was the decision regarding the ban made independently by GD&C?
>
> Finally, is it your position that USC is a fully private entity with the right to ban whomever it chooses from its properties?
>
> As you can see, there is much on this issue of which I am not yet aware.
>
> **Mark J. Austin | Partner**
> 1851 East First Street, Suite 1550 | Santa Ana, CA  92705-4067
> d - 949.265.3418 | t - 949.863.3363 | f - 949.863.3350
> maustin@bwslaw.com | vCard | bwslaw.com
> <image001.jpg>
>
> The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to

Exhibit 22
Page 243

the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Ryzewska, Kat [mailto:KRyzewska@gibsondunn.com]
**Sent:** Monday, October 07, 2019 6:42 PM
**To:** Austin, Mark J.
**Cc:** Fogelman, James P.; Mader, Shannon
**Subject:** RE: Isaacs v. USC - Meet and Confer

Mark,

We have a meet and confer deadline for USC's Motion to Dismiss this Thursday.  The hearing on your client's motion for preliminary injunction was taken off calendar by Judge Fischer (ECF 14), so there are no upcoming hearings except the one noticed by the Trustees of Dartmouth College for November 4, 2019 for their Motion to Dismiss.

Let me know if you have any other questions.

**Kat Ryzewska**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7789 • Fax +1 213.229.6789
KRyzewska@gibsondunn.com • www.gibsondunn.com

**From:** Austin, Mark J. <MAustin@bwslaw.com>
**Sent:** Monday, October 7, 2019 6:32 PM
**To:** Ryzewska, Kat <KRyzewska@gibsondunn.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Mader, Shannon <SMader@gibsondunn.com>
**Subject:** RE: Isaacs v. USC - Meet and Confer

[External Email]
Thanks, Kat.  I'm still getting my head around this case, and frankly my purpose in filing the Notice of Appearance was so that I could submit the pro hac vice application of an attorney from New Hampshire, Keith Mathews, who will be acting as Mr. Isaacs's primary attorney on the case. I think it would be best to wait until the PHV application is ruled upon, and include Mr. Mathews on the meet and confer.  Are you up against a deadline?

Exhibit 22
Page 244

I notice that various motions have been filed, and I have not yet been to PACER to sort it all out.  Is there an upcoming hearing date?

**Mark J. Austin | Partner**

1851 East First Street, Suite 1550 | Santa Ana, CA  92705-4067
d - 949.265.3418 | t - 949.863.3363 | f - 949.863.3350
maustin@bwslaw.com | vCard | bwslaw.com
<image001.jpg>

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Ryzewska, Kat [mailto:KRyzewska@gibsondunn.com]
**Sent:** Monday, October 07, 2019 5:55 PM
**To:** Austin, Mark J.
**Cc:** Fogelman, James P.; Mader, Shannon
**Subject:** FW: Isaacs v. USC - Meet and Confer

Mr. Austin,

We have received notice that you are appearing on behalf of Dr. Jeffrey Isaacs in Case No. 2:19-CV-08000-DSF-RAO before Judge Fischer at the Central District of California.  As you can see from the exchange below, we were attempting to schedule a meet and confer with your client prior to receiving the notice.  Please let us know your availability to meet and confer regarding the forthcoming motions to dismiss and anti-SLAPP motion that Gibson Dunn intends to file on its behalf and USC's behalf.

Thanks,

**Kat Ryzewska**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7789 • Fax +1 213.229.6789
KRyzewska@gibsondunn.com • www.gibsondunn.com

**From:** Ryzewska, Kat
**Sent:** Monday, October 7, 2019 3:58 PM
**To:** 'Jeffrey D. Isaacs' <jeffrey.isaacs.wg03@wharton.upenn.edu>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Mader, Shannon

Exhibit 22
Page 245

<[SMader@gibsondunn.com](mailto:SMader@gibsondunn.com)>
**Subject:** RE: Isaacs v. USC - Meet and Confer

Dr. Isaacs,

We just received notice that you have retained an attorney in this matter. As such, we will be reaching out to Mr. Austin to schedule this meet and confer.

**Kat Ryzewska**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7789 • Fax +1 213.229.6789
[KRyzewska@gibsondunn.com](mailto:KRyzewska@gibsondunn.com) • [www.gibsondunn.com](http://www.gibsondunn.com)

**From:** Jeffrey D. Isaacs <[jeffrey.isaacs.wg03@wharton.upenn.edu](mailto:jeffrey.isaacs.wg03@wharton.upenn.edu)>
**Sent:** Monday, October 7, 2019 3:54 PM
**To:** Ryzewska, Kat <[KRyzewska@gibsondunn.com](mailto:KRyzewska@gibsondunn.com)>
**Cc:** Fogelman, James P. <[JFogelman@gibsondunn.com](mailto:JFogelman@gibsondunn.com)>; Mader, Shannon <[SMader@gibsondunn.com](mailto:SMader@gibsondunn.com)>
**Subject:** Re: Isaacs v. USC - Meet and Confer

[External Email]
Will you be providing the 3.7 paperwork?

On Mon, Oct 7, 2019 at 3:46 PM Jeffrey D. Isaacs <[jeffrey.isaacs.wg03@wharton.upenn.edu](mailto:jeffrey.isaacs.wg03@wharton.upenn.edu)> wrote:

> that is fine
>
> On Mon, Oct 7, 2019 at 3:42 PM Ryzewska, Kat <[KRyzewska@gibsondunn.com](mailto:KRyzewska@gibsondunn.com)> wrote:
>
>> How about Wednesday at 4PM PST? I will send an invite and call-in information.
>>
>> **Kat Ryzewska**
>>
>> # GIBSON DUNN
>>
>> Gibson, Dunn & Crutcher LLP
>> 333 South Grand Avenue, Los Angeles, CA 90071-3197
>> Tel +1 213.229.7789 • Fax +1 213.229.6789
>> [KRyzewska@gibsondunn.com](mailto:KRyzewska@gibsondunn.com) • [www.gibsondunn.com](http://www.gibsondunn.com)
>>
>> **From:** Jeffrey D. Isaacs <[jeffrey.isaacs.wg03@wharton.upenn.edu](mailto:jeffrey.isaacs.wg03@wharton.upenn.edu)>
>> **Sent:** Monday, October 7, 2019 3:25 PM
>> **To:** Ryzewska, Kat <[KRyzewska@gibsondunn.com](mailto:KRyzewska@gibsondunn.com)>

Exhibit 22
Page 246

**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Mader, Shannon <SMader@gibsondunn.com>
**Subject:** Re: Isaacs v. USC - Meet and Confer

[External Email]
I can do a Meet& Confer Wednesday or THursday between 3-5pm PST

On Mon, Oct 7, 2019 at 3:14 PM Ryzewska, Kat <KRyzewska@gibsondunn.com> wrote:

> Dr. Isaacs,
>
> Gibson Dunn intends to file a special motion to strike the claims you have asserted against Gibson Dunn on the ground that they are based on acts in furtherance of the right to petition and are barred, as a matter of law, by California's Litigation Privilege.  See Cal. Civ. Proc. Code 425.16; Civ. Code 47(b).
>
> **Kat Ryzewska**
>
> **GIBSON DUNN**
>
> Gibson, Dunn & Crutcher LLP
> 333 South Grand Avenue, Los Angeles, CA 90071-3197
> Tel +1 213.229.7789 • Fax +1 213.229.6789
> KRyzewska@gibsondunn.com • www.gibsondunn.com
>
> **From:** Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu>
> **Sent:** Monday, October 7, 2019 3:01 PM
> **To:** Ryzewska, Kat <KRyzewska@gibsondunn.com>
> **Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Mader, Shannon <SMader@gibsondunn.com>
> **Subject:** Re: Isaacs v. USC - Meet and Confer
>
> [External Email]
> Please send the purported basis for an anti-SLAPP motion and I will respond as to scheduling a meet & confer.
>
> On Mon, Oct 7, 2019 at 2:53 PM Ryzewska, Kat <KRyzewska@gibsondunn.com> wrote:
>
>> Dr. Isaacs,
>>
>> You are required to participate in the meet and confer process in connection with our motions to dismiss.  Additionally, we intend to file a related anti-SLAPP motion, for which we will also need to meet and confer.  Are you refusing?  If so, obviously we intend to inform the Court of your refusal when we file our

Exhibit 22
Page 247

motions.

**Kat Ryzewska**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7789 • Fax +1 213.229.6789
KRyzewska@gibsondunn.com • www.gibsondunn.com

**From:** Jeffrey D. Isaacs
<jeffrey.isaacs.wg03@wharton.upenn.edu>
**Sent:** Monday, October 7, 2019 2:38 PM
**To:** Ryzewska, Kat <KRyzewska@gibsondunn.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Mader,
Shannon <SMader@gibsondunn.com>
**Subject:** Re: Isaacs v. USC - Meet and Confer

[External Email]
Kat,
Please also provide me with the required forms (Rule 3.7
Lawyer as witness) stating that you/your firm is
representing itself and that your client has consented.
Without these forms, I am likewise unable to Meet &
Confer with you . Thank you.

On Mon, Oct 7, 2019 at 2:07 PM Ryzewska, Kat
<KRyzewska@gibsondunn.com> wrote:

> Dr. Isaacs,
>
> I am emailing regarding a Motion to Dismiss that USC intends
> to file in Case No. 2:19-CV-08000-DSF-RAO on October 17,
> 2019, and a Motion to Dismiss that Gibson Dunn intends to
> file on October 25, 2019.  This email shall constitute USC's
> and Gibson Dunn's good faith attempt to meet and confer
> with you pursuant to Local Rule 7.3.
>
> USC will be moving to dismiss the complaint on the following
> grounds:
>
> 1.   All claims are barred by the doctrine of res judicata
> based on the 2012 case against Dartmouth and the 2008
> case against USC where you challenged the validity of
> the settlement agreements.
>
> 2.   Many of the claims are time barred, including the
> RICO claims, the breach of contract and related rescission

Exhibit 22
Page 248

claim, the IIED and NIED claims, and the fraud and constructive fraud claims.

3.  Many of the claims are barred by the settlement agreements you signed with USC.  For example, your RICO claim is based in part on pre-2008 conduct.

4.  The following claims fail as a matter of law:

a.  <u>RICO</u>:  You fail to plead any of the essential elements of a RICO claim. You fails to allege a RICO enterprise, the operation or management of the RICO enterprise, and at least two acts of racketeering activity: your wire and mail fraud allegations are wholly conclusory and not pleaded with particularity; you plead no facts to support your witness retaliation allegation; and your obstruction of justice claim fails because you do not allege a pending federal judicial proceeding. You also fails to plead a pattern of racketeering activity, a cognizable injury, and causation. Additionally, any statements by USC's counsel are immunized from liability under the Noerr-Pennington doctrine.

b.  <u>ADA</u> / <u>Rehabilitation Act</u>:  Your claims of retaliation under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act fail because refusing to acquiesce to litigation demands is not an "adverse action," nor is filing a motion to dismiss.  These actions are also immunized from liability under the Noerr-Pennington doctrine.

c.  <u>Bivens</u>:  Your Bivens claim fails because a Bivens claim cannot be brought against a private entity, even if the entity allegedly acted under the color of federal law.

d.  <u>Breach of Contract</u> / <u>Rescission</u>:  Your breach of contract and rescission claims fail because you fail to allege any breach by USC.  These claims are also barred by the litigation privilege.

Exhibit 22
Page 249

e.  IIED / NIED:  You fail to plead the essential elements of both your IIED and NIED claims.  For example, none of the actions you allege constitute "outrageous conduct."  These claims are also barred by the litigation privilege.

f.  Fraud:  Your fraud and constructive fraud claims fail because you fail to allege any fraud on the part of USC and because neither claim is pled with particularity.

g.  Due Process / First Amendment:  Your claim for Due Process and First Amendment Violation against USC fails because it is based on litigation conduct and thus barred by Noerr–Pennington, and because USC is not a state actor.

h.  Declaratory Relief:  Your declaratory judgment claim fails because there is no genuine, ongoing dispute.

Gibson Dunn will be moving to dismiss the complaint on the following grounds:

1.  The claims fail as a matter of law:

a.  Your claim for Due Process and First Amendment Violation against Gibson Dunn fails because it is based on litigation conduct and thus barred by Noerr–Pennington, and because Gibson Dunn is not a state actor.

b.  Your IIED claim fails because you fail to plead the essential elements of the claim.  For example, none of the actions you allege constitute "outrageous conduct."  Additionally they are barred by litigation privilege.

c.  Your intentional interference with contractual relations claim is also barred by the litigation privilege, and it fails because Gibson Dunn, as USC's agent, cannot be liable for tortiously interfering with a contract to which USC is a party.

Exhibit 22
Page 250

d.  Your RICO claims against USC fail
for the same reasons stated above, and are
additionally barred by the Noerr–
Pennington doctrine.

**Kat Ryzewska**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7789 • Fax +1 213.229.6789
KRyzewska@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged
information for the sole use of the intended recipient. Any
review, disclosure, distribution by others or forwarding
without express permission is strictly prohibited. If it has
been sent to you in error, please reply to advise the sender
of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/
for information regarding the firm and/or our privacy
policy.

This message may contain confidential and privileged
information for the sole use of the intended recipient. Any
review, disclosure, distribution by others or forwarding
without express permission is strictly prohibited. If it has
been sent to you in error, please reply to advise the sender
of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for
information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged
information for the sole use of the intended recipient.
Any review, disclosure, distribution by others or forwarding
without express permission is strictly prohibited. If it has been
sent to you in error, please reply to advise the sender of the
error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for
information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged
information for the sole use of the intended recipient. Any

Exhibit 22
Page 251

review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

--
Sent from Gmail mobile

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Exhibit 22
Page 252

| | |
|---|---|
| **From:** | Fogelman, James P. |
| **To:** | Ryzewska, Kat |
| **Subject:** | Fwd: 7-3 Meet & Confer |
| **Date:** | Wednesday, October 23, 2019 3:59:55 PM |

**James P. Fogelman**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

Begin forwarded message:

**From:** "Jeffrey D. Isaacs" <jeffrey.isaacs.wg03@wharton.upenn.edu>
**Date:** August 31, 2019 at 3:03:12 AM EDT
**To:** "Fogelman, James P. (JFogelman@gibsondunn.com)" <JFogelman@gibsondunn.com>
**Subject: 7-3 Meet & Confer**

[External Email]

James Fogelman/Gibson Dunn:

As you were unwilling to comply with 7-3 for a Meet & Confer for 1) Motion to Disqualify Counsel and Refer to US Marshal, and 2) Motion to Strike MTD within a reasonable amount of time, I am writing to request your firm cease all communication with me until this matter is addressed with the Judge. I do not feel comfortable accepting further communications from you, as you know, I have alleged felony witness intimidation against your firm.

Please consider this a Cease & Desist letter pending judicial intervention.

Signed
Jeffrey Isaacs

Exhibit 23
Page 253

| From: | Jeffrey D. Isaacs |
|---|---|
| To: | Fogelman, James P. |
| Cc: | Ryzewska, Kat |
| Subject: | Re: NO TRESPASS LETTER AND USC POLICE REPORT |
| Date: | Friday, August 2, 2019 9:36:44 PM |

[External Email]

I'm quite confused, you seem to concede in the MTD that the settlements were breached years ago, so why wouldn't I be allowed to apply to residency at USC Keck?

On Sat, Aug 3, 2019 at 12:33 AM Fogelman, James P. <JFogelman@gibsondunn.com> wrote:
  There is no need for you to visit USC and you would be trespassing if you enter campus. You have not been associated with USC in any manner for many, many years and have no business being on campus. There is no need for you to send me or my associates any more harassing emails on this topic. JPF

**James P. Fogelman**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

On Aug 2, 2019, at 9:24 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

To clarify, I wish to file a report with USC Police and make an in-person complaint and request to press charges. You [USC Counsel] are blocking me.

On Sat, Aug 3, 2019 at 12:22 AM Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:
  I wanted to file with USC Police in 2006 and I still do. They are deputized by LAPD and are the appropriate initiation point for my complaint. Please advise how we will proceed with filing the lpong overdue USC Police complaint.

On Sat, Aug 3, 2019 at 12:19 AM Fogelman, James P. <JFogelman@gibsondunn.com> wrote:
  You have no right to be on the USC campus. And you have no reason to be there. You asked me if USC or this firm is blocking you from calling a police department. We are not. But that is not the same as appearing in person on USC's campus. USC does not have a police station on campus—it has a private department of public safety. You do not need to access the campus in order to file a police report. Entering USC's campus would be trespassing. JPF

  **James P. Fogelman**

Exhibit 24
Page 254

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

On Aug 2, 2019, at 8:49 PM, Jeffrey D. Isaacs
<jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

I am not asking legal advice. I am asking if your client has lifted their prior instruction
to communicate through counsel.
I expect a concrete answer or this will go straight to the judge.
Yes, or no, I am allowed on campus? (Or, you do not know, and direct me to USC
counsel Andres Meyer, who you previously told me not to contact)

On Fri, Aug 2, 2019 at 11:44 PM Fogelman, James P. <JFogelman@gibsondunn.com>
wrote:
  I am not going to provide you advice. I still have no idea what you are talking about.
  If this is some new way of asking whether anyone is "blocking" you from calling the
  police, all I can do is reiterate that we have nothing to do with it and are not
  "blocking" such a call or standing in your way.  I have nothing further to add.

  **James P. Fogelman**

  ## GIBSON DUNN

  Gibson, Dunn & Crutcher LLP
  333 South Grand Avenue, Los Angeles, CA 90071-3197
  Tel +1 213.229.7234 • Fax +1 213.229.6234
  JFogelman@gibsondunn.com • www.gibsondunn.com

  On Aug 2, 2019, at 8:39 PM, Jeffrey D. Isaacs
  <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

  [External Email]

  Attorney Fogelman:
  USC's last instruction to me - by Dal Soglio - was to communicate to all USC entities
  through her. I assume you have replaced her role. You did not respond about the
  trespass letter. Am I permitted on USC campus to file a police report?
  If so, since when?
  Additionally, what I would like the registrar to clarify, within 5 business days,
  whether my student records have been sealed, acquitted, dismissed, and annulled.
  May I go directly to the registrar's office, or will your firm , or Andreas, handle this?

Exhibit 24
Page 255

Not sure what you mean by threatening. You have threatened me. I have asked you to follow up on a police report that should have been filed over a decade ago.

If you don't answer regarding the trespass letter, I will have to take action against your firm. That is not disrespectful, it is the simple nature of the situation. Hopefully you can understand

Dr Isaacs

On Fri, Aug 2, 2019 at 11:34 PM Fogelman, James P. <JFogelman@gibsondunn.com> wrote:

> I have no idea what you are talking about, but I know you are misrepresenting our conversation. You told me you wanted to file a police report. I told me then I had no idea what you are talking about (and still don't) but I told you that you are free to call any police department and tell them anything you want. You told me you would "confirm" that in writing. While unnecessary, you never did. We have no role in whether or not you call a police department. Your constant threats and insults are completely unprofessional, and beyond inappropriate. You have asked us to be respectful of you, and we have, and yet you continue to show me and my firm disrespect. The court will decide whether your claim is allowed to proceed. We don't think it should be allowed and we provide legal arguments to the court to support our position. You state your position. The court will decide. There is no reason for us to communicate about anything unless required by the court. This falls outside anything required and I am asking you to stop sending such threatening and harassing emails to me and my associates. Consult your own lawyer if you have any misunderstanding. JPF

> **James P. Fogelman**

> **GIBSON DUNN**

> Gibson, Dunn & Crutcher LLP
> 333 South Grand Avenue, Los Angeles, CA 90071-3197
> Tel +1 213.229.7234 • Fax +1 213.229.6234
> JFogelman@gibsondunn.com • www.gibsondunn.com

> On Aug 2, 2019, at 8:24 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

>> [External Email]

>> Attorney Fogelman:

>> Per our telephone discussion, I asked you to put in writing the status of my USC police report request that was forwarded to Dal Soglio over ten years ago. The No Trespass letter has never been retracted.
>> It is my position USC Counsel continues, and has for over a decade, to block me from filing criminal charges with USC police.

>> Please advise within 3 business days 1) the status of the no trespass letter, 2) at what

Exhibit 24
Page 256

point in time I was permitted back on USC property, 3) the status of the police report I requested, and 4) whether you will take additional information and file the report on my behalf.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Exhibit 24
Page 257

| | |
|---|---|
| **From:** | Fogelman, James P. |
| **To:** | Jeffrey D. Isaacs |
| **Cc:** | Ryzewska, Kat |
| **Subject:** | Re: NO TRESPASS LETTER AND USC POLICE REPORT |
| **Date:** | Friday, August 2, 2019 9:26:45 PM |

I have nothing further to add to my prior emails and cannot offer you any advice about this or anything else. JPF

**James P. Fogelman**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com


On Aug 2, 2019, at 9:22 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

I wanted to file with USC Police in 2006 and I still do. They are deputized by LAPD and are the appropriate initiation point for my complaint. Please advise how we will proceed with filing the lpong overdue USC Police complaint.

On Sat, Aug 3, 2019 at 12:19 AM Fogelman, James P. <JFogelman@gibsondunn.com> wrote:
You have no right to be on the USC campus. And you have no reason to be there. You asked me if USC or this firm is blocking you from calling a police department. We are not. But that is not the same as appearing in person on USC's campus. USC does not have a police station on campus—it has a private department of public safety.  You do not need to access the campus in order to file a police report.  Entering USC's campus would be trespassing. JPF

**James P. Fogelman**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com


On Aug 2, 2019, at 8:49 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

I am not asking legal advice. I am asking if your client has lifted their prior instruction to

Exhibit 25
Page 258

communicate through counsel.
I expect a concrete answer or this will go straight to the judge.
Yes, or no, I am allowed on campus? (Or, you do not know, and direct me to USC counsel
Andres Meyer, who you previously told me not to contact)

On Fri, Aug 2, 2019 at 11:44 PM Fogelman, James P. <JFogelman@gibsondunn.com>
wrote:
> I am not going to provide you advice. I still have no idea what you are talking about. If
> this is some new way of asking whether anyone is "blocking" you from calling the police,
> all I can do is reiterate that we have nothing to do with it and are not "blocking" such a call
> or standing in your way.  I have nothing further to add.

**James P. Fogelman**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

On Aug 2, 2019, at 8:39 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu>
wrote:

[External Email]

Attorney Fogelman:
USC's last instruction to me - by Dal Soglio - was to communicate to all USC entities
through her. I assume you have replaced her role. You did not respond about the trespass
letter. Am I permitted on USC campus to file a police report?
If so, since when?
Additionally, what I would like the registrar to clarify, within 5 business days, whether my
student records have been sealed, acquitted, dismissed, and annulled.
May I go directly to the registrar's office, or will your firm , or Andreas, handle this?

Not sure what you mean by threatening. You have threatened me. I have asked you to
follow up on a police report that should have been filed over a decade ago.

If you don't answer regarding the trespass letter, I will have to take action against your
firm. That is not disrespectful, it is the simple nature of the situation. Hopefully you can
understand

Dr Isaacs

On Fri, Aug 2, 2019 at 11:34 PM Fogelman, James P. <JFogelman@gibsondunn.com>
wrote:
> I have no idea what you are talking about, but I know you are misrepresenting our
> conversation. You told me you wanted to file a police report. I told you then I had no

Exhibit 25
Page 259

idea what you are talking about (and still don't) but I told you that you are free to call any police department and tell them anything you want. You told me you would "confirm" that in writing. While unnecessary, you never did. We have no role in whether or not  you call a police department. Your constant threats and insults are completely unprofessional, and beyond inappropriate. You have asked us to be respectful of you, and we have, and yet you continue to show me and my firm disrespect.  The court will decide whether your claim is allowed to proceed. We don't think it should be allowed and we provide legal arguments to the court to support our position. You state your position. The court will decide. There is no reason for us to communicate about anything unless required by the court. This falls outside anything required and I am asking you to stop sending such threatening and harassing emails to me and my associates. Consult your own lawyer if you have any misunderstanding. JPF

**James P. Fogelman**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

On Aug 2, 2019, at 8:24 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

Attorney Fogelman:

Per our telephone discussion, I asked you to put in writing the status of my USC police report request that was forwarded to Dal Soglio over ten years ago. The No Trespass letter has never been retracted.
It is my position USC Counsel continues, and has for over a decade, to block me from filing criminal charges with USC police.

Please advise within 3 business days 1) the status of the no trespass letter, 2) at what point in time I was permitted back on USC property, 3) the status of the police report I requested, and 4) whether you will take additional information and file the report on my behalf.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Exhibit 25
Page 260

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Exhibit 25
Page 261

| | |
|---|---|
| **From:** | Fogelman, James P. |
| **To:** | Jeffrey D. Isaacs |
| **Subject:** | Re: NO TRESPASS LETTER AND USC POLICE REPORT |
| **Date:** | Friday, August 2, 2019 8:47:10 PM |

This email is exactly what I just told you I want to avoid. I don't have to convince you that USC's legal position is correct, event though I believe that it is. This is what the court decides. Tell the court whatever argument you want in opposition to the motion to dismiss. But I am not going to argue with you about it or respond to any more emails about our pending motion.

**James P. Fogelman**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

On Aug 2, 2019, at 8:42 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

While we are on the subject of the MTD, which you just raised, respectfully, are you serious that the 'open ended threat' ended at revocation of my NH medical license? Are you not aware that 1) 49 other states could issue me a license, and probably would, and 2) I could reapply in NH, and reapplications are routinely granted? If you aren't familiar with the medical training system, instead of making things up you could bring in experts. This also converts your 12b6 into a MSJ as you are effectively advancing new ideas that my NH reprimand was the end of my medical career.
Are you willing to research and revise this matter?

Thank you.

On Fri, Aug 2, 2019 at 11:34 PM Fogelman, James P. <JFogelman@gibsondunn.com> wrote:
I have no idea what you are talking about, but I know you are misrepresenting our conversation. You told me you wanted to file a police report. I told you then I had no idea what you are talking about (and still don't) but I told you that you are free to call any police department and tell them anything you want. You told me you would "confirm" that in writing. While unnecessary, you never did. We have no role in whether or not you call a police department. Your constant threats and insults are completely unprofessional, and beyond inappropriate. You have asked us to be respectful of you, and we have, and yet you continue to show me and my firm disrespect. The court will decide whether your claim is allowed to proceed. We don't think it should be allowed and we provide legal arguments to the court to support our position. You state your position. The court will decide. There is no reason for us to communicate about anything unless required by the court. This falls outside anything required and I am asking you to stop sending such threatening and harassing emails to me and my associates. Consult your own lawyer if you have any misunderstanding. JPF

Exhibit 26
Page 262

**James P. Fogelman**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

On Aug 2, 2019, at 8:24 PM, Jeffrey D. Isaacs <jeffrey.isaacs.wg03@wharton.upenn.edu> wrote:

[External Email]

Attorney Fogelman:

Per our telephone discussion, I asked you to put in writing the status of my USC police report request that was forwarded to Dal Soglio over ten years ago. The No Trespass letter has never been retracted.
It is my position USC Counsel continues, and has for over a decade, to block me from filing criminal charges with USC police.

Please advise within 3 business days 1) the status of the no trespass letter, 2) at what point in time I was permitted back on USC property, 3) the status of the police report I requested, and 4) whether you will take additional information and file the report on my behalf.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

Exhibit 26
Page 263